ORIGINAL

1   ROBBINS GELLER RUDMAN
      & DOWD LLP
2   SHAWN A. WILLIAMS (213113)
    Post Montgomery Center
3   One Montgomery Street, Suite 1800
    San Francisco, CA 94104
4   Telephone: 415/288-4545
    415/288-4534 (fax)
5   shawnw@rgrdlaw.com
      – and –
6   DARREN J. ROBBINS (168593)
    DAVID C. WALTON (167268)
7   655 West Broadway, Suite 1900
    San Diego, CA 92101
8   Telephone: 619/231-1058
    619/231-7423 (fax)
9   darrenr@rgrdlaw.com
    davew@rgrdlaw.com
10
    Attorneys for Plaintiff
11
    [Additional counsel appear on signature page.]
12
                      UNITED STATES DISTRICT COURT
13
                   NORTHERN DISTRICT OF CALIFORNIA
14
    ALLAN J. NICOLOW, Individually and on    )  Case No.
15  Behalf of All Others Similarly Situated,  )
                                              )  CLASS ACTION
16                  Plaintiff,                 )
                                              )  COMPLAINT FOR VIOLATIONS OF
17      vs.                                    )  FEDERAL SECURITIES LAWS
                                              )
18  HEWLETT-PACKARD COMPANY, LEO             )
    APOTHEKER, MARGARET C. WHITMAN,          )
19  CATHERINE A. LESJAK and JAMES T.          )
    MURRIN,                                   )
20                                            )
                    Defendants.               )
21  _____  )  DEMAND FOR JURY TRIAL

22

23

24

25

26

27

28

1

**INTRODUCTION**

2    1.    This is a securities fraud class action on behalf of all persons who purchased the
3  common stock of Hewlett-Packard Company ("Hewlett-Packard" or the "Company") between
4  August 19, 2011 and November 20, 2012, inclusive (the "Class Period"). This action is brought
5  against Hewlett-Packard and certain of its officers and/or directors for violations of the Securities
6  Exchange Act of 1934 (the "1934 Act").

7    2.    Hewlett-Packard was founded in 1939 and is headquartered in Palo Alto, California.
8  Hewlett-Packard provides products, technologies, software, solutions and services to individual
9  consumers and small- and medium-sized businesses, as well as to the U.S. government, and health
10  and education sectors around the globe. The Company's Personal Systems Group segment offers
11  personal computers, workstations and software and services for commercial and consumer markets.
12  The Company's Services segment provides consulting, information technology ("IT") outsourcing
13  and technology services to infrastructure, applications and business process domains. The
14  Company's Imaging and Printing segment provides consumer and commercial printer hardware,
15  supplies, media and scanning devices. Its Enterprise Servers, Storage and Networking segment
16  offers industry standard servers and business critical systems.

17    3.    Hewlett-Packard also provides software solutions through its Software business
18  segment. On August 18, 2011, the Company expanded its software offering when it announced that
19  it would acquire control of Autonomy Corporation plc ("Autonomy") for $10.2 billion. Autonomy
20  would operate as a separate business unit under the leadership of Mike Lynch, Autonomy's founder
21  and Chief Executive Officer ("CEO"). Throughout the Class Period, following the acquisition,
22  Autonomy's business results were reported through Hewlett-Packard's Software segment.

23    4.    Hewlett-Packard ultimately stated that Autonomy's financial results had been inflated
24  and the Company recorded an $8.8 billion charge to account for the misstated results.

25

**SUMMARY OF THE ACTION**

26    5.    During the Class Period, defendants issued materially false and misleading statements
27  regarding Hewlett-Packard's financial performance, business prospects and the status of its operating
28  segments. Specifically, defendants concealed that the Company had gained control of Autonomy in

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                                    - 1 -

1  2011 based on financial statements that could not be relied upon because of serious accounting
2  manipulation and improprieties. In addition, defendants concealed known negative business trends
3  concerning the profit margins of the Enterprise Services business, formerly known as Electronic
4  Data Systems Corporation ("EDS"), which Hewlett-Packard had acquired in August 2008 for $13.0
5  billion. As a result of defendants' false and misleading statements, the Company's stock traded at
6  artificially inflated prices during the Class Period, reaching a high of $29.89 per share on February
7  16, 2012.

8       6.     On August 22, 2012, Hewlett-Packard issued a press release announcing a third
9  quarter 2012 earnings per share loss of $4.49, largely as the result of an $8.0 billion charge for
10  impairment of goodwill associated with the acquisition of EDS. On this news, the Company's stock
11  price dropped $1.56 per share on August 23, 2012 to close at $17.64 per share, a one-day decline of
12  8.0% on volume of 72.8 million shares.

13       7.     On October 3, 2012, Hewlett-Packard disclosed, for the first time, why the $8.0
14  billion write-down of EDS goodwill was necessary. Specifically, the Company revealed that the
15  Enterprise Services business had suffered a slump in operating margins from 10% to 3% between
16  2010 and the second quarter of 2012. On this news, the Company's stock price dropped $2.22
17  during the day to close at $14.91 per share, a decline of 13%, on volume of 141 million shares.

18       8.     Then, on November 20, 2012, the Company disclosed it had taken an $8.8 billion
19  charge related to its acquisition of Autonomy due to serious accounting improprieties. In fact, over
20  $5.0 billion of the write-off was necessary due to the fact that Autonomy's financial results were the
21  product of accounting fraud. The Hewlett-Packard release stated in part:

22          "HP is extremely disappointed to find that some former members of
        Autonomy's management team used accounting improprieties, misrepresentations
23          and disclosure failures to inflate the underlying financial metrics of the company,
        prior to Autonomy's acquisition by HP. These efforts appear to have been a willful
24          effort to mislead investors and potential buyers, and severely impacted HP
        management's ability to fairly value Autonomy at the time of the deal. We remain
25          100 percent committed to Autonomy and its industry-leading technology."

26          Additional background:

27          HP today announced a non-cash impairment charge of $8.8 billion related to
        Autonomy in the fourth quarter of its 2012 fiscal year. The majority of this
28          impairment charge, more than $5 billion, is linked to serious accounting

1 improprieties, misrepresentation and disclosure failures discovered by an internal
investigation by HP and forensic review into Autonomy's accounting practices prior
2 to its acquisition by HP. The balance of the impairment charge is linked to the recent
trading value of HP stock and headwinds against anticipated synergies and
3 marketplace performance.

4 HP launched its internal investigation into these issues after a senior member
of Autonomy's leadership team came forward, following the departure of Autonomy
5 founder Mike Lynch, alleging that there had been a series of questionable accounting
and business practices at Autonomy prior to the acquisition by HP. This individual
6 provided numerous details about which HP previously had no knowledge or
visibility.
7
HP initiated an intense internal investigation, including a forensic review by
8 PricewaterhouseCoopers of Autonomy's historical financial results, under the
oversight of John Schultz, executive vice president and general counsel, HP.
9
As a result of that investigation, HP now believes that Autonomy was
10 substantially overvalued at the time of its acquisition due to the misstatement of
Autonomy's financial performance, including its revenue, core growth rate and gross
11 margins, and the misrepresentation of its business mix.

12 *       *       *

13 This appears to have been a willful effort on behalf of certain former
Autonomy employees to inflate the underlying financial metrics of the company in
14 order to mislead investors and potential buyers. These misrepresentations and lack of
disclosure severely impacted HP management's ability to fairly value Autonomy at
15 the time of the deal.

16 9.      On this news, the Company's stock price dropped $1.59 per share during the day to

17 close at $11.71 per share, a decline of 12%, on volume of 155 million shares.

18 10.     The true facts, which were known by the defendants but concealed from the investing

19 public during the Class Period, included:

20 (a)     At the time Hewlett-Packard acquired Autonomy, the business's operating

21 results and historic growth were the product of accounting improprieties, including the

22 mischaracterization of sales of low-margin hardware as software and the improper recognition of

23 revenue on transactions with Autonomy business partners even where customers did not purchase

24 the products;

25 (b)     At the time Hewlett-Packard had agreed in principle to acquire Autonomy,

26 defendants were looking to unwind the deal in light of the accounting irregularities that plagued

27 Autonomy's financial statements; and

28

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                                    - 3 -

1             (c)     Enterprise Services' operating margin had collapsed from 10% in 2010 to

2  approximately 6% as of April 30, 2011, 4% as of October 31, 2011, and 3% as of April 30, 2012,

3  due to various reasons, including unfavorable revenue mix and underperforming contracts.

4                               **JURISDICTION AND VENUE**

5          11.     The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C.

6  §§78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder by the

7  Securities and Exchange Commission ("SEC"). Jurisdiction is conferred by §27 of the 1934 Act (15

8  U.S.C. §78aa).

9          12.     Venue is proper pursuant to §27 of the 1934 Act. Hewlett-Packard maintains its

10  principal executive offices at 3000 Hanover Street, Palo Alto, California 94304. Certain of the acts

11  and conduct complained of herein, including the dissemination of materially false and misleading

12  information to the investing public, occurred in this district.

13          13.     In connection with the acts and conduct alleged herein, defendants, directly and

14  indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

15  the United States mails, interstate telephone communications and the facilities of the national

16  securities exchanges and markets.

17                                **PARTIES**

18          14.     Plaintiff Allan J. Nicolow purchased the common stock of Hewlett-Packard during

19  the Class Period as set forth in the certification attached hereto and was damaged as a result of

20  defendants' wrongdoing as alleged in this complaint.

21          15.     Defendant Hewlett-Packard is a global provider of products, technologies, software,

22  solutions and services to individual customers, small- and medium-sized businesses, and large

23  enterprises, including customers in the government, health and education sectors.

24          16.     Defendant Leo Apotheker ("Apotheker") was CEO and President of Hewlett-Packard

25  until September 2011.

26          17.     Defendant Margaret C. Whitman ("Whitman") is, and since September 22, 2011 has

27  been, the Company's CEO and President. Prior to being named the Company's CEO, Whitman

28  served as a member of Hewlett-Packard's Board of Directors and continues to serve as a director.

1 Whitman signed the Company's SEC filings and participated in conference calls with analysts and
2 investors during the Class Period.

3     18.     Defendant Catherine A. Lesjak ("Lesjak") is, and at all relevant times has been, the
4 Company's Chief Financial Officer ("CFO"). During the Class Period, Lesjak's false and misleading
5 statements allowed her to be paid $9.9 million in incentive- and stock-based compensation tied to,
6 *inter alia,* the Company's reported earnings performance and the market price of Hewlett-Packard
7 common stock.

8     19.     Defendant James T. Murrin ("Murrin") was the Company's Senior Vice President,
9 Chief Accounting Officer and Controller from the beginning of the Class Period through May 1,
10 2012. During the Class Period, Murrin sold 132,500 shares of his Hewlett-Packard stock for
11 proceeds of nearly $3.5 million while in the possession of materially adverse and non-public
12 information.

13     20.     The defendants identified in ¶¶16-19 are referred to herein as the "Individual
14 Defendants."

15     21.     The Individual Defendants, because of their positions with the Company, possessed
16 the power and authority to control the contents of Hewlett-Packard's quarterly reports, press releases
17 and presentations to securities analysts, money and portfolio managers and institutional investors,
18 *i.e.,* the market. They were provided with copies of the Company's reports and press releases
19 alleged herein to be misleading prior to or shortly after their issuance and had the ability and
20 opportunity to prevent their issuance or cause them to be corrected. Because of their positions with
21 the Company, and their access to material non-public information available to them but not to the
22 public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed
23 to and were being concealed from the public and that the positive representations being made were
24 then materially false and misleading. The Individual Defendants are liable for the false and
25 misleading statements pleaded herein. Defendant Apotheker has stated that Hewlett-Packard did
26 "meticulous and thorough" due diligence prior to closing the Autonomy acquisition.

27
28

1

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

2     22.    Defendants are liable for: (i) making false and/or misleading statements; or (ii) failing

3 to disclose adverse facts known to them about Hewlett-Packard. Defendants' fraudulent scheme and

4 course of business that operated as a fraud or deceit on purchasers of Hewlett-Packard common

5 stock was a success, as it: (i) deceived the investing public regarding Hewlett-Packard's prospects

6 and business; (ii) artificially inflated the price of Hewlett-Packard common stock; (iii) caused

7 plaintiff and other members of the Class to purchase Hewlett-Packard common stock at inflated

8 prices; (iv) allowed defendant Murrin to sell Hewlett-Packard stock at artificially inflated prices; (v)

9 permitted the Company to obtain $9.6 billion in debt financing at favorable rates; and (vi) allowed

10 defendant Lesjak to maximize her incentive-based compensation.

11

**BACKGROUND**

12     23.    Hewlett-Packard was founded in 1939 and is headquartered in Palo Alto, California.

13 Hewlett-Packard provides products, technologies, software, solutions and services to individual

14 consumers and small- and medium-sized businesses, as well as to the U.S. government, and health

15 and education sectors around the globe. The Company's Personal Systems Group segment offers

16 personal computers, workstations and software and services for commercial and consumer markets.

17 The Company's Services segment provides consulting, IT outsourcing and technology services to

18 infrastructure, applications and business process domains. The Company's Imaging and Printing

19 segment provides consumer and commercial printer hardware, supplies, media and scanning devices.

20 Its Enterprise Servers, Storage and Networking segment offers industry standard servers and

21 business critical systems. Hewlett-Packard also provides financial services and software solutions

22 through its Financial Services and Software segments.

23     24.    On August 26, 2008, under the leadership of the Company's former CEO, Mark V.

24 Hurd ("Hurd"), Hewlett-Packard announced that it had competed the acquisition of EDS. The EDS

25 acquisition was heralded as the largest in the IT services sector and the second largest in the

26 technology industry, only following Hewlett-Packard's 2002 acquisition of Compaq computers. As

27 former CEO Hurd announced:

28

1    "This is a historic day for HP and EDS and for the clients we serve ....
2    Independently, each company is a respected industry leader. Together, we are a
     global leader, with the capability to serve our clients, whatever their size, location or
     sector, with one of the most comprehensive and competitive portfolios in the
3    industry."

4    Indeed, Hewlett-Packard was motivated to acquire EDS for the purpose of competing against the IT

5    service giant IBM and to maintain a competitive advantage in the service sector against up-and-

6    coming IT service rivals such as Accenture.

7         25.    Following Hurd's public ouster as the CEO of Hewlett-Packard, the Company's new

8    CEO, Leo Apotheker ("Apotheker"), continued a focused commitment to the continued growth and

9    profitability of the Company's Services segment. In fact, in May 2011, Apotheker announced that

10   he would assign a new executive vice president to lead the segment, replacing Ann Livermore until a

11   full-time head could be later named. In June 2011, Apotheker noted that the Services segment

12   "'play[s] a vital role in [Hewlett-Packard's] continued growth and success,'" particularly in light of

13   the fact that the segment accounted for nearly half of the Company's revenue and constituted two-

14   thirds of the Company's employee base.

15        26.    At the beginning of the Class Period, Hewlett-Packard's stock was trading at $23.60

16   per share.

17                    **DEFENDANTS' FALSE AND MISLEADING STATEMENTS**
                            **ISSUED DURING THE CLASS PERIOD**
18
          27.    On August 18, 2011, Hewlett-Packard announced its intention to acquire Autonomy
19
     in a $10.2 billion transaction. The release stated in part:
20
                "Autonomy presents an opportunity to accelerate our strategic vision to
21       decisively and profitably lead a large and growing space," said Léo Apotheker, HP
         president and chief executive officer. "Autonomy brings to HP higher value business
22       solutions that will help customers manage the explosion of information. Together
         with Autonomy, we plan to reinvent how both unstructured and structured data is
23       processed, analyzed, optimized, automated and protected. Autonomy has an
         attractive business model, including a strong cloud based solution set, which is
24       aligned with HP's efforts to improve our portfolio mix. We believe this bold action
         will squarely position HP in software and information to create the next-generation
25       Information Platform, and thereby, create significant value for our shareholders."

26              Apotheker continued, "Autonomy is a *highly profitable* and globally
         respected software company, with a well-regarded management team and talented,
27       dedicated employees. We look forward to partnering with a company who shares our
         commitment to solving customer problems by creating smart, cutting-edge products
28       and solutions. I am particularly pleased that Dr. Mike Lynch, who heads a team of

1    brilliant scientists and employees, will continue to lead Autonomy. I look forward to
     our collaboration as we focus on creating maximum value for the combined
2    company, its customers and employees."

3            "This is a momentous day in Autonomy's history," said Dr. Mike Lynch,
     chief executive officer and founder, Autonomy. "From our foundation in 1996, we
4    have been driven by one shared vision: to fundamentally change the IT industry by
     revolutionizing the way people interact with information. HP shares this vision and
5    provides Autonomy with the platform to bring our world-leading technology and
     innovation to a truly global stage, making the shift to a future age of the information
6    economy a reality."

7        28.     On or about September 13, 2011, defendants Lesjak and Murrin caused Hewlett-

8    Packard to file a prospectus on Form 424B5 with the SEC for the offer and sale of $4.6 billion in

9    fixed- and floating-rate notes with maturities reaching out to September 14, 2041. The prospectus

10   informed investors that the proceeds of the $4.6 billion offering would be "for general corporate

11   purposes." The September 13, 2011 prospectus incorporated by reference management's discussion

12   and analysis of the Services segment's financial performance as reported in the Company's third

13   quarter 2011 Form 10-Q, which stated in relevant part:

14           Services net revenue increased 3.6% (decreased 1.9% when adjusted for
     currency) and 1.0% (decreased 1.4% when adjusted for currency) for the three and
15   nine months ended July 31, 2011, respectively.   Infrastructure Technology
     Outsourcing net revenue increased by 5% and 2% for the three and nine months
16   ended July 31, 2011, respectively. An increase in product-related revenue and a
     favorable currency impact were partially offset by a shortfall in short-term project
17   contracts with existing clients. Technology Services net revenue increased by 5%
     and 2% for the three and nine months ended July 31, 2011, respectively, due
18   primarily to growth in our consulting business and a favorable currency impact, the
     effect of which was partially offset by reduced sales of third-party hardware.
19   Application Services net revenue increased by 2% and 1% for the three and nine
     months ended July 31, 2011, respectively. The increase for both periods was driven
20   by a favorable currency impact, the effect of which was partially offset by declines in
     short-term project work and primarily to the ExcellerateHRO divestiture completed
21   at the end of the third quarter of fiscal 2010.

22       29.     Also on September 13, 2011, the Company's former CEO participated in the

23   following Q&A with analyst Chris Whitmore at the Deutsche Bank Technology Conference:

24           [APOTHEKER:]     Autonomy – I'm sure we have many more questions on
     Autonomy, but, just to position that squarely in everybody's minds, the idea around
25   Autonomy is to really strengthen HP's capabilities tremendously in this whole notion
     of data. We talked about data in San Francisco. We will talk a lot about data,
26   probably, today, as well, structured and unstructured. And, therefore, Autonomy is a
     very important asset.
27                              *       *       *
28

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                              - 8 -

1    And let me just try to build on that and help you understand how we came to
the valuation of Autonomy. We have a pretty rigorous process inside HP that we
2    follow for all of our acquisitions, which is a DCF-based model, and we try to take a
very conservative view at this. Just to make sure everybody understands. Autonomy
3    will be, on day one, accretive to HP. For FY 2012, Autonomy, once we integrate it, is
accretive to HP.

4
    Now, we have identified five synergy possibilities – five synergy leverages
5    on how we can build up the Autonomy business and how we can synergize it
between HP and Autonomy. And I can walk you through that, through these various
6    elements. But just take it from us. We did that analysis at great length, in great
detail, and we feel that we paid a very fair price for Autonomy. And it will give a
7    great return to our shareholders.

8                                    *        *        *

9    [WHITMORE:] You're in the midst of repositioning [Enterprise Services].
Can you talk about where you are today in that process, what the end goal is? What
10   do you hope to turn EDS into?

11   [APOTHEKER:] Okay. It's not EDS anymore; it's HP Enterprise Services.
And the segment we report is that business, our enterprise services, and our technical
12   services. We bring it all together in the segment service that you see in the reporting.

13   So, what are we trying to do? Currently, our HP EDS – former EDS business
is heavily skewed towards outsourcing. We are trying to shift this balance over time
14   and it has to be gradual, because in service businesses, things move gradually to a
more balanced portfolio approach. We will be providing on top of our outsourcing
15   businesses – or alongside our outsourcing businesses additional, higher-added-value
service, be it clouds – we want to put a lot of focus on clouds – application
16   migrations towards the clouds, application modernization, and, in fact, provide more
IP for our customers as well.

17
     30.    Nine days later, on September 22, 2011, Hewlett-Packard terminated Apotheker as
18
CEO and announced that defendant Whitman would take over as the new President and CEO of the
19
Company.
20
     31.    On September 22, 2011, Hewlett-Packard hosted a conference call regarding
21
Whitman's appointment as President and CEO. Whitman stated:
22
     Second, the Autonomy acquisition, which I'm excited about, is proceeding as
23   planned, and is expected to be completed by the end of the calendar year.

24   32.    On November 21, 2011, Hewlett-Packard conducted its fourth quarter 2011 earnings

25   conference call for analysts and investors. Defendants Whitman and Lesjak were present and

26   participated in the call. During the call, Whitman stated:

27   [W]e closed the Autonomy acquisition on October 3. In the last month, we've had
hundreds of leads passed between the two companies, and we've created a new
28

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                                    - 9 -

1    information management business group that combines Autonomy, Vertica, and
     other HP software assets under Mike Lynch, and reports directly to me.
2
                                    *       *       *
3

4            Well let me just spend a moment on Autonomy. I am really excited about
     this acquisition. *As you all know, I think it really positions HP as a leader in the*
5    *Next-generation information management and analytics capabilities, as the*
     *explosion of data is making these capabilities absolutely critical. Autonomy is a*
     *unique asset.* It has a remarkable ability to manage unstructured information in a
6    way that no one else in the market does. I think that adds a lot of value not only in
     their space but actually across HP.
7
             So, what we've set up is Autonomy is actually running fairly autonomously
8    (laughter) but we have done a great job I think of integrating the go-to market. So,
     there are sales leads that are going from Autonomy to HP – interestingly, which we
9    didn't expect so much of in terms of a hardware pull-through – but also from our HP
     sales team back to Autonomy. We've got a clearing house that vets all those leads.
10   So, that what we turn over to Autonomy are really high quality leads that will allow
     Autonomy to grow much faster than they would have grown on their own. That's the
11   name of the game for 2012.

12           There's going to be lots of other things we do together but accelerating the
     growth of Autonomy using the distribution capability of HP is priority number one,
13   two and three for 2012.

14   During the call, Lesjak stated:

15           We closed the acquisition of Autonomy in October, and therefore, we had
     roughly one month of results in the software numbers. *The integration is going well*
16   *thus far, and we are focused on enabling our global sales force to ramp on the*
     *Autonomy product line-up, so they can begin selling Autonomy software in fiscal*
17   *'12.*

18   Whitman also stated the following regarding the Company's Services segment:

19           First, we increased our investment levels through fiscal-year 2011 because
     there are areas where HP had previously under-invested. This is a big reason why
20   our services margins have been coming down and remain pressured.

21   During the fourth quarter 2011 earnings conference call, Lesjak added:

22           HP services delivered revenue of $9.3 billion, up 2% from the prior year
     quarter, but down 1% in constant currency. Operating profit of $1.2 billion, or
23   12.8% of revenue, was down 360 basis points from the prior year. Our services
     turnaround will take time as we work to shift the business mix toward higher growth,
24   higher margin services. IT outsourcing revenue of $3.9 billion was up 1% year-over-
     year.
25
             33.    On December 7, 2011, the Individual Defendants caused Hewlett-Packard to file a
26
     prospectus on Form 424B5 with the SEC for the offer and sale of $3.0 billion in fixed-rate notes with
27
     maturities reaching out to December 9, 2021. The prospectus informed investors that the proceeds
28

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                                  - 10 -

1  of the $3.0 billion offering would be "for general corporate purposes." The December 7, 2011

2  prospectus incorporated by reference management's discussion and analysis of the Services

3  segment's financial performance during the third quarter of 2011.

4      34.    On December 14, 2011, Hewlett-Packard filed its 2011 Form 10-K with the SEC.

5  Defendants Whitman, Lesjak and Murrin signed the Form 10-K, which stated in relevant part:

6                  *Acquisition of Autonomy Corporation plc*

7          HP's largest acquisition in fiscal 2011 was its acquisition of Autonomy
Corporation plc ("Autonomy"). As of October 31, 2011, HP owned an approximately

8  99% equity interest in Autonomy, and HP expects to acquire a 100% equity interest
before the end of the first quarter of fiscal 2012. Autonomy is a provider of

9  infrastructure software for the enterprise. HP reports the financial results of the
Autonomy business in the HP Software segment. The acquisition date fair value

10  consideration of $11 billion consisted of cash paid for outstanding common stock,
convertible bonds, vested in-the-money stock awards and the estimated fair value of

11  earned unvested stock awards assumed by HP. In connection with this acquisition,
HP recorded approximately $6.6 billion of goodwill and amortizable purchased

12  intangible assets of $4.6 billion. HP is amortizing the purchased intangible assets on
a straight-line basis over an estimated weighted-average life of 8.8 years.

13                                *    *    *

14

15          Services net revenue increased 1.2% (decreased 1.3% when adjusted for
currency) in fiscal 2011 due to revenue increases in Infrastructure Technology

16  Outsourcing and Technology Services. Infrastructure Technology Outsourcing net
revenue increased by 2% in fiscal 2011. An increase in product-related revenue and

17  a favorable currency impact were partially offset by a shortfall in short-term project
contracts with existing clients. Technology services net revenue increased by 2% in

18  fiscal 2011, due primarily to growth in our consulting business and a favorable
currency impact, the effect of which was partially offset by reduced sales of third-

19  party hardware. Applications Services net revenue increased by 1% in fiscal 2011.
The increase was driven by a favorable currency impact, the effect of which was

20  partially offset by declines in short-term project work and weakness in public sector
spending. Business Process Outsourcing new revenue decreased by 7% in fiscal

21  2011 due primarily to the ExcellerateHRO divestiture completed at the end of the
third quarter of fiscal 2010.

22          Services earning from operations as a percentage of net revenue decreased by
1.6 percentage points in fiscal 2011. Operating margin decreased due primarily to

23  lower than expected revenue, rate concessions arising from recent contract renewals,
a lower than expected resource utilization rate and a higher mix of lower-margin

24  Infrastructure Technology Outsourcing revenue. The decrease in operating margin
was partially offset by a reduction in bad debt expense and a continued focus on

25  operating improvements and cost initiatives that favorably impacted the cost
structure of both our enterprise services and technology services businesses.

26      35.    On February 22, 2012, Hewlett Packard conducted its first quarter 2012 earnings

27  conference call for analysts and investors. Defendants Whitman and Lesjak were present and

28

1 participated in the call. During the call, Whitman stated the following regarding the Company's

2 Services segment:

> In Services, year-over-year revenues were up 1% while operating margin declined to 10.5%. This continuing margin pressure is Services really goes straight to a couple of our major challenges, like resource utilization and business mix. We're focused on transitioning to more profitable services while enhancing our systems, processes and sales force. Last quarter, we characterized Services as a long-term effort. That journey continues.
>
> In Software, with the addition of Autonomy, revenue grew 30% year-over-year with a 17.1% operating margin. *The Autonomy acquisition is going well.* And we're continuing to grow our set of assets from Information Management to our IT Performance Suite including security, management of hybrid clouds and Application Lifecycle Management. Software is a critical part of our portfolio and of our forward-looking strategy. It amplifies, differentiates, optimizes and secures our core infrastructure, builds on our solution capabilities and expands customer relationships.

During the first quarter 2012 earnings conference call, Lesjak added:

> So the performance that we delivered [in Services] was in line with the expectations that we set last quarter, and I think that that's an important point. So there shouldn't be any surprises here on that. Revenues in Services did grow 1%, it was flat, on a reported basis it was flat in constant currency while the cost structure increased due to the necessary investments that we've been talking about in service delivery, in basically building out our bench and in investing to build out our strategic enterprise services. And I put – the services that we put in that category are services around cloud, analytics and security, as well as apps modernization. And those are the higher growth, higher margin services that we need to invest into and convert this business from being less ITO heavy where the margins are not as good, and in some service lines within ITO, the margins are very unattractive and we're deemphasizing some of the revenue in that space.

36. On February 28, 2012, defendant Murrin sold 42,500 shares of his Hewlett-Packard common stock for proceeds of $1.1 million. Murrin failed in his duty, pursuant to Company policy and the federal securities laws, either to disclose the material adverse facts stated in ¶54 before selling his stock, or to abstain from trading.

37. On March 12, 2012, Hewlett-Packard filed its first quarter 2012 Form 10-Q with the SEC. Defendants Whitman and Lesjak signed the form 10-Q, which stated in relevant part:

> Services net revenue increased 1.1% (0.3% when adjusted for currency) for the three months ended January 31, 2012 due to revenue increases in Infrastructure Technology Outsourcing and Technology Services. Infrastructure Technology Outsourcing net revenue increased by 2% due to an increase in product-related revenue and a favorable currency impact, the effect of which was partially offset by a decline in short-term project contracts with existing clients. Net revenue in Technology Services increased by 2% due primarily to growth in our consulting and support businesses, the effect of which was partially offset by reduced sales of third-party hardware. Application and Business Services net revenue was flat due

1    primarily to a decline in short-term project work, the effect of which was offset by a
     favorable currency impact.

2
            Services earnings from operations as a percentage of net revenue decreased
3    by 5.7 percentage points in the three months ended January 31, 2012. Operating
     margin decreased due primarily to rate concessions arising from contract renewals,
4    investments in service delivery and sales headcount and additional costs associated
     with contract deliverable delays.

5
     38.    During May 2012, Hewlett-Packard's stock price declined as news leaked out that
6
Autonomy was performing poorly.
7
     39.    On May 23, 2012, Hewlett-Packard conducted its second quarter 2012 earnings
8
conference call for analysts and investors.  Defendants Whitman and Lesjak were present and
9
participated in the call. During the call, Hewlett-Packard acknowledged that Autonomy had a "very
10
disappointing" revenue quarter.  Whitman stated:
11
            To help improve Autonomy's performance, Bill Veghte, HP's Chief Strategy
12   Officer and Executive Vice President of HP Software, will step in to lead Autonomy.
     Mike Lynch, Autonomy's Founder and Executive Vice President for Information
13   Management will leave HP after a transition period.  The market and competitive
     position for Autonomy remains strong, particularly in cloud offerings, and we have
14   been flooded with a number of big deal leads. Bill is an experienced software leader,
     who will develop the right processes and discipline to scale Autonomy and fulfill its
15   promise, although it will take a few quarters to see tangible improvement.

16 During the call, Whitman also stated the following regarding the Company's Services segment:

17          Turning to Services, revenues were essentially flat year-over-year in constant
     currency and we stabilized margins. While margins may fluctuate quarter-to-quarter,
18   we believe that a 10% to 12% range is the right sustainable profit margin profile for
     Services through the remainder of fiscal year 2012. We're focused on building out
19   strategic practice areas, in cloud, security, information management, and application
     transformation.  And we're strengthening the industry alignment of our Services
20   business, which will help us better solve customer challenges, create more customer
     value and deepen customer relationships.  We're excited about growing these higher-
21   margin categories, but this is a business that continues to be  challenged.  It's a
     journey, and we have a lot of work ahead of us in this turnaround.

22
     40.    On June 8, 2012, Hewlett-Packard filed its second quarter 2012 Form 10-Q with the
23
SEC. Defendants Whitman and Lesjak signed the Form 10-Q, which stated in relevant part:
24
            Services net revenue decreased 1% (0.3% when adjusted for currency) for the
25   three months ended April 30, 2012 and was flat both as reported and in constant
     currency for the six months ended April 30, 2012, respectively. Application and
26   Business Services net revenue increased by 1% and remained flat for the three and
     six months ended April 30, 2012, respectively.  The revenue increase was due
27   primarily to an increase in short-term project work as well as an increase in sales of
     cloud offerings, the effect of which was offset by a reduction in contract renewals.
28   Technology Services net revenue remained flat for the three months ended April 30,

1    2012. Technology Services net revenue increased by 1% for the six months ended
     April 30, 2012, due primarily to growth in our consulting and support businesses.
2    Infrastructure Technology Outsourcing net revenue decreased by 3% and 1% for the
     three and six months ended April 30, 2012, respectively. Lower rates on contract
3    renewals for both periods, along with increased deal selectivity designed to meet
     threshold margins for new contracts, contributed to the decrease in revenues.
4
5        41.    On August 8, 2012, the Company announced that it expected to record an $8.0 billion

6    goodwill impairment charge within its Services segment due to "recent trading values of HP's stock,

7    coupled with market conditions and business trends within the Services segment." While the market

8    was generally aware that the Company's stock was trading at lower levels and that Hewlett-

9    Packard's competitors within the IT services industry were thriving, defendants continued to leave

10   investors in the dark concerning the details of the collapse in profitability and business prospects of

11   the Enterprise Services business.

12       42.    On August 22, 2012, Hewlett-Packard confirmed in a Form 8-K filed with the SEC

13   that it was indeed taking an $8.0 billion goodwill impairment charge, associated with the Services

14   segment, against third quarter 2012 earnings.

15       43.    The same day, Hewlett-Packard conducted its 3Q2012 earnings conference call for

16   analysts and investors after the close of the trading day. Defendants Whitman and Lesjak were

17   present and participated in the call. During the call, Whitman acknowledged the continuing

18   difficulties with Autonomy, while also concealing important adverse information about Autonomy

19   and Enterprise Services. Whitman stated the following:

20           Now, let me outline some areas where we're not where we need to be. While
         Enterprise Services performance in the third quarter was within our expectations,
21       there's still a lot of work that needs to be done. Earlier this month we announced a
         change in leadership at ES with Mike Nefkens stepping in to lead on an acting basis.
22       Mike is an experienced leader who has led IT transformations for a number of our
         largest accounts.

23                           *       *       *

24           Autonomy still requires a great deal of attention and we've been aggressively
         working on that business. Among the many changes we've instituted is a global
25       dashboard to track Autonomy's pipeline. A single global sales methodology, a single
         HP Services engagement process, and a global process to measure client satisfaction
26       and service delivery progress. These actions are designed to help deliver predictable
         results and improve after-sale customer satisfaction.
27

28

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                               - 14 -

1 | During the call, defendant Lesjak added:

2 |      Moving on to Services. As we announced on August 8, we are recording a
GAAP only non-cash pretax charge of approximately $8 billion for the impairment

3 | of goodwill within the Services segment. The impairment stems from the recent
trading values of HP stock coupled with market conditions and business trends

4 | within the Services segment. We do not expect this goodwill impairment charge to
result in any future cash expenditures or otherwise affect the ongoing business or

5 | financial performance of the Services segment.

6 |      In the third quarter, Services delivered revenue of $8.8 billion, down 3% from
the prior year and up 1% in constant currency. Operating profit of $959 million was

7 | 11% of revenue, down 2.7 points from the prior year, but still within our expected
range of 10% to 12%. The year-over-year decline was due to the unfavorable impact

8 | of resource management and account performance and runoff, somewhat offset by an
improvement in the cost of Services delivery.

9 |

10 |     44. In response to defendants' disclosure that Autonomy's business was still deteriorating

11 | and that Enterprise Services – *i.e.*, Electronic Data Services – was the underlying reason for the

12 | Services segment's disappointing operating margin performance, the Company's stock price dropped

13 | $1.56 per share on August 23, 2012 to close at $17.64 on heavy trading volume. Defendants,

14 | however, still had not fully disclosed how poorly the Enterprise Services business had, in fact, been

15 | performing and its dismal prospects for fiscal 2013.

16 |     45. On September 10, 2012, Hewlett-Packard filed its third quarter 2012 Form 10-Q with

17 | the SEC. Defendant Lesjak signed the Form 10-Q, which stated in relevant part:

18 |      Services net revenue decreased 3.1% (increased 1.0% when adjusted for
currency) and 1.0% (increased 0.4% when adjusted for currency) for the three and

19 | nine months ended July 31, 2012, respectively. ITO net revenue decreased by 6%
and 3% for the three and nine months ended July 31, 2012, respectively. Contractual

20 | rate declines on ongoing contracts, increased deal selectivity designed to meet
threshold margins and strategic fit, and an unfavorable currency impact contributed

21 | to the decrease in revenues for both the periods. TS net revenue decreased by 1%
and remained flat for the three and nine months ended July 31, 2012, respectively.

22 | The decrease for the three months ended July 31, 2012 was due primarily to revenue
declines in our support business driven by an unfavorable currency impact, the effect

23 | of which was partially offset by growth in our consulting business. ABS net revenue
remained flat for both the three and nine months ended July 31, 2012, respectively.

24 | An increase in sales of cloud and information management and analytics offerings
were offset by a reduction in contract renewals as well as unfavorable currency

25 | impacts.

26 |      Services earnings from operations as a percentage of net revenue for the three
and nine months ended July 31, 2012 decreased by 2.7 percentage points and

27 | 4.2 percentage points, respectively. Operating margin decreased for both periods due
primarily to contractual rate declines on ongoing contracts, a lower resource

28 | utilization rate and additional costs associated with certain contract deliverable
delays. The decrease in operating margin was partially offset by a continued focus

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS      - 15 -

1  on operating improvements and cost initiatives that favorably impacted the cost structure of both our enterprise services and technology services businesses.

2  46.    During the Company's October 3, 2012 Security Analyst Meeting, Michael Nefkens,

3  Acting Global Enterprise Services Leader, and Jean-Jacques Charhon, Senior VP and COO of

4  Enterprise Services, gave a presentation in which they displayed a PowerPoint slide detailing, *"for

5  the first time,"* the collapse in profitability of the Enterprise Services business. It showed that by

6  August 2011, Enterprise Services' operating margin had already decreased nearly 500 basis points –

7  from 10% to 5% – on $6.0 billion in quarterly revenue. It further revealed that by October 2012,

8  Enterprise Services' operating margin had deteriorated by another 40%, or to 3% on $6.0 billion in

9  quarterly revenue. During the meeting, the Company added that the Services segment's 2013

10  revenue would slide by 11% to 13% and that operating margins were expected to be in the range of

11  0% to 3%.

12  47.    In response to these disclosures, the Company's stock price dropped $2.22 – or 13% –

13  on October 3, 2012, on heavy trading volume.

14  48.    The market was stunned at the Company's "first-time" disclosure of the long-running

15  erosion of profits at Enterprise Services. In an October 3, 2012 research report entitled "HP Drops a

16  EPS Bomb for FY13," Topeka Capital Markets noted:

17
18      •    **Most Negative Impact to FY13 EPS to be Enterprise Services.** Yesterday we talked about the services business being our biggest concern. The biggest driver of YoY EPS decline is HP Enterprise Services, that is expected to
19      negatively impact FY13 EPS by $0.29-$0.35 with sales falling 11%-13% YoY. *The operating margin of the Enterprise Services business is expected*
20      *to be 0% to 3% in FY13 and well below the 11% delivered in 3QFY12. Keep in mind, HP had at one time expected operating margin to be 16% to*
21      *17.5% in this business.* Given a recent CRN article indicating HP has been trying to sell its Enterprise Services business (and since denied by HP), we
22      believe there was some truth to this article given HP's weak FY13 outlook for this business. *Since Enterprise Services was the biggest contributor of*
23      *profit for HP last quarter . . . this is a long term concern.*

24  49.    In an October 4, 2012 research report entitled "Hewlett Packard: A long turnaround,"

25  Credit Suisse commented on the new information defendants decided to disclose about the Services

26  segment and the Enterprise Services business in particular:

27          Throughout the management presentations, it was made clear that FY13 would be a fix and build year, this is especially the case for HP's Services segment.
28

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    - 16 -

1                               *    *    *

2          **Fixed cost structure and negative leverage.**  Given the 200K+ employees
   and high fixed cost structure, *the revenue declines are expected to compress*
3  *segment operating margin to 0-3% in FY13 from ~3% currently and about 10% in*
   *FY10*. The company noted that a large part of the historic margin declines were due
4  to execution and poor contract management.

5          50.     News outlets also expressed concern about the Company's disclosures regarding the

6  collapse in the profitability of the Enterprise Services business.  For example, on October 4, 2012,

7  the *Contra Cost Times*, in an article entitled "HP shares continue to sink as analysts cut price

8  targets," reported:

9          Analysts expect the company's revenue and margins to falter, increasing
   uncertainty about its recent strategic decisions which focus on transforming the
10  former industry powerhouse into an enterprise computing corporation that take on
   IBM and Dell.
11
          "*HP's assumption of turning around the enterprise services business within*
12  *one-two years looks aggressive, given the significant revenue decline and margin*
   *deterioration expected in fiscal 2013*,"  BMO Capital Markets analyst Keith
13  Bachman said.

14         51.     Then, on November 20, 2012, the Company disclosed it had taken an $8.8 billion

15  charge related to its acquisition of Autonomy due to serious accounting improprieties.  In fact, over

16  $5.0 billion of the write-off was necessary due to the fact that Autonomy's financial results were the

17  product of accounting fraud.  The Hewlett-Packard release stated in part:

18         "HP is extremely disappointed to find that some former members of
   Autonomy's management team used accounting improprieties, misrepresentations
19  and disclosure failures to inflate the underlying financial metrics of the company,
   prior to Autonomy's acquisition by HP. These efforts appear to have been a willful
20  effort to mislead investors and potential buyers, and severely impacted HP
   management's ability to fairly value Autonomy at the time of the deal. We remain
21  100 percent committed to Autonomy and its industry-leading technology."

22         Additional background:

23         HP today announced a non-cash impairment charge of $8.8 billion related to
   Autonomy in the fourth quarter of its 2012 fiscal year. The majority of this
24  impairment charge, more than $5 billion, is linked to serious accounting
   improprieties, misrepresentation and disclosure failures discovered by an internal
25  investigation by HP and forensic review into Autonomy's accounting practices prior
   to its acquisition by HP. The balance of the impairment charge is linked to the recent
26  trading value of HP stock and headwinds against anticipated synergies and
   marketplace performance.
27
          HP launched its internal investigation into these issues after a senior member
28  of Autonomy's leadership team came forward, following the departure of Autonomy

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    - 17 -

1   founder Mike Lynch, alleging that there had been a series of questionable accounting
and business practices at Autonomy prior to the acquisition by HP. This individual
2   provided numerous details about which HP previously had no knowledge or
visibility.
3
        HP initiated an intense internal investigation, including a forensic review by
4   PricewaterhouseCoopers of Autonomy's historical financial results, under the
oversight of John Schultz, executive vice president and general counsel, HP.
5
        As a result of that investigation, HP now believes that Autonomy was
6   substantially overvalued at the time of its acquisition due to the misstatement of
Autonomy's financial performance, including its revenue, core growth rate and gross
7   margins, and the misrepresentation of its business mix.

8                               *       *       *

9       This appears to have been a willful effort on behalf of certain former
Autonomy employees to inflate the underlying financial metrics of the company in
10  order to mislead investors and potential buyers. These misrepresentations and lack of
disclosure severely impacted HP management's ability to fairly value Autonomy at
11  the time of the deal.

12  52.     Analysts were studded. As *USA Today* reported on November 20, 2012:

13      The Autonomy revelation is another blow for HP, which is struggling to
reinvent itself as PC and printer sales shrink.
14
        "While the write-down is non-cash, it may call into question the credibility of
15  its board of directors," wrote Shaw Wu, analyst at Sterne Agee & Leach, to a note to
clients.
16
17                              *       *       *

        Additionally, Whitman has "highlighted she was comfortable and confident
18  in the deal," says Aaron Rakers, analyst at Stifel, Nicolaus. "Given she was on the
board when the Autonomy deal was done, I'm not sure if it's a reflection on her, but
19  another ding against the board."

20      The size and scope of the charge is staggering, given that the $8.8 billion
financial hit is nearly as large as the $10 billion HP paid for the company. But the
21  company, in a release, said: "We remain 100% committed to Autonomy and its
industry-leading technology."
22
23  53.     On this news, the Company's stock price dropped $1.59 per share during the day to

close at $11.71, a decline of 12%, on volume of 155 million shares.
24
25  54.     The true facts, which were known by defendants but concealed from the investing

public during the Class Period, were as follows:
26
27      (a)     At the time Hewlett-Packard acquired Autonomy, the business's operating

results and historic growth were the product of accounting improprieties, including the
28

1  mischaracterization of sales of low-margin hardware as software and the improper recognition of
2  revenue on transactions with Autonomy business partners even where customers did not purchase
3  the products;

4          (b)    At the time Hewlett-Packard had agreed in principle to acquire Autonomy,
5  defendants were looking to unwind the deal in light of the accounting irregularities that plagued
6  Autonomy's financial statements; and

7          (c)    Enterprise Services' operating margin had collapsed from 10% in 2010 to
8  approximately 6% as of April 30, 2011, 4% as of October 31, 2011, and 3% as of April 30, 2012,
9  due to various reasons, including unfavorable revenue mix and underperforming contracts.

10      55.    As a result of defendants' false and misleading statements, Hewlett-Packard common
11  stock traded at artificially inflated prices during the Class Period. However, after the above-alleged
12  revelations of the true but undisclosed facts seeped into the market, the Company's common stock
13  experienced exorbitant selling pressure sending its price down 60% from its Class Period high.

14                      **LOSS CAUSATION**

15      56.    During the Class Period, as detailed herein, the defendants made false and misleading
16  statements and engaged in a scheme to deceive the market and a course of conduct that artificially
17  inflated the price of Hewlett-Packard common stock and operated as a fraud or deceit on Class
18  Period purchasers of Hewlett-Packard common stock by misrepresenting the Company's business
19  and prospects. Later, when the defendants' prior misrepresentations and fraudulent conduct became
20  apparent to the market, the price of Hewlett-Packard common stock fell precipitously, as the prior
21  artificial inflation came out of the price over time. As a result of their purchases of Hewlett-Packard
22  common stock during the Class Period, plaintiff and other members of the Class suffered economic
23  loss, *i.e.*, damages, under the federal securities laws.

24                      **NO SAFE HARBOR**

25      57.    Hewlett-Packard's verbal "Safe Harbor" warnings accompanying its oral forward-
26  looking statements ("FLS") issued during the Class Period were ineffective to shield those
27  statements from liability.

28

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS     - 19 -

1    58.    The defendants are also liable for any false or misleading FLS pleaded because, at the

2  time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was

3  authorized and/or approved by an executive officer of Hewlett-Packard who knew that the FLS was

4  false. None of the historic or present tense statements made by defendants were assumptions

5  underlying or relating to any plan, projection or statement of future economic performance, as they

6  were not stated to be such assumptions underlying or relating to any projection or statement of future

7  economic performance when made, nor were any of the projections or forecasts made by defendants

8  expressly related to or stated to be dependent on those historic or present tense statements when

9  made.

10                              **CLASS ACTION ALLEGATIONS**

11    59.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules

12  of Civil Procedure on behalf of all persons who purchased or otherwise acquired Hewlett-Packard

13  common stock during the Class Period (the "Class"). Excluded from the Class are defendants and

14  their families, the officers and directors of the Company, at all relevant times, members of their

15  immediate families and their legal representatives, heirs, successors or assigns and any entity in

16  which defendants have or had a controlling interest.

17    60.    The members of the Class are so numerous that joinder of all members is

18  impracticable. The disposition of their claims in a class action will provide substantial benefits to

19  the parties and the Court. Hewlett-Packard has over 1.9 billion shares of stock outstanding, owned

20  by thousands if not tens of thousands of persons.

21    61.    There is a well-defined community of interest in the questions of law and fact

22  involved in this case. Questions of law and fact common to the members of the Class which

23  predominate over questions which may affect individual Class members include:

24                (a)    Whether the 1934 Act was violated by defendants;

25                (b)    Whether defendants omitted and/or misrepresented material facts;

26                (c)    Whether defendants' statements omitted material facts necessary to make the

27  statements made, in light of the circumstances under which they were made, not misleading;

28

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    - 20 -

1          (d)     Whether defendants knew or deliberately disregarded that their statements

2     were false and misleading;

3          (e)     Whether the price of Hewlett-Packard common stock was artificially inflated;

4     and

5          (f)     The extent of damage sustained by Class members and the appropriate

6     measure of damages.

7     62.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class

8     sustained damages from defendants' wrongful conduct.

9     63.     Plaintiff will adequately protect the interests of the Class and has retained counsel

10    who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

11    with those of the Class.

12    64.     A class action is superior to other available methods for the fair and efficient

13    adjudication of this controversy.

14                                   **COUNT I**

15              **For Violation of §10(b) of the 1934 Act and Rule 10b-5**
                                   **Against All Defendants**

16    65.     Plaintiff incorporates ¶¶1-64 by reference.

17    66.     During the Class Period, defendants disseminated or approved the false statements

18    specified above, which they knew or deliberately disregarded were misleading in that they contained

19    misrepresentations and failed to disclose material facts necessary in order to make the statements

20    made, in light of the circumstances under which they were made, not misleading.

21    67.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

22          (a)     employed devices, schemes and artifices to defraud;

23          (b)     made untrue statements of material facts or omitted to state material facts

24    necessary in order to make the statements made, in light of the circumstances under which they were

25    made, not misleading; or

26

27

28

1            (c)     engaged in acts, practices and a course of business that operated as a fraud or

2 deceit upon plaintiff and others similarly situated in connection with their purchases of Hewlett-

3 Packard common stock during the Class Period.

4       68.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

5 the market, they paid artificially inflated prices for Hewlett-Packard common stock. Plaintiff and the

6 Class would not have purchased Hewlett-Packard common stock at the prices they paid, or at all, if

7 they had been aware that the market price had been artificially and falsely inflated by defendants'

8 misleading statements.

9 **COUNT II**

10 **For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

11

      69.     Plaintiff incorporates ¶¶1-68 by reference.

12

      70.     The Individual Defendants acted as controlling persons of Hewlett-Packard within the

13

meaning of §20(a) of the 1934 Act. By virtue of their positions with the Company, and ownership of

14

Hewlett-Packard stock, the Individual Defendants had the power and authority to cause Hewlett-

15

Packard to engage in the wrongful conduct complained of herein. Hewlett-Packard controlled the

16

Individual Defendants and all of its employees. By reason of such conduct, defendants are liable

17

pursuant to §20(a) of the 1934 Act.

18

**PRAYER FOR RELIEF**

19

WHEREFORE, plaintiff prays for judgment as follows:

20

      A.     Determining that this action is a proper class action, designating plaintiff as Lead

21

Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil

22

Procedure and plaintiff's counsel as Lead Counsel;

23

      B.     Awarding plaintiff and the members of the Class damages, including interest;

24

      C.     Awarding plaintiff reasonable costs and attorneys' fees; and

25

      D.     Awarding such equitable/injunctive or other relief as the Court may deem just and

26

proper.

27

28

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS     - 22 -

1    **JURY DEMAND**

2        Plaintiff demands a trial by jury.

3    DATED: November 26, 2012        ROBBINS GELLER RUDMAN
                & DOWD LLP
4                   SHAWN A. WILLIAMS

5

6                         SHAWN A. WILLIAMS

7                   Post Montgomery Center
8                   One Montgomery Street, Suite 1800
               San Francisco, CA  94104
9                   Telephone: 415/288-4545
               415/288-4534 (fax)
10
               ROBBINS GELLER RUDMAN
11                   & DOWD LLP
               DARREN J. ROBBINS
12                  DAVID C. WALTON
               655 West Broadway, Suite 1900
13                  San Diego, CA  92101
               Telephone: 619/231-1058
14                  619/231-7423 (fax)

15                  LAW OFFICE OF ALFRED G.
                YATES, JR., P.C.
16                  ALFRED G. YATES, JR.
               519 Allegheny Building
17                  429 Forbes Avenue
               Pittsburgh, PA  15219
18                  Telephone: 412/391-5164
               412/471-1033 (fax)
19
               Attorneys for Plaintiff
20
S:\CptDraft\Securities\Cpt Hewlett-Packard.doc
21

22

23

24

25

26

27

28

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS        - 23 -

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

ALLAN J. NICCOLAI ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the class action complaint in this matter (the "action") and authorizes its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transaction(s) in Hewlett Packard Company (HPQ) that is/are the basis of this litigation is/are listed on the attached schedule.

**PURCHASED 200 SHARES HPQ @$21.8699/share on May 24, 2012**

5.    During the three years prior to the date of this Certificate, Plaintiff has sought to serve or has served as a representative party for a class in a case under the federal securities laws as follows: (list, if any)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

   I declare under penalty of perjury that the foregoing is true and correct. Executed this 24TH day of November, 2012.

                                                    _____
                                                            Plaintiff