1   DARRYL P. RAINS (CA SBN 104802)
    DRains@mofo.com
2   MORRISON & FOERSTER LLP
    755 Page Mill Road
3   Palo Alto, California 94304-1018
    Telephone:  650.813.5600
4   Facsimile:  650.494.0792

5   JUDSON E. LOBDELL (CA SBN 146041)
    JLobdell@mofo.com
6   MARK R.S. FOSTER (CA SBN 223682)
    MFoster@mofo.com
7   MORRISON & FOERSTER LLP
    425 Market Street
8   San Francisco, California 94105-2482
    Telephone:  415.268.7000
9   Facsimile:  415.268.7522

10  Attorneys for defendant Hewlett-Packard Company

11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                     SAN FRANCISCO DIVISION

15

16                                          Master File No. C-12-5980 CRB

17  IN RE HP SECURITIES LITIGATION          Class Action

18  This Document Relates To:  All Actions  HEWLETT-PACKARD
                                            COMPANY'S MOTION TO
19                                          DISMISS CONSOLIDATED
                                            COMPLAINT
20
                                            Date:    November 8, 2013
21                                          Time:    10:00 a.m.
                                            Judge:   Hon. Charles R. Breyer
22                                          Court:   6, 17th floor

23

24

25

26

27

28

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE THAT on November 8, 2013, at 10:00 a.m., or at such time thereafter as the matter may be heard, in the courtroom of the Honorable Charles R. Breyer, located at 450 Golden Gate Avenue, San Francisco, California, Courtroom 6, 17th Floor, defendant Hewlett-Packard Company ("HP") will, and hereby does, move pursuant to Federal Rules of Civil Procedure 8, 9(b), and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (Dec. 22, 1995), codified in relevant part at 15 U.S.C. § 78u-4 *et seq.*, to dismiss plaintiff's consolidated complaint for violation of the federal securities laws, which was filed on May 3, 2013.

This motion is based on this notice and the accompanying memorandum of points and authorities, the request for judicial notice, the declaration of Mark R.S. Foster, the papers on file in the action, the argument of counsel, and other such matters as may be considered by the Court before the motion is taken under submission.

## ISSUES TO BE DECIDED

1.      Whether plaintiff's claim against HP under section 10(b) of the Securities Exchange Act of 1934 should be dismissed on the ground that plaintiff has failed to plead with particularity facts giving rise to a strong inference that HP acted with scienter — the intent to deceive, manipulate, or defraud.

2.      Whether plaintiff's section 10(b) claim should also be dismissed on the ground that plaintiff has failed to plead with particularity that HP's public statements were materially false or misleading when made.

# **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES .................................................................................................iii

SUMMARY OF ARGUMENT .......................................................................................... 1

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 5

I.     THE COMPLAINT DOES NOT ALLEGE FACTS SUPPORTING A STRONG
       INFERENCE OF FRAUDULENT INTENT ........................................................... 5

       A.     The Complaint Does Not Adequately Plead HP's Scienter for Statements
              Made Before the Transaction Closed. ........................................................... 7

              1.     Optimistic Statements Regarding the Acquisition. .......................... 7

              2.     Statements About HP's Due Diligence Efforts. ............................... 9

              3.     HP's Repetition of Autonomy's Financial Results ........................ 11

              4.     The "Whistleblowers" and "Confidential Witnesses." ................. 13

              5.     Mr. Lane's Inquiry Regarding Ending the Acquisition. ................ 15

              6.     The Briody Wage Claim. ............................................................... 16

       B.     The Complaint Does Not Adequately Plead HP's Scienter for Statements
              Made After the Transaction Closed. ........................................................... 16

              1.     HP's Reported Software Revenue. ................................................ 17

              2.     HP's Reported Goodwill and Intangible Assets. ........................... 20

              3.     "Whistleblower No. 4" and the PwC Internal Investigation. ........ 22

              4.     Lynch's State of Mind is Not Imputed to HP. ............................... 23

       C.     Plaintiff's Scienter Allegations, Considered "Holistically," Do Not Support
              a Strong Inference of Scienter. ................................................................... 23

II.    THE COMPLAINT DOES NOT ALLEGE FACTS SHOWING HP'S
       STATEMENTS WERE FALSE WHEN MADE. ................................................... 25

       A.     The Complaint Does Not Adequately Plead the Falsity of HP's Statements
              Made Before the Transaction Closed. ......................................................... 26

       B.     The Complaint Does Not Adequately Plead the Falsity of HP's Post-
              Acquisition Financial Statements and Disclosures. .................................... 29

              1.     HP's Software Revenue Recognition. ............................................ 29

              2.     HP's Goodwill and Intangible Assets. ........................................... 31

              3.     "Whistleblower No. 4" and the PwC Internal Investigation. ......... 33

              4.     Status Updates Regarding Autonomy's Integration into HP's
                     Existing Business. ......................................................................... 34

       CONCLUSION ........................................................................................................ 35

# TABLE OF AUTHORITIES

**Page**

CASES

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002)........................................................................... 33

*Brogren v. Phohlad*,
   933 F. Supp. 793 (D. Minn. 1995) ................................................................. 10

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
   No. 12 Civ. 1203(PAE), 2013 WL 1174017 (S.D.N.Y. Mar. 22, 2013) ........................ 10, 28

*City of Omaha, Neb. Civilian Emps. Ret. Sys. v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012)........................................................... 20, 21, 32

*Coble v. Broadvision, Inc.*,
   No. C 01-01969 CRB, 2002 WL 31093589 (N.D. Cal. Sept. 11, 2002)................... 25

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)...................................................................................... 5

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)...................................................................................... 5

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011)......................................................................... 20

*Glazer Capital Mgmt. v. Magistri*,
   549 F.3d 736 (9th Cir. 2008)................................................................... 6, 23

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1999)........................................................................ 30

*GSC Partners CDO Fund v. Washington*,
   368 F.3d 228 (3d Cir. 2004).......................................................................... 10

*Hanrahan v. Hewlett-Packard Co.*,
   No. C 05-02047 CRB, 2006 WL 1699573 (N.D. Cal. June 16, 2006) ................... 16

*Higginbotham v. Baxter Int'l Inc.*,
   495 F.3d 753 (7th Cir. 2007)........................................................................ 22

*In re Boston Sci. Corp. Sec. Litig.*,
   686 F.3d 21 (1st Cir. 2012) .......................................................................... 22

*In re Connetics Corp. Sec. Litig.*,
   542 F. Supp. 2d 996 (N.D. Cal. 2008) ......................................................... 16

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010).............................................................................. 28

*In re Daou Sys. Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005)....................................................................... *passim*

*In re GlenFed, Inc. Sec. Litig.*,
  42 F.3d 1541 (9th Cir. 1994)........................................................................ 26, 32

*In re Hansen Natural Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ................................................................ 19

*In re Harmonic, Inc., Sec. Litig.*,
  No. C 00-2287 PJH, 2006 U.S. Dist. LEXIS 90450 (N.D. Cal. Dec. 11, 2006)...................... 3

*In re Huffy Corp. Sec. Litig.*,
  577 F. Supp. 2d 968 (S.D. Ohio 2008) ................................................................. 11

*In re ICN Pharm., Inc. Sec. Litig.*,
  299 F. Supp. 2d 1055 (C.D. Cal. 2004) .......................................................... 32, 33

*In re Levi Strauss & Co. Sec. Litig.*,
  527 F. Supp. 2d 965 (N.D. Cal. 2007) ................................................................. 31

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ................................................... 8, 11, 26, 27

*In re Read-Rite Corp. Sec. Litig.*,
  335 F.3d 843 (9th Cir. 2003)............................................................................. 26

*In re Remec, Inc., Sec. Litig.*,
  388 F. Supp. 2d 1170 (S.D. Cal. 2005) ................................................................. 32

*In re Remec, Inc., Sec. Litig.*,
  415 F. Supp. 2d 1106 (S.D. Cal. 2006) ................................................................. 30

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012)..................................................................... 8, 24, 33

*In re Silicon Graphics, Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999)...................................................................... 6, 7, 26

*In re Tibco Software, Inc. Sec. Litig.*,
  No. C 05-2146 SBA, 2006 WL 1469654 (N.D. Cal. May 25, 2006) ...................................... 34

*In re The Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002)..........................................................*passim*

*In re VeriFone Holdings, Inc., Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012)............................................................*passim*

*In re Wet Seal, Inc., Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ........................................... 32, 33

*In re Yahoo! Inc. Sec. Litig.*,
   No. C 11-02732 CRB, 2012 WL 3282819 (N.D. Cal. Aug. 10, 2012)................................... 22

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011) .................................................................... 6

*Kane v. Madge Networks N.V.*,
   No. C-96-20652-RMW, 2000 WL 33208116 (N.D. Cal. May 26, 2000), *aff'd sub nom.*
   *Kane v. Zisapel*, 32 F. App'x 905 (9th Cir. 2002) .................................. 34

*Lapiner v. Camtek, Ltd.*,
   No. C 08-01327 MMC, 2011 U.S. Dist. LEXIS 9985 (N.D. Cal. Feb. 2, 2011) ................... 19

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011) ................................................................ 23, 33

*Metzler Inv. GmbH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008)...........................................................*passim*

*N.M. State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011)........................................................... 12

*NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*,
   No. 10 Civ. 440(LAK)(HBP) 2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012) .......................... 28

*Philco Inv., Ltd. v. Martin*,
   2011 WL 4595247 (N.D. Cal. Oct. 4, 2011)............................................... 28

*Pittleman v. Impac Mortg. Holdings, Inc.*,
   2008 WL 4809962 (C.D. Cal. Oct. 6, 2008) ............................................. 14

*Reiger v. PwC, LLP*,
   117 F. Supp. 2d 1003 (S.D. Cal. 2000), *aff'd, DSAM Global Value Fund v. Altris
   Software, Inc.*, 288 F.3d 385 (9th Cir. 2002) ........................................ 12

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001).............................................................*passim*

**TABLE OF AUTHORITIES**
(continued)

Page

*Rubke v. Capitol Bancorp, Ltd.*,
　551 F.3d 1156 (9th Cir. 2009)..................................................................*passim*

*Rudolph v. UTStarcom*,
　560 F. Supp. 2d 880 (N.D. Cal. 2008) ................................................. 17

*Schiller v. Physicians Res. Grp., Inc.*,
　No. Civ.A. 3:97-cv-3158-L, 2002 WL 318441 (N.D. Tex. Feb. 26, 2002)............................ 10

*Slayton v. Am. Express Co.*,
　604 F.3d 758 (2d Cir. 2010)................................................................ 22

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
　365 F.3d 353 (5th Cir. 2004)................................................................ 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
　551 U.S. 308 (2007) ...................................................................... 1, 7

*Tripp v. Indymac Fin. Inc.*,
　No. CV07-1635-GW(VBKx) 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ....................... 31

*Virginia Bankshares v. Sandberg*,
　501 U.S. 1083 (1991)........................................................................ 8

*Zucco Partners, LLC v. Digimarc Corp.*,
　552 F.3d 981 (9th Cir. 2009)............................................................*passim*

**STATUTES**

15 U.S.C.
　§ 78u-4 ............................................................................. i, 7, 25

*Private Securities Litigation Reform Act of 1995*,
　Pub. L. No. 104-67, 109 Stat. 737 (Dec. 22, 1995) ....................................*passim*

**OTHER AUTHORITIES**

Federal Rules of Civil Procedure
　Rule 8 ............................................................................. i
　Rule 9(b) .......................................................................... i
　Rule 12(b)(6)....................................................................... i

# SUMMARY OF ARGUMENT

Hewlett-Packard Company ("HP") was deceived and defrauded. In acquiring Autonomy Corporation plc ("Autonomy") for $11 billion, HP relied upon the rapid growth in Autonomy's reported revenues, and on Autonomy's representations about the profitability of its businesses, its software, and the broad reach of its customer base. But after the acquisition, Autonomy faltered. Its profitability declined. Something was amiss, but HP at first still thought it was fixable. Then, acting on information from an Autonomy insider, forensic accountants from PricewaterhouseCoopers LLP ("PwC") were hired to investigate. That investigation revealed that Autonomy had lied to HP and the world about its finances, grossly overstating its revenues, growth, and prospects.

In an attempt to spin Autonomy's accounting fraud into an investor class action, plaintiff has filed a complaint recasting the victim — HP — as the perpetrator. The complaint, however, lacks factual support and asserts conclusions that are entirely implausible. It cannot withstand scrutiny under the Private Securities Litigation Reform Act of 1995 (the "Reform Act").

Under the Reform Act, a complaint must plead with great factual particularity both that the defendant made material misrepresentations and acted with scienter — the intent "to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007) (citation and internal quotation marks omitted). The facts must give rise to an inference of fraud that is both "cogent" and at least "as compelling as any opposing inference" that could be drawn. *Id.* at 314, 324. To meet this standard, the specific facts must be supported by sources that are reliable, such as internal documents, meeting records, or witnesses with "personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). This complaint falls far short.

Plaintiff's complaint challenges HP's executives' statements leading up to the acquisition, as well as its financial reporting and disclosures following the acquisition. Plaintiff alleges that, before the acquisition, HP's executives knew about Autonomy's fraudulent accounting and/or turned a blind eye to it, but proceeded with the $11 billion transaction anyway, making misrepresentations to investors along the way about the "fairness" of the price and the rigor of the

1   due diligence process.  But plaintiff's complaint offers no facts to support its conclusory

2   allegations — no internal HP documents, no accounts from witnesses with personal knowledge,

3   no descriptions of meetings, and nothing else.  The absence of facts is unsurprising because

4   plaintiff's theory — that HP executives lied to HP's shareholders to acquire a damaged company

5   — makes no sense.

6       Plaintiff would have the Court credit the notion that HP, after the acquisition closed,

7   knowingly adopted Autonomy's fraudulent practices.  But the complaint itself makes clear that

8   this did not happen:  sales gains and margins fell dramatically after HP took over.  It is

9   unsurprising, therefore, that plaintiff's conclusory allegations that HP's post-acquisition financial

10  statements were false, and that unnamed HP employees deliberately continued with Autonomy's

11  fraudulent revenue recognition policies, are entirely lacking in factual support and corroborating

12  details from reliable sources that are required by a series of Ninth Circuit decisions addressing

13  accounting fraud claims, including *In re Daou Sys. Inc. Sec. Litig.*, 411 F.3d 1006, 1016–17, 1023

14  (9th Cir. 2005); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068–69 (9th Cir.

15  2008); *Zucco*, 552 F.3d at 991, 995; and *In re VeriFone Holdings, Inc., Sec. Litig.*, 704 F.3d 694,

16  700–01 (9th Cir. 2012).

17      This complaint alleges no details and no reliable sources.  The inference of accounting

18  fraud that plaintiff advances is implausible for many additional reasons, including that HP has

19  never restated its independently audited financial statements, PwC conducted a forensic

20  accounting review and an internal investigation, HP voluntarily announced the results of the

21  investigation, and none of the HP executives charged with making the challenged statements is

22  alleged to have profited from the fraud through stock sales or otherwise.  The most compelling

23  inference here is that Autonomy hid its problems from HP so that, as the complaint alleges,

24  Autonomy's owners could "cash out of Autonomy before it collapsed under the weight of its own

25  fraud."  (Compl. ¶ 6.)   For these and other reasons set out below, the complaint should be

26  dismissed.

27

28

## BACKGROUND

*Hewlett-Packard*.  HP is one of Silicon Valley's most successful and admired companies. It is a leader in personal computing, computer servers and mainframes, printers, and enterprise-level technology infrastructure.  (Compl. ¶ 108.)[1]  HP had revenues of over $120 billion in its most recent fiscal year.  (Ex. 2 at 41.)[2]

*Autonomy*.  Autonomy held itself out as the worldwide leader in software used to search unstructured data.  (Compl. ¶ 15.)  Unstructured data is information that does not fit well into relational data tables, making it difficult to search using traditional computer database programs. Autonomy reported a "meteoric rise" in its sales, customer base, and financial performance between 2005 and 2011.  (*Id*. ¶ 16.)

*Hewlett-Packard's Acquisition of Autonomy*.  HP's acquisition of Autonomy was the result of a six-month-long process.  HP's then-chief executive officer, Léo Apotheker, first met with Autonomy's chief executive officer, Michael Lynch, in April 2011.  (*Id*. ¶ 31.)  The next month, HP's board of directors "approved Apotheker's proposal to look deeper into acquiring Autonomy."  (*Id*.)  HP hired two financial advisors, Barclays Bank and Perella Weinberg Partners, "to evaluate a possible transaction with Autonomy."  (*Id*.)  HP later hired KPMG to assist in that evaluation.  (*Id*. ¶ 36.)

HP conducted its due diligence for the transaction over a three-week period between late-July and mid-August 2011.  (*Id*. ¶ 33.)  HP and its advisors reviewed Autonomy's audited financial statements, interviewed its independent outside auditing firm (Deloitte), and reviewed a number of its larger sales contracts.  (*Id*. ¶¶ 34, 36, 39.)  HP's directors met in July and August to monitor the discussions.  (*Id*. ¶¶ 32, 33, 35.)  HP and its advisors were assured there were no "material improprieties."  (*Id*. ¶ 39.)

---

[1] Plaintiff's complaint makes a number of allegations regarding HP's history of "leaks," board turmoil, and supposed need for a "transformation."  (*E.g*., Compl. ¶¶ 9–14, 26–29.)  It also makes allegations about post–class period events that have nothing to do with the misrepresentations alleged in the complaint.  (*E.g*., Compl. ¶¶ 91–92, 96–103.)  These allegations should be disregarded.  *See In re Harmonic, Inc., Sec. Litig.*, 2006 U.S. Dist. LEXIS 90450, at *50–57 (N.D. Cal. Dec. 11, 2006) (striking "background" allegations because they were "irrelevant" to the claims).
[2] All references to "Ex. __" are to the exhibits attached to the declaration of Mark R.S. Foster.

HP and Autonomy ultimately agreed on a purchase price of approximately $11 billion. (*Id.* ¶ 44.)  The transaction was announced publicly on August 18, 2011 (the beginning of plaintiff's proposed class period) and closed on October 3, 2011.  (*Id.* ¶ 72.)

*Outside Observers Criticize or Support the Proposed Acquisition*.  HP's Autonomy acquisition was criticized by a number of outside observers.  Many said the purchase price was too high, some questioned whether Autonomy really had become the "de facto standard" search engine for unstructured data, and others questioned Autonomy's future prospects given "contracting" margins and profits "growing in the single digits."  (*Id.* ¶¶ 46, 49.)

Other observers, by contrast, supported the move.  Wells Fargo said Autonomy would "be a good addition to [HP's] software portfolio."  (Ex. 7 at 1.)  Credit Suisse agreed, writing: "[f]undamentally, we believe that this is the correct strategy which eventually could unlock value."  (Ex. 8 at 4.)  And Morningstar wrote:  "[w]e view the [Autonomy] acquisition positively because it gives HP a foothold in content management, a fast-growing market that can be bundled with its infrastructure and services offerings."  (Ex. 9 at 9.)

*Autonomy Does Not Deliver Expected Financial Results Following the Acquisition*.  HP included Autonomy in its financial reporting beginning in February 2012.  The results were disappointing right from the start.  Everyone expected software license revenue to grow "significantly" following the acquisition.  (Compl. ¶ 78.)  But, in the first three quarters following the acquisition, HP's software license revenue grew by only 12%, 7%, and 2%, respectively — far less than HP's earlier growth rate, and lower than analysts expected.  (*Id.*)

Similarly, from 2009 to 2011, Autonomy had averaged operating margins of 43.4%; HP's software segment, by contrast, had operating margins averaging only 23.5%.  (*Id.* ¶ 77.)  Everyone expected HP's software margins to increase with the addition of Autonomy's software sales.  (*See id.* ¶ 78.)  But, in the first quarter following the acquisition, HP reported software operating margins of only 17.1%.  (*Id.* ¶ 77.)  And the trend continued, with HP reporting software margins of 17.7% and 18% in subsequent quarters.  (*Id.*)

Something was clearly wrong.  At first, it appeared to be a matter of management process and discipline which could be addressed with a "great deal of attention" and aggressive

management.  (*Id.* ¶ 194.)  The majority of Autonomy's prior management, including former chief executive officer Michael Lynch, was replaced by May 2012.  (*Id.* ¶¶ 80–81.)

*Allegations of Improprieties and an Internal Investigation*.  In May 2012, a "senior member of Autonomy's management team" alerted HP's executive management to "serious accounting improprieties" at Autonomy.  (*Id.* ¶ 80.)  PwC was retained to conduct an internal investigation and forensic accounting review of two years' worth of Autonomy's pre-acquisition transactions.  The investigation revealed that Autonomy had, prior to the acquisition, engaged in "serious accounting improprieties, disclosure failures, and outright misrepresentations."  (*Id.* ¶ 84.)  HP disclosed these findings to the public and reported a write-off on November 20, 2012.  (*Id.*)  This lawsuit followed.

## ARGUMENT

A section 10(b) claim has six elements — a statement, falsity, scienter, reliance, loss causation, and damages.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005).  At least two of these elements — scienter and falsity — are not pleaded here in accordance with the special heightened pleading requirements imposed by the Reform Act.

## I.      THE COMPLAINT DOES NOT ALLEGE FACTS SUPPORTING A STRONG INFERENCE OF FRAUDULENT INTENT.

To plead a fraud claim against HP, plaintiff must show how HP acted with scienter, a "mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  Scienter includes both intent to mislead and "deliberate recklessness."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009).  Deliberate recklessness is "a form of intentional or knowing misconduct" in which the "danger of misleading buyers or sellers . . . is either known to the defendant or is so obvious that the actor must have been aware of it."  *Id.* (internal quotation marks omitted).  The "ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity."  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (citation omitted).

A corporation cannot form an intent to deceive or defraud. A corporation's scienter must, of necessity, be imputed from the mental state of its officers or directors. In *Glazer*, the Ninth Circuit held that (in most cases) a plaintiff must "plead scienter with respect to those individuals who actually made the false statements." *Glazer Capital Mgmt. v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008); *accord Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366–67 (5th Cir. 2004) (to determine "whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter, we . . . look to the state of mind of the individual corporate . . . officials who make or issue the statement").[3]

The person who "makes" a statement, in turn, is the person or entity "with authority over the content of the statement and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2303 (2011). As the Supreme Court made clear, Rule 10b-5 does not reach individuals who might provide "substantial assistance" in the making of a misleading statement, including persons who "suggest what to say," "create," "prepare," or "draft" the statement, or even "provide" the information contained in the statement. *Id.* at 2302. Instead, primary liability under Rule 10b-5 is imposed on those who actually "make" materially false statements with the requisite state of mind. *See id.*

Plaintiff's task, then, was to plead facts showing that the persons at HP with ultimate "authority" over the content of the company's statements either knew of, or were "deliberately reckless" about, the statements' purported falsity.

These facts must be pleaded in "great detail." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999). And they must be supported by reliable sources. *Zucco*, 552 F.3d at 995; *In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084–85 (9th Cir. 2002). These sources must, themselves, be described with sufficient detail for the court to assess their

---

[3] The Ninth Circuit has not completely foreclosed the possibility, in extreme circumstances, that a plaintiff might plead "collective scienter." But collective scienter is not alleged here, and plaintiff's theory would not, in any event, fall within the very narrow limits of that exception. *See Glazer*, 549 F.3d at 744–45 (collective scienter "might be appropriate" in "circumstances [where] a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication"); *cf. Zucco*, 552 F.3d at 1001 ("narrow exception" applies only where "falsity is patently obvious").

reliability.  *E.g.*, *Zucco*, 552 F.3d at 995–96 (complaint must plead facts showing that confidential witnesses had "personal knowledge"); *Silicon Graphics*, 183 F.3d at 984–85 (complaint relying on documents must state facts "including their contents, who prepared them, which officers reviewed them and from whom she obtained the information"); *In re The Vantive*, 283 F.3d at 1087–88 ("plaintiffs have failed to cite to any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports").

These detailed facts must give rise to a "strong inference" of scienter that is both "cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged."  15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323–24 (2007). A court must "take into account plausible opposing inferences" and "compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference."  *Zucco*, 552 F.3d at 991.

### A.  The Complaint Does Not Adequately Plead HP's Scienter for Statements Made Before the Transaction Closed.

HP made a number of positive statements in the weeks leading up to the Autonomy acquisition, which closed on October 3, 2011.  Plaintiff pleads a large number of supposed "facts" — about "red flags," "reckless" due diligence, and accusations by "confidential witnesses" — that purportedly show a strong inference that HP knew its statements were false. But these allegations do not come close to supporting a strong inference of scienter.

### 1.  Optimistic Statements Regarding the Acquisition.

Before the Autonomy acquisition was completed, HP's executives made several optimistic statements about the transaction.  Léo Apotheker, who was then HP's chief executive, said HP was paying "a very fair price for Autonomy."  (Compl. ¶ 172.)  He said the price resulted from "a pretty rigorous process inside HP," including use of a "DCF-based model," which "identified five synergy possibilities."  (*Id.*)  Meg Whitman, who became HP's chief executive shortly before the deal closed, told investors (on her first day as chief executive) she thought the strategies and initiatives the Company disclosed on August 18 (which included the announcement of the

Autonomy acquisition) were "right" but that she would look into them more as chief executive. (*Id.* ¶ 177.) And Ray Lane, HP's chairman, chimed in that the Autonomy acquisition was at the "market price," and "we think we can build a heck of a business out of it." (*Id.* ¶¶ 177–78.)

These statements — expressing what is "fair" and "right," and about what executives "think" — are statements of opinion. *See Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1093 (1991) (statement that $42 would be a "fair price" was opinion); *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009) ("financially fair" was a statement of opinion).

To plead scienter for a statement of opinion, a plaintiff must plead facts showing the opinion was not "believed" or "sincerely held" by the person offering it. *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 882 & n.11, 883–84 (9th Cir. 2012) ("Plaintiff had not alleged any facts showing that Defendants 'believed' or 'knew' that their statements regarding partnership prospects and the clinical trial results were false"); *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1265 (N.D. Cal. 2000) (no liability unless "opinion was not sincerely held"). These facts would include, for example, evidence the speaker had contemporaneously expressed a contrary opinion or possessed information that refuted his publicly expressed opinion. *See Rubke*, 551 F.3d at 1162 (complaint failed to plead facts indicating that defendants "actually saw or assessed" "facts indicating [belief that] prior valuations were incorrect"); *Rigel*, 697 F.3d at 882 (allegations that defendants "should have had different expectations and beliefs" insufficient).

Plaintiff's complaint does not allege any facts showing Mr. Apotheker, Ms. Whitman, or Mr. Lane disbelieved the optimistic opinions they expressed. The complaint does not allege facts showing, for example, that they had elsewhere expressed contrary opinions, or that insiders had advised them that the price for Autonomy was not a "fair price" or "market price." Nor does the complaint allege facts showing these individuals did not believe that HP's process was "pretty rigorous" or that the initiatives HP undertook regarding Autonomy were "right." Indeed, the complaint does not allege anything about HP's valuation analysis that was not publicly disclosed. Plaintiff's complaint thus does not adequately plead that these statements were deliberately false when they were made.

This issue was addressed by the Ninth Circuit in *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001). *Ronconi* involved a corporate acquisition that the acquiring company's executives allegedly "knew" "was a failure" "almost from the start," but they "repeatedly lied to the market" to create the "false impression that the merger was going well." *Id*. at 428. The Ninth Circuit found these allegations did not show "the company's more optimistic predictions were known to be false or misleading at that time by the people who made them." *Id*. at 430. The court noted:

> That a pessimistic argument could have been made against the merger, and that had they known in September what they learned by the following May they would not have spoken so optimistically, does not raise a strong inference that defendants actually knew their forward-looking statements to investors were false or misleading when made.

*Id*. After all, "[h]onest optimism followed by disappointment is not the same as lying or misleading with deliberate recklessness." *Id*. at 432. Here, as in *Ronconi*, the complaint fails to plead scienter with regard to HP's pre-acquisition statements supporting the acquisition.

## 2. Statements About HP's Due Diligence Efforts.

Mr. Apotheker told investors that HP's due diligence review of Autonomy's business was "rigorous," "extremely tight and very professional." (Compl. ¶¶ 172, 176.) Plaintiff claims these statements were deliberately false.

According to plaintiff's complaint, HP's due diligence was "limited" to "publicly-reported financial statements and approximately 25 sales contracts." (*Id*. ¶ 34.) HP hired KPMG to assist in the due diligence process, but it was allegedly "only a 'limited engagement.'" (*Id*. ¶ 36.) Moreover, Autonomy's auditor (Deloitte) disclosed the existence of an earlier whistleblower and reported that its review "failed to discover any material improprieties," but "HP intentionally failed to independently run [the whistleblower's] allegations to ground." (*Id*. ¶ 39.) Plaintiff's complaint concludes: HP's due diligence was "severely reckless." (*Id*. ¶ 58.)

Saying HP's due diligence was "severely reckless," of course, is not the same thing as alleging specific facts showing Mr. Apotheker was "deliberately reckless." Plaintiff's complaint alleges no specific facts showing he knew his representations about HP's due diligence were false or deliberately disregarded any contrary information. The complaint does not allege that

Mr. Apotheker knew or must have known the extent or scope of KPMG's "limited engagement," that HP's diligence relied on financial statements audited by Deloitte without access to its underlying workpapers, or that anything about Deloitte's review of earlier whistleblower allegations was inadequate. Plaintiff's criticisms of HP's due diligence thus say nothing about Mr. Apotheker's mental state.

Besides, Mr. Apotheker didn't just say that HP's due diligence was "extremely tight and very professional." He went on to explain what he meant. For example, Mr. Apotheker explained that HP relied on Autonomy's audited financial statements: "they're being audited on very professional standards . . . that's the basis of our due diligence." (Compl. ¶ 41.)

Plaintiff's complaint also fails to allege Mr. Apotheker had any frame of reference from which to conclude that HP's due diligence was, as plaintiff alleges, "severely reckless." Scienter cannot be inferred unless a complaint pleads specific facts showing the speaker knew his company's due diligence fell dramatically below standards in the industry. *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 2013 WL 1174017, at *19 (S.D.N.Y. Mar. 22, 2013) (plaintiff "had not alleged that Kinross knew, or had reason to know, that it had done materially less homework than was customary"); *Schiller v. Physicians Res. Grp., Inc.*, 2002 WL 318441, at *11 (N.D. Tex. Feb. 26, 2002) (no inference of scienter where complaint did not "provide any specific facts that allege the level of due diligence accomplished on other acquisitions, which other acquisitions were completed without adequate due diligence, or which of the Individual Defendants participated or otherwise involved themselves in the due diligence process").

Plaintiff was required to allege that Mr. Apotheker deliberately and recklessly turned a blind eye to obvious deficiencies in HP's due diligence process — the equivalent of embarking on a "suicide mission." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 244 (3d Cir. 2004) (inadequate diligence did not give rise to inference of scienter); *Brogren v. Phohlad*, 933 F. Supp. 793, 800 (D. Minn. 1995) (flawed due diligence claim insufficient without allegations showing "why defendants would knowingly sabotage their company"). But the complaint does not allege

facts showing Mr. Apotheker knew HP's due diligence was allegedly "severely reckless." No strong inference of scienter can be drawn from the complaint's due diligence allegations.[4]

### 3. HP's Repetition of Autonomy's Financial Results.

Plaintiff alleges that Mr. Apotheker and Shane Robison, HP's head of strategy and technology, touted financial information originally issued by Autonomy. The complaint alleges, for example, that Mr. Apotheker referred to Autonomy's reported financial performance when he noted Autonomy had "a compound annual growth rate of approximately 55 percent and adjusted operating profit at a rate of approximately 83 percent." (Compl. ¶¶ 44, 163–64, 171–75.) The complaint adds that Mr. Robison repeated Autonomy's claim that "IDOL growth year on year is about 17%." (*Id.* ¶ 172.)

Plaintiff says HP "incorporated by reference" Autonomy's financial statements when Messrs. Apotheker and Robison repeated Autonomy's reported results. (*Id.* ¶¶ 44, 173.) But HP cannot be liable for repeating information about Autonomy's performance unless it knew the information was false. *See, e.g.*, *In re McKesson HBOC*, 126 Supp. 2d at 1276–77 (company is not liable for having "recapitulated HBOC's false financial data" unless executive who "recapitulated" information had knowledge of its falsity). And plaintiff fails to plead how, when, or by what means Messrs. Apotheker and Robison learned the truth about Autonomy's statements.

Plaintiff says that Messrs. Apotheker and Robison, as well as other HP executives, knew (or recklessly ignored) that Autonomy's financial results were fraudulent from supposed "red flags" — that is, negative comments from various bloggers, commentators, and analysts. (Compl. ¶¶ 15–25.) These "red flags" supposedly informed HP's executives — well before they agreed to pay $11 billion to acquire Autonomy — all about Autonomy's "accounting improprieties and overvaluation" and "aggressive accounting practices." (*Id.* ¶ 42.)

---

[4] Any inference of scienter is further undercut by the complaint's concession that HP retained two financial advisors and KPMG to assist with its due diligence. *See In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 996 (S.D. Ohio 2008) (no scienter for statement that company had conducted "extensive due diligence" where company had retained professionals to conduct it).

But the allegations do not bear this out. Plaintiff's cited "red flag" statements at most merely raise questions rather than offer answers. Plaintiff's complaint cites analysts who raised "troubling questions" or identified "questionable" accounting changes. (*Id.* ¶¶ 17–18.) It cites "critical" analyst reports which "queried" the appropriateness of Autonomy's revenue recognition policies. (*Id.* ¶¶ 20–21.) And it cites commentators who "aggressively question[ed]" Autonomy's financial reports, arguing they raised "more questions than answers" and seemed to "flatter the true picture." (*Id.* ¶¶ 22–23.)

There is a big difference between asking questions, even skeptically, and providing real concrete information about accounting fraud. True "red flags" — the kind necessary to support a "strong inference" of scienter — must be "in your face facts, that cry out, how could defendants have not known that the financial statements were false." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1103 (9th Cir. 2011) (quotations and brackets omitted). Red flags must show, for example, a "complacency" that is "willful" in the face of weekly reports, quarter after quarter, showing contemporaneous accounting violations. *In re VeriFone*, 704 F.3d at 705–06, 709. Thus, a strong inference of scienter does not arise unless a complaint points to "letters, notes, memos, telephone calls, or conversations" — specific and detailed facts — showing a defendant's awareness of accounting fraud. *Reiger v. PwC, LLP*, 117 F. Supp. 2d 1003, 1012 (S.D. Cal. 2000), *aff'd*, *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385 (9th Cir. 2002).

Plaintiff's allegations don't meet this exacting standard. Moreover, the reports and blogs plaintiff cites are more balanced than plaintiff lets on. For example, plaintiff's complaint extracts quotations from a January 2010 *Financial Times* article. (Compl. ¶ 21.) But the rest of the article says the "followers of the UK's largest software stock split into two camps," a "majority of bulls," and a "smaller but highly vocal camp of bears." (Ex. 10.) Similarly, plaintiff quotes extensively from reports by a noted "bear" named Paul Morland. (Compl. ¶¶ 17, 19–20, 22–23.) But, elsewhere in one of the reports, Mr. Morland wrote that Autonomy's record was "still pretty good" (Ex. 5 at 1) and later upgraded his investment rating, saying that Autonomy's software "gives it the opportunity to become a dominant global force." (Ex. 6 at 3.) Mr. Morland

emphasized that his various bearish reports on Autonomy were "not accusing Autonomy of fraud." (Ex. 12.)

News articles and analyst reports that merely note disagreements among investors do not support a strong inference of fraudulent intent. In *Ronconi*, the Ninth Circuit rejected similar hindsight allegations in concluding that "[t]he complaint fails to describe, chart or graph what sales actually did. Nor does the complaint identify any documents or facts suggesting that the defendants knew" their statements were false. 253 F.3d at 431.

These are precisely the kinds of detailed facts missing from plaintiff's "red flags" allegations. Plaintiff offers no descriptions, charts, graphs, documents, or any other facts from inside HP. Instead, plaintiff's complaint relies entirely on commentary from random bloggers, writers, and analysts outside HP — people with no knowledge about Autonomy's true financial picture, HP's acquisition analysis process, or the state of mind of HP's executives. Plaintiff's reliance on these unreliable secondary sources demonstrates the inadequacy of its complaint.

## 4. The "Whistleblowers" and "Confidential Witnesses."

Plaintiff's complaint says that statements by four "whistleblowers" or "confidential witnesses" establish that HP's executives knew about Autonomy's accounting fraud before the acquisition was completed. The statements do no such thing.

A complaint that relies on statements from confidential witnesses must "pass two hurdles" to satisfy the Reform Act — it must plead facts showing "the witnesses in question have personal knowledge of the events they report," and the witnesses' statements "must themselves be indicative of scienter." *Zucco*, 552 F.3d at 995. Confidential witness allegations do not support a strong inference of scienter if the witness's job responsibilities are not alleged, if the witness did not work for the defendant during the class period, if the witness lacks firsthand knowledge, or if the witness does not offer facts showing the defendants were exposed to information contradicting their public statements. *Id.* at 996–98.

Plaintiff's complaint does not clear either hurdle. The complaint does not plead identifying information about the witnesses that would show they were in a position to have

1    relevant and reliable personal knowledge, and the witnesses' statements as alleged do not indicate

2    that HP's executives possessed information contradicting their public statements.

3         Plaintiff's allegations about "Whistleblower No. 1" prove the point. "Whistleblower

4    No. 1" allegedly told Deloitte about unspecified "improper accounting" at Autonomy in 2010,

5    long before HP came on the scene. (Compl. ¶ 39.) Thus, during the due diligence process,

6    Deloitte allegedly informed HP of the witness's allegations, but assured HP that Deloitte's

7    "subsequent review had failed to discover any material improprieties." (*Id.*) The complaint does

8    not plead any facts giving rise to any inference that HP acted with scienter.

9         Plaintiff's allegations as to other "whistleblowers" suffer from similar flaws. The second

10   witness, whom plaintiff calls "Whistleblower No. 2" or "Joe Bloggs," allegedly sent an email to a

11   securities analyst with questions about Autonomy. (Compl. ¶¶ 47–48.) Mr. "Bloggs" did not

12   disclose any information about himself, and it is unknown whether he was ever an Autonomy

13   employee or had any personal knowledge of accounting improprieties. Moreover, plaintiff's

14   complaint does not allege that Mr. "Bloggs's" allegations were ever communicated to any HP

15   executive. *See Pittleman v. Impac Mortg. Holdings, Inc.*, 2008 WL 4809962, at *2 (C.D. Cal.

16   Oct. 6, 2008) ("statements made by anonymous bloggers are even less compelling and seem to be

17   nothing more than idle Internet speculation").

18        "Whistleblower No. 3," the stock analyst Paul Morland, allegedly sent HP's investor

19   relations department an email to "tell[] them they were making a big mistake." (Compl. ¶ 67.)

20   Plaintiff's complaint alleges no facts showing Mr. Morland had any personal knowledge, or other

21   basis for knowing, about accounting fraud at Autonomy. And the complaint offers no other

22   details about Mr. Morland's email — for all we know, Mr. Morland's email merely expressed

23   disagreement with HP's purchase decision. *See Zucco*, 552 F.3d at 998 (no inference of scienter

24   where confidential witness statements "demonstrate only that there was some disagreement");

25   *Metzler*, 540 F.3d at 1069 (no scienter where witnesses "point only to disagreement and

26   questioning"). Indeed, as already noted, Mr. Morland said elsewhere that he was "not accusing

27   Autonomy of fraud." (Ex. 12.) As if that were not enough, the complaint does not allege that Mr.

28

Morland's email was sent to any of the HP executives responsible for making statements on the company's behalf.

Finally, plaintiff's complaint contains several paragraphs concerning allegations made by a witness plaintiff calls "Confidential Witness No. 1." Unlike the other witnesses, plaintiff's allegations about "Confidential Witness No. 1" offer several details regarding the witness's identity and some specifics about Autonomy's accounting fraud. (Compl. ¶¶ 50–56.) But "Confidential Witness No. 1" never communicated his views and information to anyone at HP. Indeed, as far as can be determined, "Confidential Witness No. 1" never shared his information with anyone, anywhere, until plaintiff's complaint was filed. Moreover, "Confidential Witness No. 1" allegedly left Autonomy in July 2011 (a month before the class period begins), so he has no personal knowledge about the mental state of HP's executives during the class period. (*Id.* ¶ 50.)

### 5. Mr. Lane's Inquiry Regarding Ending the Acquisition.

Plaintiff alleges that Mr. Lane "asked HP's financial advisers (Barclays and Parella) whether HP could back out of the deal before it closed." (Compl. ¶ 73.) Plaintiff claims this shows Mr. Lane (along with Ms. Whitman and Ms. Lesjak) "recklessly disregarded, and/or turned a blind eye to, Autonomy's overvaluation and impairments." (*Id.*)

This allegation does not support a "strong inference" of scienter. The complaint alleges no facts about Mr. Lane's supposed inquiry — when it occurred, who was involved, what was said, or that it had anything to do with Autonomy's accounting. *See In re The Vantive*, 283 F.3d at 1087–92 (9th Cir. 2001) (complaint must plead "adequate corroborating details" and the "sources" of its allegations). And it pleads no facts showing Mr. Lane had any reason, or motive, to get HP out of the transaction.

Instead, plaintiff offers a confusing (and inaccurate) dissertation on provisions of the U.K. Takeover Code, mixed with a discussion of the transaction's "material adverse change" provision. (Compl. ¶¶ 69–72.) Plaintiff's dissertation conflicts with both the then-applicable provisions of U.K. Takeover Code Rule 13.4, which allows an offeror to withdraw its offer if changed circumstances are "of material significance" (Ex. 14), and the terms of HP's agreement with

Autonomy, which allowed HP to cancel the transaction upon discovery of any "misrepresentation of fact" or any failure to disclose "a fact necessary to make the information" provided by Autonomy not misleading (Ex. 1 at 39). None of these provisions provides support for any inference that Mr. Lane intended to defraud investors or acted with deliberate recklessness regarding the accuracy of his pre-acquisition statements.[5]

### 6. The Briody Wage Claim.

Four days before the Autonomy acquisition was completed, a former Autonomy employee, Virginia Briody, filed a $96,000 wage claim with the New Hampshire Department of Labor. (Compl. ¶¶ 62–66, 97, 167.) Plaintiff's complaint does not allege any facts showing that HP executives learned about this claim before the acquisition of Autonomy was completed, or that a claim for $96,000 should have been a "red flag" for HP's executives. *See In re Connetics Corp. Sec. Litig.,* 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (scienter allegations inadequate where complaint is not accompanied by "independent investigation into the facts alleged"). Nor does plaintiff plead that HP had any opportunity to investigate the claim before the transaction closed.

Plaintiff's complaint thus alleges no specific facts showing any HP executive concluded, based on Ms. Briody's allegations, that HP's optimistic statements about the acquisition were false or misleading.

### B. The Complaint Does Not Adequately Plead HP's Scienter for Statements Made After the Transaction Closed.

Plaintiff's complaint shifts focus for the period following HP's completion of the Autonomy acquisition on October 3, 2011. The pre-acquisition period focuses on the

---

[5] Similarly, no inference of scienter arises from the allegation that HP's chief financial officer, Ms. Lesjak, allegedly expressed opposition to the transaction at an HP board meeting. (Compl. ¶¶ 32, 34.) The complaint does not allege that her opposition had anything to do with Autonomy's accounting fraud; indeed, the complaint alleges that she thought the deal was "too expensive." (*Id.* ¶ 32.) That senior executives do not always see eye-to-eye is no basis for finding scienter. *Hanrahan v. Hewlett-Packard Co.*, 2006 WL 1699573, at *4–5 (N.D. Cal. June 16, 2006) (disagreement about merits of merger did not support claim).

acquisition's price, merits, rationale, and HP's due diligence process. The post-closing period, by contrast, largely involves HP's financial statements.

Plaintiff's complaint alleges that, after the transaction closed, HP "continued" Autonomy's revenue recognition fraud for nearly a year, and also refused to write down the goodwill and intangible assets booked on its balance sheet as a result of the Autonomy acquisition. (Compl. ¶¶ 135–36, 139–41.) But plaintiff's complaint offers no support for plaintiff's claim that HP's executives approved financial statements, and signed certifications vouching for their accuracy, while knowing (or recklessly disregarding) that HP purportedly had adopted and continued Autonomy's improper revenue recognition practices. Nor does the complaint allege any facts showing HP's executives knowingly or recklessly refused to write down allegedly inflated goodwill and intangible asset values on its balance sheets.

### 1.    HP's Reported Software Revenue.

Plaintiff contends that, after the acquisition, HP knowingly or recklessly "continued" Autonomy's improper revenue recognition practices. (*See, e.g.*, Compl. ¶¶ 135–37, 139, 143, 145.) HP allegedly did this by recognizing revenue even though the end user had not committed to the purchase, recognizing hardware sales as software license revenues, and taking up-front revenue for hosting arrangements which should have been recognized over time. (*Id.* ¶¶ 135–36.)

Plaintiff, however, does not allege that the HP executives who made the challenged statements knew of these purported practices.[6] To allege scienter for revenue recognition fraud, a plaintiff must plead detailed facts supporting an inference that HP's executives "knowingly and recklessly engaged in an improper accounting practice." *Metzler*, 540 F.3d at 1068–69; *see also Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 889 (N.D. Cal. 2008) ("to plead fraudulent intent based on [alleged] GAAP violations, plaintiffs must allege facts showing that: (1) specific accounting decisions were improper; and (2) the defendants knew specific facts at the time that rendered their accounting determinations fraudulent") (quotation marks omitted).

---

[6] We show in Part II.B.1 below, that plaintiff pleads no facts substantiating these allegations.

For example, the Ninth Circuit recently upheld scienter allegations in an accounting fraud case because the complaint cited to multiple internal emails written by the company's chief executive and chief financial officer directing others to make unsupported and improper accounting adjustments to achieve pre-announced financial targets. *In re VeriFone*, 704 F.3d at 705, 708, 710. And the Ninth Circuit earlier approved scienter allegations where several confidential witnesses provided accounts that demonstrated the defendants "personally directed" the allegedly improper recognition of revenue. *In re Daou*, 411 F.3d at 1023. Nothing like that is alleged here.

Instead, the complaint makes only general allegations that HP's "Worldwide Director of Software Revenue Recognition" undertook "detailed studies of Autonomy's software revenue recognition practices." It also alleges that HP's independent auditors at Ernst & Young reviewed "Deloitte's Autonomy audit work papers in connection with its year-end audit." (Compl. ¶ 75; *see also id.* ¶¶ 139, 179, 183.) But the complaint provides no details about these "studies" and "reviews." It does not allege what they involved or what conclusions were reached, much less whether any improper revenue recognition was discovered. *In re The Vantive*, 283 F.3d at 1087–88 (complaint dismissed where plaintiffs "failed to cite to any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports"). Nor does the complaint allege that the results of these supposed studies and reviews were ever communicated to the HP executives responsible for making statements to the investing public.

The complaint also suggests that scienter may be inferred from HP's decision to terminate Michael Lynch, Autonomy's former chief executive, in May 2012. (Compl. ¶¶ 80, 195.) Plaintiff says the true reason Mr. Lynch was terminated is because Ms. Whitman (HP's current chief executive) and Ms. Lesjak (HP's chief financial officer) had discovered the truth about Autonomy's revenue recognition practices *before* a "whistleblower" came forward. (*Id.*) But plaintiff pleads no facts to support this charge, instead alleging only that HP began to investigate a "whistleblower's" claims of accounting fraud by Autonomy. *See Zucco*, 552 F.3d at 1002 (claim that resignation of certain employees established company's knowledge of employees' role

in fraud was not compelling and did not overcome competing inference that employees resigned or were terminated for unrelated reasons).[7]

Plaintiff's complaint is missing the key ingredients found in cases upholding scienter allegations for revenue recognition fraud. It alleges no internal emails about baseless or fraudulent accounting entries, no disputes with finance staff or independent auditors, no internal reports contradicting the company's reported revenues, no acknowledgement of improper accounting, and no internal witnesses claiming HP's executives had knowledge of any fraud.

The complaint also ignores a key problem — HP has not restated its post-acquisition financial reports, which received unqualified audit opinions. (*See* Ex. 2 at 72, 73; Ex. 3 at 75, 76.) This means HP's internal accounting staff, internal auditors, and independent auditors at Ernst & Young have all concluded that HP's financial reports did not contain any material accounting errors. HP's executives were entitled to rely on these professionals and experts in concluding that HP's financial statements were accurate and not misleading. *See Metzler*, 540 F.3d at 1069 (no scienter where external auditors did not "counsel[] against" revenue recognition); *Zucco*, 552 F.3d at 997 n.5 (absence of restatement undercut inference of scienter); *Lapiner v. Camtek, Ltd.*, 2011 U.S. Dist. LEXIS 9985, at *28 (N.D. Cal. Feb. 2, 2011) ("[w]eighing against an inference of scienter [is] . . . the absence . . . of any allegation that defendants have restated their financials"); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1157–58 (C.D. Cal. 2007) ("unqualified opinion 'highly probative' of an absence of scienter"). HP's executives were not "deliberately reckless" in relying on these professionals.

Plaintiff's complaint thus offers no factual basis for inferring that HP's executives either knew, or were deliberately reckless in not learning, that HP purportedly had adopted and continued Autonomy's improper revenue recognition practices.

---

[7] Plaintiff alleges that Ms. Whitman and Ms. Lesjak signed false Sarbanes-Oxley certifications, but this allegation does not support any inference of scienter. (Compl. ¶¶ 127, 179–80, 187); *see Zucco*, 552 F.3d at 1004 ("'Sarbanes-Oxley certifications are not sufficient, without more, to raise a strong inference of scienter'") (quoting *Glazer*, 549 F.3d at 747–48).

### 2. HP's Reported Goodwill and Intangible Assets.

HP recorded additions to the goodwill and intangible assets on its balance sheet as a result of the Autonomy acquisition. (Compl. ¶¶ 140, 142, 180.) HP wrote down the values of these assets in November 2012. (*Id.* ¶ 84.) Plaintiff alleges HP "recklessly failed to consider the impairment of the $6.8 billion of goodwill and $4.6 billion of purchased intangible assets" at some earlier point in time. (*Id.* ¶ 140.)

Goodwill is an asset whose value is an estimate of "[t]he excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities." *Intangibles—Goodwill and Other (Topic 350)*, Financial Accounting Standards Codification, § 350-20-35-14 (Fin. Accounting Standards Bd. 2011) (Ex. 13). Purchased intangible assets are assets, like software code, intellectual property, and customer relationships, whose value cannot be readily determined according to the market. *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 108 n.1 (2d Cir. 2011). Accounting rules obligate companies to evaluate goodwill annually, and on an intra-year basis "if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." (Compl. ¶ 131; Ex. 13 at § 350-20-35-30.) An impairment charge must be taken when recorded goodwill exceeds the implied fair value of that goodwill for the relevant reporting unit. (Ex. 13 at § 350-20-35-11.)

Because they are based on estimates and are not "objectively determinable," goodwill and intangible asset values are statements of opinion. *Fait*, 655 F.3d at 110 ("allegations regarding goodwill do not involve misrepresentations or omissions of material fact, but rather a misstatement regarding [defendants'] opinion," because "estimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact").

Accordingly, to plead scienter for statements about the value of goodwill and intangible assets on HP's balance sheet, plaintiff was required to allege specific facts showing HP's executives "did not believe the statements regarding goodwill [and intangible assets] at the time they made them." *City of Omaha, Neb. Civilian Emps. Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012) (complaint dismissed for failure to show statements about goodwill were not

believed).  Plaintiff pleads no facts showing that any responsible HP executive did not actually "believe that these estimates and assumptions [were] reasonable under the circumstances."  (Ex. 2 at 27.)  While defendant Lynch is alleged to have known about Autonomy's pre-acquisition fraud, he is not alleged to have had any role in HP's post-acquisition accounting, let alone any role in making any of the statements on behalf of HP that plaintiff puts at issue.

Plaintiff asserts that Ms. Whitman and Ms. Lesjak knew or recklessly disregarded that HP's goodwill and intangible assets were overstated, "because they participated in a quarterly meeting with HP/Autonomy's executives to examine HP/Autonomy's financial results." (Compl. ¶ 183.)  But plaintiff does not allege anything about this "quarterly meeting."  Plaintiff's complaint does not describe what topics were discussed, what conclusions were reached, or what was learned about HP's goodwill and intangible asset values.  *See In re The Vantive*, 283 F.3d at 1087–88 (complaint must allege "adequate corroborating details" about information communicated in meetings); *In re Daou*, 411 F.3d at 1022 ("[g]eneral allegations of defendants' . . . attendance at meetings . . . are insufficient").

At bottom, plaintiff's complaint seems to allege nothing more than this:  because HP later wrote down its goodwill and intangible assets by large amounts in November 2012, HP's executives who made this judgment must have realized, sometime earlier, that an interim impairment adjustment was required.  But the Second Circuit recently rejected this exact argument:  "a large impairment charge [of $14 billion] in October 2008 does not explain that CBS should have known that an impairment test was necessary in early 2008, particularly when an impairment test had just been conducted in the fourth quarter of 2007."  *City of Omaha*, 679 F.3d at 69 & n.6.

That logic applies with equal force here.  HP conducted its annual impairment analysis in late 2011, shortly after the Autonomy merger closed, and informed investors that, as a matter of practice, it would review its assets for possible impairment once a year.  (Compl. ¶ 144; Ex. 2 at 43 ("[w]e will continue to evaluate goodwill and indefinite-lived intangibles on an annual basis as of the beginning of our fourth fiscal quarter or whenever events, changes in circumstances or changes in management business strategy indicate that there may be a potential indicator of

impairment").  Plaintiff's complaint alleges no facts showing HP's executives knew the values of HP's goodwill and intangible assets were impaired at some point before November 2012, when impairment charges were recorded.

### 3.    "Whistleblower No. 4" and the PwC Internal Investigation.

In May 2012, "a senior member of Autonomy's leadership team" — whom plaintiff calls "Whistleblower No. 4" — allegedly "raised serious accounting improprieties" to HP's executive team.  (Comp. ¶ 80.)  Plaintiff's complaint does not provide any more details.  Plaintiff says this bare allegation meets its burden of creating a "strong inference" of scienter.

To the contrary, HP responded to "Whistleblower No. 4's" allegations by launching a thorough, professional investigation.  (*Id.*)  Commencing an internal investigation, of course, undercuts, rather than supports, any inference of fraudulent intent.  As this Court has recognized, "taking time to investigate a situation prior to disclosing the situation to the investing public is not fraudulent."  *In re Yahoo! Inc. Sec. Litig.*, 2012 WL 3282819, at *22 (N.D. Cal. Aug. 10, 2012); *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 777 (2d Cir. 2010) ("[o]rdering an investigation as soon as they learned" of accounting problem was the "'prudent course of action that weakens rather than strengthens an inference of scienter'") (quoting *Horizon Asset Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 763 (8th Cir. 2009)).

Plaintiff's theory seems to be that anytime someone makes allegations, everyone who learns about those allegations has knowledge of fraud.  That is not the law.  "Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention.  [Defendants] might more plausibly have been accused of deceiving investors had managers called a press conference before completing the steps necessary to determine just what had happened."  *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 760–61 (7th Cir. 2007); *accord In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d 21, 31 (1st Cir. 2012) (no scienter where company investigated before disclosing problems).

HP was entitled to take the time to get things right.  PwC conducted an investigation, and PwC's findings were disclosed.  These facts do not support a strong inference that HP's executives knew, or were deliberately reckless about, the accuracy of HP's disclosures.

### 4. Lynch's State of Mind is Not Imputed to HP.

Finally, Lynch's knowledge cannot be somehow "imputed" to HP for purposes of pleading scienter, as plaintiff suggests it should be. (*See* Compl. ¶ 109.) While plaintiff alleges that Lynch became an HP executive vice president after the acquisition, plaintiff does not allege that Lynch made any of the challenged statements. As explained above, there can be no corporate scienter absent scienter on the part of "those individuals who actually made the false statements." *Glazer,* 549 F.3d at 745. Lynch's knowledge and intent is therefore irrelevant to the claims against HP. *See id.* (the "mere fact that someone at [the company] had knowledge of the illegal transactions is not sufficient to satisfy the scienter pleading requirements of the PSLRA").

### C. Plaintiff's Scienter Allegations, Considered "Holistically," Do Not Support a Strong Inference of Scienter.

Scienter allegations should not just be analyzed in isolation. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324 (2011). A court must also consider a complaint's scienter allegations "holistically" to determine "whether they combine to create a strong inference of intentional conduct or deliberate recklessness." *In re VeriFone*, 704 F.3d at 702–03; *Zucco*, 552 F.3d at 992 ("we will conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second . . . we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness").

Plaintiff's "holistic" scienter theory is that HP's executives "recklessly disregarded, and/or turned a blind eye to, Autonomy's overvaluation and impairments, [then] reluctantly allowed the Autonomy Acquisition to close, and resolved to try to quietly clean up the HP/Autonomy debacle internally" after the transaction was completed. (Compl. ¶ 73; *see also* ¶ 77 (after the acquisition, HP began "a gradual wind-down of Autonomy's improper accounting practices").)

But plaintiff's hodgepodge of "red flags," bloggers, "whistleblowers," and "confidential witnesses" do not combine to support this theory. According to plaintiff's theory, HP's executives proceeded with an $11 billion transaction, and touted it to investors, while knowing

about (or recklessly closing their eyes to) Autonomy's accounting fraud. That makes no sense. Proceeding with the transaction suggests honest optimism for the future, not recklessness or intentional fraud (whereas proceeding with a knowingly–doomed transaction would be a silly and extremely short-sighted executive strategy). Similarly, HP's decision to hire two investment banks and KPMG to conduct due diligence suggests a desire to get the truth about Autonomy, not consciously disregard its problems. And the fact that all these professional firms (along with Deloitte, Autonomy's auditors) failed to discover Autonomy's accounting problems strengthens the conclusion that HP's executives also were unaware of them.

According to plaintiff's theory, HP's executives decided to "continue" Autonomy's fraudulent accounting practices for a while after the acquisition, then changed their minds and decided to disclose them. That makes no sense either. After all, HP's executives reported disappointing software revenues and margins in the quarters immediately following the acquisition. That suggests a willingness to deliver bad news rather than a scheme to conceal the acquisition's shortcomings. Similarly, the executives' decision, in November 2012, to disclose Autonomy's accounting fraud and write down HP's goodwill and intangible assets likewise shows a willingness to disclose Autonomy's problems rather than conceal them. *See In re Rigel*, 697 F.3d at 883–85 ("if the individual defendants were acting based on their belief that they had a financial motive to conceal the 'true' results of the clinical trial, they would not have voluntarily publicly disclosed all the data and the statistical methodology"). And the fact that HP's finance and accounting staffs, and HP's independent auditors, saw no reason to restate HP's post-acquisition financial reports strengthens the conclusion that HP's executives did not knowingly or recklessly make false disclosures after the acquisition.

For the same reason, the decision to engage PwC to conduct an investigation into the allegations made by "Whistleblower No. 4" shows a desire to find out the truth, not hide it. Plaintiff says HP waited too long to disclose the investigation, but the complaint pleads no facts about how the investigation was conducted, what was discovered, who discovered it, how it was discovered, or when it was discovered. Nothing about the investigation supports plaintiff's theory that HP's executives intended to conceal Autonomy's false accounting.

Plaintiff's theory is further undermined by its failure to offer some reason why executives would attempt to conceal bad news. Most often, that reason is money. Plaintiffs typically allege that bad news was concealed so insiders could sell their stock before the bad news was made public. But plaintiff's complaint alleges no stock sales by any HP executive. *See Coble v. Broadvision, Inc.*, 2002 WL 31093589, at *4 (N.D. Cal. Sept. 11, 2002) (complaint did not "proffer any theory as to why defendants would make these false statements if they did not personally profit from them").

In the end, plaintiff's "holistic" scienter theory must be weighed and found to be at least as "compelling" as the competing proposition — that Autonomy hid its problems from HP so Autonomy's insiders could "cash out of Autonomy before it collapsed under the weight of its own fraud." (Compl. ¶ 6.) *See Zucco*, 552 F.3d at 991 (court must "compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference").

The lack of specific facts in plaintiff's complaint makes this an easy task. The most compelling inference is also the most simple and obvious one, and also the one most clearly supported by the pleaded facts — HP's executives (along with their advisors) were duped into buying a company that was not what Autonomy's managers claimed it was, and it took time for HP to figure it out and disclose the truth to investors. The Court should therefore find that plaintiff's scienter allegations do not meet the Reform Act's heightened pleading requirements.

## II. THE COMPLAINT DOES NOT ALLEGE FACTS SHOWING HP'S STATEMENTS WERE FALSE WHEN MADE.

The Reform Act says a section 10(b) claim's "falsity" allegations must be pleaded with particularity. A complaint must "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *Metzler*, 540 F.3d at 1070 (quoting 15 U.S.C. § 78u-4(b)(1)).

1    This means, among other things, that a complaint must include the "who, what, when,
2    where, and how" of the alleged fraud.  *Silicon Graphics*, 183 F.3d at 998.  It must also describe
3    the "contemporaneous statements or conditions" that are "inconsistent" with the allegedly false
4    statements.  *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003); *In re GlenFed, Inc. Sec.*
5    *Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (there is "no reason to assume that what is true at the
6    moment plaintiff discovers it was also true at the moment of the alleged misrepresentation").

7        Plaintiff's task, then, was not only to make a list of statements it claims were false or
8    misleading.  Plaintiff also was required to set forth, in "great detail," contemporaneous facts
9    showing "why" each statement was false at the time it was made.  Plaintiff's complaint falls far
10   short of this standard.  It lists many statements it says were false, but hardly offers any alleged
11   "facts" to show "why."  We address each group of "falsity" allegations in turn.

12   **A.     The Complaint Does Not Adequately Plead the Falsity of HP's Statements**
13   **         Made Before the Transaction Closed.**

14       Plaintiff's complaint lists a large number of statements, made by HP's executives before
15   the Autonomy acquisition was completed, that supposedly were "qualitatively materially false
16   and misleading."  (Compl. ¶¶ 163–64, 168–72, 174–78.)  Most of these statements simply
17   repeated information provided by Autonomy.  Thus, HP summarized Autonomy's reported
18   financial performance (*id.* ¶¶ 163–64), repeated Autonomy's claim to be the "de facto standard"
19   for searching unstructured data with 400 OEM customers (*id.* ¶¶ 168–69), and cited to
20   Autonomy's reported high margins and rapid growth (*id.* ¶¶ 171, 174).  As shown above in Part
21   I.A, HP's executives did not know at the time that Autonomy had made any misrepresentations.

22       HP's only other pre-acquisition statements concerned its reasons for the deal and its due
23   diligence process.  (*See* Compl. ¶¶ 172, 174, 176–78.)  For example, Mr. Apotheker allegedly told
24   securities analysts that HP decided to acquire Autonomy because HP had "identified five synergy
25   possibilities" and felt it was paying "a very fair price for Autonomy."  (*Id.* ¶ 172.)  Similarly,
26   Mr. Robison allegedly told analysts that Autonomy's business was "growing nicely and will
27   continue."  (*Id.* ¶ 174.)  And Mr. Lane allegedly told a reporter that the acquisition "was market
28   price."  (*Id.* ¶ 178.)

Plaintiff's complaint does not allege any facts showing these statements were false. Statements about "synergies," continued business "growth," and "market price" are all statements of opinion. Plaintiff does not allege any facts showing these opinions were not actually held by Messrs. Apotheker, Robison, or Lane at the time they were expressed. *Rubke*, 551 F.3d at 1162 (dismissing claim because "[c]omplaint must allege with particularity that . . . directors and officers believed the Exchange Offer was unfair"); *see also In re McKesson*, 126 F. Supp. 2d at 1265 ("an opinion is only false if the speaker does not in fact hold that opinion").

In the same vein, plaintiff's complaint does not plead specific facts showing HP's due diligence process was misrepresented to investors. Mr. Apotheker told HP's shareholders that HP's due diligence process was "rigorous," "extremely tight and very professional." (Compl. ¶¶ 172, 176.) Plaintiff says these statements were false because HP completed its due diligence in three weeks, did not review Deloitte's work papers, and did not independently investigate Deloitte's assurances that a prior whistleblower's allegations did not involve any "material improprieties."[8] (Compl. ¶¶ 173, 176.)

But plaintiff's allegations don't explain why Mr. Apotheker's assurances were false. Plaintiff's complaint pleads no facts showing why a three-week due diligence process could not be "rigorous," "tight," or "professional." Nor does plaintiff allege any facts showing HP needed to go beyond Deloitte's audited financial statements and examine its underlying workpapers in order to complete a "rigorous" or "professional" due diligence review. Similarly, plaintiff alleges no facts showing that HP's reliance on Deloitte's assurances that its investigation turned up no material improprieties was somehow less than "rigorous" or "professional."

Plaintiff seems to be arguing from a conclusion — HP's due diligence did not discover Autonomy's defects; therefore, HP's due diligence efforts were not "rigorous" or "professional."

---

[8] Plaintiff's allegations are insufficient for the additional reason that they are based on an uncorroborated media report that relies on unidentified sources. The complaint does not allege any independent investigation of the statements regarding HP's due diligence that are contained in that report. In similar circumstances, courts have refused to credit allegations based on such sources. *See, e.g.*, *In re McKesson HBOC*, 126 F. Supp. 2d at 1272 ("[c]onclusory allegations of wrongdoing are no more sufficient if they came from a newspaper article than from plaintiff's counsel").

But plaintiff pleads no facts to back up this conclusion. *See NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, 2012 WL 3191860, at \*19 (S.D.N.Y. Feb. 9, 2012) ("[t]he fact that a due diligence investigation turned out to reach results that ultimately proved to be incorrect does not mean that a statement by a company that it had performed extensive due diligence was false at the time it was made").

Furthermore, Mr. Apotheker's descriptions of HP's diligence process as being "rigorous" and "professional" conveyed very little concrete information to investors. Courts routinely conclude that conclusory statements of this sort cannot be false or misleading. *See, e.g., Kinross Gold Corp.*, 2013 WL 1174017, at \*16 (descriptions of due diligence process as "exhaustive" and "very detailed and in-depth" "do not rise to the level of an actionable misstatement . . . . They are puffery"); *see also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("[w]hen valuing corporations, however, investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel-good monikers"); *Philco Inv., Ltd. v. Martin*, 2011 WL 4595247 (N.D. Cal. Oct. 4, 2011) (statements like "'tremendous value' and 'important investment' are general and mere puffery").

Finally, plaintiff's complaint cites to statements made by Ms. Whitman on the day she was named as HP's new chief executive, but it does not allege any facts showing Ms. Whitman's statements were false. Ms. Whitman allegedly said she was "supportive" of the Autonomy acquisition and thought the strategies announced on August 18 were "right," although she also said that, as chief executive, she would "step back and take a hard look at this," and would "dive in and have a more informed [] view" in the future. (Compl. ¶ 177.)

Plaintiff says these statements were misleading because they did not disclose Mr. Lane's inquiries to HP's investment bankers about allegedly backing out of the transaction. (*Id.*; *see also id.* ¶ 73.) This allegation, without more, does not contradict Ms. Whitman's claims to be "supportive" of the acquisition and the "strategy" behind it. Ms. Whitman's general and optimistic statements conveyed her sincerely held opinion at the time; the claim that Mr. Lane allegedly considered other options does not show Ms. Whitman's description of her views was

false or misleading.  *See Rubke*, 551 F.3d at 1162 (a complaint does not plead falsity of an opinion without specific allegations showing it was not subjectively believed by its speaker).

**B.     The Complaint Does Not Adequately Plead the Falsity of HP's Post-Acquisition Financial Statements and Disclosures.**

After the acquisition, HP reported revenues from its new Autonomy acquisition on its income statement and also recorded portions of the acquisition's value as goodwill and intangible assets on its balance sheet.  Plaintiff alleges HP knew these revenues and assets were wrong but, instead of fixing the problem, decided to continue Autonomy's improper practices.

Thus, plaintiff's complaint alleges without any factual support that, "[a]fter the Autonomy acquisition, HP's Software Segment, via Autonomy's operations, continued Autonomy's practices of improperly recognizing revenue."  (Compl. ¶ 135.)  The complaint also alleges that HP "failed to record an impairment loss for goodwill and purchased intangible assets in connection with the Autonomy acquisition," and "recklessly failed to consider the impairment . . . until November 2012."  (*Id*. ¶¶ 134, 140.)  These allegations do not plead falsity.

**1.     HP's Software Revenue Recognition.**

Plaintiff alleges that, after completion of its Autonomy acquisition, HP recognized revenue in violation of several generally accepted accounting rules.  According to plaintiff, HP "continued Autonomy's practices of improperly recognizing revenue" from (i) software licensing transactions where the end user was not obligated to purchase the software license, (ii) sales of hardware treated as software license revenue, and (iii) hosting arrangements treated as upfront software license revenue instead of revenue recognized over time.  (*Id*. ¶ 135.)  Plaintiff's complaint, however, offers no facts to back up these charges.

To allege improper revenue recognition, a plaintiff must describe the "basic detail[s]" of the improperly-recorded transactions.  These include:  "the approximate amount by which revenues and earnings were overstated; the products involved in the contingent transaction; the dates of any of the [improperly-recorded] transactions, or the identities of any of the [affected] customers or employees involved in the transactions."  *In re Daou*, 411 F.3d at 1016 (internal quotation marks and parentheticals omitted).  These detailed allegations must be accompanied by

"specific descriptions of how" the company "violated GAAP procedures and, in so doing, misled present and potential investors." *Id.* at 1020.

Plaintiff's complaint, however, offers no facts to support its charge of accounting impropriety. Instead, to support the claim of post-acquisition accounting fraud by HP, the complaint just cross-references allegations concerning Autonomy's pre-acquisition accounting fraud. (Compl. ¶ 179 (cross-referencing allegations at ¶¶ 165–167, 169, 175–76, 178).) There are no sources, support, or transactions identified for the alleged "overstatement" figures. (*Id.* ¶ 160.) Thus, plaintiff's theory is nothing stronger than "Autonomy did it, so HP must have continued doing it."

That logic does not hold up. The Reform Act's "falsity requirement is not satisfied by conclusory allegations that a company's class period statements regarding its financial well-being are *per se* false based on the plaintiff's allegations of fraud generally." *Metzler*, 540 F.3d at 1070. That rule applies with even more force where, as here, a complaint alleges that a fraudulent "practice continued into the Class Period but provides no specifics about why the practice is thought to have occurred during the Class Period." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999) (rejecting allegations that company continued alleged pre-class period practice of making phony sales); *In re Remec*, *Inc., Sec. Litig.,* 415 F. Supp. 2d 1106, 1118 (S.D. Cal. 2006) (transaction ten months before class period did not support claims regarding revenue recognition during class period).[9]

Plaintiff's own allegations, moreover, undercut its claim that HP continued Autonomy's improper revenue practices. After all, if HP had continued recognizing revenue as Autonomy did before the acquisition, one would have expected HP to have reported blockbuster software revenue results. But the complaint alleges an immediate and significant drop in HP's reported software revenue growth following the acquisition. Indeed, HP's software segment's revenue

_____

[9] Plaintiff's complaint only discusses one specific transaction — the one involved in the Briody wage claim. (Compl.¶¶ 62–67.) Plaintiff mistakenly alleges that this transaction was accounted for "a month after the Autonomy Acquisition closed." (*Id.* ¶ 65.) An email attached to the complaint, however, shows that the transaction and any related accounting really occurred a year before the acquisition. (Compl. Ex. 5.) Accounting fraud committed by Autonomy before it was acquired does not show the fraud continued on HP's watch.

grew at only half the pace at which it had grown prior to the acquisition — just the opposite of what analysts had predicted. (Compl. ¶ 77.)  The complaint also alleges a similar surprising drop in HP's post-acquisition software operating margins. (*Id*.)  If HP had "continued" Autonomy's improper practices, one would have expected to see large increases in HP's software margins. But, following the acquisition, HP reported software operating margins that were less than half of what Autonomy had reported previously, and even less than HP's historical average. (*Id*.)  HP's actual reported results are the opposite of what one would have seen had HP really "continued" Autonomy's revenue recognition practices.

The more plausible inference, based on HP's post-acquisition financial results, is that HP correctly recorded revenues from its new Autonomy business.  This inference is bolstered by the facts that HP's outside auditors issued unqualified audit opinions throughout the class period, including with respect to the fiscal year ending October 31, 2012 (*see* Ex. 3 at 75), and that HP never restated its post-acquisition software revenues. *See In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987–88 (N.D. Cal. 2007) ("in light of the unqualified opinions issued [by the outside auditor] . . . the complaint fails to raise a plausible inference that the financial statements were misstated"); *Tripp v. Indymac Fin. Inc.*, 2007 WL 4591930, at *5 (C.D. Cal. Nov. 29, 2007) ("[p]laintiffs must first show that there was a GAAP violation and, . . . [the company's] financials have been audited without restatement").

### 2.     HP's Goodwill and Intangible Assets.

HP recorded additional goodwill of $6.8 billion, and additional purchased intangible assets of $4.6 billion, as a result of the Autonomy acquisition. (Compl. ¶ 140.)

Plaintiff alleges HP waited too long to record impairment write-downs for the goodwill and intangible assets added to its balance sheet as a result of the Autonomy acquisition. (Compl. ¶¶ 7, 140, 142.)  Not recording the impairment sooner, the complaint alleges, means that HP's financial statements were false and misleading from the date of the acquisition until the impairment charges were taken in November 2012. (*Id*.)

Later accounting charges, of course, do not make earlier statements false.  As the Ninth Circuit has explained:

> The fact that an allegedly fraudulent statement and a later statement are different does not necessarily amount to an explanation as to why the earlier statement was false. For example, both the valuation of assets and the setting of loan loss reserves are based on flexible accounting concepts, which, when applied do not always (or perhaps ever) yield a single correct figure. In order to allege the circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and the later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood.

*In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc); *accord In re Remec, Inc., Sec. Litig.*, 388 F. Supp. 2d 1170, 1175 (S.D. Cal. 2005) (complaint alleged impairment "write-down should have been taken 'well before it did,'" but failed "to adequately explain the nature of the fraud with respect to goodwill impairment"); *In re ICN Pharm., Inc.*, 299 F. Supp. 2d 1055 at 1064–65 (C.D. Cal. 2004) (claim rejected because complaint did not "state specific facts relating to the specific communications that put [the company's] management on notice" of need to perform interim impairment analysis ); *In re Wet Seal*, *Inc., Sec. Litig.,* 518 F. Supp. 2d 1148, 1152 (C.D. Cal. 2007) (complaint must allege facts "showing *why* the charge was untimely").

HP's goodwill and intangible asset estimates are, as noted, statements of opinion. They are a matter of business judgment. HP disclosed that it used "independent third-party appraisal firms to assist us in determining the fair values of assets acquired and liabilities assumed," and that those "valuations require management to make significant estimates and assumptions, especially with respect to intangible assets." (Ex. 2 at 41.) HP also explained that its estimates "of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable." (*Id.*)

Accordingly, plaintiff was obligated to show that HP's goodwill and intangible asset valuations were both objectively wrong, under the applicable accounting rules, and also "subjectively false," meaning that the HP executives responsible for estimating them did not actually believe their estimates and valuations were correct. *See City of Omaha*, 679 F.3d at 67–69. Plaintiff's complaint does not contain any specific facts to support either kind of allegation. It does not adequately plead that HP's goodwill and intangible asset values were "objectively"

wrong during the class period, and it does not adequately allege that HP's executives understood their estimates and judgments were wrong.

At most, plaintiff's claim amounts to nothing more than the assertion that HP's executives should have acted more quickly to examine, and write down, HP's goodwill and intangible assets. That claim, even if it could be proved, would not establish that HP's earlier balance sheet valuations were incorrect. *See In re Wet Seal*, 518 F. Supp. 2d at 1160–62 (where "significant judgment is required in developing estimates of future cash flows to test a long-lived asset for recoverability . . . that [defendant's] cash flow estimates proved in hindsight to be too optimistic does not mean that the failure to take an impairment charge earlier was a violation of GAAP"); *In re ICN*, 299 F. Supp. 2d at 1065 ("delinquent write-down of the impaired assets, without anything more, does not state a claim of securities fraud, stating at best, a bad business decision").

### 3. "Whistleblower No. 4" and the PwC Internal Investigation.

Plaintiff alleges that "Whistleblower No. 4" made accusations about "serious accounting improprieties" in May 2012. Plaintiff argues that HP should have disclosed those accusations when they were received, instead of waiting until after PwC had thoroughly investigated the accusations. (Compl. ¶190.)

HP, of course, had no free-floating "affirmative duty to disclose any and all material information." *Matrixx*, 131 S. Ct. at 1321. Disclosure is required "only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Id.* at 1321–22 (quotations omitted). An omission must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *In re Rigel*, 697 F.3d at 881 n.10 (allegedly "omitted information did not contradict" challenged statements).

For this reason, HP had a duty to disclose "Whistleblower No. 4's" accusations only if disclosure was necessary to make some other statement not misleading. But HP made no affirmative representations between May 2012 and November 2012 about whistleblowers or internal investigations. The Ninth Circuit held recently in *Metzler* that the plaintiff was "unable to connect" the non-disclosure of a government investigation to "some affirmative statement or

omission . . . that suggested it was *not* under any regulatory scrutiny." *Metzler*, 540 F.3d at 1071. The same is true here. HP made no affirmative statement that falsely implied the absence of an internal investigation and thus did not make any misleading statement.

4.    **Status Updates Regarding Autonomy's Integration into HP's Existing Business.**

HP's executives gave periodic updates on the company's progress in integrating Autonomy into HP's existing software business. Early on, Ms. Whitman (HP's chief executive) told investors the Autonomy integration project was "priority number one, two and three for 2012." (Compl. ¶ 76.) Ms. Lesjak (HP's chief financial officer) said "[t]he integration is going well thus far." (*Id.* ¶¶ 76, 185.) Later on, Ms. Whitman and Ms. Lesjak candidly acknowledged problems with the Autonomy business. Ms. Whitman disclosed that "Autonomy had a very disappointing license revenue quarter," which she attributed to "classic entrepreneurial company scaling challenges." (*Id.* ¶ 191.) And, still later, Ms. Whitman told an interviewer she wanted to "make sure that [Autonomy] gets integrated into the rest of HP in a good way." (*Id.* ¶ 81.) Ms. Whitman also told investors that "Autonomy still requires a great deal of attention," and Ms. Lesjak added HP still had "a lot of work to do over the next several quarters to improve Autonomy's performance." (*Id.* ¶¶ 82, 200.)

Plaintiff claims all these statements were "qualitatively false" because they did not disclose "HP's aggressive work to unwind Autonomy's materially inflated revenue, profits, EPS, growth rate and margins." (*Id.* ¶ 186.) Plaintiff does not allege any facts, for example, showing the integration process was not Ms. Whitman's highest priority or was not "going well" so far. *See Kane v. Madge Networks N.V.*, 2000 WL 33208116, at *2 (N.D. Cal. May 26, 2000), *aff'd sub nom. Kane v. Zisapel*, 32 F. App'x 905 (9th Cir. 2002) (statements regarding "significant progress . . . in combining the two companies" and that acquisition was "fabulous" were "too vague to qualify as material misstatements of fact"). Nor does the complaint allege that later integration problems were not the result of "classic entrepreneurial company scaling challenges." (Compl. ¶ 172.) *See In re Tibco Software, Inc.*, 2006 WL 1469654, at *23–24 (N.D. Cal. May 25, 2006) (statements about the integration of software company unavailing).

Similarly, plaintiff's complaint does not allege facts showing Autonomy did not face "classic entrepreneurial company scaling challenges" or need "a great deal of attention," or that HP did not still have "a lot of work to do . . . to improve Autonomy's performance." (*Id.* ¶ 82.)

Plaintiff's theory is, at bottom, an omissions theory — HP said Autonomy was having problems and they were being addressed, but did not disclose HP was purportedly slowly working to "unwind" Autonomy's improper practices without disclosing it to investors. Plaintiff's complaint does not allege any specific facts to support this charge. *See Ronconi*, 253 F.3d at 431–32 (rejecting conclusory allegations that "consolidation . . . had not gone well" in light of "significant problems[,] . . . inefficiencies and cost excesses" following merger).

## CONCLUSION

Plaintiff's task was to plead scienter and falsity in the manners prescribed by the Reform Act and Ninth Circuit authority. This, plaintiff has not done. Plaintiff's complaint does not plead specific facts supporting a "compelling inference" that HP acted with fraudulent intent. Plaintiff's complaint also does not plead specific facts showing HP's pre-acquisition optimism and post-acquisition financial statements were materially false and misleading.

Plaintiff offers no motive, no conflicting internal documents, no HP witnesses, no accounting restatement, and no stock sales or other profits. Plaintiff gives no reason to reject the most obvious and compelling inference suggested by the facts: that Autonomy hid its problems from HP so that, as the complaint alleges, its owners could "cash out of Autonomy before it collapsed under the weight of its own fraud." (Compl. ¶ 6.)

Plaintiff's complaint thus does not meet the pleading requirements imposed by the Reform Act and Ninth Circuit authority. It should therefore be dismissed.

Dated: July 2, 2013                                  MORRISON & FOERSTER LLP


By:     */s/ Darryl P. Rains*
                                                    Darryl P. Rains
                                                    Attorneys for defendant
                                                    Hewlett-Packard Company

ECF ATTESTATION

I, Mark R.S. Foster, am the ECF User whose ID and Password are being used to file this:

HEWLETT-PACKARD COMPANY'S MOTION TO DISMISS
CONSOLIDATED COMPLAINT

In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that a Darryl P. Rains has concurred in this filing.


Dated:  July 2, 2013                              MORRISON & FOERSTER LLP


                                        By:    /s/ *Mark R.S. Foster*
                                              Mark R.S. Foster