KESSLER TOPAZ MELTZER
  & CHECK, LLP
RAMZI ABADOU (Bar No. 222567)
ELI R. GREENSTEIN (Bar No. 217945)
STACEY M. KAPLAN (Bar No. 241989)
PAUL A. BREUCOP (Bar No. 278807)
IOANA A. BROOKS (Bar No. 253123)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel:  (415) 400-3000
Fax:  (415) 400-3001
rabadou@ktmc.com
egreenstein@ktmc.com
skaplan@ktmc.com
pbreucop@ktmc.com
ibrooks@ktmc.com

*Counsel for Lead Plaintiff PGGM Vermogensbeheer B.V.*
*and Lead Counsel for the Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE HP SECURITIES LITIGATION,<br><br>This Document Relates To: All Actions | Master File No. C-12-5980 CRB<br><br>**<u>CLASS ACTION</u>**<br><br>**LEAD PLAINTIFF'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Date:   November 8, 2013<br>Time:  10:00 a.m.<br>Judge: Honorable Charles R. Breyer<br>Room: 6 - 17th Floor |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................... 6

      A.    New HP CEO Apotheker Promises to Quickly Transform HP ............................ 6

            1.    HP, Apotheker, Lane and Robison Conduct "Limited" Due
                  Diligence for Autonomy ............................................................................ 8

            2.    Apotheker and Lynch Announce the Offer in a Joint Press
                  Release ...................................................................................................... 9

      B.    Defendants Whitman and Lane Seek to Rescind the Offer ................................... 11

      C.    HP Attempts to Quietly Unwind Autonomy's Improper Accounting
            Practices ................................................................................................................ 12

      D.    A Senior HP/Autonomy Executive Thwarts Defendants' Efforts to
            Quietly Fix Autonomy ........................................................................................... 15

      E.    The Class Period Ends ........................................................................................... 16

III.  LEGAL STANDARDS ........................................................................................ 17

IV.   ARGUMENT ....................................................................................................... 20

      A.    Defendants' False and Misleading Class Period Statements Are
            Actionable ............................................................................................................. 20

            1.    Defendants Were Reckless in Not Knowing About
                  Autonomy's Possible Impairments ........................................................... 20

            2.    Apotheker's Due Diligence Statements Are Actionable .......................... 23

            3.    HP's Misrepresentations about HP's Autonomy Valuation
                  Are Actionable .......................................................................................... 27

            4.    Defendants' Due Diligence and Valuation
                  Misrepresentations Are Not Mere Statements of Corporate
                  Optimism ................................................................................................... 29

      B.    Defendants' Statements Are Not Protected by the PSLRA's "Safe
            Harbor" .................................................................................................................. 30

      C.    Defendants Failed to Disclose Material Information During the
            Class Period .......................................................................................................... 32

            1.    Whitman and Lane Failed to Disclose that They Tried to
                  Rescind the Offer While Simultaneously Making Positive
                  Statements About Autonomy ..................................................................... 32

            2.    Defendants Are Liable For Their February and March 2012
                  Misrepresentations .................................................................................... 35

        3.     Defendants' Post-May 2012 Statements Are Actionable By Omission ............................................................................38

D.    The Misconduct that HP Accused Lynch of Should Be Imputed to HP .................................................................................41

E.    Defendants' *Janus* Arguments Lack Merit....................................44

F.    HP/Autonomy's Goodwill Statements Were Materially False and Misleading When Made ...............................................46

G.    Additional Facts Pled in the Complaint Buttress Plaintiff's Scienter Allegations ..............................................................51

        1.     Plaintiff's Motive Allegations Are Cogent and Compelling....................51

        2.     Defendants Were "Hands-On" Managers ...........................52

        3.     HP's Autonomy-Related Purge Is Evidence of Scienter ..........................53

        4.     The Size of HP's Autonomy Write-Down Supports Scienter ..................53

H.    Plaintiff Has Adequately Alleged "Control Person" Liability ...............................54

V.     CONCLUSION ..............................................................................57

# TABLE OF AUTHORITIES

Page(s)

**CASES**

Aldridge v. A.T. Cross Corp.,
    284 F.3d 72 (1st Cir. 2002) ...................................................................... 49

Allstate Life Ins. Co. v. Robert W. Baird & Co., Inc.,
    2010 WL 4581242 (D. Ariz. 2010) ......................................................... 41

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) .................................................................................. 17

Batwin v. Occam Networks, Inc.,
    2008 U.S. Dist. LEXIS 52365 (C.D. Cal. 2008) ....................... 30, 51, 54

Berson v. Applied Signal Tech., Inc.,
    527 F.3d 982 (9th Cir. 2008) ............................................................. passim

Binder v. Gillespie,
    184 F.3d 1059 (9th Cir. 1999) .................................................................. 17

Brody v. Transitional Hosps. Corp.,
    280 F.3d 997 (9th Cir. 2002) .............................................................. 38, 39

Brogren v. Phohlad,
    933 F. Supp. 793 (D. Minn. 1995) ........................................................... 24

Burgess v. Premier Corp.,
    727 F.2d 826 (9th Cir. 1984) .................................................................... 55

Castaneda v. Saxon Mortg. Servs.,
    687 F. Supp. 2d 1191 (E.D. Cal. 2009) ............................................. 45, 51

Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.,
    2012 WL 685344 (N.D. Cal. 2012) ......................................................... 50

City of Austin Police Ret. Sys. v. Kinross Gold Corp.,
    2013 WL 1174017 (S.D.N.Y. 2013) .................................................. 23, 29

City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012) ..................................................... 44

City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) .................................................. 39

Coble v. Broadvision, Inc.,
    2002 WL 31093589 (N.D. Cal. 2002) ............................................... 25, 51

*Commc'ns. Workers of Am. Plan for Emps. Pensions & Death Benefits v. CSK Auto Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) ................................................................17

*Curry v. Hansen Med., Inc.*,
    2012 U.S. Dist. LEXIS 112449 (N.D. Cal. 2012) ....................................2, 42

*Desaigoudar v. Meyercord*,
    223 F.3d 1020 (9th Cir. 2000) ..........................................................................18

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    847 F. Supp. 2d 624 (S.D.N.Y. 2012) ............................................................32

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ..........................................................................................18

*Durgin v. Mon*,
    659 F. Supp. 2d 1240 (S.D. Fla. 2009) ..........................................................23

*Fait v. Regions Fin. Corp.*
    655 F.3d 105 (2d Cir. 2011) ............................................................................49

*Frank v. Dana Corp.*,
    646 F.3d 954 (6th Cir. 2011) ..........................................................................19

*Freedman v. Value Health, Inc.*,
    958 F. Supp. 745 (D. Conn. 1997) ..................................................................25

*Freidus v. Barclays Bank PLC*,
    2013 U.S. App. LEXIS 17159 (2d Cir. 2013) ................................................49

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..............................................................5

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ....................................................................41, 42

*Gompper v. VISX, Inc.*,
    298 F.3d 893 (9th Cir. 2002) ..........................................................................49

*Griffin v. McNiff*,
    744 F. Supp. 1237 (S.D.N.Y. 1990) ................................................................23

*GSC Partners CDO Fund v. Washington*,
    368 F.3d 228 (3d Cir. 2004) ............................................................................24

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ..........................................................................51

*Hanrahan v. Hewlett-Packard Co.*,
    2006 WL 1699573 (N.D. Cal. 2006) ..............................................................28

*Hawaii Ironworkers Annuity Trust Fund v. Cole*,
   2011 U.S. Dist. LEXIS 98769 (N.D. Ohio 2011)....................................44, 45

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ...........................................................20, 50, 40

*Horizon Asset Mgmt. v. H&R Block, Inc.*,
   580 F.3d 755 (8th Cir. 2009) ...................................................................50

*Howard v. Everex Sys.*,
   228 F.3d 1057 (9th Cir. 2000) ..................................................2, 26, 53, 55

*Howard v. Hui*,
   2001 WL 1159780 (N.D. Cal. 2001) ..........................................................54

*IBEW Local 90 Pension Fund v. Deutsche Bank AG*,
   2013 U.S. Dist. LEXIS 43774 (S.D.N.Y. 2013) ...........................................49

*In re Acterna Corp. Sec. Litig.*,
   378 F. Supp. 2d 561 (D. Md. 2005)............................................................49

*In re Adaptive Broadband Sec. Litig.*,
   2002 U.S. Dist. LEXIS 5887 (N.D. Cal. 2002) .......................................3, 52

*In re Adecco S.A.*,
   371 F. Supp. 2d 1203 (S.D. Cal 2005) .......................................................34

*In re Alloy, Inc.*,
   2011 WL 4863716 (Del. Ch. 2011) ............................................................24

*In re Allstate Life Ins. Co. Litig.*,
   2012 U.S. Dist. LEXIS 72900 (D. Ariz. 2012) ...........................................44

*In re Alstom SA, Sec. Litig.*,
   454 F. Supp. 2d (S.D.N.Y. 2006) ..............................................................52

*In re Am. Apparel, Inc. S'holder Litig.*,
   2013 U.S. Dist. LEXIS 6977 (C.D. Cal. 2013) .....................................45, 53

*In re Am. Apparel, Inc. S'holder Litig.*,
   855 F. Supp. 2d 1043 (C.D. Cal. 2012) .....................................................31

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ................................................17, 35

*In re Amylin Pharms., Inc. Sec. Litig.*,
   2003 U.S. Dist. LEXIS 7667 (S.D. Cal. 2003)......................................30, 31, 49

*In re Apollo Grp. Inc. Sec. Litig.*,
   395 F. Supp. 2d 906 (D. Ariz. 2005) ...................................................38, 40

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) ...................................................56

*In re Boston Sci. Corp. Sec. Litig.*,
686 F.3d 21 (1st Cir. 2012) .......................................................................50

*In re BP Prudhoe Bay Royalty Trust Sec. Litig.*,
2007 U.S. Dist. LEXIS 83007 (W.D. Wash. 2007) ..................................34

*In re Cadence Design Sys., Inc. Sec. Litig.*,
692 F. Supp. 2d 1181 (N.D. Cal. 2010) ...................................................41

*In re Cendant Corp. Litig.*,
60 F. Supp. 2d 354 (D.N.J. 1999) ......................................................23, 25

*In re Century Aluminum Co. Sec. Litig.*,
749 F. Supp. 2d 964 (N.D. Cal. 2010) .....................................................26

*In re Charles Schwab Corp. Sec. Litig.*,
257 F.R.D. 534 (N.D. Cal. 2009) .............................................................56

*In re ChinaCast Educ. Corp. Sec. Litig.*,
2012 WL 6136746 (C.D. Cal. 2012) ........................................................26

*In re Cisco Sys. Inc. Sec. Litig.*,
2013 WL 1402788 (N.D. Cal. 2013) ........................................................22

*In re Citigroup, Bond. Litig.*,
2010 U.S. Dist. LEXIS 69257 (S.D.N.Y. 2010) .....................................48

*In re Connectics Corp. Sec. Litig.*,
542 F. Supp. 2d 996 (N.D. Cal. 2008) .....................................................46

*In re CornerStone Propane Partners, L.P. Sec. Litig.*,
416 F. Supp. 2d 779 (N.D. Cal. 2005) .....................................................41

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..............................24, 26, 30, 31

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir 2010) ............................................................29, 31

*In re Cutera Sec. Litig.*,
No. C 07-2128 VRW, slip op. (N.D. Cal. 2008) .....................................31

*In re CV Therapeutics, Inc. Sec. Litig.*,
2004 U.S. Dist. LEXIS 17419 (N.D. Cal. 2004) .....................................31

*In re Cybershop.com Sec. Litig.*,
189 F. Supp. 2d 214 (D.N.J. 2002) ..........................................................34

*In re Cylink Sec. Litig.*,
178 F. Supp. 2d 1077 (N.D. Cal. 2001) .................................................... 54

*In re Daou Sys.*,
411 F.3d 1006 (9th Cir. 2005) ................................................. 18, 37, 38

*In re DDi Corp. Sec. Litig.*,
2005 U.S. Dist. LEXIS 28216 (C.D. Cal. 2005) .................................... 29

*In re Diamond Foods, Inc.*,
2012 U.S. Dist. LEXIS 170704 (N.D. Cal. 2012) ....................... 4, 26, 55

*In re Dura Pharms., Inc. Sec. Litig.*,
452 F. Supp. 2d 1005 (S.D. Cal. 2006) ............................................... 27

*In re Foundry Networks, Inc. Sec. Litig.*,
2003 U.S. Dist. LEXIS 18200 (N.D. Cal. 2003) .................................. 30

*In re Foundry Networks, Inc. Sec. Litig.*,
2003 WL 22077729 (N.D. Cal. 2003) ................................................. 34

*In re GlenFed, Inc. Sec. Litig.*,
42 F.3d 1541 (9th Cir. 1994) ..................................................... 47, 53

*In re Gupta Corp. Sec. Litig.*,
900 F. Supp. 1217 (N.D. Cal. 1994) ................................................... 55

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ............................................... 36

*In re Harmonic, Inc., Sec. Litig.*,
2006 U.S. Dist. LEXIS 90450 (N.D. Cal. 2006) .............................. 50, 51

*In re Heckmann Corp. Sec. Litig.*,
869 F. Supp. 2d 519 (D. Del. 2011) ........................................ 4, 5, 25

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) ............................................... 24

*In re ICN Pharms., Inc.*,
299 F. Supp. 2d 1055 (C.D. Cal. 2004) ............................................... 49

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................. 31

*In re Impac Mortg. Holdings, Inc.*,
554 F. Supp. 2d 1083 (C.D. Cal. 2008) ............................................... 49

*In re InfoSonics Corp. Sec. Litig.*,
2007 U.S. Dist. LEXIS 57784 (S.D. Cal. 2007) .................................... 27

*In re Int'l Rectifier Corp. Sec. Litig.*,
    2008 2008 U.S. Dist. LEXIS 44872 (C.D. Cal. 2008) ...................49

*In re J.P. Jeanneret Assocs.*,
    769 F. Supp. 2d 340 (S.D.N.Y. 2011) ...................30

*In re Juniper Networks, Inc. Sec. Litig.*,
    542 F. Supp. 2d 1037 (N.D. Cal 2008) ...................54

*In re Lattice Semiconductor Corp. Sec. Litig.*,
    2006 U.S. Dist. LEXIS 262 (D. Or. 2006) ...................41

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...................*passim*

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ...................37, 39

*In re Levi Strauss & Co. Sec. Litig.*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) ...................4, 49

*In re Ligand Pharms., Inc., Sec. Litig.*,
    2005 U.S. Dist. LEXIS 44911 (S.D. Cal. 2005) ...................29, 39

*In re Loral Space & Commc'ns Ltd. Sec. Litig.*,
    2004 WL 376442 (S.D.N.Y. 2004) ...................26

*In re MannKind Sec. Actions*,
    835 F. Supp. 2d 797 (N.D. Cal. 2011) ...................54

*In re Marsh & McLennan Cos. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ...................41

*In re McKesson HBOC, Inc., Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...................*passim*

*In re Merck & Co., Sec., Derivative & "ERISA" Litig.*,
    2011 U.S. Dist. LEXIS 87578 (D.N.J. 2011) ...................44, 45

*In re Metawave Commc'ns Corp. Sec. Litig.*,
    298 F. Supp. 2d 1056 (W.D. Wash. 2003) ...................54

*In re Musicmaker.com Sec. Litig.*,
    2001 U.S. Dist. LEXIS 25118 (C.D. Cal. 2001) ...................30

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...................31, 49, 53

*In re NorthPoint Commc'ns Grp., Inc., Sec. Litig. & Consol. Cases*,
    221 F. Supp. 2d 1090 (N.D. Cal. 2002) ...................52

*In re Northwest Biotherapeutics Inc. Sec. Litig.*,
  2008 U.S. Dist. LEXIS 54028 (W.D. Wash. 2008) ...................................... 26

*In re Nuvelo, Inc. Sec. Litig.*,
  668 F. Supp. 2d 1217 (N.D. Cal. 2009) ...................................... 31

*In re NVIDIA Corp. Sec. Litig.*,
  2011 WL 4831192 (N.D. Cal. 2011) ...................................... 39

*In re Omnivision Techs. Sec. Litig.*,
  2013 U.S. Dist. LEXIS 46032 (N.D. Cal. 2013) ...................................... 18

*In re Parmalat Sec. Litig.*,
  594 F. Supp. 2d 444 (S.D.N.Y. 2009) ...................................... 42

*In re Pfizer Inc. Sec. Litig.*,
  2013 U.S. Dist. LEXIS 49333 (S.D.N.Y. 2013) ...................................... 45

*In re Pilgrim's Pride Corp. Sec. Litig.*,
  2010 U.S. Dist. LEXIS 84260 (E.D. Tex. 2010) ...................................... 47

*In re RAIT Fin. Trust Sec. Litig.*,
  2008 U.S. Dist. LEXIS 103549 (E.D. Pa. 2008) ...................................... 30

*In re Read-Rite Corp. Sec. Litig.*,
  335 F.3d 843 (9th Cir. 2003) ...................................... 19, 20

*In re Remec, Inc. Sec. Litig.*,
  388 F. Supp. 2d 1170 (S.D. Cal. 2005) ...................................... 48

*In re Remec Inc. Sec. Litig.*,
  3:04-cv-01948-MMA-WMC, slip. op. (S.D. Cal. 2006) ...................................... 48

*In re Remec, Inc. Sec. Litig.*,
  415 F. Supp. 2d 1106 (S.D. Cal. 2006) ...................................... 36

*In re REMEC Inc. Sec. Litig.*,
  702 F. Supp. 2d 1202 (S.D. Cal. 2010) ...................................... 27, 48

*In re Rigel Pharms., Inc. Sec. Litig., Inter-Local Pension Fund GCC/IBT v. Deleage*,
  697 F.3d 869 (9th Cir. 2012) ...................................... 39

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ...................................... 26

*In re Silicon Graphics Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ...................................... 20

*In re Silicon Storage Tech. Inc.*,
  2006 WL 648683 (N.D. Cal. 2006) ...................................... 20

*In re St. Jude Med. Inc. Sec. Litig.*,
   836 F. Supp. 2d 888 (D. Minn. 2012) ...............................................28, 44

*In re Stellent, Inc. Sec. Litig.*,
   326 F. Supp. 2d 970 (D. Minn. 2004) ............................................................6

*In re Stillwater Capital Partners Inc. Litig.*,
   853 F. Supp. 2d 441 (S.D.N.Y. 2012) ........................................................44

*In re SunPower Sec. Litig.*,
   2011 U.S. Dist. LEXIS 152920 (N.D. Cal. 2011) ..................................18, 4

*In re Tibco Software, Inc.*,
   2006 U.S. Dist. LEXIS 36666 (N.D. Cal. 2006) ........................................37

*In re Turbodyne Techs., Inc. Sec. Litig.*,
   2000 U.S. Dist. LEXIS 23020 (C.D. Cal. 2000) ...................................54, 55

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009).................................................3, 52, 53

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ....................................................................19

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ................................................................*passim*

*In re VeriSign, Inc. Deriv. Litig.*,
   531 F. Supp. 2d 1173 (N.D. Cal. 2007) .....................................................34

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) .....................................................34

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003) .......................................................55

*In re Yahoo! Inc. Sec. Litig.*,
   2012 U.S. Dist. LEXIS 113036 (N.D. Cal. 2012) ..............................*passim*

*Janus Capital Grp., Inc. v. First Derivative Traders*,
   131 S. Ct. 2296 (2011) .........................................................................*passim*

*Kane v. Madge Networks N.V.*,
   2000 WL 33208116 (N.D. Cal. 2000) ........................................................37

*Kerr v. Exobox Techs. Corp.*,
   2012 U.S. Dist. LEXIS 7523 (S.D. Tex. 2012) .....................................41, 43

*Kyung Cho v. UCBH Holdings, Inc.*,
   2012 U.S. Dist. LEXIS 123234 (N.D. Cal. 2012) ......................................43

*Lapiner v. Camtek, Ltd.*,
   2011 U.S. Dist. LEXIS 9985 (N.D. Cal. 2011) .................................................................... 36

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
   2011 U.S. Dist. LEXIS 93873 (N.D. Ala. 2011) .................................................................. 45

*Mallen v. Alphatec Holdings, Inc.*,
   2012 U.S. Dist. LEXIS 39416 (S.D. Cal. 2012) .................................................................. 30

*Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) .............................................................................................. 41

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011) .........................................................................................2, 4, 19, 38

*McGann v. Ernst & Young*,
   102 F.3d 390 (9th Cir. 1996) .............................................................................................. 51

*McIntire v. China MediaExpress Holdings, Inc.*,
   2013 WL 752954 (S.D.N.Y. 2013) ...................................................................................... 23

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...................................................................................... 40, 47

*Middlesex Ret. Sys. v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...................................................................51, 53, 54

*Morgan v. AXT, Inc.*,
   2005 U.S. Dist. LEXIS 42346 (N.D. Cal. 2005) .................................................................. 29

*Murdeshwar v. Search Media Holdings, Ltd.*,
   2011 WL 7704347 (S.D. Fla. 2011) .................................................................................... 23

*NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*,
   2012 WL 3191860 (S.D.N.Y. 2012) .................................................................................... 24

*Nguyen v. Radient Pharms. Corp.*,
   2011 U.S. Dist. LEXIS 124631 (N.D. Cal. 2011) .......................................................... 54, 55

*Nieman v. Duke Energy Corp.*,
   2013 U.S. Dist. LEXIS 110693 (W.D.N.C. 2013) ............................................................ 6, 29

*No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) .......................................................................................passim

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
   54 F.3d 1424 (9th Cir. 1995) .............................................................................................. 54

*Norfolk Cnty. Ret. Sys. v. Ustian*,
   2009 U.S. Dist. LEXIS 65731 (N.D. Ill. 2009) .................................................................... 2

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
 380 F.3d 1226 (9th Cir. 2004) ..................................................................52

*Paracor Fin., Inc. v. GE Capital Corp.*,
 96 F.3d 1151 (9th Cir. 1996) ...............................................................55, 56

*Philco Inv., Ltd. v. Martin*,
 2011 WL 4595247 (N.D. Cal. 2011) ....................................................29, 45

*Pittleman v. Impac Mortg. Holdings, Inc.*,
 2008 WL 4809962 (C.D. Cal. 2008) ........................................................22

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*,
 717 F. Supp. 2d 1170 (E.D. Wash. 2010)..................................................52

*Provenz v. Miller*,
 102 F.3d 1478 (9th Cir. 1996) ...........................................................31, 49

*Providence v. Aeropostale, Inc.*,
 2013 U.S. Dist. LEXIS 44948 (S.D.N.Y. 2013) ..................................31, 34

*Reiger v. Price Waterhouse Coopers LLP*,
 117 F. Supp. 2d 1003 (S.D. Cal. 2000) ....................................................20

*Ret. Sys. v. Bank of Am. Corp.*,
 2012 U.S. Dist. LEXIS 129529 (S.D.N.Y. Aug. 2012) ............................43

*Ret. Sys. v. Bank of Am. Corp.*,
 2012 U.S. Dist. LEXIS 96317 (S.D.N.Y. 2012) .......................................43

*Ret. Sys. v. Psychiatric Solutions, Inc.*,
 2011 U.S. Dist. LEXIS 35661 (M.D. Tenn. 2011)................................29, 30

*Reves v. Ernst & Young*,
 507 U.S. 170 (1993) ...................................................................*passim*

*Rodriguez v. Countrywide Homes*,
 2008 U.S. Dist. LEXIS 82874 (E.D. Cal. 2008) ......................................54

*Ronconi v. Larkin*,
 253 F.3d 423 (9th Cir. 2001). Dkt. No. 139 at 6 ....................................37

*Rosenbaum Capital, LLC v. McNulty*,
 549 F. Supp. 2d 1185 (N.D. Cal. 2008)....................................................31

*Roth v. OfficeMax, Inc.*,
 527 F. Supp. 2d 791 (N.D. Ill. 2007) ........................................................20

*Rubke v. Capitol Bancorp*,
 551 F.3d 1156 (9th Cir. 2009)..................................................................48

*S. Ferry LP v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ................................................................*passim*

*Saltz v. First Frontier, L.P.*,
   485 F. App'x 461 (2d Cir. 2012) .......................................................... 20

*Sapirstein-Stone-Weiss Found. v. Merkin*,
   2013 U.S. Dist. LEXIS 84035 (S.D.N.Y. 2013) ................................. 24

*Schiller v. Physicians Res. Grp., Inc.*,
   2002 WL 318441 (N.D. Tex 2002) ...................................................... 23

*Schwarz v. Thinkstrategy Capital Mgmt. LLC*,
   797 F. Supp. 2d 439 (S.D.N.Y. 2011) ................................................... 5

*SEC v. Das*,
   2011 U.S. Dist. LEXIS 106982 (D. Neb. 2011) ............................. 46, 47

*SEC v. Mercury Interactive, LLC*,
   2011 U.S. Dist. LEXIS 134580 (N.D. Cal. 2011) ............................... 32

*SEC v. Mozilo*,
   2009 U.S. Dist. LEXIS 104689 (C.D. Cal. 2009) ............................... 29

*Siemers v. Wells Fargo & Co.*,
   2006 U.S. Dist. LEXIS 60858 (N.D. Cal. 2006) ................................. 54

*Slayton v. Am. Express Co.*,
   604 F.3d 758 (2d Cir. N.Y. 2010) ....................................................... 50

*South Cherry St., LLP v. Hennesee Group LLC*,
   573 F.3d 98 (2d Cir. 2009) .................................................................. 25

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
   365 F.3d 353 (5th Cir. 2004) ............................................................... 41

*Stephenson v. Pricewaterhousecoopers, LLP*,
   768 F. Supp. 2d 562 (S.D.N.Y. 2011) ................................................. 20

*Steward Int'l Enhanced Index Fund v. Carr*,
   2010 U.S. Dist. LEXIS 5047 (D.N.J. 2010) ........................................ 33

*Stocke v. Shuffle Master, Inc.*,
   615 F. Supp. 2d 1180 (D. Nev. 2009) .................................................. 30

*Stratte-McClure v. Stanley*,
   784 F. Supp. 2d 373 (S.D.N.Y. 2011) ............................................ 27, 49

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) ............................................................... 45

*Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*,
  633 F. Supp. 2d 763 (D. Ariz. 2009) ...................................................................*passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...........................................................................................*passim*

*Tripp v. Indymac Fin. Inc.*,
  2007 WL 4591930 (C.D. Cal. 2007) ..............................................................36

*Virginia Bankshares v. Sandberg*,
  501 U.S. 1083 (1991) .......................................................................................34

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) .......................................................................29, 34

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) ............................................................34

*Westley v. Oclaro, Inc.*,
  897 F. Supp. 2d 902 (N.D. Cal. 2012) ..........................................................30

*Wozniak v. Align Tech.*,
  850 F. Supp. 2d 1029 (N.D. Cal. 2012) ..................................................37, 39

*Zelman v. JDS Uniphase Corp.*,
  376 F. Supp. 2d 956 (N.D. Cal. 2005) ..........................................................26

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .................................................................4, 41, 51

## STATUTES

15 U.S.C. §78u-4(b)(1)(B) ...................................................................................18

Private Securities Litigation Reform Act ...................................................*passim*

**TABLE OF ACRONYMS**

| | |
|---|---|
| CAGR | Compound annual growth rate |
| DCF | Discounted cash flow |
| DSO | Days sales outstanding |
| FASB | Financial Accounting Standards Board |
| FASC | Financial Accounting Standards Codification |
| FQ | Fiscal quarter |
| FTSE | Financial Times and Stock Exchange |
| FY | Fiscal year |
| GAAP | Generally Accepted Accounting Principles |
| IDOL | Intelligent Data Operating Layer, a platform by Autonomy that enables computers to search and process text taken from databases, audio, video, text files or streams |
| IFRS | International Financial Reporting Standards |
| IP | Intellectual property |
| IPR&D | In-process research and development |
| IT | Information technology |
| LSE | London Stock Exchange |
| M&A | Mergers and acquisitions |
| MAC | Material adverse change |
| MD&A | Management Discussion and Analysis |
| O/S | Overstatement |
| OEM | Original equipment manufacturer |
| PC | Personal computer |
| PCAOB | Public Company Accounting Oversight Board |
| PE | Price-to-earnings ratio |
| PIRC | Pensions & Investment Research Consultants, Ltd, |
| PSLRA | Private Securities Litigation Reform Act |
| PSG | Personal Systems Group, a division of Hewlett-Packard |
| S&M | Autonomy's Sales and Marketing |
| SaaS | Software as a service, *i.e.*, providing users with computer applications via the internet as opposed to installing the software on their computers |
| TTM | Trailing twelve months |
| VAR | Value-added reseller |
| VSOE | Vendor-specific objective evidence |
| y-o-y or Y/Y | Year over year |

**STATEMENT OF ISSUES TO BE DECIDED**

1. Whether Lead Plaintiff's Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint") alleges facts giving rise to a strong inference that Defendants intentionally *or* with deliberate recklessness made materially false and misleading statements and/or omissions – an inference that is at least as compelling as Defendants' rote inference that they "acted in the utmost good faith."[1] *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (Ginsburg, J.); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694 (9th Cir. 2012).

2. Whether the false and misleading statements of present fact alleged in the Complaint qualify as "forward looking" statements and, if so, whether such statements were accompanied by "meaningful" cautionary language. *See No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936-37 (9th Cir. 2003); *see* §IV.B., *infra*.

3. Whether HP's Class Period statements about HP's Autonomy acquisition and integration were rendered misleading when made by the simultaneous failure to disclose that: (i) in September 2011, Defendants Whitman and Lane sought to rescind HP's offer to acquire Autonomy (¶¶69, 73, 102); (ii) Whitman and Lesjak were alerted, "as early as December 2011[,] to significant problems with the integration of Autonomy into HP that were negatively impacting its performance" (¶102); (iii) in May 2012, Whitman learned from a "senior member of Autonomy's leadership team" that Autonomy was engaging in improper accounting practices (¶¶80, 84, 88, 152); and (iv) HP's Autonomy reported goodwill and acquired intangible assets

---

[1] Docket ("Dkt.") No. 139 at 1. For purposes of this opposition: "Plaintiff" refers to the Lead Plaintiff PGGM Vermogensbeheer B.V. and the putative Class; "Defendants" refers to Hewlett-Packard Company ("HP" or the "Company"), and "Individual Defendants" Margaret C. Whitman (HP's current CEO), Léo Apotheker (HP's former CEO), Catherine A. Lesjak (HP's current CFO), Michael R. Lynch (Autonomy Corporation plc's ("Autonomy") founder and HP's Class Period Executive Officer), Shane V. Robison (HP's former Executive Vice President and Chief Strategy and Technology Officer), Raymond J. Lane (former Executive Chairman of the Board of Directors ("Board")), and James T. Murrin (HP's Class Period Principal Accounting Officer). The "Class Period" is August 19, 2011 to November 20, 2012, inclusive. "¶" citations are to the Complaint and unless otherwise noted, all emphasis is added and internal citations and footnotes are omitted.

were materially overstated, and its impairments were materially understated, in HP's Class Period filings with the Securities and Exchange Commission ("SEC") (¶¶149-62). *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322 (2011) (Sotomayor, J.); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008); *see* §IV.C., *infra*.

4.      Whether the Complaint alleges sufficient facts showing that all of the Individual Defendants, as HP's top executive directors and officers, possessed the power to direct the management and policies of HP. *See Howard v. Everex Sys.*, 228 F.3d 1057, 1064-65 (9th Cir. 2000); *see* §IV.H., *infra*.

5.      Whether Defendant Lynch's scienter can and should be imputed to HP under the doctrine of *respondeat superior*. *See Curry v. Hansen Med., Inc.*, 2012 U.S. Dist. LEXIS 112449, at *35-36 (N.D. Cal. 2012) (Wilken, C.J.); *see* §IV.D., *infra*.

6.      Whether Plaintiff was required to allege stock sales to successfully plead the Individual Defendants' various motives to mislead investors. *See Am. W. Holding*, 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period.").

## SUMMARY OF ARGUMENT

Defendants have filed nearly 120 pages of motion to dismiss briefing claiming that the Complaint fails to allege a case of false and misleading statements – or any other cause of action for that matter. Of course, they do so largely by ignoring the Complaint's allegations and offering their own version of events, one where they were all – save Defendant Lynch – mere victims of the grave misconduct Defendant Whitman publicly accused him of on November 20, 2012. ¶¶5-8, 84-85, 87. Defendants waste much time misstating the pleading standards and then suggest that the Complaint does not contain any allegations to meet those standards. Rather than identifying a single pleading defect in the Complaint, however, Defendants seek to recast Plaintiff's allegations to create the false impression that Plaintiff's theory is akin to a "suicide mission" by the Individual Defendants to pay $11 billion for a fraudulent asset.[2]

---

[2]      Dkt. No. 133 at 10; Dkt. No. 127 at 2, 10.

Specifically, Defendant Whitman suggests that the "Complaint appears to be premised on the bizarre and counterintuitive theory that Ms. Whitman…[was] aware of Autonomy's fraud at the time of the acquisition and hid it from the market for several quarters for no particular reason. They then **voluntarily** disclosed the very facts that the Complaint alleges they worked so hard to conceal. This theory makes no sense." Dkt. No. 139 at 1. But that's not what the Complaint alleges. As to Defendant Whitman, the Complaint cogently alleges that she, along with the rest of HP's Board, was "just too exhausted" to oversee Apotheker's, Lane's and Robison's reckless abandon to acquire Autonomy in the period before HP's August 18, 2011 announcement. ¶¶6, 26. Despite the Board's now admitted lack of oversight before the announcement, she voted, as a member of HP's Board, to authorize the deal. ¶¶6, 89, 92.

The Complaint then alleges that almost immediately after HP announced its offer, and Defendant Whitman was selected to replace Defendant Apotheker as CEO, she learned, in her words, about "potential issues at Autonomy," including that Autonomy had been "aggressive in its accounting." ¶¶73, 89. But by then, HP's options were limited by the U.K. City Code on Takeovers and Mergers ("City Code") which mandated that HP demonstrate circumstances affecting Autonomy which HP could not have reasonably foreseen at the time of HP's August 18, 2011 announcement in order to withdraw its offer. ¶¶69-73. Indeed, according to Autonomy's own U.K. lawyers, the "[f]ailure to identify a specific liability of the target group in the course of due diligence **before** the offer is made would not normally provide grounds on which subsequently to withdraw an offer."[3] Given the numerous red flags about Autonomy before the offer was announced (¶¶16-25), and immediately thereafter (¶¶45-49, 60-61, 67), Plaintiff alleges that HP was legally foreclosed from satisfying the City Code's mandates. ¶72. Nor does the Complaint allege that Defendant Whitman "voluntarily" disclosed Autonomy's misconduct. It alleges that a **whistleblower** – "a senior member of Autonomy's leadership team" – forced her hand. ¶¶7, 80-83, 152. Even then, she waited six full months to make the disclosure while simultaneously making positive statements about Autonomy. ¶¶80, 84, 100, 177, 191-94.

---

[3]     *See* Declaration of Ramzi Abadou in Support of Lead Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Abadou Decl."), Exhibit ("Ex.") A

HP's effort to recast Plaintiff's allegation about the May 2012 whistleblower into the proposition that "anytime **someone** makes allegations, **everyone** who learns about those allegations has knowledge of fraud" is not the least bit instructive.  Dkt. No. 133 at 22.  The whistleblower wasn't just "anyone" at HP; the Complaint alleges that he was a "senior member of Autonomy's U.S. leadership team," who told HP's General Counsel and CEO Whitman.  ¶152.  This Court's ruling in *In re Yahoo! Inc. Sec. Litig.*, 2012 U.S. Dist. LEXIS 113036 (N.D. Cal. 2012) does not in any way undermine this alleged disclosure failure because, unlike the defendants in *Yahoo!*, here, Defendants Whitman and Lesjak **did** speak – specifically and repeatedly – about Autonomy after the May 2012 whistleblower accused Autonomy's management of wrongdoing.[4]  *See* ¶80; *Matrixx*, 131 S. Ct. at 1322 ("companies can control what they have to disclose…by controlling what they say to the market").

Defendants' efforts to mischaracterize the Complaint notwithstanding, Plaintiff alleges several categories of actionable misstatements and omissions during the Class Period.  First, the Complaint alleges that Defendants Apotheker, Whitman, Lynch, Lane and Robison misled investors about HP's Autonomy due diligence and valuation after they announced the offer on August 18, 2011.  ¶¶58, 163-64, 168-78.  In September 2011, for instance, Defendant Apotheker represented that HP: (i) had applied a "very conservative" and "rigorous" due diligence process in evaluating Autonomy; (ii) ran "an extremely tight and very professional due diligence process;" and (iii) "paid a very fair price for Autonomy."  ¶¶58, 172; *see In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 530-32, 540 (D. Del. 2011).  Apotheker, who now claims that these statements were mere "puffery," was fired as HP's CEO only a week after making these misleading statements.  And while the Complaint provides painstaking detail describing how and why these statements were deliberately reckless when made (¶¶165, 173, 175-76), one need look no further than HP's own counsel's prior statements to conclude that HP's Autonomy due

---

[4]     Moreover, this is not a "duty to disclose" or "duty to update" case like *Yahoo!* where defendants were able to argue, on the facts alleged there, "that the statement [at issue] is silent as to Alipay, and thus, no duty to disclose arises."  *Id*. at *24.  Here, again, after the whistleblower came forward in May 2012, Defendants made specific, repeated statements about Autonomy.

diligence was not the least bit effective.[5]  In March 2013, **prior** to being retained by HP for this litigation, Wachtell, Lipton, Rosen & Katz publicly commented (in a client marketing report, no less) that the "acquisition of Autonomy by Hewlett-Packard and subsequent $8.8 billion write-down…**underscore[s]** the importance of **effective** due diligence in the cross-border acquisition context."[6]  That's precisely what the Complaint alleges.  ¶¶70-73.

Defendant Robison asserts, by contrast, that "HP's decision not to undertake a full-blown forensic examination during due diligence of an audited public company does not provide a compelling inference of scienter."  Dkt. No. 142 at 6.  The primary issue here, however, is not whether HP's due diligence itself was severely reckless but, rather, whether Defendants' statements **about** HP's Autonomy due diligence were severely reckless when made.[7]  In other words, "Defendants' argument that they lacked scienter because they were unaware of the [] fraud quite misses the point.  The issue here is not what the defendants knew about the [] fraud, but what they knew about their own due diligence process when they made allegedly false representations [] about that process."[8]  And, when weighed against the numerous red flags the Complaint specifically alleges were raised about Autonomy before and immediately after the acquisition was announced on August 18, 2011 (and its steep $11 billion price tag), "HP's decision not to undertake a full-blown" examination of Autonomy before it made its offer was anything but "extremely tight" or "rigorous."  It was reckless.  Defendant Robison's continued inability to appreciate this fact is why Defendant Whitman had him fired for his role in leading HP's failed Autonomy due diligence.  ¶86.

Second, the Complaint alleges that, following the market's overwhelmingly negative response to HP's August 18, 2011 announcement, Defendants Lane and Whitman tried to rescind

---

[5]    *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010) ("minimal due diligence…alleged to establish the falsity of Defendants' assurances").

[6]    *See* Abadou Decl., Ex. B.

[7]    Defendants Apotheker, Lane and Whitman made such statements as referenced in ¶¶58, 172, 174-78.

[8]    *See Schwarz v. Thinkstrategy Capital Mgmt. LLC*, 797 F. Supp. 2d 439, 444-45 (S.D.N.Y. 2011).

the offer. ¶¶68-73. The Complaint describes when, how and why they were unable to do so. *Id.* Again, HP's own counsel here has previously (and correctly) observed on our facts that the "[w]holesale application of the acquiror's [HP's] domestic due diligence standards to the target's [Autonomy's] jurisdiction **can…result in missing a problem**." Abadou Decl., Ex. B. Similarly, here, the Complaint alleges that: (i) HP's due diligence failed to fully recognize the harsh limitations imposed by the City Code for acquisitions; (ii) recklessly turned a "'blind eye'" to Autonomy's potential issues; and (iii) how those failures precluded HP from withdrawing its offer between the time of the announcement (August 18, 2011) and closing (October 3, 2011). ¶¶16-25, 68-73; *VeriFone*, 704 F.3d at 708. Defendants Whitman and Lane's concealment of HP's failed effort to withdraw the offer is actionable.[9]

Relatedly, only a week after HP announced the offer, the Complaint alleges that Defendant Lesjak canceled an important road show appearance meant to defend the terms of HP's Autonomy deal. ¶47. Lesjak does not dispute the accuracy of Plaintiff's allegation. Rather, she claims that her "absence from the road show hardly is surprising given her opposition to the Autonomy transaction." Dkt. No. 136 at 3, n.2. That might be true for whatever it's worth but, rather than tell investors about "her opposition to the Autonomy transaction," or say nothing at all, she promoted it by misleadingly representing that she was "pleased with the Autonomy acquisition," while simultaneously certifying the Company's reported Autonomy goodwill in HP's quarterly reports on Forms 10-Q filed with the SEC for the first three quarters of 2012. ¶¶149, 152, 155, 185, 187-88. In reality, Lesjak was not "pleased." As she previously told the full HP Board in July 2011, Defendant Lesjak believed that Autonomy was, among other things, "not in the best interests of the company" and "too expensive." ¶32.

Third, the Complaint alleges that after the transaction closed on October 3, 2011, HP's Worldwide Director of Software Revenue Recognition, Paul Curtis, confirmed internally at HP what numerous market observers had long suspected – namely, that Autonomy **had** artificially inflated its growth and future prospects *via* improper revenue recognition practices. ¶¶74-79, 100,

---

[9]     *See generally Nieman v. Duke Energy Corp.*, 2013 U.S. Dist. LEXIS 110693, at *20-21, *25-26 (W.D.N.C. 2013).

134-41. HP's own 2012 Annual Report on Form 10-K later admitted as much by (belatedly) revealing that "subsequent to the Autonomy purchase price allocation period, which concluded *in the first quarter of fiscal 2012* [January 31, 2012]...**HP identified certain indicators of impairment**." ¶147. Despite this discovery, throughout the Class Period, Defendants Whitman and Lesjak represented that the Company's quarterly reports "contain[ed] all adjustments, including normal recurring adjustments, necessary to present fairly HP's financial position." ¶¶149, 152, 155. Defendants' limited response to these detailed and damning allegations is telling.

Fourth, the Complaint alleges that, in February 2012, Defendants Whitman and Lesjak misled HP's shareholders about Autonomy's seamless integration into HP when they knew, contemporaneously, that the Company's integration efforts were suffering from "significant problems...that were negatively impacting [Autonomy's] performance." ¶¶102, 185. The source for this allegation (and quotation) is HP's very own Class Period Executive Officer, and direct Whitman report (¶109), Defendant Lynch who later accused Defendants Whitman and Lesjak of failing to disclose this "material" information. ¶100. Finally, the Complaint alleges that HP's surreptitious efforts to unwind Autonomy's accounting irregularities were thwarted by a "senior member" of HP/Autonomy's "leadership team," who blew the whistle on HP/Autonomy's misconduct in May 2012, and that HP and Defendants Whitman, Lane, Lesjak and Murrin failed to disclose this material development to shareholders until November 2012.[10] ¶¶80-83.

In addition to adequately pleading actionable false statements and omissions, the Complaint also pleads strong facts supporting Defendants' scienter. Defendants' suggestion that the "complaint does not allege facts showing, for example, that [] **insiders** had advised [Mr. Apotheker, Ms. Whitman or Mr. Lane] that the price for Autonomy was not a 'fair price' or 'market price'" is nonsense. Dkt. No. 133 at 8. At a July 2011 Board meeting described with excruciating detail in the Complaint, for instance, Plaintiff alleges that HP CFO Lesjak (*i.e.*, an "*insider*") told Defendants Lane, Apotheker and Whitman that, even at approximately $6 billion,

[10] *See Berson*, 527 F.3d at 987 (Once defendants choose to speak, they must speak truthfully.).

Autonomy was "too expensive." ¶32. Although the Complaint describes this meeting in great detail, including the date of the meeting, who attended and what was said by specific persons there (*id.*), HP's dismissal papers nevertheless inaccurately suggest that the "complaint offers no…descriptions of meetings, and nothing else" to support its claim that HP's executives misrepresented the "'fairness' of the price" HP paid to acquire Autonomy. Dkt. No. 133 at 1-2.

In addition, and despite the cogent allegations of his motives (¶¶13, 26-29, 31-33, 36, 38, 44-46, 58), Apotheker's dismissal motion claims that "Plaintiff never explains how an alleged desire to 'transform' HP could possibly have prompted Mr. Apotheker (or anyone else) to pursue the purchase of an allegedly fraudulent enterprise."[11] Dkt. No. 127 at 5. In fairness, the Complaint painstakingly depicts Apotheker's willingness to "suspend disbelief" about Autonomy's possible impairments to defend his credibility with the market and rush HP's due diligence to avoid a leak about the deal. ¶¶12-13, 34-35. The allegations of Defendants' Whitman's scienter, in her role as HP's CEO, are also particularly compelling. On November 20, 2012, for instance, the Complaint alleges that Defendant Whitman was pressed to publicly admit that she **knew** about Autonomy's impairments soon after the offer was announced which motivated her to try to withdraw the offer – "what I do **know** [Whitman said] **is that after we announced the acquisition** [on August 18, 2011] there were a number of blogs that came to the fore about potential issues at Autonomy." ¶¶68-73, 89, 92.

Later the same day, Defendant Whitman again was forced to concede that HP had learned, prior to the expiration of the offering period, that "bloggers and some financial analysts had claimed in the past that **Autonomy was aggressive in its accounting**." ¶73. In a subsequent statement to the *San Jose Mercury News* in December 2012, HP again confirmed "**that it had been aware of apprehensions expressed about Autonomy**" after the offer was announced. ¶96. The Complaint then cogently alleges that Defendant Whitman's known apprehensions about

---

[11] Apotheker made a similar argument in *Gammel v. Hewlett-Packard Co.*, where he was recently found to have acted with scienter in making misleading statements related to HP's failed Palm, Inc. acquisition. *See* 2013 U.S. Dist. LEXIS 68026, at *58-61 (C.D. Cal. 2013) ("Apotheker [] knew [his] June and July [2011] statements…were false or deliberately reckless.").

Autonomy's accounting practices ***after*** the offer was announced motivated her failed attempt to rescind the offer under the City Code – a fact which, again, she concealed from HP's shareholders during the Class Period. ¶¶68-69, 73. In fact, Defendants Whitman and Lesjak actually ***promoted*** Autonomy's prospects during this period. ¶¶76, 177, 185. After replacing Defendant Apotheker as HP CEO on September 22, 2011, for instance, Defendant Whitman falsely represented that she was "supportive of the actions [to acquire Autonomy] that were announced on August 18 [2011]" and that "from what I know now, I think the [Autonomy] strategy is right, the initiatives that we undertook on August 18 [2011] are right." ¶177. In truth, Whitman fired Apotheker because she loathed his "transformational" deal and was then actively looking for a way out of it.

While Defendants half-heartedly raise other arguments – such as whether Defendants' false statements constitute "puffery," or whether Defendant Murrin possessed sufficient control over the primary violators – these merit little more than passing mention. Predominantly, Defendants raise questions of fact that cannot be decided here. And in those rare instances where such arguments could be decided on a motion to dismiss, they utterly fail to carry their burden. For all these reasons, Defendants' motions to dismiss should be denied.

*Michael R. Lynch* (November 2012)
"Why did HP senior management apparently wait six months to inform its
shareholders of the possibility of a material event related to Autonomy?" (¶100)

*Margaret C. Whitman* (November 2012)
"I regret that I voted for this deal." (¶89)

## I.     INTRODUCTION[1]

The Complaint states actionable claims against all of the Defendants. They have no serious response. Where they actually do respond, Defendants either ignore crucial facts, misconstrue the law or both.  The Complaint centers on HP's now-admittedly failed $11 billion acquisition of Autonomy on October 3, 2011 – a British U.K. software technology company founded by HP Class Period Executive Officer, Defendant Lynch – that HP was later forced to announce an $8.8 billion write down for on November 20, 2012.  Many of Plaintiff's core allegations flow from Defendants' own ill-advised public statements, "open letters," leaks to the press and other public recriminations.  Indeed, to date, Defendant Lynch **still** maintains an active blog about this matter that, in his words, "provides relevant information pertaining to the accusations made by Hewlett Packard (HP) on 20 November 2012 of financial impropriety at Autonomy. The former management team of Autonomy strongly rejects the accusations made by HP."[2]  The corporate dysfunction depicted alongside the misconduct alleged in the Complaint is staggering.

Speaking for all of the Defendants, Whitman's dismissal motion claims that the "only cogent inference to be drawn from the allegations [in the Complaint] is that Ms. Whitman **and the other defendants** acted in the utmost good faith."[3]  Incredible.  Less than a year ago, on November 20, 2012, Defendant Whitman bluntly accused Defendant Lynch of engaging in "serious accounting improprieties, disclosure failures, and outright misrepresentations," and concluded that Defendants Apotheker and Robison, whom Defendant Whitman had fired for their

---

[1]     Plaintiff objects to the following exhibits proffered by Defendant Lynch because they are offered for the truth of the matters asserted therein: Dkt. No. 126, Exs. 1-2.

[2]     www.AutonomyAccounts.org

[3]     Dkt. No. 139 at 1.

role in HP's botched Autonomy acquisition, should be held "responsible." ¶¶5, 84-86, 92, 217. There is nothing remotely compelling about her current proffered inference of "good faith" mismanagement. Indeed, "[n]egligence can always be offered as an explanation for fraudulent behavior, but here it does not create an inference that is more compelling than plaintiff[']s."[4] In turn, HP suggests that the Complaint should be dismissed because it "recast[s] the victim – HP – as the perpetrator."[5] This takes chutzpah. Again, on November 20, 2012, Defendant Whitman squarely cast HP's ***shareholders*** as the victims here and, accordingly, represented that she would "seek redress against various parties in the appropriate civil courts to recoup what we can for our shareholders." ¶84. Now, almost a year after accusing Defendant Lynch of engaging in fraud, Defendant Whitman has yet to deliver on her empty campaign-style assurance. Whitman would probably prefer to forget that her former colleague, Defendant Lynch, personally pocketed $800 million (in cash) from his transaction with HP. ¶¶45, 84 n.30, 100.

Whitman's current claims notwithstanding, the Complaint alleges that Defendants Apotheker and Lynch publicly announced HP's $11 billion offer to acquire Autonomy on August 18, 2011, recklessly extolling Autonomy's record high margins and historical financial performance.[6] The following day, and in response to the announcement, HP's share price unusually fell 20% on heavy trading volume. Analysts immediately described HP's offer as "value-destroying" and "expensive," while others found that HP was "massively overpaying" for Autonomy. ¶46. The Complaint then alleges that the almost universally negative reaction to the announcement confirmed to Defendants that the red flags that had been previously raised about Autonomy prior to the announcement – including those raised by Autonomy's ***own*** former head of investor relations (Marc Geall) and HP's ***own*** CFO (Cathie Lesjak) – were recklessly ignored by HP, Apotheker, Lane and Robison during HP's three week due diligence. ¶¶24, 32, 42, 45-46, 58, 209.

---

[4]     *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 U.S. Dist. LEXIS 65731, at *35 (N.D. Ill. 2009).

[5]     Dkt No. 133 at 1.

[6]     Despite his company's Joint Press Release with HP, Defendant Lynch suggests that he did not make any statements during the Class Period. *See* §IV.E., *infra*; Abadou Decl., Ex. C.

Only a week after the announcement, HP fired Defendants Apotheker and Robison.[7]   In Defendant Whitman's blunt words at the time, "the two people that should have been held responsible [for HP's Autonomy acquisition] are gone." ¶86.   Similarly, following the announcement, but unbeknownst to investors, the Complaint asserts that, in September 2011, Whitman and Lane sought to rescind the offer before it closed in October 2011. ¶68.   The Complaint specifically alleges why they were unable to do so under the City Code and who they specifically asked about withdrawing.   ¶¶69-73.   The Complaint then alleges that the stop-gap measure for HP's Autonomy fiasco, what was supposed to have been HP's due diligence, was reckless at best.  Indeed, had HP done even the most cursory due diligence, the Complaint alleges that HP could easily have discovered the Autonomy emails entered into evidence in the *Briody* matter demonstrating that Autonomy was engaging in a fraud obvious enough to detect through effective due diligence prior to HP's August 18, 2011 announcement.  ¶¶62-67.

The *Briody* matter may only involve one Autonomy employee in a case involving only $96,000 from HP's current vantage point, but had HP done even the most cursory due diligence, the *Briody* matter (which was filed before the offer period closed on October 3, 2011) could have saved HP and its shareholders an $8.8 billion write-down and billions in dollars of market losses. ¶¶62-66.   Moreover, had the Company taken the time to so much as interview Autonomy's customers and sales personnel to determine if the rumors about Autonomy's artificially bloated revenues were true, it would and could have easily discovered what CW1 relayed to Plaintiffs about Autonomy's improper conduct in the period before the Class Period.   ¶¶50-56.  Indeed, according to HP's own auditor's (KPMG LLP ("KPMG")) **August 9, 2011** assessment about HP's Autonomy due diligence, KPMG warned the Individual Defendants that HP's "[d]ue diligence comprised **telephone discussions** with [Autonomy] management and access to **very limited** proprietary financial and tax information.  The majority of findings and observations are based on **oral representations** from [Autonomy] management and reading published financial

---

[7]      *See In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009); *In re McKesson HBOC, Inc., Sec. Litig.*, 126 F. Supp. 2d 1248, 1275 n.16 (N.D. Cal. 2000); *In re Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887, at *42-43 (N.D. Cal. 2002).

information."[8]  KPMG also informed HP that "***very limited information***" was provided to it by Autonomy during its due diligence.[9]

After Defendants Whitman and Lane tried, but failed, to withdraw HP's Autonomy offer, the transaction closed on October 3, 2011, at which time Autonomy immediately began reporting out of HP's Software Segment.  The Complaint alleges that, between October 2011 and December 2011, Whitman, Lane and Lesjak learned first-hand what many sophisticated market observers had long suspected about Autonomy, and what HP's willy-nilly due diligence efforts had overlooked – namely, that Autonomy was engaged in serious accounting irregularities and, as a consequence, was wildly overvalued at the time of the acquisition.  Rather than disclose that HP had purchased yet ***another*** troubled asset, and take a third damaging and humiliating multi-billion dollar write-down in the span of a year (¶¶27, 71, 73), the Complaint alleges that HP began to surreptitiously unwind Autonomy's improper accounting practices.  ¶¶74-79. Defendants' repeated references to the absence of stock sales to attack these cogent motive allegations are not instructive as they "neither negate[] scienter, nor support[] plaintiff's other scienter allegations."[10]  In other words, they amount to zero.  As the Hon. Richard Seeborg recently observed in *SunPower*:[11]

> [T]he motive of someone associated with a company to have that company succeed, live another day is a pretty powerful motive.  I mean, we see it all the time. You know, to disregard the idea that because they don't have any personal trading interest that it's fanciful to suggest that there's any motive out there to enhance the corporate – the results of the company [] I mean I don't find that fanciful at all.  I think that can be a very powerful motive.  People live or die on whether or not their companies succeed....And so I just don't find that at all a troubling suggestion that that would be the motive.[12]

---

[8]     *See* Abadou Decl., Ex. D.

[9]     *Id*. This is not a case like *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009), where "the alleged misrepresentations d[id] not concern especially prominent facts" or the misrepresentations were "largely definitional" and thus "would not be immediately obvious to corporate management."

[10]     *In re Diamond Foods, Inc.*, 2012 U.S. Dist. LEXIS 170704, at *23 (N.D. Cal. 2012) (Alsup, J.).

[11]     Neither is a restatement necessary to plead scienter.  *See In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987-88 (N.D. Cal. 2007).

[12]     Abadou Decl., Ex. E at 25:9-20.

The Complaint then describes how the scheme to quietly unwind Autonomy's fraudulent accounting practices was upended by a "senior member of Autonomy's leadership team" who blew the whistle on Autonomy's improper revenue recognition practices to HP's general counsel, John Schultz, and Defendant Whitman in May 2012. ¶¶80, 84. At roughly the same time, Defendant Lynch was suspiciously removed from HP. ¶80. A full six months later, on November 20, 2012, Defendant Whitman announced HP's massive $8.8 billion Autonomy write-down and simultaneously accused Defendant Lynch of "serious accounting improprieties, disclosure failures and outright misrepresentations." ¶¶5, 8, 84, 88, 217. In the interim, however, Defendants Whitman and Lesjak made several actionable misleading statements about HP's Autonomy unit. ¶¶76, 80, 111, 127, 134, 142-43, 145, 149-58, 163-64, 168-69, 171-72, 177-80, 182, 184-85, 187-89, 191, 194, 196-97, 199-202, 204-06. On June 5, 2012, for instance, a month after the May 2012 whistleblower came forward, Whitman responded to a specific question about Lynch's ouster, stating that "*for many entrepreneurs* [*i.e.*, Lynch], *processes and discipline are dirty words*, and you have to have those things, especially within the context of HP. I know exactly how this world [works]," and that she wanted to "make sure that [Autonomy] gets integrated into the rest of HP *in a good way*."[13] While walking right up to the line, Defendant Whitman deliberately concealed that she had earlier learned from a "senior member of Autonomy's leadership team" in May 2012 that Defendant Lynch had been engaging in serious accounting improprieties and disclosure failures. ¶¶81, 84. This is actionable misconduct under §10(b) and Rule 10b-5.

By November 20, 2012, the Company had to finally admit what all of the Defendants, except perhaps Defendants Lesjak and Lynch, were at least reckless in not knowing since HP's July 2011 Board meeting – namely, that "Autonomy was *substantially overvalued* at the time of its acquisition." ¶85. Defendants' subsequent explanation that Defendant Lynch's misconduct had "severely impacted HP management's ability to fairly value Autonomy at the time of the

---

[13] The following month, in July 2012, HP deputy general counsel Paul T. Porrini, who led HP's in-house legal team for the Autonomy acquisition, and signed the August 18, 2011 press release, abruptly resigned from HP. ¶81.

deal" ignores that the Complaint's allegations that HP's own CFO (Defendant Lesjak) had earlier warned the full HP Board – including Defendants Whitman, Lane and Apotheker – that, at $6 billion Autonomy was "too expensive." As did others. ¶¶45-46, 57, 60-61. In the end, and as set forth throughout herein, Defendants' dismissal motions do little more than "kick up dust" and ought be denied.[14]

## II. STATEMENT OF FACTS

### A. New HP CEO Apotheker Promises to Quickly Transform HP

In March 2011, after only four months in his role as HP's CEO, former German software executive Defendant Apotheker announced his breathtaking new strategy to "transform" HP from a low-margin computer hardware producer into a high-margin corporate software and services provider.[15] ¶27. The Complaint alleges that Defendant Apotheker announced this strategy because he knew that HP's core hardware Personal Systems Group was struggling to generate revenue growth. *Id.* In order to deliver on his plan, the Complaint alleges that Defendant Apotheker began to pursue what he described as a single "transformative" corporate acquisition that would firmly and quickly position the Company in the high-margin software and software services industries. ¶28.

The market was highly skeptical of Apotheker's strategy and, at HP's Summit Press Conference on March 14, 2011, analysts asked him pointed questions about his plans. *Id.* ("You are way, way behind here….You have given us platitudes about launching a public cloud but you have any details?"); ("Do you feel – will it be particularly – do you feel you will have a hard time or will it be a challenge to compete…?"). Ultimately, Apotheker responded that he found their questions laughable. *Id.* (Apotheker: "I found it amusing."); (Apotheker: "I find this amusing."); (Apotheker: "I don't have the feeling I gave you platitudes…Why don't we leave it at that?…There is another platitude for you."). Following the investor conference, the Complaint describes how a chastened Apotheker doubled-down on his promise to "transform" HP by fiscal

---

[14] *In re Stellent, Inc. Sec. Litig.*, 326 F. Supp. 2d 970, 975 n.1 (D. Minn. 2004).

[15] A majority of HP's Board did not meet Apotheker before unanimously voting to hire him. ¶26.

year ending October 31, 2011. ¶29. In addition, by the time he announced his strategy shift, the Complaint also alleges that Apotheker had become frustrated by HP's scuttling of his effort to acquire Comverse Technology Inc. ("Comverse") – a high-tech software company, but one emerging from a recent accounting backdating scandal. ¶¶29, 37.

Autonomy came to Apotheker's attention as a potential acquisition target *via* Frank Quattrone's Qatalyst Partners, who brokered a meeting between Lynch, Lane and Apotheker at HP's Palo Alto headquarters in April 2011. ¶¶30-31. Immediately following the meeting, the Complaint alleges that Defendant Apotheker told Defendant Lane that he wanted to buy Autonomy. ¶31. Defendants do not dispute the accuracy of these facts. The following month, in May 2011, the Complaint describes how HP's Board approved Apotheker's proposal to look deeper into acquiring Autonomy, code naming the plan, "Project Tesla." *Id.* Despite the questions about Autonomy's accounting issues, Autonomy presented Apotheker with a seemingly exclusive opportunity – a panacea – by which to quickly improve HP's anemic financial performance and simultaneously deliver on his promise to "transform" HP. *Id.* The Complaint alleges that, by July 2011, Apotheker gave a presentation to the full HP Board – in Defendants Lane, Lesjak and Whitman's presence – on the absolute necessity of HP's acquiring Autonomy, saying "[t]his Company is a burning platform…We're going to have to hold hands and go through this together." ¶32.

This was not a "suicide mission" for Apotheker; it was a desperate plea by a desperate new CEO seeking support for an acquisition that he came to believe, however recklessly, would turn HP around. The Complaint alleges that Apotheker was willing to overlook the red flags raised in HP's due diligence about Autonomy's possible revenue recognition practices because of: (i) Autonomy's "technological promise;" (ii) the internal and external challenges to his capacity to "transform" HP; and (iii) the ever-present possibility of a leak dooming his transaction. ¶¶11-13, 16, 27-29, 32-34. Following Apotheker's plea to the Board, and at the same July 2011 meeting, Defendant Lesjak challenged his proposal, stating "I can't support [the Autonomy Acquisition]. I don't think it's a good idea. I don't think we're ready. ***I think it's too expensive***. I'm putting a line down. ***This is not in the best interests of the company***." ¶32.

Defendants' dismissal motions do not dispute that CFO Lesjak made these statements or that her comments put Whitman, Lane and Apotheker (who were all in the same room) on notice that the corporate officer at HP primarily responsible for managing the Company's financial risks viewed the deal as reckless. ¶¶32-33. Although the Complaint pleads that Lesjak specifically objected to the price of acquiring Autonomy (and when, where and to whom she did so (¶32)), HP's dismissal papers claim that the "complaint does not allege facts showing, for example, that…insiders had advised [Mr. Apotheker, Ms. Whitman, or Mr. Lane] that the price for Autonomy was not a 'fair price' or 'market price.'" Dkt. No. 133 at 8.

1. **HP, Apotheker, Lane and Robison Conduct "Limited" Due Diligence for Autonomy**

As set forth above, determined to deliver on his unequivocal promise to transform HP into a high-margin software company, and to do so as quickly as possible to avoid a leak about the deal, the Complaint describes how Apotheker rushed HP's Autonomy due diligence so as to announce the offer by 3Q11. ¶¶34-39. Moreover, aware that CFO Lesjak and Finance Committee Chair John H. Hammergren vigorously opposed the deal (¶¶32, 37), the Complaint alleges that Apotheker, Lane and Robison circumvented HP's Board Finance Committee prior to full Board review on August 17, 2011 to avoid added scrutiny of what they knew was a risky transaction. ¶¶37-38. Further, to expedite HP's due diligence, the Complaint alleges that HP recklessly relied on **Autonomy's** auditor's (Deloitte Touche Tohmatsu Limited ("Deloitte")) historical audits of Autonomy in the U.K. ¶¶36, 40-41.

While HP did engage KPMG for its own due diligence, the Complaint alleges that KPMG was specifically instructed by HP to limit its work to reviewing the prior audits of Autonomy performed by Deloitte in London. ¶36. In fact, after the Class Period, KPMG went on record to confirm that its role on the Autonomy due diligence was only a "**limited engagement**." *Id.*; *see also* Abadou Decl., Ex. D. The Complaint further alleges that, over the course of its "limited" due diligence, HP's due diligence team spoke by telephone with Autonomy's auditors at Deloitte. ¶39. During the call, Deloitte disclosed that, 18 months earlier, an Autonomy finance executive in London had alleged that improper accounting practices were occurring at Autonomy. *Id.* The

Complaint cogently alleges that, in its haste to announce the offer, HP recklessly failed to run this allegation about Autonomy's impairments to ground. *Id.* HP can quibble here all it wants but, ultimately, it does not deny its knowledge of these facts. Nor can it do so, as the Complaint alleges that KPMG later revealed that ***all*** of the information KPMG was provided by Deloitte, including allegations of Autonomy's improper revenue recognition practices, were "***equally disclosed to HP***." *Id.*

**2. Apotheker and Lynch Announce the Offer in a Joint Press Release**

On August 18, 2011, after its three week "limited" due diligence, HP announced its offer to purchase Autonomy for $11 billion. The announcement caused the Company's stock price to fall 20% in a single trading day on massive trading volume. ¶¶34, 44-45. Analysts variously described HP's offer as "value-destroying" and "expensive," while others concluded that HP was "***massively overpaying***" for Autonomy and probably "***felt compelled to act***" given Apotheker's earlier guarantees to "transform" HP. ¶46. On November 30, 2012, a *New York Times* article headlined "From H.P., a Blunder that Seems to Beat All," reported that a "former Autonomy executive ***laughed*** this week when I asked if even Autonomy executives thought H.P. had overpaid. 'Let's put it this way,' this person said. 'H.P. paid a very full price. It was certainly our duty to our [Autonomy] shareholders to say yes.'" ¶45. The Complaint alleges that all of the Defendants were either aware of, or recklessly ignored these and other highly damaging facts. ¶¶16-25, 29-43, 85-87, 91-96, 101, 165-69.

In September 2011, U.K. analyst Paul Morland ("Morland") sent HP's Investor Relations Department an email warning that "they were making a big mistake" in acquiring Autonomy. ¶67. Defendants claim that it is unclear what "mistake" Morland told HP they were making and that he may simply have expressed disagreement with the acquisition. Dkt. No. 136 at 6; Dkt. No. 133 at 14. Even taking Defendants' argument as true, however, the e-mail certainly would have alerted them to Morland's previous published reports on Autonomy, which accused it, *inter alia*, of: (i) recognizing hardware revenue as software revenue; (ii) improperly exaggerating its growth rate; (iii) improperly recognizing revenue up front; and (iv) recognizing hosting revenues

as license revenues – the very practices HP claimed to be stunned by in November 2012.[16] ¶¶19-20, 22.

Following the market's almost universally negative reaction to HP's announcement, the Complaint alleges that Apotheker recklessly defended the proposed deal. ¶¶58-59. At a September 13, 2011 investor conference, for instance, Apotheker was specifically asked "[w]hat specific steps around due diligence did HP take to investigate any concerns around [Autonomy's] accounting prior to completing or announcing the transaction." ¶176. In response, Apotheker misrepresented that HP had applied a "very conservative" and "rigorous" process in evaluating Autonomy, adding that HP ran "an extremely tight and very professional due diligence process." ¶¶58, 86, 172, 176. Apotheker further misrepresented that HP's valuation and due diligence had resulted in "a very fair price for Autonomy" – "*just take it from us*. We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy. And it will give a great return to our shareholders." ¶¶58, 172.

At the same September 13, 2011 conference, Apotheker also relayed Defendant Lynch's prior statements that Autonomy "generates 40% margin," and noted that HP "bring[s] scale, essentially scale and complementarily to that asset only makes it an even more palpable asset for us because it gives us the opportunity to really provide a return very quickly for our shareholders." ¶171. As referenced in the Complaint, these statements were deliberately reckless when made. ¶¶166-67, 172. In response to a question about the strength HP/Autonomy's core IDOL OEM platform, the Complaint alleges that Defendant Robison recklessly represented that "[t]here's *no data* that indicates the core OEM franchise is deteriorating. If you look at the growth for the IDOL platform, it's growing nicely and will continue." ¶174. In truth, mounds of publicly-available data existed as early as 2009 clearly

---

[16] The fact that Morland may have told CNBC that he was not accusing Autonomy of fraud does nothing to change this analysis. Dkt. No. 134-12; Dkt. No. 133 at 14. Nor does HP's argument that Morland had no personal knowledge of the accounting fraud. Dkt. No. 133 at 14. Morland was an industry analyst in the U.K. who closely tracked Autonomy and published numerous reports questioning its revenue recognition and reported growth. ¶¶17, 19-20, 22, 24.

indicating that Autonomy's core IDOL OEM franchise was "vaporware writ large" and nonexistent. ¶¶24, 61, 89, 93-95.

Then, on September 22, 2011, only a week after defending HP's offer, and before his deal with Autonomy had yet to even *close*, HP fired Apotheker. ¶68. The same day, Defendant Whitman took over as CEO and, during a joint interview with Lane, Lane conceded that Apotheker's "transformational" strategy had been so reckless that it was no longer even worth mentioning − "*that word has been stricken from our language*, that we're transforming HP. Because HP is $120 billion, and so with Autonomy's enormous success and enormous profitability and synergies that we can gain, we think we can build a heck of the business out of it but *it has nothing to do with transforming*." ¶¶68, 177. During the same September 22, 2011 interview, Lane also stated that, although he wished HP "could have bought it [Autonomy] cheaper, [] *it was market price*." ¶178. Lane by then either knew, or was reckless in not knowing, that at $11 billion, Autonomy wasn't "market" price.[17] ¶¶16-25, 32-42, 45-56, 60-67. Indeed, HP has effectively admitted that Lane's statement was inaccurate by virtue of their $8.8 billion Autonomy write down. ¶¶84, 217.

**B.    Defendants Whitman and Lane Seek to Rescind the Offer**

The following day, on September 23, 2011, FBN Securities noted that "[i]ncoming CEO Whitman stated that for now she is supportive of the August 18 [2011] decision[] to purchase Autonomy ([]expected to [close] by the end of the year,[])…but she noted that she will be evaluating the[] decision[] closely (implying some reversal possibility, in opinion)," and that "[w]ith Autonomy, there is a contractual commitment, but there is the possibility of a negotiated solution." ¶178. There was, however, no "possibility of a negotiated solution" given what the Complaint specifically alleges were HP's draconian foreign contractual obligations to Autonomy under the City Code. ¶¶68-73, 178. The Complaint painstakingly alleges that, by then, Lane had

---

[17]    Two weeks before the offer period closed on October 3, Oracle's CEO, Larry Ellison, disclosed that Oracle had rejected a proposal to acquire Autonomy for $6 billion. ¶60. In response, HP's (soon-to-be) Executive Officer, Defendant Lynch, publicly attacked Ellison's assertion that he had shopped Autonomy to Oracle. *Id.* On September 28, 2011, Ellison issued a press release responding to Lynch's denial called "***Please Buy Autonomy***," which asserted that "[e]ither Mr. Lynch has a very poor memory *or he's lying*." *Id.*

specifically asked HP's financial advisers (Barclays and Perella) whether HP could back out of the deal. ¶73. He was told that U.K. takeover rules made that impossible. *Id.*

The Complaint alleges that for HP to successfully invoke a material adverse condition under the City Code, HP was required to demonstrate to the U.K. Takeover Panel that circumstances had arisen affecting Autonomy which HP ***could not have reasonably foreseen at the time of the announcement*** of HP's August 18, 2011 offer. ¶72. Given the numerous, publicly-available red flags about Autonomy that made it reasonably ***foreseeable*** that Autonomy ***was*** overvalued and/or engaging in improper accounting practices, the Complaint alleges that HP could not successfully invoke the material adverse condition necessary to withdraw the offer. *Id.*

**C.      HP Attempts to Quietly Unwind Autonomy's Improper Accounting Practices**

Next, the Complaint alleges that, after the offering period closed on October 3, 2011, HP immediately began to claw back commissions paid to Autonomy salespeople that the Company knew were using improper revenue recognition practices. ¶¶74, 182. HP also began to change ***how*** revenue was recognized and commissions were paid by Autonomy. ¶¶74-75, 77. Then, beginning in October 2011, the Complaint describes how HP began to undertake detailed studies of Autonomy's software revenue recognition practices, and that these studies revealed that Autonomy's management had, in fact, been engaging in improper revenue recognition practices. ¶¶75, 139. Defendant Lynch appeared to confirm that Defendant Whitman knew, contemporaneously, about Autonomy's aggressive accounting practices when, in an "open letter," he rhetorically asked Defendant Whitman to "explain how such issues could ***possibly*** have gone undetected during…HP's financial oversight of Autonomy for a year from acquisition until October 2012 (a period during which all of the Autonomy finance reported to HP's CFO Cathie Lesjak)." ¶100. In the same "open letter," Defendant Lynch also provocatively asked whether "Ms Whitman and Ms Lesjak [were] aware that Paul Curtis (HP's Worldwide Director of Software Revenue Recognition)…undertook in December 2011 detailed studies of Autonomy's software revenue recognition with a view to optimising for US GAAP?" ¶100.

Either Defendants knew that Mr. Curtis had discovered and was "optimizing," or were severely reckless in not knowing that he had discovered and was "optimizing," Autonomy's

improper bogus revenue recognition practices as of January 2012. ¶¶134-38. The Complaint goes even further by specifically alleging how: (i) Whitman was "hands-on" regarding HP's Autonomy division; (ii) Lynch was a direct Whitman report; and (iii) Autonomy's CFO, Sushovan Hussain, was a direct report to HP CFO Lesjak. ¶¶65, 76, 100, 109, 177. Indeed, on November 21, 2011, Whitman stated that Autonomy was her "***priority number one, two and three for 2012***," and represented that she would "obviously step back and take a hard look at this [acquisition]…and I'll dive in and have a more informed [] view for you probably at our next earnings call." ¶177.

The Complaint then specifically alleges that, by year-end 2011, HP's corporate auditor, Ernst & Young LLP ("E&Y") also began reviewing Deloitte's Autonomy audit work papers in connection with E&Y's year-end audit for HP. ¶75. The Complaint alleged how and why Autonomy's revenue recognition "problem should have been almost immediately apparent to HP upon completion of the acquisition. It would have had costs against which it could not book revenue coming out of unfulfilled contracts in both the unended quarter prior to the 2011 year end plus costs going into the early quarters of 2012." *Id.* HP does not plausibly explain how it could possibly have missed Autonomy's problems by this time period. And if it suggests on reply that it did miss Autonomy's problems, it was severely reckless in doing so. ¶¶16-25, 29-40, 46-67, 69, 72-77, 85-87, 89, 91-96, 100-02, 137-39, 141, 146-48.

By December 2011, as Lesjak, Murrin and Whitman learned first-hand about Autonomy's improper revenue recognition practices, HP simultaneously began a gradual wind-down of those practices which began to manifest in HP/Autonomy's publicly-reported Software Segment results in February 2012. ¶¶77-79, 100, 182-86. The now uncontested forensic analysis provided in the Complaint buttresses Plaintiff's accounting allegations. In the six quarters leading up to the Autonomy Acquisition, for example, the Complaint alleges that Autonomy's revenues equated to approximately 31% of HP's software revenue (or approximately 24% of the combined revenues). ¶77. Between 1Q09 and 2Q11, Autonomy's reported operating margin ranged from 40% to

50%,[18] averaging 43.4%. HP's software revenue operating margin between 2Q10 and 4Q11 ranged between 17.6% and 28%, averaging 23.5%. *Id.* Hence, expecting that just one-quarter of HP's Software Segment revenue would benefit from the Autonomy margins that Apotheker publicly touted about Autonomy on August 18 and September 13, 2011, the Complaint alleges that analysts had expected HP's software margin to spike to 27.3% (J.P. Morgan), with the consensus analyst estimate at 21.9%, well above the previous year's 1Q11 software operating margin of 17.6%. *Id.* Yet, on February 22, 2012, HP reported only a 17.1% software operating margin. *Id.* This trend continued in 2Q12 and 3Q12, with HP software operating margins of 17.7% (v. 2Q11 of 20.2% and consensus of 20.4%) and 18% (v. 3Q11 of 19.4% and consensus of 22.2%). ¶¶77, 191-208.

The Complaint then carefully describes how HP's publicly-reported license revenue growth also curiously began to deteriorate after HP's Software Segment started incorporating Autonomy. ¶¶78, 145. For instance, HP revealed that its license revenue accounted for approximately 32% of HP's software revenues (which ranged between $656 million to $1.02 billion a quarter between 1Q10 and 3Q12). ¶78. Autonomy's license revenue ranged between $121 and $180 million between 1Q10 and 2Q11. *Id.* Thus, incorporating Autonomy's historical financial statements and license revenue on HP's books should have ***increased*** HP's license revenue growth significantly in 2012. *Id.* In the four quarters leading up to HP's integration of Autonomy, HP reported license revenue growth between 3% and 33%, averaging 23.5%. ¶¶78, 147. For the four quarters before the Autonomy Acquisition was announced, Autonomy reported license revenue growth between 10% and 23%, averaging 15.5%. Yet, in 1Q12, 2Q12 and 3Q12, HP reported license revenue growth of just 12%, 7% and 2%, respectively. ¶78.

Defendants claim that Lead Plaintiff's allegations are "implausible" because one should have expected HP Software numbers to ***increase*** after the Autonomy acquisition. Defendants' effort to mischaracterize the Complaint in this manner is not the least bit illuminating. The Complaint specifically alleges that HP's Software Segment's disappointing gross margins and

---

[18] Autonomy's 3Q09 operating margin was an outlier caused by significant spending on a product launch. ¶77 n.28.

license revenue growth were caused by HP's efforts to **fix** the Autonomy unit's materially inflated high growth rates and margins. ¶¶74-77. Rather than disclose that HP was experiencing lower than expected operating margins and license revenue growth as a result of HP's efforts to **unwind** Autonomy's materially inflated revenue, profits, EPS, growth rates and margins, the Complaint alleges that Whitman, Murrin and Lesjak concealed these facts. ¶¶74-82, 133-34, 145, 149-58, 182-206. The Complaint further alleges that the decline in HP's software license revenue growth also coincided with explosive growth in HP's software services revenue, strongly suggesting that Autonomy's revenue recognition for SaaS term deals were being aligned with GAAP negatively weighing on HP/Autonomy's reported license revenue growth. ¶186.

Finally, the Complaint alleges that while Defendants knew that "roughly 250 Autonomy employees [] quit" since the acquisition closed, including Autonomy's President, COO, Chief Marketing Officer and Chief Technology Officer, they represented in February 2012 that HP's integration efforts were "going well." ¶¶81, 185. Defendants' dismissal papers ignore that one of the Complaint's key sources about Whitman's and Lesjak's misleading integration statements was no less than HP's own top fifteen Class Period Executive Officer – Defendant Lynch – who revealed in yet another "open letter" that "[t]he former management of Autonomy began alerting Ms Whitman **as early as December 2011** to significant problems with the integration of Autonomy into HP that were negatively impacting its performance…**Why was this not communicated to shareholders at that time**?" ¶102.

### D. A Senior HP/Autonomy Executive Thwarts Defendants' Efforts to Quietly Fix Autonomy

In May 2012, the Complaint alleges that a "senior member of Autonomy's leadership team" disclosed serious accounting improprieties at HP/Autonomy to HP GC Schultz and Defendant Whitman. ¶¶80, 84, 88, 152. This material development, too, was concealed from investors. In Defendant Lynch's words, subsequent to his removal from HP, "why did HP senior management apparently wait six months to inform its shareholders of the possibility of a **material** event related to Autonomy?" ¶100. Then, on August 22, 2012, the Complaint asserts that Whitman began to partially disclose, however incompletely, that "**Autonomy still requires a**

*great deal of attention and we've been aggressively working on that business*." ¶¶82, 200. By the time she made this statement, Defendant Whitman had known about the May 2012 whistleblower for three full months. ¶80. The same day, HP revealed that its Software Segment results had worsened, and warned that it could record a goodwill impairment in that segment, causing at least one analyst to note that "[a]fter Autonomy's poor performance the last couple quarters, we suspect that goodwill associated with Autonomy will constitute part of the write-off." ¶¶82, 202, 214. In response to these partial disclosures and half-truths, HP's share price fell approximately 11.5% from a closing price of $19.47 on August 21, 2012 to a closing price of $17.23 on August 23, 2012. ¶¶82, 203, 216.

Three months after the May 2012 whistleblower alerted HP to HP/Autonomy's accounting fraud, the Complaint also alleges that Whitman misleadingly attributed Autonomy's problems to "classic entrepreneurial Company *scaling challenges*." ¶¶172, 191. It was a highly misleading justification given the facts then known to her.[19] ¶80. By September 7, 2012, Morningstar highlighted that "[t]he software division...stands out with its failure to deliver growth," adding that HP's results were "a *far cry* from the growth trajectory that HP must have expected to justify the steep price tag of this [Autonomy] acquisition." ¶203. Around the same time, Indigo Equity Research observed that "HP *hinted* at possible further write-downs next Q for Autonomy," explaining that "[s]oftware is relatively limited and uncompetitive, despite the Autonomy acquisition." *Id.* Morningstar added that "HP's expansion in...[s]oftware (via Autonomy) is not paying off." *Id.* By this time, Defendant Whitman had known about the May 2012 whistleblower for four full months.

### E. The Class Period Ends

On November 20, 2012, the Company revealed what all of the Defendants, except perhaps Defendants Lesjak, Lynch and HP Board member John H. Hammergren, were at least reckless in not knowing since at least July 2011 – namely, that "Autonomy was substantially

---

[19] Notably, in September 2011, Apotheker made the exact opposite statement when he said that HP "*bring[s] scale*, essentially scale and complementarily to that asset only makes it an even more palpable asset for us because it gives us the opportunity to really provide a return very quickly for our shareholders." ¶171.

overvalued at the time of its acquisition." ¶¶5, 8, 37, 85, 217. Defendants' suggestion that Lynch's misconduct had "severely impacted HP management's ability to fairly value Autonomy at the time of the deal" is implausible given the fact that the Complaint specifically alleges that HP's own CFO (Lesjak) had earlier told the full HP Board – that Autonomy was overvalued during a July 2011 Board meeting. ¶¶32, 85.

The same day, HP revealed that Autonomy had concealed $100 to $200 million of hardware costs within its reported sales and marketing expenses for 2010 and 2009 – which previously totaled $375 million for 2010 and 2009 to inflate its reported gross profit. HP therefore has sought to represent that up to 50% of Autonomy's reported sales and marketing costs were fictitious and overstated, but that HP failed to discover that significant discrepancy until November 2012. Asked whether HP was "stable" given HP's torrid revelations, Defendant Whitman almost instinctively retorted that "the two people that should have been held responsible [Apotheker and Robison] are gone." ¶86. Now, per her Fed. R. Civ. P. 12(b)(6) motion, she claims that Defendants Apotheker and Robison both acted in the "utmost good faith." Dkt. No. 139 at 1.

## III. LEGAL STANDARDS

In assessing a Fed. R. Civ. P. 12(b)(6) motion in a PSRLA case, courts are to consider the complaint in its entirety, "accept all factual allegations…as true" and construe them in the light most favorable to plaintiff. *Tellabs*, 551 U.S. at 314; *see Commc'ns. Workers of Am. Plan for Emps. Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1120 (D. Ariz. 2007). The question is not whether a plaintiff will prevail in the action, but whether she is entitled to offer evidence in support of her claim. *See In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1241 (N.D. Cal. 2008). A complaint should not be dismissed if it contains sufficient factual matter that, accepted as true, states a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 884 (2009). Stated differently, a motion to dismiss should be denied if the factual content in the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1022 (C.D. Cal. 2008).

To state a claim under §10(b) of the Exchange Act, a plaintiff must allege: (1) a false statement or omission; (2) of material fact; (3) made with scienter; (4) on which the plaintiff justifiably relied; and (5) that proximately caused the alleged loss. *See Binder v. Gillespie*, 184 F.3d 1059, 1063 (9th Cir. 1999); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).[20] Falsity is adequately alleged by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). A complaint sufficiently pleads falsity where, as here, it includes (1) each statement or omission alleged to have been misleading (¶¶44, 58, 76, 80, 111, 127, 134, 142-43, 145, 149-58, 163-64, 168-69, 171-72, 174, 176-80, 182, 184-85, 187-89, 190-92, 194, 196-97, 199-202, 204-06); (2) the reason or reasons why they statement or omission is misleading (¶¶58, 150, 153, 158, 165, 172-73, 175-76, 178-79, 181, 186, 188, 193, 195-96, 198-99, 201, 205-06); and (3) all facts on which that belief is formed (¶¶15-25, 31-102, 126-41, 148, 152, 155, 157, 159-62, 166-69). *See Desaigoudar v. Meyercord*, 223 F.3d 1020, 1023 (9th Cir. 2000); *In re Omnivision Techs. Sec. Litig.*, 2013 U.S. Dist. LEXIS 46032, at *15-17 (N.D. Cal. 2013).

In this Circuit, assessing falsity and scienter is often a "unitary inquiry" because they are often "'strongly inferred from the same set of facts.'" *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005). To plead scienter, a plaintiff must "'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive ***or with deliberate recklessness*** as to the ***possibility*** of misleading investors." *Berson*, 527 F.3d at 987. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. A complaint survives if, "[w]hen the allegations are accepted as true and taken collectively," a reasonable person would "deem the inference of scienter at least as strong as any opposing inference[.]" *Id.* at 326. In other words, a tie goes to the Plaintiff. The Court should "consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation." *S. Ferry LP v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Here, the Complaint alleges myriad facts which,

---

[20] None of the Defendants contest the loss causation and only Defendant Lynch disputes the element of reliance.

taken together, adequately allege scienter as to each of the §10(b) Defendants. *See In re SunPower Sec. Litig.*, 2011 U.S. Dist. LEXIS 152920, at *15-17 (N.D. Cal. 2011) (Seeborg, J.).

The Ninth Circuit has also just recently reiterated that while a ***dual*** scienter analysis remains permissible, the "risk…is that a ***piecemeal*** analysis will obscure a ***holistic*** view." *VeriFone*, 704 F.3d at 703; *see Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011). The Court should therefore review "all the allegations holistically," *Matrixx*, 131 S. Ct. at 1324, "to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Gammel*, 2013 U.S. Dist. LEXIS 68026, at *47-48; *see VeriFone*, 704 F.3d at 703 ("[W]e approach this case through a holistic review of the allegations to determine whether they combine to create a strong inference of intentional conduct or deliberate recklessness."). Moreover, and critically under our facts, this Circuit has now made unmistakably clear that "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5." *Id.* at 708.[21]

One other thing also now bears mentioning. In seeking dismissal, Defendants rely on authorities that have been either expressly abrogated by the Ninth Circuit or drastically narrowed by the United States Supreme Court. *See Tellabs*, 551 U.S. 308; *S. Ferry*, 542 F.3d at 784 ("[*Tellabs*] suggests that perhaps *Silicon Graphics, Vantive* and *Read-Rite* are ***too demanding*** and focused ***too narrowly*** in dismissing vague, ambiguous, or general allegations outright.").[22] Defendants also overlook that *S. Ferry* "represent[ed] a seismic shift in the [Ninth] Circuit's

---

[21] In *In re McKesson, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000), defendants, as here, argued that allegations from "newspaper articles should be discounted because they are hearsay." Judge Whyte disagreed, reasoning that "[e]ven under the Reform Act, plaintiffs are only required to plead facts, not to produce admissible evidence." *Id.* Thus, "if the newspaper article includes numerous factual particulars and is based on an independent investigative effort, it is a source that may be credited in determining whether plaintiffs have alleged facts sufficient to raise a strong inference of scienter." *Id.*; *see also* ¶14 n.7 ("HP has obtained neither a retraction nor a correction of the news articles quoting HP insiders as referred to herein.").

[22] Dkt. No. 139 at 10 (citing *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002); Dkt. No. 131 at 2, 7, 10 (citing *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999)); Dkt. No. 136 at v, 2 (citing *Silicon Graphics*); Dkt. No. 133 at 26 (citing *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843 (9th Cir. 2003); Dkt. No. 133 at 6, 7, 26 (citing *Silicon Graphics*); Dkt. No. 127 at 9 (citing *Vantive*, 283 F.3d 1079).

analysis of securities fraud complaints and significantly lowers the bar for pleading scienter[.]" *Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 788-89 (D. Ariz. 2009); *see also Matrixx*, 131 S. Ct. at 1322. Indeed, following *S. Ferry*, *Matrixx* and *Tellabs*, the Ninth Circuit's most recent published discussion of scienter ignored *Vantive* and *Read-Rite* altogether and expressly found that *Silicon Graphics* had been "abrogated." *VeriFone*, 704 F.3d at 701.

## IV.    ARGUMENT

### A.    Defendants' False and Misleading Class Period Statements Are Actionable

#### 1.    Defendants Were Reckless in Not Knowing About Autonomy's Possible Impairments

Defendants Apotheker, Lane, Whitman and Robison broadly claim that the falsity of their August and September 2011 statements has not been adequately alleged because Plaintiff lacks proof that they were aware of ***any*** "red flags" about Autonomy in the period leading up to the Company's August 18, 2011 announcement. Dkt. No. 142 at 3, 5; Dkt. No. 127 at 7; Dkt. No. 136 at 6, 7 & n.10; Dkt. No. 131 at viii, 11. Their claim is hard to credit.[23] *S. Ferry*, 542 F.3d at 785. ¶¶15-25, 47-49, 92. First, Whitman has already admitted that she learned about reports accusing Autonomy of questionable accounting practices upon the announcement of the Autonomy deal.[24] ¶¶69, 73, 87-89*; see also* ¶¶92, 96, 100. Next, in the years leading up HP's

---

[23]    Plaintiffs do not claim that Defendants had a duty to disclose the negative reports about Autonomy. Dkt. No. 139 at 7. Rather, those analyst reports should have (and the market assumed that they did) caused Defendants to conduct thorough and extensive due diligence on Autonomy. Thus, when Defendants told investors that HP had conducted extensive due diligence and repeated Autonomy's financial results, those statements were material. By contrast, the publicly available information in *Higginbotham v. Baxter Int'l, Inc.* "had no apparent link to the fraud." 495 F.3d at 753, 759 (7th Cir. 2007).

[24]    *VeriFone*, 704 F.3d at 707-08, 710, credited allegations that defendants were "hands-on managers" who "were on notice that there might be issues." Dkt. No. 133 at 12. In *Roth v. OfficeMax, Inc.*, 527 F. Supp. 2d 791, 798-99 (N.D. Ill. 2007), there was no admission by defendants that they knew about the "red flags." Dkt. No. 131 at 11. In *In re Silicon Storage Tech. Inc.*, 2006 WL 648683, at *17 (N.D. Cal. 2006), the court refused to infer that defendants were aware of one "irrelevant" analyst report which "did not concern" defendants' products. Dkt. No. 142 at 3. *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1007-08 (S.D. Cal. 2000) and *Stephenson v. Pricewaterhousecoopers, LLP*, 768 F. Supp. 2d 562, 571-73 (S.D.N.Y. 2011) applied the heightened standard for auditor scienter. Dkt. No. 133 at 12; Dkt. No. 136 at 7 & n.10, 8 n.11; In *Saltz v. First Frontier, L.P.*, 485 F. App'x 461, 464 (2d Cir.

August 18, 2011 announcement, numerous analysts voiced concern about Autonomy's revenue and seemingly gravity-defying growth rates. ¶¶17-25. From 2007 to 2010, analysts variously accused Autonomy of: (i) "benefit[ting] significantly" from questionable changes in clarifying certain accounting items; (ii) "consistently overstated revenue and grossly understated expenses;" (iii) "[m]assaging [its] growth rate;" (iv) "extremely misleading statements about its accounting;" (v) "unusual items in the accounts;" (vi) "revenue recognition [that] may have been accelerated;" (vii) "evidence to suggest the early recognition of revenues;" (viii) "[u]nusual balance sheet movements;" (ix) "growth rates [that] appear to be overstated;" (x) "early recognition of deferred revenues;" and (xi) "never growing as quickly as it said it was." ¶¶17, 19-22, 30. To the extent they want to now argue they were unaware of these issues, that supports Defendants' recklessness.

Despite these questions, on August 18, 2011, Defendant Apotheker unequivocally represented that "Autonomy's recent operating and financial performance has been strong, including its most recent results for the quarter ending June 30, 2011. Over the last five years, Autonomy has grown its revenues at a compound annual growth rate of approximately 55 percent and adjusted operating profit at a rate of approximately 83 percent." ¶¶44, 163. In response to a specific analyst question about Autonomy during a same day conference call, Apotheker represented that:

> Autonomy has grown its revenues at a compound annual growth rate of approximately 55% and adjusted operating profit at a rate of approximately 83% over the last 5 years. We're buying *a very strong business* and we believe that we can extract a lot more out of this business by combining it with HP.

¶164. Apotheker also represented that "[i]n 2010, Autonomy had gross margins in the high 80s and operating margins above 40%[]" and noted that Autonomy has "demonstrated a strong consistent track record of double-digit revenue growth." ¶¶44, 164. Likewise, HP reiterated that Autonomy was "highly profitable," and "[e]nhances HP's financial profile" given its "strong growth and profit margin profile" and "consistent track record of double-digit revenue growth, with 87 per cent gross margins and 43 percent operating margins in calendar year 2010." ¶164.

2012), there were no allegations that an investment advisor was aware of red flags, but merely that it had "a presumed duty…to be aware of what is going on."

Defendants' suggestion that the negative analyst and other reports about Autonomy should not be credited because other analysts took a different view makes no sense. Dkt. No. 142 at 3, 7-8; Dkt. No. 139 at 6; Dkt. No. 133 at 4, 12-13. The Complaint does not deny that there were two narratives about Autonomy in the lead up to HP's offer: "whether it was a 'real innovation-driven tech story [], or a M&A-led roll-up with a healthy dash of questionable accounting." ¶25. Rather, it alleges that when HP represented that it had conducted "extensive" due diligence and repeated Autonomy's publicly-reported financial statements, the market was led to believe that HP had taken adequate steps to rule out the possibility that Autonomy's "questionable" accounting practices were true. HP's failure to do so, while affirmatively creating the opposite impression, was highly misleading.

The Complaint also alleges that analysts had also specifically noted that Autonomy reported consistently high DSOs – a telltale indicator of improper revenue recognition (¶¶21, 46, 137 & n.36) and specifically questioned whether Autonomy was improperly recognizing hardware revenue as software revenue – the very practice that HP later accused Autonomy's management of engaging in. ¶¶91-95. Then, upon the announcement of HP's $11 billion offer, HP's stock price fell 20%, while Autonomy's stock price surged 75%. ¶45. Analysts described HP's offer as nothing short of "defy[ing] logic." ¶46. On August 29, 2011, the Complaint alleges that Defendants learned that Autonomy OEM was not used nearly as widely or extensively as Autonomy claimed. ¶¶49, 57. Defendants' suggestion that they did not know about the accusations raised about Autonomy's OEM business is belied by the fact that they were summarized in a publicly-available analyst report days after the announcement.[25] Dkt. No. 127 at 8 n.7; Dkt. No. 136 at 6; Dkt. No. 133 at 14. Nor were the red flags about Autonomy merely "idle [i]nternet speculation" as in *Pittleman v. Impac Mortg. Holdings, Inc.*, 2008 WL 4809962, at *2 (C.D. Cal. 2008). ¶¶48-49, 57, 61; Dkt. No. 133 at 14. Moreover, CFO Lesjak's sudden decision to cancel a road show appearance meant to defend the deal, just one week after the

---

[25]    In *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *11-12 (N.D. Cal. 2013), by contrast, plaintiffs alleged that defendants "would have known" of allegations by virtue of their positions, not that the information was published by a respected analyst. ¶49; Dkt. No. 127 at 8 n.7.

announcement, and despite the negative publicity that it garnered, is strong evidence of HP's knowledge of the red flags about Autonomy. ¶47.

### 2. Apotheker's Due Diligence Statements Are Actionable

HP and Apotheker claim that Plaintiff makes no allegation that he was aware of the level of due diligence HP performed on Autonomy despite the fact that Apotheker spoke at length about the Company's due diligence in September 2011.[26] Dkt. No. 127 at 2; Dkt. No. 133 at 10, 27. It's a desperate argument. If Defendant Apotheker was as unaware about HP's Autonomy due diligence as he now claims, then how could he justifiably defend the Company's due diligence efforts without deliberately misleading HP's shareholders? ¶¶41, 58, 86-87, 137, 167, 172, 176. To the extent he now claims he was kept in the dark about the level or quality of HP's due diligence, his due diligence statements were misleading. *Ernst & Young*, 641 F. 3d 1089, 1098 (9th Cir. 2011).[27]

Defendant Apotheker's representations that HP's due diligence was "rigorous," "extensive" and "extremely tight" on September 13, 2011 were also misleading when made because the Complaint alleges that he knew that HP relied entirely on Deloitte's ***previous*** audits of Autonomy's financial statements for its due diligence. ¶¶36, 40-41, 86, 176. *See In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 371 (D.N.J. 1999) (statement that defendant "did all the due diligence that one does when one buys a public company" actionable where due diligence

---

[26]     Plaintiff is not alleging that Defendants' shoddy due diligence, "in itself," demonstrates scienter, *Murdeshwar v. Search Media Holdings, Ltd.*, 2011 WL 7704347, at *17 (S.D. Fla. 2011), or merely that defendants "would have learned the truth" if they performed diligence as represented. *McIntire v. China MediaExpress Holdings, Inc.*, 2013 WL 752954, at *17 (S.D.N.Y. 2013); *Durgin v. Mon*, 659 F. Supp. 2d 1240, 1255 (S.D. Fla. 2009); *Griffin v. McNiff*, 744 F. Supp. 1237, 1251 (S.D.N.Y. 1990); Dkt. No. 142 at 6. Rather, the Complaint alleges that Defendants misrepresented the ***extent*** of their due diligence and, where "Defendants were reckless in representing they had conducted due diligence" it "may amount to a false or misleading statement." *Murdeshwar*, 2011 WL 7704347, at *17; Dkt. No. 127 at 7.

[27]     Nor is Plaintiff required to allege that HP's "due diligence fell dramatically below standards in the industry." Dkt. No. 133 at 10, 27; Dkt. No. 127 at 6. This is not a case like *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 2013 WL 1174017, at *19 (S.D.N.Y. 2013) where the false statement at issue was "we have done far more homework than one would typically see in a significant acquisition," thus necessitating an inquiry into "how [defendant's] due diligence compared to that done by others." Likewise, in *Schiller v. Physicians Res. Grp., Inc.*, 2002 WL 318441, at *11 (N.D. Tex 2002), the complaint contained only a conclusory allegation that defendants "did virtually no due diligence before making acquisitions."

---

was "based almost entirely on public information audited by [the acquisition target's] auditor"). The Complaint also alleges that, although HP's due diligence team requested the working papers underlying Autonomy's audits by Deloitte, Autonomy refused to provide them. ¶¶34; S*ee* ¶¶16-17. It also alleges that Defendant Lynch actively limited HP's due diligence of Autonomy to Autonomy's publicly-reported financial statements, and approximately 25 sales contracts. ¶¶34, 42.[28] In their haste to announce the offer by 3Q11, HP's due diligence team capitulated. ¶34.

Following the Class Period, KPMG confirmed that HP's Autonomy due diligence was "limited." ¶36.[29] In addition, while Whitman and Apotheker have suggested otherwise (¶¶41, 86), Deloitte likewise confirmed that it "was not engaged by HP, or by Autonomy, to provide any due diligence in relation to the acquisition of Autonomy." ¶86.[30] The Complaint adds that, although HP's internal procedures required the Board's Finance Committee to review and approve acquisitions before they reached the full Board, this procedure was suspiciously not followed for the Autonomy acquisition.[31] ¶37. In fact, Defendant Lesjak's dismissal papers

---

[28] *See Sapirstein-Stone-Weiss Found. v. Merkin*, 2013 U.S. Dist. LEXIS 84035, at *16 (S.D.N.Y. 2013).

[29] In *GSC Partners CDO Fund v. Washington*, 368 F.3d 228 (3d Cir. 2004), defendants conducted nearly a year of intensive due diligence on an acquisition target. *Id.* at 232-35; Dkt. No. 127 at 7, 10; Dkt. No. 133 at 10. In *Brogren v. Phohlad*, 933 F. Supp. 793, 800 (D. Minn. 1995) "plaintiffs provide[d] no facts to support the[] allegation[]" that defendants "failed to conduct due diligence." In *NECA-IBEW Pension Trust Fund v. Bank of Am. Corp.*, 2012 WL 3191860, at *19 (S.D.N.Y. 2012), "[p]laintiffs d[id] not allege that [defendant] did not perform its due diligence investigation as it had been represented to investors." Dkt. No. 133 at 27-28.

[30] Despite this, Defendants argue that they were entitled to rely on Deloitte and KPMG. Dkt. No. 142 at 2, 8; Dkt. No. 136 at v, 1, 6 & n.9; Dkt. No. 133 at 24; Dkt. No. 127 at 7; Dkt. No. 139 at 6; Dkt. No. 131 at vii, 4-5, 8, 11. But "[a]uditors are hired and retained by insiders. A few top auditing firms compete for high-profile clients….Therefore, they have strong structural incentives to yield to management on close questions." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1197 (C.D. Cal. 2008). This is particularly true where, as here, Deloitte was not only conflicted but *wasn't HP's auditor*. ¶¶36, 40-41, 86. Apotheker argues that these allegations should be ignored because there is no evidence that he was aware of them. Dkt. No. 127 at 7. But "the more likely an [defendant] would have discovered the truth if a reasonable audit had been conducted, the stronger the scienter inference." *Ernst & Young*, 641 F. 3d at 1098. *In re Alloy, Inc.*, 2011 WL 4863716, at *11 (Del. Ch. 2011) merely states that the fact that advisors are paid is not sufficient, "*standing alone*," to state a bad faith claim. Dkt. No. 131 at 12, n.5. Finally, the fact that auditors "were retained [to conduct diligence] does not establish, in and of itself, that 'extensive due diligence' was conducted." *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 996 (S.D. Ohio 2008).

[31] The fact that members of HP's Finance Committee ultimately voted for the deal does not change the fact that they were prevented from conducting an independent review prior to full

---

confirm that, contrary to best practices (*see id.*), she was stripped of her ability to review HP's due diligence over Autonomy. Dkt. No. 136 at 1, 6; ¶38.

The Complaint also alleges that HP's due diligence team was made aware of specific allegations of potential misconduct at Autonomy. Eighteen months before HP announced its offer, a senior finance executive at Autonomy made allegations that Autonomy was engaged in improper revenue recognition practices. ¶¶39, 42. While this information was disclosed to HP's due diligence team before the August 18 announcement, neither HP nor KPMG ran it to ground.[32] ¶39. *See Heckmann*, 869 F. Supp. 2d at 530-32, 540-541; *Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 754 (D. Conn. 1997). In addition, by August 9, 2011, the Individual Defendants specifically learned that KPMG's "[d]ue diligence comprised telephone discussions with management and access to very limited proprietary financial and tax information. The majority of findings and observations are based on oral representations from management and reading published financial information." Abadou Decl., Ex. D. KPMG contemporaneously informed HP that the City Code resulted in "very limited information being provided prior to a transaction closing" and that "[t]he data and access provided to us during due diligence was very limited." *Id.*; *c/f* Dkt. No. 127 at 7; Dkt. No. 133 at 3 (HP and its advisors "reviewed a number of [Autonomy's] larger sales contracts.").

Defendants Robison and Apotheker now claim that they had not "had the opportunity to gain firsthand knowledge as the owner of Autonomy's business," Dkt. No. 142 at 1-2, 5;[33] Dkt.

---

Board review in contravention of HP's policies. Dkt. No. 127 at 10. Indeed, the Finance Committee had blocked Apotheker's previous acquisition of Comverse before that proposed deal reached full Board review. ¶37.

[32] Defendants' sole response is that, despite the fact that analysts had questioned Autonomy's Deloitte-audited financial statements for years, as well as Deloitte's independence, they were entitled to rely on Deloitte rather than running the accusation to ground themselves. Dkt. No. 142 at 5-6; Dkt. No. 127 at 8; Dkt. No. 136 at 6; Dkt. No. 133 at 13-14. It's not a very good argument. *See Cendant*, 60 F. Supp. 2d at 371 (statement that defendant "did all the due diligence that one does when one buys a public company" actionable where due diligence was "based almost entirely on public information audited by [the acquisition target's] auditor").

[33] Contrary to HP's argument (Dkt. No. 133 at 11), *McKesson*, 126 F. Supp. 2d 1248 confirms that HP is liable for repeating Autonomy's publicly-reported financial results if it was "deliberately reckless to the truth." *Id.* at 1276. Moreover, *McKesson* reiterates that "allegations of 'red flags'" about "improper accounting practices" are "highly probative of scienter, because it tends to negate the possibility of innocent mistake." *Id.* at 1274. In *South Cherry St., LLP v.*

No. 127 at 5, 9, 11; Dkt. No. 133 at 11, 26, even though Apotheker told the market that HP **had** conducted extensive due diligence before HP announced its offer to purchase Autonomy. ¶¶58, 176.

Thereafter, Defendants Apotheker, Lane, Whitman and Robison publicly expressed confidence in Autonomy's financial results and told HP's shareholders that those results would improve after the acquisition closed.[34] ¶¶163, 168-69, 171-72, 174, 177; *see Diamond Foods*, 2012 U.S. Dist. LEXIS 170704, at *35-37 (inference of scienter where defendants' statements on conference call indicated that they "had actual knowledge of [the company's business segment], and were aware of how that business would impact the company's financial statements"). "At the pleading stage…allegations that significant 'red flags' were ignored, can suffice to withstand a motion to dismiss." *Ernst & Young*, 641 F. 3d at 1102; *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956, 971 (N.D. Cal. 2005).[35] As here, "the more likely a[] [defendant] would have discovered the truth **if** a reasonable audit **had been** conducted, the stronger the scienter inference." *Ernst & Young*, 641 F. 3d at 1098; *VeriFone*, 704 F.3d at 708; *see also Everex*, 228 F.3d at 1064 (inferring scienter and stating "[defendant] cannot simply argue that he looked the other way"); *S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1259-60 (W.D. Wash. 2009).[36]

---

*Hennesee Group LLC*, 573 F.3d 98, 112 (2d Cir. 2009), plaintiffs did not plead "any fact" that "should have alerted [defendants, prior to their representations] that the [acquisition target's] representations were dubious." In *Coble v. Broadvision, Inc.*, 2002 WL 31093589, at *4 (N.D. Cal. 2002), the "only" specific allegation that defendants knew about an expense misstatement was the statement of one former employee that the company was "slashing funds for corporate events and travel." Dkt. No. 127 at 5-6, 11; Dkt. No. 136 at 2. Plaintiff does not seek to hold Defendant Robison liable for statements after his termination by HP. Dkt. No. 142 at 1.

[34]    Plaintiffs are not arguing Defendants' scienter based solely on their positions at HP. Defendants' positions at the Company, however, do add to the scienter calculus. *See Countrywide*, 588 F. Supp. 2d at 1191 ("[A] defendant's position within the company is a relevant circumstance to consider in the *Tellabs* analysis."); *In re Northwest Biotherapeutics Inc. Sec. Litig.*, 2008 U.S. Dist. LEXIS 54028, at *3 (W.D. Wash. 2008).

[35]    In *Ernst & Young*, the Ninth Circuit found scienter adequately pled against an **outside auditor** because a reasonable investigation **would have** revealed the fraud. 641 F. 3d at 1098. This applies with even more force against the Individual Defendants here because "pleading sufficient facts to support a strong inference of scienter by an outside auditor is difficult because [they] have more limited information than, for example, the **company executives** who oversee the audit." *Id.* at *18, 20.

[36]    Defendants argue that the Complaint fails to cite a CW, internal report, meeting, or communication. Dkt. No. 139 at 5; Dkt. No. 127 at 8-9; Dkt. No. 136 at 1, 3; Dkt. No. 133 at 1,

### 3. HP's Misrepresentations about HP's Autonomy Valuation Are Actionable

The Complaint next alleges that, despite the credible and persistent questions raised about Autonomy's growth, revenue recognition and OEM business (¶¶24, 47-49, 57, 60-61, 94), in August and September 2011 Defendants extolled Autonomy's revenue growth, margins, and shift to SAS and reiterated that Autonomy's OEM business was the "de-facto standard among more than 400 OEMs[.]" ¶¶58, 163-64. "[W]here parties maintain high valuations on assets in the face of red flags that the valuations are inaccurate, courts have sustained securities fraud claims." *Stratte-McClure v. Stanley*, 784 F. Supp. 2d 373, 387-388 (S.D.N.Y. 2011). On September 13, 2011 Apotheker touted Autonomy's "40% margin," ¶171, and Defendant Robison added that "[t]here's no data that indicates the core OEM franchise is deteriorating."[37] ¶174. While HP argues that these statements were not false when made, Dkt. No. 133 at 26, their claim is hard to square with, among other things, HP's November 20, 2012 concession that Autonomy's financial results for 2009 and 2010 were overstated by an astonishing *50%*. ¶45 n.21, 87, 137, 141; Dkt. No. 136 at 1-2; Dkt. No. 131 at 4, 9-10.

The Complaint also alleges that, on August 13, 2011, just days before HP's scheduled August 18 announcement, Autonomy demanded even more money from HP. *Id.* Thereafter,

---

7. To the contrary, the Complaint makes CW allegations, describes e-mails sent to HP warning them about Autonomy, names internal and external whistleblowers, internal meetings and conversations, and HP's internal processes and reviews following the Autonomy acquisition. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (The PSLRA "do[es] not require the pleading of detailed evidentiary matter in securities litigation."). Defendants' authorities are not to the contrary. In *In re Loral Space & Commc'ns Ltd. Sec. Litig.*, 2004 WL 376442, at *17 (S.D.N.Y. 2004), the court merely found that the internal reports pled in the complaint did not support plaintiff's allegations, not that internal reports are necessary to plead scienter. Dkt. No. 136 at 3, 5, n.6. In *In re ChinaCast Educ. Corp. Sec. Litig.*, 2012 WL 6136746, at *6 (C.D. Cal. 2012), there was "a total absence of factual allegations" supporting scienter. In *In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 973 (N.D. Cal. 2010), plaintiff failed to allege how the misclassification of a one-time transaction would have been obvious to management. Dkt. No. 127 at 8-9.

[37] Robison's statement is material. Dkt. No. 142 at 4 & n.4. Immaterial puffery "use[s] terms that are not measurable and not tethered to facts that a reasonable person would deem important to a securities investment decision." *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006).[37] *See also In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1234-35 (S.D. Cal. 2010); *In re InfoSonics Corp. Sec. Litig.*, 2007 U.S. Dist. LEXIS 57784, at *18-19 (S.D. Cal. 2007).

---

Defendant Apotheker twice went to Lane and the Board to authorize additional funds, resulting in HP offering Lynch even more money, despite the fact that Defendant Lynch had refused to provide Autonomy's working papers during HP's due diligence. ¶¶34, 35. The newly negotiated price equated to an 11 times revenue premium for Autonomy. ¶¶24, 42. On August 17, 2011, during an internal Board conference call conducted the day before the announcement, Lesjak again objected to the deal. ¶43.[38] By September 2011, Oracle's Larry Ellison described Autonomy's price as "absurdly high" and disclosed that Oracle had rejected a proposal to acquire Autonomy for $6 billion: we "told Mr. Lynch that with a current market value of $6 billion, Autonomy was already *extremely over-priced*." ¶60. Likewise, Dell's Michael Dell refused to give Autonomy serious consideration, stating "[n]ot at that price. That was an overwhelmingly obvious conclusion that any reasonable person would draw." ¶61.

On September 13, 2011, analysts grilled Defendants Apotheker and Robison about HP's offer, stating that it "seemed to be anticipating explosive growth…yet our analysts that cover Autonomy think it's growing in the high, *single-digits organically*." ¶172. In response, Apotheker defended HP's offer price, assuring investors that HP had "a pretty rigorous process…that we follow for all of our acquisitions [] and we try to take a very conservative view at this…[,]" "*just take it from us*" he said, "[w]e did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy." ¶¶58, 172. Although Apotheker now argues that his statements are immaterial as a matter of law, Dkt. No. 127 at 3, 12, statements are not deemed mere puffery where, as here, they are "either immediately preceded or followed by very specific statements of fact that supposedly justify or supply a foundation for the optimism." *S. Ferry LP # 2 v. Killinger*, 399 F. Supp. 2d 1121, 1129-30 (W.D. Wash. 2005); *see In re St. Jude Med. Inc. Sec. Litig.*, 836 F. Supp. 2d at 878, 888 (D. Minn. 2012) (statements not puffery

---

[38]     Unlike *Hanrahan v. Hewlett-Packard Co.*, 2006 WL 1699573, at *4-5 (N.D. Cal. 2006), where plaintiff alleged that statements that the Board had unanimously approved a merger were misleading because one board member had voiced opposition prior to voting for the deal, Dkt. No. 133 at 16, n.5; Dkt. No. 127 at 9-10, Lesjak's vehement opposition to the price of the deal, in conjunction with the myriad other red flags discussed above, suffice to plead Apotheker's reckless disregard or willful blindness.

where they were a direct response to analyst's question). Lane made similar actionable misstatements. ¶¶177-78.

Nor does Plaintiff merely allege "fraud by hindsight," or that Apotheker was simply a "bad manager." Dkt. No. 127 at 9. The Complaint specifically alleges that Autonomy's reported $6 billion market value already exceeded by more than seven times its reported annual revenue and 15 times its operating profit in the period leading up to the deal. ¶¶33, 35. During a July 20, 2011 Board meeting, HP's CFO Lesjak bristled at the price of the deal (¶35), and told the full Board (including Whitman, Lane, and Apotheker) that "I can't support [the Autonomy Acquisition]. I don't think it's a good idea. I don't think we're ready. I think it's too expensive. *I'm putting a line down*. This is not in the best interests of the Company." ¶¶32, 42, 173. *See Duke Energy*, 2013 U.S. Dist. LEXIS 110693, at *21 (falsity established where several board members "had mounted significant yet undisclosed opposition").

### 4. Defendants' Due Diligence and Valuation Misrepresentations Are Not Mere Statements of Corporate Optimism

Only "statements on the extreme edge of generality and vagueness may be insufficient as a basis for a securities fraud claim….'[T]he exception for puffery is narrowly drawn.'" *S. Ferry*, 399 F. Supp. 2d at 1130 (quoting *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)). While Apotheker suggests otherwise, his "statements of [HP's] 'rigorous due diligence' are hard facts because these allegations are capable of empirical verification." *Garden City Emps.' Ret. Sys. v. Psychiatric Solutions, Inc.*, 2011 U.S. Dist. LEXIS 35661, at *133-34 (M.D. Tenn. 2011); ¶¶58, 87, 137, 172.

Here, the Complaint alleges that Apotheker misrepresented that HP had applied an "extremely tight and very professional due diligence process" that was "conservative," "rigorous," and had resulted in a "*very fair price*" for Autonomy. ¶¶58, 172. These are not mere statements of corporate optimism, Dkt. No. 133 at 28; Dkt. No. 127 at 3, 12; *see S. Ferry*, 399 F. Supp. 2d at 1129-30,[39] because specific statements made to quell investor concern are not

---

[39] *See In re DDi Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 28216, at *53-54 (C.D. Cal. 2005); *SEC v. Mozilo*, 2009 U.S. Dist. LEXIS 104689, at *25 (C.D. Cal. 2009); *Morgan v. AXT, Inc.*, 2005 U.S. Dist. LEXIS 42346, at *29-31 (N.D. Cal. 2005) (same).

puffery. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959-60 (9th Cir. 1996). Moreover, Apotheker's statements were not "generalized statements of corporate optimism, but [a] response[] to specific questions posed during the conference calls." *In re Ligand Pharms., Inc., Sec. Litig.*, 2005 U.S. Dist. LEXIS 44911, at *61-62 (S.D. Cal. 2005).[40] "Both the fact of the misrepresentation about performing due diligence and its materiality to a reasonable investor are patent." *In re J.P. Jeanneret Assocs.*, 769 F. Supp. 2d 340, 356-58 (S.D.N.Y. 2011); *Psychiatric Solutions, Inc.*, 2011 U.S. Dist. LEXIS 35661, at *133-34.[41]

### B. Defendants' Statements Are Not Protected by the PSLRA's "Safe Harbor"

Only forward-looking statements are protected by the Private Securities Litigation Reform Act's ("PSLRA") "safe harbor" and "statements are not considered forward-looking just because there are other forward-looking statements made in their proximity." *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 7667, at *19 (S.D. Cal. 2003); *see also In re Musicmaker.com Sec. Litig.*, 2001 U.S. Dist. LEXIS 25118, at *68 (C.D. Cal. 2001). Despite these principles, Defendant Robison argues that his statement that OEM "'will continue' to grow" are shielded by the PSLRA. Dkt. No. 142 at 4 & n.5. His statement, however, "concerns historical and current facts" because "for the [OEM] to 'continue to grow,' it is necessary that they have **already been growing**." *Mallen v. Alphatec Holdings, Inc.*, 2012 U.S. Dist. LEXIS 39416, at *32-35 (S.D. Cal. 2012).[42] To hold otherwise would permit "any corporation [to]

---

[40]     *Yahoo!*, 2012 U.S. Dist. LEXIS 113036, at *51 acknowledged that statements that might otherwise be puffery may be actionable when "made in response to [specific market] concerns." Dkt. No. 127 at 3, 12. In *Kinross Gold*, 2013 WL 1174017, at *16 and *Philco Inv., Ltd. v. Martin*, 2011 WL 4595247 (N.D. Cal. 2011), the statements were not made in response to specific analyst questions or investor concern. Dkt. No. 133 at 28. In *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir 2010), the company's statement that its "employee relations are good" was too vague to bear on the core question of whether the company disclosed the need to restructure its sales force.

[41]     *See also In re New Century*, 588 F. Supp. 2d at 1206, 1226-27 (C.D. Cal. 2008); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009); *Batwin v. Occam Networks, Inc.*, 2008 U.S. Dist. LEXIS 52365, at *40-41 (C.D. Cal. 2008); *In re RAIT Fin. Trust Sec. Litig.*, 2008 U.S. Dist. LEXIS 103549, at *25-26 (E.D. Pa. 2008).

[42]     *See also In re Foundry Networks, Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 18200, at *13-14 (N.D. Cal. 2003) (statement that company's "biggest challenge [was] to continue to meet demand, concern[s] then existing conditions").

shield itself from future exposure for past misconduct by making present-tense statements regarding the misconduct and its effects on the corporation." *Am. W. Holding*, 320 F.3d at 929, 937. For this reason, courts have found Robison's authorities "problematic" because they do not "explain[] how a past or present *fact* can be deemed an 'assumption' because only assumptions underlying a prediction about the future are protected by the safe harbor provision." *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 918 (N.D. Cal. 2012).

Whitman's statements are similarly not protected by the PSLRA's safe harbor. Dkt. No. 139 at 12. First, the majority of Whitman's statements are statements of present fact. ¶¶76, 80, 111, 127, 134, 142-43, 145, 149-58, 177, 178-80, 182, 184-85, 187-89, 190-92, 194, 196-97, 199-200, 204-06. Moreover, Whitman's "statements were not allegedly misleading because they failed to predict the future, but because they concealed or downplayed" current undisclosed facts. *In re Nuvelo, Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1230-31 (N.D. Cal. 2009); *see* ¶¶76-82, 111, 127, 134, 142-43, 145, 149-58, 177-82, 184-200, 204-06.[43] Because Plaintiff alleges that these statements were misleading due to her omissions, they are not protected by the PSLRA's safe harbor.[44] *See New Century*, 588 F. Supp. 2d at 1225-27. Further, the PSLRA only protects "forward-looking statement[s]…accompanied by meaningful cautionary statements." *Cutera*, 610 F.3d at 1112. Dismissing a statement under the safe harbor requires Defendants to make "a stringent showing: There must be sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading.'" *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1072 (C.D. Cal. 2012) ("*Am. Apparel I*"); Dkt. No. 139 at 12 & n.9; Dkt. No. 142 at 4 & n.5. In other words, "the cautionary statement must discredit the alleged misrepresentations to such an extent that 'the risk of real deception drops to nil.'" *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005).

---

[43] *Cutera*, 610 F.3d at 1111-13, does not address whether statements that are alleged to be misleading as a result of a defendant's material omissions are protected by the safe harbor. Moreover, this is not a projections case like *Cutera*, where the "lawsuit comes down to a claim that the company missed the earnings estimate it announced [three months earlier]." *In re Cutera Sec. Litig.*, No. C 07-2128 VRW, slip op. at 20 (N.D. Cal. Sep. 30, 2008) (Abadou Decl., Ex. F).

[44] *In re CV Therapeutics, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 17419, at *33-34 (N.D. Cal. 2004); *Providence v. Aeropostale, Inc.*, 2013 U.S. Dist. LEXIS 44948, at *31-32, 37-38, 44 (S.D.N.Y. 2013) ("the safe harbor does not apply to material omissions").

Here, Defendants have not made the required "stringent showing." *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996); *Amylin*, 2003 U.S. Dist. LEXIS 7667, at *20.

Cautionary language is not meaningful when it warns of risk factors that were not merely hypothetical but were in fact already occurring. *See Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1191 (N.D. Cal. 2008); *Countrywide*, 588 F. Supp. 2d at 1178 n.62. Here, HP's warnings that: (i) "[t]here is a risk that HP will be unable to successfully execute this transformation;" (ii) "during the course of our due diligence, we may not identify all of the factors necessary to estimate our costs accurately;" or (iii) HP "may be required to incur additional material charges relating to the impairment of those assets," (Dkt. No. 141 at 2-9) were not only vague, boilerplate language that could be found in any company's warnings in connection with an acquisition, but they also failed to disclose current facts necessary to make them not misleading (*i.e.*, that various whistleblowers had accused Autonomy of being an outright fraud).

## C. Defendants Failed to Disclose Material Information During the Class Period

### 1. Whitman and Lane Failed to Disclose that They Tried to Rescind the Offer While Simultaneously Making Positive Statements About Autonomy

After HP announced its offer, Lane and Whitman instructed HP's financial advisors to see whether HP could back out of the deal in September 2011.[45] ¶¶69-73, 178; *see Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 643-44 (S.D.N.Y. 2012) (defendant's "sudden − and prescient − shift" "supports the inference that it possessed some unique insight").[46] These

---

[45]    HP argues that the Complaint "pleads no facts showing [] Lane had any reason, or motive, to get HP out of the transaction." Dkt. No. 133 at 15. To the contrary, the Complaint alleges that Lane was aware of the severe negative market reaction to the proposed deal. ¶¶7, 68. Thereafter, he learned that HP had drastically overpaid for Autonomy. Lane argues that, even if HP attempted to withdraw, it could have been the result of negative market reaction – not the price. Dkt. No. 131 at vii-viii, 8. The negative market reaction, however, was to the price (given, among other things, the numerous concerns about Autonomy's accounting). ¶¶45-46.

[46]    Whitman and Lane argue that they are not liable under Rule 10b-5(a) or (c) because the Complaint has no allegations of conduct beyond misrepresentations and omissions. Dkt. No. 139 at vi, 14; Dkt. No. 131 at 12, n.7. As their own authority makes clear, however, a defendant may "be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations." *SEC v. Mercury Interactive, LLC*, 2011 U.S. Dist. LEXIS 134580, at *6 (N.D. Cal. 2011) (quoting *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d

allegations are pled with sufficient particularity and should be accepted as true. *Compare* Dkt. No. 139 at 12; Dkt. No. 131 at vii, 7-8; Dkt. No. 133 at 15 *with* ¶¶32-43, 68-73, 102; *Tellabs*, 551 U.S. at 326.[47] And, although the Complaint cogently alleges that Lane and Whitman were told by HP's due diligence advisors that the City Code made withdrawing the offer impossible (¶¶68-73), HP and Lane now claim that the Complaint "misconstrues" and "offers a confusing (and inaccurate) dissertation" on the City Code because the material adverse change condition provision in the HP/Autonomy offer agreement allowed cancellation. Dkt. No. 131 at 8; Dkt. No. 133 at 15-16. There is nothing the least bit "confusing" about Plaintiff's "dissertation" on City Code law. In fact, **Autonomy's** own U.K. lawyers, experts in the City Code, published "A Guide to Takeovers in the United Kingdom," in September 2011 confirming Plaintiff's understanding of U.K. law as follows:

> The Panel has ruled that **for an offeror to invoke a material adverse change condition**, and so withdraw its offer, the offeror is required to demonstrate to the Panel that circumstances have arisen affecting the target which could not have reasonably been foreseen at the time of the announcement of the offer and which are of an entirely exceptional nature. **Failure to identify a specific liability of the target group in the course of due diligence before the offer is made would not normally provide grounds on which subsequently to withdraw an offer**.

Abadou Decl., Ex. A; *see* OFFER BY WPP GROUP PLC ("WPP") FOR TEMPUS GROUP PLC ("TEMPUS"), UK Panel Statement 2001/15 (Nov. 6, 2001) ("For an offeror to invoke a material adverse change condition and so withdraw its offer requires, in the opinion of the Panel, the offeror to demonstrate to the Panel that exceptional circumstances have arisen affecting the offeree company which could not have reasonably been foreseen at the time of the announcement of the offer."); *Steward Int'l Enhanced Index Fund v. Carr*, 2010 U.S. Dist. LEXIS 5047, at *10-19 (D.N.J. 2010); ¶¶39, 43, 69-73.

That HP was attempting to withdraw its offer in September 2011 is further supported by Defendant Lynch's post-Class Period accusations against his former colleagues at HP. ¶102. In

---

1039, 1057 (9th Cir. 2011)). Here, Whitman and Lane, while reassuring jittery investors that Autonomy was the right strategy for HP, engaged in conduct to withdraw the offer. ¶¶68-73.

[47] Defendants did not, as they argue, voluntarily choose to launch an investigation and disclose HP/Autonomy's misconduct. Dkt. No. 139 at vi, 1, 4, 9; Dkt. No. 131 at 12 & n.6; Dkt. No. 133 at 22, 24. Rather, the Complaint alleges that the May 2012 whistleblower compelled them to.

November 2012, Lynch rhetorically asked HP to explain whether it "approach[ed] the UK Takeover Panel at any stage in an attempt to rescind its offer to buy Autonomy before completion? If so what was the reason it gave and ***why was this material change of view not communicated to shareholders***?" *Id.* As alleged in the Complaint, Defendants' Lane and Whitman's conduct was even more egregious than Lynch has suggested because they did not just fail to communicate their "change of view" to HP's shareholders but, rather, after they discovered that they could not withdraw their offer, they began defending the deal to investors. For example, on September 22, 2011, Lane misrepresented that HP bought Autonomy for "market price," ¶178,[48] and Whitman represented that "the [Autonomy] strategy is right, the initiatives that we undertook on August 18 [2011] are right…" ¶177.[49]

Defendant Whitman claims that these statements were immaterial as a matter of law, Dkt. No. 139 at vi, 11, even though they were made in response to specific analyst questions and that she expressed her support for a acquisition that had garnered significant investor concern. *See Warshaw*, 74 F.3d at 960. Moreover, these statements are actionable for the added reason that Whitman failed to disclose HP's efforts to withdraw the offer. *See Providence*, 2013 U.S. Dist. LEXIS 44948, at *41-42 ("rosy predictions that might otherwise be puffery are rendered

---

[48]    Lane's statement was misleading, not only because he withheld the fact that he had attempted to withdraw HP from the deal, but also because he was aware, *inter alia,* that: (i) numerous analysts and commentators thought that those reported numbers were improperly inflated; (ii) Autonomy had strong-armed Lane into raising HP's offer above that original offer price; (iii) Autonomy had stymied HP's due diligence; and (iv) that Lesjak vigorously opposed the deal at a meeting that Lane attended. Dkt. No. 131 at 3-4. Thus, the Complaint does not plead his scienter collectively. Dkt. No. 131 at 10, n.4. This is also not a case like *In re VeriSign, Inc. Deriv. Litig.*, 531 F. Supp. 2d 1173, 1206 (N.D. Cal. 2007) where half of the defendants joined the Board *after* the alleged fraudulent transaction and, for the other half, the complaint merely alleged that the director defendants collectively "disseminated or approved financial statements that did not disclose the [] practices that were occurring…." Dkt. No. 131 at v., 9-10 & n.4. In *In re Adecco S.A.*, 371 F. Supp. 2d 1203, 1218 (S.D. Cal 2005), "the Complaint group[ed] all individual Defendants together to claim that they all knew" because the problem was "well known throughout the Company."

[49]    In Whitman's authorities, there were no facts alleged that the misleading statements were made in response to specific analyst questions and market concerns, or that they were misleading as a result of material omissions. *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1246 (N.D. Cal. 1998); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1167-68 (C.D. Cal. 2007); *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 232 (D.N.J. 2002); *In re Foundry Networks, Inc. Sec. Litig.*, 2003 WL 22077729, at *8 n.9 (N.D. Cal. 2003).

problematic for [] material omissions"). Defendants' claim that Plaintiff must plead actual knowledge or a subjective belief that their statements were false. Dkt. No. 131 at vii,[50] 1, 5-6; Dkt. No. 133 at 7-8, 27.[51] Even if actual knowledge were required, as detailed above, Defendants Lane and Whitman were aware of numerous red flags pointing to the conclusion that HP's acquisition of Autonomy was, in Lesjak's words "not in the best interests of the Company." ¶¶15-25, 32-33; *see In re BP Prudhoe Bay Royalty Trust Sec. Litig.*, 2007 U.S. Dist. LEXIS 83007, at *19-20 (W.D. Wash. 2007) (actual knowledge pled where defendants were "aware of the numerous red flags"); *Amgen*, 544 F. Supp. 2d at 1027-29.

### 2. Defendants Are Liable For Their February and March 2012 Misrepresentations

On February 22, 2012, the Complaint alleges that HP announced that its software license revenue grew just 12%, well below its 23.5% average for the four quarters leading up to the Autonomy acquisition. ¶¶77-78, 184. Despite Defendants' previous representations about Autonomy's stellar license revenue growth, HP's license revenue actually **contracted** after adding Autonomy. *Id.* Based on Apotheker's August 18, 2011 and September 22, 2011 representations, analysts had expected HP's software margins to spike with the addition of Autonomy's purported 40-50% margins but HP's software margins actually decreased in 1Q10 – falling well short of analysts' expectations. ¶¶77-78. The Complaint alleges that HP/Autonomy's poor results were the direct consequence of HP's attempts to end Autonomy's improper revenue recognition practices. ¶¶74-79. Defendants argue that Plaintiff's allegations are unsupported. Dkt. No. 133 at 35; Dkt. No. 127 at 9. Not so.

In fact, the Complaint alleges that after HP spent months scouring Autonomy's books and revenue recognition policies in October 2011 to "optimize" them under U.S. GAAP, Autonomy suddenly stopped reporting the same sales growth and high margins that it had previously

---

[50] Lane's in-circuit authority is distinguishable. Dkt. No. 131 at vii, 1, 5-7. In *McKesson*, 126 F.2d at 1264, for instance, the statement at issue was a "fairness opinion" by a third party advisor. Dkt. No. 133 at 8, 27.

[51] *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1092-94 (1991) holds that statements of belief or opinions can be materially misleading whenever they are not supported by the underlying facts. *C/f* Dkt. No. 133 at 7-8, 27.

reported for at least 3 consecutive years.  ¶¶75, 100, 164.  Defendants offer no explanation for how an entity that, according to HP, had previously reported over 50% of its revenues improperly could suddenly cease engaging in those practices without any detection by HP.  HP recklessly failed, until November 2012, to consider Autonomy's impairment of the $6.8 billion of goodwill and $4.6 billion of purchased intangible assets that HP falsely reported during the Class Period as a result of acquiring Autonomy.  ¶¶15-25, 32-43, 45-56, 60-90, 93-96, 100-03.  HP, which included Autonomy within its HP Software Segment, reported total goodwill of $14.1 billion at October 31, 2011, of which Autonomy comprised *47%*.  The Complaint alleges that HP gradually wrote off accounts receivable and deferred revenue during the Class Period that it knew was uncollectible and/or improperly recorded in an effort to address the problems at HP/Autonomy, and falsely misrepresented its accounting policy disclosure for revenue recognition in connection with Autonomy's accounting improprieties.  ¶¶140, 145.

Because HP knew and/or recklessly disregarded that Autonomy's financial statements were materially false and misleading after the acquisition closed on October 3, 2011, HP could not accurately justify the fair value it assigned to Autonomy's intangible assets in HP's 2011 Annual Report.  ¶¶141-43.  HP's due diligence team, which purportedly performed "extensive" due diligence on Autonomy, either learned of, or recklessly disregarded, that Autonomy was mischaracterizing low margin hardware revenue estimated to have comprised 10-15% of Autonomy's revenue.  Indeed, on November 20, 2012, HP admitted that, for 2009 and 2010, PwC's investigation had concluded that Autonomy had mischaracterized *$160 million to $245 million* of revenue and a similar amount related to cost of sales to artificially distort Autonomy's gross profit.  ¶141.  Now, according to HP, neither HP's due diligence, HP's purported integration efforts nor its in-house Chief of Software Revenue Recognition was able to detect, until six months after HP initiated its investigation into the May 2012 whistleblower, Autonomy's improper accounting practices.  ¶¶36-39, 74-84.  Implausible.

Defendants also now argue that Plaintiff has not pled specific transactions related to Autonomy's fraudulent revenue practices during this period.  Dkt. No. 139 at 14; Dkt. No. 133 at 30.  Plaintiff's allegation, however, is not that particular revenue figures in HP's financial

statements were materially false, but rather that HP's efforts to unwind Autonomy's improper accounting practices are probative of Defendants' scienter.[52] When HP was caused to report its 1Q10 Software results, for instance, it failed to disclose that HP was unwinding Autonomy's aggressive revenue recognition practices. ¶186.[53] Instead, on February 22, 2012, Whitman and Lesjak falsely reassured investors that "[t]he Autonomy acquisition is going well" and that HP was "pleased with the Autonomy acquisition." ¶185.[54]

The Complaint adds that Defendant Whitman and Lesjak held quarterly business meetings with Autonomy management to discuss Autonomy's financial performance during the Class Period, including at the end of 1Q10. ¶¶111, 114. Given that "the former management of Autonomy began alerting [] Whitman as early as December 2011 to significant problems with the integration of Autonomy into HP that were negatively impacting its performance," ¶102, the

---

[52] In the authorities HP relies on, the financial statements were alleged to be materially false and misleading solely due to the vague misleading violations alleged there. Dkt. No. 133 at 19, 24, 31. *Lapiner v. Camtek, Ltd.*, 2011 U.S. Dist. LEXIS 9985, at *2 (N.D. Cal. 2011); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1146 (C.D. Cal. 2007). *Tripp v. Indymac Fin. Inc.*, 2007 WL 4591930, at *5 (C.D. Cal. 2007), involved allegations that the company had inadequately hedged against risks and, in *In re Remec, Inc. Sec. Litig.*, 415 F. Supp. 2d 1106, 1118 (S.D. Cal. 2006), the court found that one improper transaction ten months before the class period did not support that the company consistently engaged in the practice during the class period. Dkt. No. 133 at 30.

[53] HP's deferred revenue write-downs further support an inference of scienter because they demonstrate Defendants' knowledge that Autonomy's revenues were uncollectible and/or improperly recorded. ¶¶140, 145-47, 182. In fact, the sales to fictitious customers that HP accused Autonomy of would have resulted in uncollectible deferred revenues. ¶146. Lesjak counters that three quarters of write-downs were necessary as a result of converting Autonomy from IFRS to GAAP. Dkt. No. 136 at 11. The PSLRA, "in no way turns FRCP 12 into a trial-type, papers-only proceeding, much less one in which defendants get the benefit of every conceivable doubt, including credibility calls. That is reserved for the jury." *LDK Solar*, 584 F. Supp. 2d at 1260.

[54] Whitman and Lesjak's statements were material. *See S. Ferry*, 399 F. Supp. 2d at 1129-30 (where defendants "highlighted the importance of [the company's] ability to integrate its acquisitions…a reasonable investor would assign some importance to [defendant's] reference to [the company's] past systems integration experience"); Dkt. No. 136 at 10 & n.15; Dkt. No. 139 at 11. Even if they were statements of optimism, Plaintiff has pled that Defendants had no reasonable basis for making them. In Defendants' authorities, by contrast, the plaintiffs did not "demonstrate [defendant's] lack of belief in or lack of a reasonable basis for what he was asserting, nor do they demonstrate [defendant's] knowledge of undisclosed facts seriously undermining the statements' accuracy." *Wozniak v. Align Tech.*, 850 F. Supp. 2d 1029, 1037 (N.D. Cal. 2012); *see In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007).

Complaint does not merely contain, as Defendants now suggest, "general allegations" of Defendants' "attendance at meetings." *Daou*, 411 F.3d at 1022. Rather, it alleges that Defendants Whitman and Lesjak were having direct conversations with HP/Autonomy's senior executives at the same time they were being alerted to significant problems with Autonomy's integration into HP that were negatively impacting HP's software performance. *Id.* Dkt. No. 139 at 5, n.5; Dkt. No. 136 at 3 & n.4; Dkt. No. 133 at 21. These undisclosed facts, that were contemporaneously known to them, directly contradicted Whitman's and Lesjak's representations. *Compare* Dkt. No. 133 at 34; Dkt. No. 139 at 13, n.10.[55]

### 3. Defendants' Post-May 2012 Statements Are Actionable By Omission

In May 2012, a "senior member of Autonomy's leadership team," raised serious accounting improprieties at HP/Autonomy with HP's GC Schultz. ¶80. Schultz then informed Whitman, who hired PwC to do an investigation into his allegations. *Id.*[56] Defendants not only knowingly concealed this material development from investors for the duration of the Class Period but, over the next six months, they repeatedly blamed Autonomy's woes on "scaling" problems and told investors that they continued to have "every confidence that Autonomy will be a very big and very profitable business." ¶¶191, 194, 207-08. Their omissions created "an impression of a state of affairs that differ[ed] in a material way from the one that actually

---

[55]  Defendants rely heavily on the Ninth Circuit's opinion in *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). Dkt. No. 139 at 6; Dkt. No. 127 at 9; Dkt. No. 142 at 3; Dkt. No. 133 at 9, 12-13, 35. In *Ronconi*, plaintiffs attempted to plead that defendants' statements regarding a merger were false because defendants were experiencing "significant problems" and "continuing difficult problems" but "[n]owhere…state[d] what these 'significant' or 'difficult' problems were." *Id.* at 432. There were no allegations in *Ronconi* that the acquired company was a fraud but, rather, simply that the merger was "not as productive a maneuver as [defendants] had hoped." *Id.* at 434. In *In re Tibco Software, Inc.*, 2006 U.S. Dist. LEXIS 36666, at *70-71 (N.D. Cal. 2006), CW statements that software remained separate until December were not inconsistent with defendants' allegedly false statement, in late December, that integration was complete. Dkt. No. 133 at 34. In *Kane v. Madge Networks N.V.*, 2000 WL 33208116 (N.D. Cal. 2000), the court found that allegations that an acquisition was being successfully integrated not actionable where plaintiff did not plead with particularity that a key executive was planning to leave. Dkt. No. 139 at 11; Dkt. No. 133 at 34; Dkt. No. 136 at 10, n.15. Here, Defendants concealed that hundreds of employees, including major Autonomy executives, had departed.

[56]  HP's contention that the Complaint does not plead Whistleblower 4 with particularity is without merit. Dkt. No. 133 at 22, 24. The Complaint specifies the exact parties to the conversation, when it took place, what was discussed, who it was disclosed to, and what specific steps HP took as a result. ¶80.

---

exist[ed]." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see Matrixx*, 131 S. Ct. at 1322 ("companies can control what they have to disclose under these provisions by controlling what they say to the market"); *In re Apollo Grp. Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005).[57]

Defendants now argue that they were not required to disclose the May 2012 whistleblower's allegations under this Court's ruling in *Yahoo!*, 2012 U.S. Dist. LEXIS 113036. Dkt. No. 139 at 7-8, 13-14, Dkt. No. 133 at 22; Dkt. No. 136 at 8, 10-11. Not so fast. In *Yahoo!*, plaintiffs alleged that defendants failed to disclose problems at Alipay, a subsidiary of Alibaba Group – a Chinese company that Yahoo had invested in. *Id.* at *23. In arguing that defendants' statements had triggered a duty to disclose, plaintiffs there (weakly) pointed to defendants' statements regarding the value of Alibaba.com, an entirely separate subsidiary of Alibaba Group. *Id.* The statement at issue there, however, explicitly qualified that it did "not include estimates of the value of Alibaba's privately held businesses [*i.e.*, Alipay]." *Id.* In turn, the Court justifiably reasoned that "[i]t is hard to see how a statement that expressly does not value the privately held businesses [*i.e.*, Alipay] affirmatively creates an impression that the value is different in a material way than the actual value." *Id.* at *31.

Here, by contrast, Defendants made specific statements about Autonomy itself which created the misleading impression that Autonomy's problems were, among other things, merely "scaling" issues that the Company could and would resolve.[58] ¶¶172, 191-94. On May 23, 2012,

---

[57] Defendants were also required to disclose these facts in their From 10-Q's filed on June 8, 2012 and September 10, 2012. ¶¶196-198, 204-209. Item 303 of SEC Regulations S-K requires that companies describe in their quarterly and annual reports "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303.

[58] Defendants' authority is not to the contrary. In *In re Rigel Pharms., Inc. Sec. Litig., Inter-Local Pension Fund GCC/IBT v. Deleage*, 697 F.3d 869, 880-81 (9th Cir. 2012), the Ninth Circuit reasoned that where defendants' press release explicitly disclosed side effects, the subsequent release of more detailed information "such as a few cases of mild hypertension or some cases…that did not require dose reductions, was not inconsistent." In *In re NVIDIA Corp. Sec. Litig.*, 2011 WL 4831192, at *11 (N.D. Cal. 2011), there was no indication that defendants considered the problem material. In *Brody*, 280 F.3d at 1007 defendants disclosed that they had received "expressions of interest" from potential acquirers when they had received actual offers. The statements here, by contrast, created an impression that differed materially from what existed

for instance, analysts specifically asked whether HP expected Autonomy's disappointing results to persist, asking whether the "weakness in [Autonomy] revenue…change[] [HP's] outlook on the business at all[?]" ¶191. In response, Defendant Whitman misleadingly responded that "[w]hen Autonomy turned in disappointing results, [HP] actually did a fairly deep dive to understand what happened there. And in my view, this is not the product. Autonomy is a terrific product. It's not the market. There is an enormous demand for Autonomy. It's not the competition…***This is classic entrepreneurial scaling challenges***." *Id.* She then assured the market that it would just "take [HP] a couple of quarters to work through some of the growing pains." *Id.* This caused investors to conclude that HP would "do well in the software business, ***given the company's comments about the strong pipeline for its Autonomy products***." ¶192.[59] Further, on June 5, 2012, Whitman again represented that "this is the classic case of scaling a business [Autonomy] from start-up to grown up" and unequivocally told investors "I have every confidence that Autonomy will be a very big and very profitable business…. But we needed different leadership to age Autonomy, and by that I mean ***age it kind of like wine***." ¶194.[60] *See Berson*, 527 F.3d at 985.[61]

---

at the time by misleading the market that Autonomy was having problems (that HP could fix) with "scaling" when, in fact, Autonomy was effectively a Ponzi-scheme. Dkt. No. 139 at 3.

[59] Whitman's statement, made in response to a specific analyst question, is not puffery. Dkt. No. 139 at 11-12. *Ligand.*, 2005 U.S. Dist. LEXIS 44911, at *61-62. Indeed, to the extent the subject was not of importance to HP or the market, it is unclear why the Company's own CEO would have engaged in a "deep dive" on the issue. None of Whitman's authorities involve statements which were specific responses to analyst concern. Dkt. No. 139 at 11-12. *Wozniak v. Align Tech., Inc.*, 2011 WL 2269418, at *4 (N.D. Cal. 2011); *LeapFrog*, 527 F. Supp. 2d at 1050; *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012).

[60] *See also* ¶¶82, 152, 155, 200 (August 22, 2012: "Autonomy still requires a great deal of attention and we've been aggressively working on that business" and HP had "a lot of work to do over the next several quarters to improve Autonomy performance."); ¶204 (September 10, 2012: "[a]t the time of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the carrying value.").

[61] Nor is this a case like *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1071 (9th Cir. 2008), where the Ninth Circuit found that defendants' general statements regarding its overall financial health ("revenue projections and anticipated growth") did not give rise to a duty to disclose "specific regulatory investigations." Dkt. No. 133 at 33-34.

Despite these facts, Defendants now claim that they were not required to disclose their "investigation" because it wasn't complete. Dkt. No. 139 at 7-8, 13-14, Dkt. No. 133 at 22; Dkt. No. 136 at 8, 10-11. The portion of *Yahoo!* that Defendants cite for this proposition, however, analyzed defendants' "duty to correct" prior *truthful* statements that had allegedly become misleading. 2012 U.S. Dist. LEXIS 113036, at *64. Unlike a duty to disclose, liability for failure to "correct" does not arise if the correction is made within a "reasonable time." *Id.* In *Yahoo!*, defendants made their disclosure just five **weeks** after receiving notice of the problem. *Id.* They proceeded to continuously update the market on the progress of the negotiations, disclosing the final results just two months later. *Id.*[62] Had the Defendants here remained silent regarding Autonomy, it might be proper to analyze whether they had a duty to disclose the investigation within a "reasonable time." However, "at the point Defendants chose to speak about [Autonomy], they had a duty to speak fully and truthfully." *Apollo*, 395 F. Supp. 2d at 920. They failed to do so.

### D. The Misconduct that HP Accused Lynch of Should Be Imputed to HP

A corporation's scienter is derived from its employees and agents. *See Allstate Life Ins. Co. v. Robert W. Baird & Co., Inc.*, 2010 WL 4581242, at *22 (D. Ariz. 2010). "A complaint that alleges facts giving rise to a strong inference that at least one corporate agent acted with the required state of mind satisfies the PSLRA even if the complaint does not name the corporate agent as an individual defendant or other-wise identify the agent." *Matrix Capital Mgmt. Fund, L.P. v. BearingPoint, Inc.*, 576 F.3d 172, 189-90 (4th Cir. 2009) (collecting cases). "[T]here is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter [and] courts have readily attributed the scienter of management-level employees to corporate defendants." *In re Marsh & McLennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) (collecting cases).[63]

---

[62]  *Higginbotham*, 495 F.3d at 760-61, analyzed whether defendants had fulfilled their **duty to correct** within a reasonable time and the reasonable correction there took place within two months.

[63]  *See also In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1192 n.8 (N.D. Cal. 2010); *In re CornerStone Propane Partners, L.P. Sec. Litig.*, 416 F. Supp. 2d 779, 791 (N.D.

Here, Whitman accused Lynch – who was a top 15 senior executive officer at HP from October 2011 to May 2012 – of committing fraud on November 20, 2012. ¶¶84, 86, 109. On November 20, 2012, HP asserted that "Autonomy was substantially overvalued at the time of its acquisition" as the result of "a ***willful*** effort on behalf of certain former Autonomy employees [including Defendant Lynch] to inflate the underlying financial metrics of the company ***in order to mislead investors***…." ¶85. HP claims that *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) stands for the proposition that a corporation's scienter can be imputed only from "those individuals who actually made the false statements." Dkt. No. 133 at 6, 23. *Glazer*, however, explicitly reserved deciding whether "it might be possible to plead scienter under a collective theory" because "[t]hat issue is not before us." *Id.*[64] The issue, however, is squarely before this Court. Since *Glazer*, courts in this district have imputed the scienter of speaking and non-speaking employees to corporate "persons." For example, recently, in *Curry v. Hansen Med., Inc.*, 2012 U.S. Dist. LEXIS 112449 (N.D. Cal. 2012), plaintiffs alleged that the company's former senior vice president of commercial operations manipulated Hansen's financial results, thus making it inevitable that false and misleading statements regarding Hansen's financial condition would be disseminated to investors. *Id.* at *3-4, 6, 12-13. There, defendants disclosed that "an investigation conducted by Hansen's audit team revealed that the data was concealed from or falsified for Hansen's accounting department and outside auditor,"

---

Cal. 2005) (Vice President); *In re Lattice Semiconductor Corp. Sec. Litig.*, 2006 U.S. Dist. LEXIS 262, at *37-38, 55-56 (D. Or. 2006) (Controller).

[64] *Zucco's* "narrow exception," 552 F.3d at 1001, pertained to the core operations inference, not whether an employee's scienter could be imputed to the company. Dkt. No. 133 at 6, n.3; *see Glazer*, 549 F.3d at 745 ("[I]n certain circumstances, some form of collective scienter pleading might be appropriate. For instance.…"). Nor does the Fifth Circuit's opinion in *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366-67 (5th Cir. 2004) change the analysis: we "look to the state of mind of the individual corporate official or officials who make or issue the statement [] or order or approve its making or issuance, ***or who furnish information or language for inclusion therein***…" Dkt. No. 133 at 6. Indeed, recently, in *Kerr v. Exobox Techs. Corp.*, 2012 U.S. Dist. LEXIS 7523, at *40 (S.D. Tex. 2012), the court, following *Southland*, rejected the notion that *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011) ("*Janus*") limited the attribution of scienter to those with "ultimate authority" over the statement: "[t]he Court finds no reason to read *Janus* to limit the liability of the corporation on grounds of scienter. Exobox 'made' the statements contained in the public filings under *Janus*; Plaintiffs need only assert that Sonfield furnished the information or language for inclusion in order to attribute his scienter to Exobox."

---

including information about improper revenue recognition. *Id.* at *4. Despite the fact that the SVP had not "made" statements, the court found the corporation itself liable based on the scienter of its SVP. *Id.* at *3-4, 6, 12-13, 35.

Chief Judge Wilken determined that "a corporate entity can be vicariously liable under §10(b) for the fraudulent acts of its officers, if the officers are alleged to have acted within the scope of their employment and for the benefit of the company." *Hansen*, 2012 U.S. Dist. LEXIS 112449, at *36 (citing *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1088 (N.D. Cal. 2001)). This is because, "[i]n *Hollinger*, the Ninth Circuit overturned its previous rule that the vicarious liability provisions in certain sections of the Securities Act supplanted the common law doctrine of respondeat superior." *Hansen*, 2012 U.S. Dist. LEXIS 112449, at *36; *see also Tellabs*, 513 F.3d at 708 ("[T]he doctrines of *respondeat superior* and apparent authority remain applicable to suits for securities fraud."); *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 450 (S.D.N.Y. 2009) (Kaplan, J.); *McKesson*, 126 F. Supp. 2d at 1277 (Whyte, J.). Applying this standard, *Hansen* found that because a senior vice president "undertook [a] scheme in the scope of his employment [] his scienter is imputed to Hansen through vicarious liability," even though he did not "make" any statements. *Id.* at *36-37.[65]

Similarly, in *Kyung Cho v. UCBH Holdings, Inc.*, 2012 U.S. Dist. LEXIS 123234 (N.D. Cal. 2012), Judge White found that the scienter of UCBH's Vice President and Manager of Credit Policy could be imputed to UCBH under the doctrine of *respondeat superior*. *Id.* at *28-31.[66] Plaintiffs alleged that the VP had "engag[ed] in a conspiracy and fraudulent scheme to deceive the investing public and bank regulators by manipulating the Bank's books and records." *Cho*, 2012 U.S. Dist. LEXIS 123234, at *28. Thus, "[i]n light of the imputation of [VP's]

---

[65] Nor does *Janus* alter this analysis. *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 2012 U.S. Dist. LEXIS 129529 at *5-6 (S.D.N.Y. Aug. 2012) ("*Janus* does not concern corporate scienter. Rather, *Janus* addresses what it means to 'make' a statement for purposes of [§10(b) and Rule 10b-5]. And there is no dispute that BoA, through its various public filings, 'made' the statements and omissions at issue in this action."); *Kerr*, 2012 U.S. Dist. LEXIS 7523, at *39.

[66] *See also Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 2012 U.S. Dist. LEXIS 96317, at *51-53 (S.D.N.Y. 2012) ("[c]ourts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority").

scienter through respondeat superior, the Court [found] that Plaintiffs [had] sufficiently alleged a primary violation of Section 10(b) and Rule 10b-5 by the Bank." *Id.* at *31. Likewise, here, Lynch was HP's Executive Vice President of Information Management and led Information Management (which included the Software Segment), one of HP's largest divisions. ¶¶45, 73. Because HP itself accused Lynch of knowingly engaging in "serious accounting improprieties, disclosure failures, and outright misrepresentations," ¶¶5, 8, 84, his scienter should be imputed to HP as a matter of law. ¶109.

### E. Defendants' *Janus* Arguments Lack Merit

Defendant Lynch argues that he is not liable for HP/Autonomy's Software Division's results in HP's SEC filings ***that he was responsible for*** because he did not "make" those statements under *Janus*. Dkt. No. 125 at 7. He similarly argues that he "cannot be held liable under Section 10(b) for statements made when he was not an officer of HP." Dkt. No. 125 at 7. Fair enough. He is, however, liable for: (i) statements made when he was an officer of Autonomy and/or HP from October 2011 to May 2012; (ii) the false and misleading statements contained in HP's joint August 18, 2011 press release with Autonomy, Abadou Decl., Ex. C; ¶44, and (iii) statements made by Defendants Apotheker and Robison relaying Autonomy's financial results as those statements are attributable to Lynch. ¶¶164, 171-72.

"[A]ttribution" that is "implicit from ***surrounding circumstances*** is strong evidence that a statement was made by" a defendant. 131 S. Ct. 2302-03; *see United States SEC v. Landberg*, 836 F. Supp. 2d 148, 154 (S.D.N.Y. 2011) ("[T]he SEC alleges adequate surrounding circumstances for a reasonable fact finder to conclude that the statements alleged to be fraudulent were implicitly attributed to Gould, which is 'strong evidence' that Gould was the 'maker' of those statements, thereby satisfying *Janus*.").[67] As here, "[i]t is not inconsistent with *Janus Capital* to presume that multiple people in a single corporation have the joint authority to 'make' an SEC filing, such that a misstatement has ***more than one 'maker'***." *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012); *see In re Merck & Co., Sec., Derivative & "ERISA" Litig.*, 2011 U.S. Dist. LEXIS 87578, at *102 (D.N.J.

---

[67] *In re Stillwater Capital Partners Inc. Litig.*, 853 F. Supp. 2d 441, 460 (S.D.N.Y. 2012).

2011) (defendant "was at the time of each attributed statement an officer of Merck" who "made the statements pursuant to his responsibility and authority to act as an agent of Merck, not as in *Janus*, on behalf of some separate and independent entity").

The majority of cases that have found potential liability of corporate insiders involve public statements that have in some way been attributed to a corporate insider, such that the investing public knows that person played a large role in the preparation of the misstatements and is ultimately responsible for them. *See* Jeffries, Browning, "The Implications of *Janus* on Issuer Liability in Jurisdictions Rejecting Collective Scienter," 43 Seton Hall L. Rev. 491, 513-514 (2013); *see also Hawaii Ironworkers Annuity Trust Fund v. Cole*, 2011 U.S. Dist. LEXIS 98769 at *17-22 (N.D. Ohio 2011).[68] During the Class Period, HP made it abundantly clear that Defendant Lynch was responsible for its Software Division's financial results. ¶¶45, 73.

Upon the completion of the acquisition, HP immediately named Lynch as one of HP's top 15 executive officers. ¶¶45, 73. Lynch continued to lead Autonomy within HP, ¶45, and HP acknowledges that Lynch was responsible for those results. *See* Dkt. No. 139 at 2 ("Lynch again failed to meet license revenue projections for Autonomy"); *id.* ("[Lynch's first full quarter leading Software, Q1 FY2012, ended with mixed results.").[69] Indeed, according to HP, Defendant Lynch was fired because **he** did not deliver positive results for HP's Software Division. ¶80. It is fair to conclude, therefore, that Lynch had "ultimate authority" over the results of HP's Software division, which the Complaint alleges were false and misleading when

---

[68]   Lynch argues that *Janus* "rejected a definition of 'make' that 'would permit private plaintiffs to sue a person who 'provides the false or misleading information that another person then puts into the statement.'" Dkt. No. 125 at 7. *But see In re Allstate Life Co. Litig.*, 2012 U.S. Dist. LEXIS 72900, at *12-15 (D. Ariz. 2012) (under *Janus*, defendant "made" statements even though they "were not made directly to Plaintiffs, but rather were, with [defendant's] knowledge, incorporated into the Official Statements").

[69]   *Compare with* Dkt. No. 133 at 21 (Lynch "is not alleged to have had any role in HP's post-acquisition accounting"); Dkt. No. 125 at 7 ("[N]or do Plaintiffs allege that [] Lynch ever participated in preparing either the financial statements or any of the public statements made by HP").

made.  *See In re Pfizer Inc. Sec. Litig.*, 2013 U.S. Dist. LEXIS 49333, at *38-40 (S.D.N.Y. 2013);[70] ¶¶73, 109, 119-20, 123, 134, 145, 149-50.[71]

Finally, despite their arguments to the contrary, Defendants Whitman's, Lesjak's, Apotheker's and Lane's "signatures on documents containing allegedly false representations is sufficient" to satisfy *Janus*.  *Compare In re Am. Apparel, Inc. S'holder Litig.*, 2013 U.S. Dist. LEXIS 6977, at *90 (C.D. Cal. 2013) ("*Am. Apparel II*") *with* Dkt. No. 139 at 3 & n.3; Dkt. No. 131 at 4.  ¶¶111-15.  *See also Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 2011 U.S. Dist. LEXIS 93873, at *3 (N.D. Ala. 2011); *Merck & Co.*, 2011 U.S. Dist. LEXIS 87578, at *102 (individual defendants liable where each "was at the time of each attributed statement an officer of Merck," who "made the statements pursuant to his responsibility and authority to act as an agent of Merck, not as in *Janus*, on behalf of some separate and independent entity"); *SEC v. Das*, 2011 U.S. Dist. LEXIS 106982, at *18 (D. Neb. 2011).[72]

## F.  HP/Autonomy's Goodwill Statements Were Materially False and Misleading When Made

During the Class Period, HP issued financial statements and related earnings releases for the fiscal year ended October 31, 2011, and for each of its first three quarters of fiscal year ended

---

[70]   Lynch argues that Plaintiff cannot show reliance because he did not make a statement that: (1) could be relied upon; or (2) gave rise to a duty to disclose, Dkt. No. 125 at 8-9,  even though he "made" actionable statements under *Janus*.

[71]   The Complaint does not, as Defendant Lynch glibly suggests, merely recite his title and date of employment. Dkt. No. 125 at 1, 5, 6 & n.4, 8, 9.  Rather, it alleges that he was the architect of Autonomy's fraudulent accounting practices and was motivated to cash out of Autonomy before it collapsed under the weight of that fraud.  ¶¶6, 30.  In addition, HP has accused Defendant Lynch of engaging in "serious accounting improprieties, disclosure failures, and outright misrepresentations." ¶¶5, 84.  CW1 also confirmed Lynch's participation in Autonomy's fraud. ¶52.  Lynch's authority does not compel the opposite conclusion. *Castaneda v. Saxon Mortg. Servs.*, 687 F. Supp. 2d 1191, 1200 (E.D. Cal. 2009), analyzed claims of common law fraud under California law.  *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007), required that the complaint "identif[y] the role of [each] defendant[] in the alleged fraudulent scheme," a burden which has clearly been met here.  In *Philco*, 2011 WL 4595247, at *8, defendant was not accused of making "outright misrepresentations" by his employer.  Dkt. No. 125 at 9.

[72]   Apotheker argues that he not liable for repeating Autonomy's financial misrepresentations because he was not the person with ultimate authority over the statements. Dkt. No. 127 at 11.  But "[o]ne 'makes' a statement by stating it."  *Janus*, 131 S. Ct. at 2302.

---

October 31, 2012, that were materially misstated in violation of GAAP and SEC regulations because Defendants: (i) failed to record an impairment loss for goodwill and purchased intangible assets in connection with the Autonomy Acquisition, which resulted in a material overstatement of the Company's reported assets by at least $5.7 billion for goodwill and $3.4 billion for purchased intangible assets; (ii) materially misrepresented HP/Autonomy's revenue recognition policies; (iii) failed to disclose that a material amount of the deferred revenue acquired in the Autonomy Acquisition was improperly recorded; (iv) materially misrepresented HP/Autonomy's disclosures for the Software Segment; and (v) failed to disclose known trends and uncertainties in HP Software Segment, which included Autonomy.

Defendants argue that Plaintiff cannot establish the falsity of HP's goodwill statements because the Complaint merely alleges "fraud by hindsight."[73] Dkt. No. 133 at 21, 26, 31-32; Dkt. No. 139 at 6, 14; Dkt. No. 136 at v, 1. HP knew in May 2012 that Autonomy had material accounting improprieties. At the very latest, at that date, HP questioned the value they had previously assigned to Autonomy's goodwill. The discovery of an accounting fraud at Autonomy is a change in "events [or] circumstances" as specified under GAAP. ¶162. After being armed with knowledge of an accounting fraud at Autonomy, during the Class Period, HP continued to issue their April 30, 2012 Quarterly Report on Form 10-Q (filed on June 8, 2012) and their July 31, 2012 Quarterly Report on Form 10-Q (filed on September 10, 2012) that reported goodwill and purchased intangibles at full value without any disclosure of the potential impairment or actual impairment. This is not "fraud by hindsight."

The Complaint describes how HP's Worldwide Director of Software Revenue recognition undertook a detailed study of Autonomy's revenue recognition practices. ¶75. By December 2011, HP had engaged E&Y and KPMG to undertake "detailed studies of Autonomy's software revenue recognition with a view to optimizing for U.S. GAAP."[74] *Id.* HP's own "Critical

---

[73] In *In re Connectics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008), the Complaint "rel[ies] entirely on another complaint as the sole basis for [its] allegations." Dkt. No. 133 at 16. Moreover, the allegations stemming from the *Briody* matter are based almost entirely on internal Autonomy e-mails, not simply another complaint's allegations.

[74] Despite this, HP claims that nobody noticed that "critical documents" were missing "from the obvious places" at Autonomy. ¶87. HP offers no explanation, however, for why its extensive

Accounting Policies and Estimates," assured investors that the Company "evaluate[s] goodwill and indefinite-lived intangibles on an annual basis as of the beginning of its fourth fiscal quarter or whenever events, changes in circumstances or changes in management business strategy indicate that there may be a potential indicator of impairment." ¶144. Despite these allegations, Defendants argue that Plaintiff pleads no facts that they could have uncovered Autonomy's improper recognition of revenue which totalled 50% in 2009 and 2010.[75] Dkt. No. 136 at 7; Dkt. No. 133 at 18; ¶44, n.21, 137.

Defendants' reliance on the Ninth Circuit's *en banc* decision in *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) is unavailing. In *GlenFed*, the Ninth Circuit found falsity ***adequately pled*** even though it noted that, like goodwill, the loan loss reserves were "permissible judgments" that "are based on flexible accounting concepts, which, when applied, do not always (or perhaps ever) yield a single correct figure." *Id.* Defendants argue that more is required here because their goodwill statements involved judgment. Dkt. No. 136 at 9 & n.12; Dkt. No. 133 at 20-21, 31-33; Dkt. No. 139 at 5; *see In re Pilgrim's Pride Corp. Sec. Litig.*, 2010 U.S. Dist. LEXIS 84260, at *2-9, *102-103 (E.D. Tex. 2010) (falsity adequately alleged because defendants failed to test for goodwill impairment in connection with its chicken segment, despite adverse changes in the chicken industry including increasing cost of feed ingredients and weak market demand and negative cash flows from operations); *In re Citigroup, Bond. Litig.*, 2010 U.S. Dist. LEXIS 69257, at *67-68 (S.D.N.Y. 2010).

Next, HP cites *In re Remec, Inc. Sec. Litig.*, 388 F. Supp. 2d 1170, 1175 (S.D. Cal. 2005) ("*Remec I*"), claiming that HP's Autonomy-related goodwill statements were not false when made. Dkt. No. 133 at 32; Dkt. No. 136 at 9; Dkt. No. 139 at 9. Defendants, however, ignore that that court later found that allegations that Remec was assuming high margins and rates of

---

reviews failed to question that "critical documents" were missing "from [] obvious places." *Ernst & Young*, 641 F. 3d at 1100-1101 (scienter adequately pled because, "[w]hile the Complaint indicates that [defendant company's] executives may have attempted to deceive EY, there is an equal inference that EY overlooked significant events without further questioning or investigation").

[75] In *Metzler*, 540 F.3d at 1068, by contrast, plaintiffs alleged that defendants were aware of the fact that some campus administrators falsified reports as result of "general awareness of the day-to-day workings of the company's business" and access to high-level enrollment data.

growth in its goodwill analysis "*g[a]ve rise to a strong inference* that the assumptions underlying

the goodwill impairment analys[e]s…were not within the broad realm of objectively reasonable

assumptions when viewed in light of [the company's] then existing financial condition." *In re*

*Remec Inc. Sec. Litig.*, 3:04-cv-01948-MMA-WMC, slip. op. at 5-6 (S.D. Cal. 2006) ("*Remec*

*II*"); *see* Abadou Decl., Ex. G.  At summary judgment, the court again denied defendants' motion

as to the falsity of the goodwill statements based on plaintiff's proffered evidence that goodwill

was impaired at the time the challenged statements were made.  *In re Remec Inc. Sec. Litig.*, 702

F. Supp. 2d 1202, 1227-28 (S.D. Cal. 2010).  Importantly, while the court applied *Rubke* to

defendants' statements of optimism, it did not apply *Rubke* to defendants' goodwill statements.[76]

*Id*. at 1227-29, 1245.

Here, again, the Complaint alleges that, after months of intensive review of Autonomy's

revenue recognition policies and workpapers, Defendants learned that Autonomy's "growth" had

been based on accounting that was improper under GAAP, thus "giv[ing] rise to a strong

inference that the assumptions underlying the goodwill impairment analys[e]s…were not within

the broad realm of objectively reasonable assumptions when viewed in light of [the company's]

then existing financial condition." *Remec II* at 5-6; ¶¶75, 148.  This is especially true for

Defendants' goodwill statements in February, March, May, June, August and September 2012

(¶¶149-56, 158, 182, 187, 190, 196, 199, 201, 204), after they had considerable time to review

Autonomy's performance.[77]  ¶131; *see IBEW Local 90 Pension Fund v. Deutsche Bank AG*, 2013

---

[76]     Defendants rely on *Rubke v. Capitol Bancorp*, 551 F.3d 1156 (9th Cir. 2009) even though
defendants cite no case in this Circuit applying *Rubke* to goodwill statements.

[77]     Plaintiffs in *Fait v. Regions Fin. Corp.* 655 F.3d 105, 112 (2d Cir. 2011) "relie[d] mainly
on allegations about adverse market conditions to support the contention that defendants should
have reached different conclusions about the amount of and the need to test for goodwill," and, in
any event, *Freidus v. Barclays Bank PLC*, 2013 U.S. App. LEXIS 17159, at *21-22 (2d Cir.
2013) recently limited *Fait*.  In *In re ICN Pharms., Inc*., 299 F. Supp. 2d 1055, 1064 (C.D. Cal.
2004), the only person who allegedly "told" defendants of problems was a "competitor" thus the
"information was coming from a party that had divergent interests."  Dkt. No. 133 at 21, 31-32;
Dkt. No. 139 at 5.  The plaintiffs in *City of Omaha v. CBS Corp*. alleged only that, at some
undetermined earlier date, the defendants "had knowledge of events or circumstances which
would have required them to reach the conclusion" that they should have performed an
impairment analysis earlier. 679 F.3d 64, 68 (2d Cir. 2012); Dkt. No. 136 at 5 & n.6; Dkt. No.
133 at *20-21, 32-33; Dkt. No. 131 at vii, 1, 5-6. In *In re Int'l Rectifier Corp. Sec. Litig.*, 2008
2008 U.S. Dist. LEXIS 44872 (C.D. Cal. 2008), the corporation and its top finance executives

U.S. Dist. LEXIS 43774, at *40-41 (S.D.N.Y. 2013); *see also Amylin*, 2003 U.S. Dist. LEXIS 7667, at *25-26; *Stratte-McClure*, 784 F. Supp. 2d at 387 ("where parties maintain high valuations on assets in the face of red flags that the valuations are inaccurate, courts have sustained securities fraud claims"); Dkt. No. 136 at 1-2; Dkt. No. 131 at 4, 9-10; *see also In re New Century*, 588 F. Supp. 2d 1206, 1236 (C.D. Cal. 2008) (goodwill misstatements actionable where defendant "simply failed to obtain the necessary evidence to even audit the testing.").[78] Finally, the Complaint alleges that HP had a heightened awareness that Autonomy's aggressive revenue recognition practices were a fraud risk because revenue recognition is an assumed fraud risk in the high-margin software technology sector. ¶138 & n.36.

were not, as here, conducting full analyses of the subsidiaries accounting practices. Dkt. No. 136 at 2-4. In *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 574 (D. Md. 2005), the company disclosed that its financial results were so "bleak" that it was testing its goodwill every quarter. Not surprisingly, the court refused to infer that the company had tested its goodwill during one of those quarters (with no allegation that the test had shown impairment). Dkt. No. 136 at 5. Lesjak's reliance on *Gompper v. VISX, Inc.,* 298 F.3d 893 (9th Cir. 2002) is unavailing after *Tellabs. See In re Impac Mortg. Holdings, Inc.*, 554 F. Supp. 2d 1083, 1091 n.4 (C.D. Cal. 2008) ("The Supreme Court's ruling results in a standard that is slightly more favorable to securities plaintiffs than previously applied by the Ninth Circuit [in *Gompper*]" which required that "it was more likely than not that the defendants' conduct was fraudulent.").

[78] Defendants' reliance on "clean" audit opinions provides no shelter, Dkt. No. 139 6-7; Dkt. No. 133 at 19, 24, 31, as management, not outside auditors, are responsible for the Company's financial statements. *See Reves v. Ernst & Young*, 507 U.S. 170, 190-91 (1993); *LDK Solar*, 584 F. Supp. 2d at 1246 (denying motion to dismiss where "unqualified [audit] opinion did not necessarily exonerate [defendant]"). At best, this raises an affirmative defense that is inappropriate at the motion to dismiss stage. *See Provenz*, 102 F.3d at 1491. Nor is a restatement necessary to plead scienter. "To hold otherwise would shift to accountants the responsibility that belongs to the courts" and allow Defendants "to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002); *see also LDK Solar*, 584 F. Supp. 2d at 1245. In *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987-88 (N.D. Cal. 2007), "the court agree[d]…*that the lack of restatement or an unqualified independent auditor's opinion does not absolve or shield a defendant from liability*" but found that plaintiffs "failed to plead facts suggesting improper accounting." Dkt. No. 133 at 31.

**G.** **Additional Facts Pled in the Complaint Buttress Plaintiff's Scienter Allegations**

**1.** **Plaintiff's Motive Allegations Are Cogent and Compelling**

As set forth in the Complaint, Defendants' motivations, though varied, combined to perpetrate a fraud on HP's investors.[79]  ¶¶6, 10-14, 16-41, 43, 45-47, 50-56, 58-61, 68-77, 79-80. HP argues that the allegations regarding HP's history of leaks, Board turmoil and Apotheker's "transformational" corporate strategy should be disregarded.  *Compare* Dkt. No. 133 at 3, n.1 *with* ¶¶10-14, 34, 219 n.44.  In *In re Harmonic, Inc., Sec. Litig.*, 2006 U.S. Dist. LEXIS 90450, at *50-57 (N.D. Cal. 2006), which HP cites in support of its argument, the allegations were stricken because they were fraud allegations repeated from a complaint that had been previously dismissed and which plaintiffs had expressly disclaimed for purposes of the non-fraud Securities Act claims at issue there.  Dkt. No. 133 at 3, n.1.[80]

Defendants claim that the stronger inference here is that, for an entire year, they were blissfully unaware of Defendant Lynch's misconduct.  Dkt. No. 142 at 1; Dkt. No. 139 at vi, 1, 5, 9-10; Dkt. No. 136 at v., 1, 3-5; Dkt. No. 133 at 2, 23; Dkt. No. 127 at 2-3, 5-6, 10-11.[81]

---

[79]     Unlike here, in *Slayton v. Am. Express Co.*, 604 F.3d 758, 776 (2d Cir. N.Y. 2010), plaintiffs did "not allege[] *any* theory as to why the defendants would knowingly mislead investors."  Dkt. No. 131 at vi, 5, 9.  In *Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*, 2012 WL 685344, at *8 (N.D. Cal. 2012), defendants failed to allege a single actionable statement.  Dkt. No. 136 at 5.

[80]     In *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007), by contrast, there was "no reason at all" to infer defendants' knowledge (or willful blindness) prior to the May 10 statements at issue because "[k]nowledge does not come until May at the earliest."  In *Horizon Asset Mgmt. v. H&R Block, Inc.*, 580 F.3d 755, 763 (8th Cir. 2009) the only allegation that defendants were aware of problems was the statement of one confidential witness "contend[ing] that [the defendant] had knowledge of the accounting problems in April 2004, six months before he began working for [the company]."  In *Slayton*, 604 F.3d 758, which applied an actual knowledge standard, the fact that defendants had just disclosed the same large losses in the previous quarter negated scienter.  Moreover, there were no allegations that defendants knew losses would increase and the sole source of plaintiff's allegations stated the defendants were "stunned" when they learned the truth months later.  *Id.* at 775-77.  *In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d 21, 29-31 (1st Cir. 2012) stands for the unremarkable proposition that a Company was not required to immediately ascertain and disclose the impact of firing 10 members of its 1,100 person sales staff.

[81]     In *Coble*, 2002 WL 31093589, at *3, "plaintiffs did not proffer *any* theory as to why defendants would make the[] false statements."

---

Defendants also suggest that there was no reason for them to cover up Autonomy's fraud, because it would come to light eventually. *Id.* That's a jury issue. The Complaint, which should be accepted as true, alleges that Defendants Whitman, Lane and Lesjak opted to quietly clean up the mess Apotheker and Lynch left behind in the hopes that it would never come to light. The "fact that a gamble – concealing bad news in the hope that it will be overtaken by good news – fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Compare Tellabs II*, 513 F.3d at 710 *with* Dkt. No. 131 at 5. Defendant' lack of stock sales, Dkt. No. 139 at vi, 1, 8-10; Dkt. No. 142 at 1, 6-7; Dkt. No. 127 at 11; Dkt. No. 136 at 2, 5 & n.7; Dkt. No. 131 at 5; Dkt. No. 133 at 2, 25, are meaningless here because "a party that introduces fraudulent information into the securities market does not less damage to the public because the party did not trade stocks." *McGann v. Ernst & Young*, 102 F.3d 390, 396 (9th Cir. 1996). "In other words, the lack of stock sales by a defendant is not dispositive of scienter." *Am. W. Holding*, 320 F.3d at 944.[82]

## 2. Defendants Were "Hands-On" Managers

"[T]he Ninth Circuit [has] held senior management accountable for information about which they claimed to have superior knowledge." *S. Ferry*, 687 F. Supp. 2d at 1259-60; *Tellabs II*, 513 F.3d at 711. A complaint therefore adequately pleads scienter where, as here, it contains "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database, a specific admission by a top executive that '[w]e know exactly how much we have sold in the last hour around the world,' or other particular 'details about the defendants' access to information within the company.'" *Zucco*, 552 F.3d at 1001. Here, Whitman and Apotheker admitted on numerous occasions that they were monitoring every detail about Autonomy's acquisition and/or integration into HP. ¶¶76, 177, 191. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004); *see Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*,

---

[82] *See also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992); *LDK Solar*, 584 F. Supp. 2d at 1247 (absence of insider trading by a defendant did not weigh against scienter); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1191 (C.D. Cal. 2007) (same); *Batwin*, 2008 U.S. Dist. LEXIS 52365, at *43-45 (same).

717 F. Supp. 2d 1170, 1178-79 (E.D. Wash. 2010); *In re NorthPoint Commc'ns Grp., Inc., Sec. Litig. & Consol. Cases*, 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002).

### 3. HP's Autonomy-Related Purge Is Evidence of Scienter

The executive resignations and firings alleged in the Complaint also provide evidence of scienter. *See Adaptive*, 2002 U.S. Dist. LEXIS 5887, at *42-43. On September 22, 2011, before his deal with Autonomy had yet to even close, Apotheker was ousted as HP's CEO. ¶68. Robison, who ran HP's Autonomy due diligence, was terminated just a month after HP began reviewing Autonomy's revenue recognition practices. ¶117. In April 2012, Lynch was removed around the same time that HP claims it became aware of Autonomy's fraud. ¶80. In July 2012, the leader of HP's in-house legal team for the Autonomy acquisition, and who signed the August 18, 2011 press release announcing the deal, abruptly resigned his post just within months of the May 2012 whistleblower's allegations. ¶81. In April 2013, after months of pressure following the November 20, 2012 disclosures, Lane was forced to give up his position as Chairman of the Board. ¶221.

The Court should find these terminations one of several factors to support an inference of scienter here. *See McKesson*, 126 F. Supp. 2d at 1275 n.16; *In re Alstom SA, Sec. Litig.*, 454 F. Supp. 2d at 187, 208 (S.D.N.Y. 2006). HP's argument that Plaintiff has not proven that Lynch was terminated because HP discovered Autonomy's misconduct is weak, Dkt. No. 133 at 18-19, as in *UTStarcom*, this court reasoned that "the proximity of Defendants' departures to the [] investigations adds one more piece to the scienter puzzle." 617 F. Supp. 2d at 975-76. (quoting *In re Impax Labs., Inc., Sec. Litig.*, 2007 U.S. Dist. LEXIS 52356, at *26-27 (N.D. Cal. 2007)).

### 4. The Size of HP's Autonomy Write-Down Supports Scienter

The sheer magnitude of the Company's $8.8 billion write-down here (85% of the value HP attributed to Autonomy) is further indicia of scienter. [83] ¶¶5, 84, 217; *Ernst & Young*, 641 F.

---

[83] Lesjak's argument, that she could not be expected to know the accounting details concerning Autonomy, (Dkt. No. 136 at 4), is difficult to square with Whitman's representation that Autonomy would be "HP's priority number one, two and three" in 2012, and HP's three month intensive review of Autonomy's financial statements and revenue recognition policies. ¶¶74-76.

3d at 1100-1101. On November 20, 2012 HP admitted that $200 million of Autonomy's 2009 and 2010 revenue had been recorded improperly or prematurely – over 50% of Autonomy's revenue for that period. ¶44, n.21, 137. "Although it is possible to infer negligence from these accounting problems, as opposed to scienter, the Court [should] find[] that the magnitude and extent of the problems, as alleged in the Complaint, gives rise to at least an equally strong inference of scienter." *UTStarcom*, 617 F. Supp. 2d at 975. "Considering the number, magnitude, and multi-year financial impacts of [the violations], it is certainly reasonable to infer scienter just as strongly as an innocent inference." *Ernst & Young*, 641 F. 3d at 1100-1101.

## H. Plaintiff Has Adequately Alleged "Control Person" Liability

"A *prima facie* case of control person liability requires evidence (1) that a primary violation of the securities laws occurred and (2) that defendant directly *or indirectly* controlled the person or entity committing the primary violation." *New Century*, 588 F. Supp. 2d at 1233. For the reasons stated above, Plaintiff has alleged primary violations of the federal securities laws. "In order to make out a *prima facie* case, it is not necessary to show actual participation or the exercise of actual power…." *Id.*; *see also Everex*, 228 F.3d at 1066.[84] Plaintiff need not plead a Section 20(a) defendant's "scienter or 'culpable participation' in the alleged wrongdoing." *Am. Apparel II*, 2013 U.S. Dist. LEXIS 6977, at *122 (citing *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993)).[85] A defendant can be found liable even if

---

[84] Defendants repeatedly argue that the Complaint fails to plead that they "exercised" power or control over HP. Dkt. No. 130 at 4; Dkt. No. 127 at 12; Dkt. No. 139 at 13; Dkt. No. 125 at 10. In the Ninth Circuit, "in order to make out a *prima facie* case, it is **not** necessary to show actual participation or the *exercise* of actual power." *Everex*, 228 F.3d at 1065. *See UTStarcom*, 617 F. Supp. 2d at 979-80.

[85] Lesjak, Murrin, and Robison argue that "the Complaint makes no serious claim that [Lesjak] exercised actual control over any of the other Individual Defendants." Dkt. No. 136 at 11-12; Dkt. No. 142 at 8; Dkt. No. 130 at 7. The Complaint, however, alleges that Lesjak and Robison controlled HP, not the Individual Defendants. *See* ¶¶119, 124, 240 ("the Insider Defendants acted as controlling persons of HP within the meaning of §20(a)…"); *Middlesex*, 527 F. Supp. 2d at 1193-94 (company's CFO, Senior Vice President, Corporate Development, and Senior Vice President of Finance liable under 20(a) because their "respective positions gave them control over [defendant corporation]"). "[Lane's] reliance upon *GlenFed* is equally tenuous." *Apollo*, 690 F. Supp. 2d at 968-69; Dkt. No. 130 at 1, 4-5&n.; Dkt. No. 131 at 13. "[T]he 'holding of *GlenFed* does not apply to the situation…, where,' as here, 'liability is not dependent upon showing that the control person engaged in fraud.'" *Id.*

they "believed in good faith that they were not perpetrating a fraud." *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1434 (9th Cir. 1995); *see In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 819 (N.D. Cal. 2011).[86]

Section 20(a) claims need only "be pleaded in accordance with [Rule] 8(a)(2), requiring that the plaintiff provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Apollo*, 690 F. Supp. 2d at 967; Dkt. No. 130 at 1, 4-5 & n.3; Dkt. No. 131 at 13. Indeed, since this Court decided *Howard v. Hui*, 2001 WL 1159780 (N.D. Cal. 2001), "the weight of recent case law indicates that" the "appropriate [pleading] standard" under §20(a) is Rule 8. *Radient*, 2011 U.S. Dist. LEXIS 124631, at *26; *Siemers v. Wells Fargo & Co.*, 2006 U.S. Dist. LEXIS 60858, at *42 (N.D. Cal. 2006); *Batwin*, 2008 U.S. Dist. LEXIS 52365, at *75 ("The Court respectfully declines to follow [*Splash*]"). "[I]t is reasonable to presume that these officers had the power to control or influence the particular transactions giving rise to the securities violation.'"[87] *In re Turbodyne Techs., Inc. Sec. Litig.*, 2000 U.S. Dist. LEXIS 23020, at *42 (C.D. Cal. 2000).

Here, Defendants Whitman, Apotheker, and Lesjak were HP's Class Period CEOs and CFO, respectively, were actively involved in HP's day-to-day operations and made numerous allegedly false and misleading statements on conference calls, SEC filings and otherwise. ¶¶111-14, 119-24. Defendant Lynch was HP's Executive Vice President of Information Management,

---

[86] Lane argues that he is not liable under 20(a) because he acted in good faith. Dkt. No. 131 at 14 n.8, 15. It is well established in this Circuit that culpability is not required to plead control. *Apollo*, 690 F. Supp. 2d at 975; *see also Nguyen v. Radient Pharms. Corp.*, 2011 U.S. Dist. LEXIS 124631, at *29 (N.D. Cal. 2011) (same); *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1054 (N.D. Cal 2008) ("[C]ulpability and corresponding particularity arguments are properly asserted in [defendants'] Answer, not a 12(b)(6) motion."); *Middlesex*, 527 F. Supp. 2d at 1193 (same); *Cylink*, 178 F. Supp. 2d at 1089 (same); *Rodriguez v. Countrywide Homes*, 2008 U.S. Dist. LEXIS 82874, at *7 (E.D. Cal. 2008) (same). Lane's authority is not to the contrary. In *Donohoe*, 30 F.3d at 912, the Seventh Circuit stated, at **summary judgment**, that "because good faith was an affirmative defense to control person liability, the burden of **proving** good faith was on the defendants."

[87] Despite these allegations, Lane, Lynch and Murrin suggest that Plaintiff's allegations are analogous to those in several cases where "boilerplate" language was the **only** allegation of control. *See* Dkt. No. 131 at 14; Dkt. No. 125 at 10-11; Dkt. No. 130 at 6-7; Dkt. No. 139 at 15. *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1091 (W.D. Wash. 2003) refused to credit allegations of control based merely on defendant's position as "a sales executive responsible for international sales."

one of HP's top 15 officers, and was in charge of one of HP's largest divisions from October 2011 to May 2012.  ¶45.  Robison was HP's Executive Vice President and Chief Strategy and Technology Officer from May 2001 to November 2011, ¶117, and was also a member of HP's Executive Counsel and helped shape the Company's strategy and technology research agenda.  *Id.*  Robison also led HP's Autonomy due diligence and spoke at HP's investor conferences on the Company's behalf.  ¶¶38, 117, 171, 174.  Likewise, the Complaint alleges that Lane was heavily actively involved in HP, including the Autonomy negotiations and making false and misleading statements.  ¶¶31, 33, 67, 177.  Defendant Murrin was HP's Chief Accounting Officer during the Class Period. ¶116.  Thus, the Individual Defendants "were actively involved in the day-to-day operations of [the Company and] were senior executives."  *See Diamond Foods*, 2012 U.S. Dist. LEXIS 170704, at *39; s*ee also Radient*, 2011 U.S. Dist. LEXIS 124631, at *28; ¶¶119, 123, 240.[88]

Moreover, in this Circuit, "'director status 'is a sort of red light" that indicates the potential for day-to-day involvement in a company.'"  *Apollo*, 690 F. Supp. 2d at 976 (quoting *Fouad v. Isilon Sys.*, 2008 U.S. Dist. LEXIS 105870, at *35 (W.D. Wash. 2008)).  Here, Whitman and Lane sat on HP's Board of Directors.  ¶¶110, 115.  Likewise, "when a corporate officer signs a document on behalf of the corporation, that signature will be rendered meaningless unless the officer believes that the statements in the document are true." *Everex*, 228 F.3d at 1061.[89]  Because Defendants Lane, Murrin, Whitman and Lesjak all signed SEC filings "that are alleged to have contained actionable misrepresentations…[the] approvals through signing sufficiently allege control over those who have been alleged to have violated Section 10(b)."  *In*

---

[88]   *Everex*, 228 F.3d at 1067 supports Plaintiff's claim.  Dkt. No. 131 at 14; Dkt. No. 125 at 10-11; Dkt. No. 130 at 6-7.  There, the Ninth Circuit dismissed claims against an alleged control person who "served as a director for less than three months during the class period" and plaintiff provided "no specific indication that [he] supervised or had any responsibility for the preparation of financial statements." *Id.* By contrast, in *Everex*, control claims were allowed to go forward against a defendant because "although [he] did not work on the projections and did not make much of a review of the financial statements…[he] was authorized to participate in the release of the financial statements and signed off on the statements as correct." 288 F.3d at 1066.

[89]   *Paracor Fin., Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996) is a summary judgment opinion. Dkt. No. 130 at 6.  Moreover, the alleged control person in *Paracor* did not sign the company's financial statements.  *See Everex*, 228 F.3d at 1065-66.

*re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003); ¶¶111-16.[90]  "It makes sense that the authority to sign and certify the contents of a registration statement implies the authority to effectuate changes to that statement by withholding certification." *See In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 555 (N.D. Cal. 2009).

The Individual Defendants' suggestion that Plaintiff was required to plead their ability to control over the "statements" at issue, the "transactions at issue," or "with respect to Autonomy," and that the "concept of control in the context of a recently-acquired, foreign subsidiary comprising a minor portion of the Company's overall revenue makes little sense" is without merit.  Dkt. No. 136 at 12, n.17; Dkt. No. 131 at 14; Dkt. No. 130 at 1-5, 8.  The control person "inquiry must revolve around the 'management and policies' of the corporation, not around discrete transactions." *Paracor*, 96 F.3d at 1162; Dkt. No. 131 at 13.  The out-of-circuit authorities Defendants rely on that do require a plaintiff to demonstrate that a defendant "had an ability to control the specific transaction or activity upon which the primary violation is based" are not the law in this Circuit.  *See, e.g.*, *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 730 (W.D. Tex. 2010); Dkt. No. 136 at 11-12 (citing *ArthroCare*); *Apollo*, 690 F. Supp. 2d at 975.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that the Defendants' motions to dismiss should be denied.  In the event the Court grants, in whole or in part, the motions to dismiss, Plaintiff requests leave to amend.  *See* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires.").

---

[90]    Citing *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1227, 1241-43 (N.D. Cal. 1994), Murrin argues that the fact that he signed the false Annual Report is insufficient to allege control. Dkt. No. 130 at 6.  *Gupta*, however, cited *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984), which required plaintiffs to make a "'showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed.'"  *Burgess* was decided prior to *Hollinger*.  "'Prior to *Hollinger*, it was clear that a plaintiff needed to show actual participation to make out a prima facie §20(a) case in this circuit.' *Hollinger* 'shifted the burden to the defendant[,]' however, 'to show that she, acted in good faith and did not directly or indirectly induce the violations.'"  Consequently, "it is not necessary to show actual participation or the exercise of power[]' to make out a prima facie §20(a) claim in the Ninth Circuit." *Apollo*, 690 F. Supp. 2d at 970-71.

Dated: August 30, 2013

Respectfully submitted,

KESSLER TOPAZ MELTZER
  & CHECK, LLP

*/s/ Ramzi Abadou*
RAMZI ABADOU
ELI R. GREENSTEIN
STACEY M. KAPLAN
PAUL A. BREUCOP
IOANA A. BROOKS
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001
rabadou@ktmc.com
egreenstein@ktmc.com
skaplan@ktmc.com
pbreucop@ktmc.com
ibrooks@ktmc.com

-and-

DAVID KESSLER
DARREN J. CHECK
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
dkessler@ktmc.com
dcheck@ktmc.com

*Counsel for Lead Plaintiff PGGM*
*Vermogensbeheer B.V. and Lead Counsel for*
*the Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2013, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 30, 2013.

KESSLER TOPAZ MELTZER
  & CHECK, LLP

*/s/ Ramzi Abadou*
RAMZI ABADOU