WACHTELL, LIPTON, ROSEN & KATZ
MARC WOLINSKY (*pro hac vice*)
GEORGE T. CONWAY III (*pro hac vice*)
RACHELLE SILVERBERG (*pro hac vice*)
VINCENT G. LEVY (*pro hac vice*)
51 West 52nd Street
New York, NY 10019
Tel./Fax: 212.403.1000/2000
MWolinsky@wlrk.com
GTConway@wlrk.com
RSilverberg@wlrk.com
VGLevy@wlrk.com

FARELLA, BRAUN & MARTEL, LLP
NEIL A. GOTEINER, State Bar No. 83524
THOMAS B. MAYHEW, State Bar No. 183539
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
Tel./Fax: 415.954.4400/4480
NGoteiner@fbm.com
TMayhew@fbm.com
CWheeler@fbm.com

*Attorneys for Defendant Hewlett-Packard Company*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HP SECURITIES LITIGATION | Master File No. C-12-5980 CRB |
| | Class Action |
| This Document Relates to: All Actions | **REPLY MEMORANDUM IN FURTHER SUPPORT OF HP'S MOTION TO DISMISS** |
| | Date: Friday, November 8, 2013 |
| | Time: 10:00 a.m. |
| | Dept.: Courtroom 6, 17th Floor |
| | Judge: Hon. Charles R. Breyer |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

TABLE OF ABBREVIATIONS ........................................................................................ vii

STATEMENT OF ISSUES ............................................................................................... viii

SUMMARY OF ARGUMENT ......................................................................................... viii

ARGUMENT ....................................................................................................................... 1

I.      Plaintiff's Scienter Allegations, Viewed As a Whole, Are Inadequate. ................... 1

II.     Plaintiff's Scienter Allegations, Viewed Individually, Are Inadequate. ................... 3

        A.      Plaintiff's Allegations of Pre-Acquisition Scienter Are Deficient. ............... 3

        B.      Plaintiff's Allegations of Post-Acquisition Scienter Are Deficient. ............. 9

        C.      Plaintiff's Effort to Impute Lynch's State of Mind Upon HP Fails. ........... 13

III.    HP's Pre-Acquisition Statements Were Only False or Misleading to the Extent They
        Incorporate Autonomy's Pre-Acquisition Financials. .............................................. 17

        A.      Most of the Challenged Pre-Acquisition Statements Are Alleged to Be False
                Only Because They Recapitulate or Are Based upon Autonomy's Financials. ......... 17

        B.      Apotheker's Due-Diligence Statements Were Not False or Misleading. .................. 18

        C.      HP's Non-Disclosure that Lane and Whitman Allegedly Sought to Rescind the
                Offer Is Not Actionable. ............................................................................. 22

IV.     HP's Post-Acquisition Statements Were Not False or Misleading. ......................... 23

        A.      The Pre-"Whistleblower" Statements Were Not False or Misleading. ......... 23

        B.      The Post-"Whistleblower" Statements Were Not False or Misleading. ....... 24

        C.      HP's Accounting of Goodwill Was Not False or Misleading. ..................... 26

V.      The Section 20(a) Claim Must Be Dismissed. ......................................................... 29

CONCLUSION ................................................................................................................. 30

**Cases**

*Allstate Life Ins. Co.* v. *Robert W. Baird & Co.*,
    756 F. Supp. 2d 1113 (D. Ariz. 2010) ........................................................................ 16

*Batwin* v. *Occam Networks, Inc.*,
    2008 U.S. Dist. LEXIS 52365 (C.D. Cal. July 1, 2008) ............................................. 21

*Bolger* v. *First State Fin. Serv.*,
    759 F. Supp. 182 (D.N.J. 1991) ................................................................................. 25

*Central Bank of Denver* v. *First Interstate Bank of Denver*,
    511 U.S. 164 (1994) ................................................................................................. 13-14

*City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*,
    2013 WL 1174017 (S.D.N.Y. Mar. 22, 2013) ........................................................... 20

*Curry* v. *Hansen Med., Inc.*,
    2012 U.S. Dist. LEXIS 112449 (N.D. Cal. Aug. 10, 2012) ................................... 15, 16

*DSAM Global Value Fund* v. *Altris Software, Inc.*,
    288 F.3d 385 (9th Cir. 2002) ....................................................................................... 3

*Dura Pharms., Inc.* v. *Broudo*,
    544 U.S. 336 (2005) ................................................................................................... 17

*Fait* v. *Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011) ....................................................................................... 27

*Fait* v. *Regions Fin. Corp.*,
    712 F. Supp. 2d 117 (S.D.N.Y. 2010) ..................................................................... 27-28

*Freedman* v. *Value Health, Inc.*,
    958 F. Supp. 745 (D. Conn. 1997) ........................................................................... 4, 21

*Garden City Emps.' Ret. Sys.* v. *Psychiatric Solutions, Inc.*,
    2011 U.S. Dist. LEXIS 35661 (M.D. Tenn. Mar. 31, 2011) ...................................... 20

*Glazer Capital Mgmt., LP* v. *Magistri*,
    549 F.3d 736 (9th Cir. 2008) ......................................................................... 3, 14, 15, 16

*Higginbotham* v. *Baxter Int'l Inc.*,
    495 F.3d 753 (7th Cir. 2007) .......................................................................... 9, 11, 12, 25

*Howard* v. *Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ................................................................................... 5, 29

*IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*,
    2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) ......................................................... 28-29

*In re Amylin Pharms., Inc. Sec. Litig.*,
    2003 U.S. Dist. LEXIS 7667 (S.D. Cal. May 1, 2003)......................................................... 29

*In re Browning-Ferris Indus., Inc. S'holder Deriv. Litig.*,
    830 F. Supp. 361 (S.D. Tex. 1993) ...................................................................................... 25

*In re Cadence Design Sys., Inc. Sec. Litig.*,
    692 F. Supp. 2d 1181 (N.D. Cal. 2010) ............................................................................... 16

*In re Cendant Corp. Litig.*,
    60 F. Supp. 2d 354 (D.N.J. 1999) ........................................................................................ 19

*In re Citigroup Inc. Bond Litig.*,
    723 F. Supp. 2d 568 (S.D.N.Y. 2010) ................................................................................. 29

*In re Countrywide Fin. Corp. Sec. Litig.*,
    588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................................. 7

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ............................................................................................. 20

*In re DDi Corp. Sec. Litig.*,
    2005 U.S. Dist. LEXIS 28216 (C.D. Cal. July 20, 2005) ................................................... 21

*In re Diamond Foods Inc. Sec. Litig.*,
    2012 U.S. Dist. LEXIS 170704 (N.D. Cal. Nov. 30, 2012) ................................................. 6

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994) ............................................................................................... 27

*In re Heckmann Corp. Sec. Litig.*,
    869 F. Supp. 2d 519 (D. Del. 2012) ...................................................................................... 4

*In re Huffy Corp. Sec. Litig.*,
    577 F. Supp. 2d 968 (S.D. Ohio 2008) ................................................................................. 7

*In re IBP, Inc., S'holders Litig.*,
    789 A. 2d 14 (Del. Ch. 2001) ................................................................................................ 9

*In re Levi Strauss & Co. Sec. Litig.*,
    527 F. Supp. 2d 965 (N.D. Cal. 2007) ................................................................................. 29

*In re Ligand Pharms., Inc., Sec. Litig.*,
    2005 U.S. Dist. LEXIS 44911 (S.D. Cal. Sept. 27, 2005) ................................................. 21

*In re Marsh & Mclennan Co., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006) ................................................................................. 16

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...................................................................... 3, 16, 17

*In re New Century*,
    588 F. Supp. 2d 1206 (C.D. Cal. 2008) .......................................................................... 21, 29

*In re NorthPoint Commc'ns Grp.*,
    221 F. Supp. 2d 1090 (N.D. Cal. 2002) .................................................................. 12

*In re Parmalat Sec. Litig.*,
    594 F. Supp. 2d 444 (S.D.N.Y. 2009) .............................................................. 15-16

*In re Pilgrim's Pride Corp. Sec. Litig.*,
    2010 U.S. Dist. LEXIS 84260 (E.D. Tex. Aug. 17, 2010) ............................. 29, 30

*In re RAIT Fin. Trust Sec. Litig.*,
    2008 U.S. Dist. LEXIS 103549 (E.D. Pa. Dec. 22, 2008) .................................. 21

*In re Read-Rite Corp.*,
    335 F.3d 843 (9th Cir. 2003) ............................................................................. 24

*In re Remec, Inc., Sec. Litig.*,
    388 F. Supp. 2d 1170 (S.D. Cal. 2005) .............................................................. 27

*In re Remec Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) .............................................................. 28

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ........................................................................ 18, 24

*In re Siebel Sys., Inc. Sec. Litig.*,
    2005 WL 3555718 (N.D. Cal. 2005) ................................................................... 13

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ............................................................................... 3

*In re SunPower Sec. Litig.*,
    No. 09-5473 (N.D. Cal.) ..................................................................................... 10

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................ 13

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002) ............................................................................ 12

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ..................................................................... 1, 3, 5

*In re Yahoo! Inc. Sec. Litig.*,
    2012 WL 3282819 (N.D. Cal. Aug. 10, 2012) ............................................. 20, 25

*Kerr* v. *Exobox Tech. Corp.*,
    2012 U.S. Dist. LEXIS 7523 (S.D. Tex. Jan. 23, 2012) .................................... 16

*Kyung Cho* v. *UCBH Holdings, Inc.*,
    2012 U.S. Dist. LEXIS 123234 (N.D. Cal. Aug. 29, 2012) ................................ 15

*Lipton* v. *Pathogenesis Corp.*,
    284 F. 3d 1027 (9th Cir. 2002) ........................................................................... 10

*Makor Issues & Rights, Ltd.* v. *Tellabs Inc.*,
   513 F. 3d 702 (7th Cir. 2008) ............................................................. 13, 14, 15, 16, 17

*Matrix Capital Mgmt. Fund, LP* v. *BearingPoint, Inc.*,
   576 F. 3d 172 (4th Cir. 2009) ................................................................................. 15

*Matrixx Initiatives, Inc.* v. *Siracusano*,
   131 S. Ct. 1309 (2011) ............................................................................................ 22

*Morgan* v. *AXT*,
   2005 U.S. Dist. LEXIS 42346 (N.D. Cal. Sept. 21, 2005) .................................... 21

*N.M. State Inv. Council* v. *Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) ............................................................. 4, 5, 7, 10, 13

*NECA-IBEW Pension Trust Fund* v. *Bank of Am. Corp.*,
   2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012) .......................................................... 20

*Nieman* v. *Duke Energy Corp.*,
   2013 WL 4004274 (W.D.N.C. July 26, 2013) ....................................................... 18

*Nursing Home Pension Fund* v. *Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ................................................................................ 12

*Pa. Pub. Sch. Empls. Ret. Sys.* v. *Bank of Am. Corp.*,
   874 F. Supp. 2d 341 (S.D.N.Y. 2012) .................................................................... 16

*Philco Invs., Ltd.* v. *Martin*,
   2011 WL 4595247 (N.D. Cal. Oct. 4, 2011) .......................................................... 20

*Plumbers Union Local No. 12 Pension Fund* v. *Ambassador's Grp.*,
   717 F. Supp. 2d 1170 (E.D. Wash. 2010) ............................................................. 12

*Ronconi* v. *Larkin*,
   253 F.3d 423 (9th Cir. 2001) ................................................................................. 24

*S. Ferry LP, # 2* v. *Killinger*,
   399 F. Supp. 2d 1121 (W.D. Wash. 2005) ............................................................ 21

*S. Ferry LP, # 2* v. *Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009) .............................................................. 6

*Sapirstein-Stone-Weiss Found.* v. *Merkin*,
   2013 U.S. Dist. LEXIS 84035 (S.D.N.Y. June 11, 2013) ....................................... 7

*SEC* v. *Mozillo*,
   2009 U.S. Dist. LEXIS 104689 (C.D. Cal. Nov. 3, 2009) ..................................... 21

*Shields* v. *Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ..................................................................... 13, 20, 24

*Southland Sec. Corp.* v. *INSpire Ins. Solutions, Inc.*,
   365 F.3d 353 (5th Cir. 2004) ................................................................................. 15

*Stocke* v. *Shuffle Master, Inc.*,
   615 F. Supp. 2d 1180 (D. Nev. 2009) ........................................................................ 21

*Stratte-McClure* v. *Morgan Stanley*,
   784 F. Supp. 2d 373 (S.D.N.Y. 2011) ...................................................................... 29

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*,
   531 F.3d 190 (2d Cir. 2008) ......................................................................... 14, 15, 16

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).......................................................................................... 2, 4, 13

*Virginia Bankshares, Inc.* v. *Sandberg*,
   501 U.S. 1083 (1991).......................................................................................... 17-18

*Warshaw* v. *Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) ...................................................................................... 21

*Zucco Partners, LLC* v. *Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...................................................................................... 3

**Federal Statutes and Rules**

15 U.S.C. § 77k, Section 11 of Securities Act of 1933................................................ 29

15 U.S.C. § 78j(b), Section 10(b) of Exchange Act of 1934 ..................... 3, 13, 15, 16,17, 22, 23, 29

15 U.S.C. § 78u-4, PSLRA ........................................................ 13, 23, 26, 29

15 U.S.C. § 78t(a), Section 20(a) of Exchange Act of 1934...................................... 29, 30

17 C.F.R. 240.10b-5, Rule 10b-5 ............................................................................ 3, 29

Fed. R. Civ. P. 8(a) .................................................................................................. 29

Fed. R. Civ. P. 9(b) .............................................................................................. 4, 29

# TABLE OF ABBREVIATIONS

| Abbreviation | Reference |
|---|---|
| Compl. | Plaintiff's Consolidated Complaint dated May 3, 2013 (Docket # 100). |
| HP. Br. | HP's Motion to Dismiss (Docket # 133). |
| HP Ex. __ | Exhibit __ filed in support of HP's motion to dismiss:<br><br>• Exhibits 1 through 14 were submitted with Mark R.S. Foster's Declaration of July 2, 2013 (Docket #134).<br><br>• Exhibits 15 and 16 are submitted contemporaneously herewith by declaration of Marc Wolinsky dated October 2, 2013. |
| Opp. | Lead Plaintiff's Omnibus Memorandum of Law filed on August 30, 2013, in Opposition to Defendants' Motions to Dismiss (Docket #168). |
| Pl. Ex. __ | Exhibit __ to Declaration of Ramzi Abadou filed on August 30, 2013, in support of Plaintiff's Brief in Opposition (Docket #169). |
| Whitman Ex. __ | Exhibit __ to Declaration of Jeffrey M. Kaban filed on July 2, 2013, in support of Margaret C. Whitman's Motion to Dismiss (Docket #141). |

**STATEMENT OF ISSUES**

1. Whether a plaintiff may plead a securities-fraud claim against the acquirer of a busi-

ness that turned out to have fraudulent financial statements when there is no basis for concluding that

the acquirer either knowingly or with conscious recklessness agreed to be the victim of a fraud?

2. Whether a plaintiff may raise a strong inference that the acquirer defrauded the public

after the acquisition by not disclosing the pre-acquisition improprieties of the acquired business

when: (a) there are no factual allegations establishing whether, when, how, or from whom the ac-

quirer learned of the improprieties before a "whistleblower" came forward months after the deal

closed; (b) the acquirer conducted an investigation as soon as the "whistleblower" came forward and

disclosed the results of the investigation to the public and the authorities; (c) no cogent motive or

reason is given as to why the acquirer would hide the fraud only to switch course just a few months

later; and (d) there are no particularized facts establishing that the acquirer intentionally or with de-

liberate recklessness made any misleading statements either before the "whistleblower" came for-

ward or after?

3. Whether the knowledge of Michael Lynch about the nature and extent of the fraud

that Autonomy committed against HP can result in liability for HP?

**SUMMARY OF ARGUMENT**

Plaintiff's complaint must plead particularized facts to cogently and compellingly convince

the court that the victims of Autonomy's fraud were fraudsters themselves. The complaint fails eve-

ry which way to do that. And the opposition brief reads like a bad novel, imagining motives to

commit fraud that simply do not rest on the well-pleaded facts. The complaint should be dismissed.

As plaintiff would have it, Léo Apotheker, HP's CEO at the time the deal was announced,

was "reckless in not knowing about Autonomy's possible impairments" (Opp. 20) because he was so

bent on "transforming" HP that he was willing to spend $11 billion of HP's cash on a company that

would not transform anything. The HP board was "reckless" too. Why? Because the directors were

"just too exhausted" to rein Apotheker in. Opp. iii. In other words, while the opposition tries to de-

ny it, plaintiff's theory is that Apotheker blindly proceeded on a "suicide mission" and that the other

HP defendants[1] followed along out of fatigue.  Opp. 7.  The pleaded facts don't support this illogical theory of scienter.

Plaintiff's defense of his other pre-closing claims are just as fallacious.  The charge is that Apotheker (and, derivatively, HP) committed securities fraud when Apotheker characterized HP's diligence as "extensive."  But Apotheker explained what he meant by this when he went on to say that Autonomy was "audited like any other FTSE company" and that this was "the basis of [HP's] due diligence."  Compl. ¶ 41.[2]  Plaintiff has no response to this fact, so simply ignores it.  Instead, plaintiff seeks to bring into this case a KPMG due diligence report that purportedly shows that HP knew that its due diligence was deficient.  But the complete document, like Apotheker's complete statement, undoes this claim as well.  It states that HP's due diligence was "comparable with other acquisitions involving large U.K. publicly traded companies."  Pl. Ex. D.[3]

The bad novel continues with the allegations against Apotheker's successor, Meg Whitman.  Plaintiff charges that she, too, committed securities fraud by making upbeat statements about Autonomy while she supposedly knew all about (or deliberately turned a blind eye to) the Autonomy accounting improprieties.  But plaintiff cites no facts establishing a "strong inference" that Whitman discovered or even suspected fraud before a senior Autonomy executive came forward with information in May 2012 that triggered an investigation.  Instead, plaintiff's brief misquotes Whitman's public statements and cites a handful of analyst reports questioning the acquisition, labeling those "red flags."  But there is no factual allegation establishing that Whitman was even aware of these purported "red flags," still less that it was the sort of "in your face fact[], that cr[ies] out, how could [defendants] not have known that the financial statements were false?"  *N.M. State Inv. Council* v.

---

[1]  As used in this brief, the "HP defendants" refers to all the defendants other than Michael Lynch.  The "individual HP defendants" are the HP defendants other than HP.

[2]  "FTSE" refers to the FTSE 100 index of the largest companies listed on the London Stock Exchange, of which Autonomy was a member.

[3]  Plaintiff also cites a takeover manual written by HP's litigation counsel in which it is stated, with the benefit of hindsight, that the Autonomy deal shows the need for effective due diligence.  But "the fact that a due diligence investigation turned out to reach results that ultimately proved to be incorrect does not mean that a statement by a company that it had performed extensive due diligence was false at the time it was made."  *NECA-IBEW Pension Trust Fund* v. *Bank of America Corp.*, 2012 WL 3191860, at *19 (S.D.N.Y. Feb. 9, 2012); *see also Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994).

*Ernst & Young LLP*, 641 F.3d 1089, 1103 (9th Cir. 2011) (internal quotation marks omitted) (third alteration in original).

And like the rest of plaintiff's claims, the claim against Whitman fails because there is no coherent explanation for why the victim of a fraud would knowingly (or with deliberate recklessness) agree to spend billions to buy an overvalued asset with misstated revenues. All that plaintiff can come up with is the contention that the reason why HP went forward with the suicide mission is because HP was stuck with the deal under an arcane provision of the UK Takeover Code. So, being stuck, Whitman sought to sweep the pre-acquisition fraud under the rug by quietly unwinding it.

But contrary to plaintiff's lynchpin supposition, if HP had learned that Autonomy was a fraud after the deal was struck, HP *would have had* recourse. The contract of sale expressly gave HP an out if "any business, financial, or other information" disclosed by Autonomy "either contains a misrepresentation of fact or omits to state a fact necessary to make the information contained therein not misleading." HP Ex. 1 at 39; HP Br. 15-16. Thus, plaintiff's allegation that HP was stuck with the deal indicates that HP had *not* discovered Autonomy's fraud, and only undermines its claim.

Nor is there any support for the baseless allegation that, in the face of a "history of leaks" at HP, Whitman or any of the other HP defendants intentionally hid the fraud until a "whistleblower" came forward in May 2012 and "forced [Whitman's] hand." Opp. iii. Again, there is no plausible explanation for why any HP defendant would put his or her reputation on the line to cover up a problem created by someone else only to turn around and report it to criminal and regulatory authorities on both sides of the Atlantic. Is it remotely cogent to conclude that, after having supposedly covered up a multi-billion dollar fraud, any HP defendant would then go ahead and blow the whistle on Lynch oblivious to the certainty that the authorities would investigate the cover-up as well?

Plaintiff's last-gasp effort to maintain its claim against the victim of Autonomy's fraud is to say that, at a minimum, the HP defendants learned about the Autonomy fraud when a senior Autonomy executive came forward in late-May 2012, but then they improperly remained quiet until November 2012. But remaining silent is not fraud. Section 10(b) does not impose the duty to disclose all material information, only the duty not to make misleading or false statements. *Matrixx Initiatives, Inc.* v. *Siracusano*, 131 S. Ct. 1309, 1321-22 (2011). The May 23, 2012, and June 5, 2012,

Whitman statements that plaintiff points to — statements that, on their face, reflect Whitman's opinion as to why Autonomy's results had disappointed — were made either before or just after the "whistleblower" came forward. "Courts have found that taking time to investigate a situation prior to disclosing the situation to the investing public is not fraudulent." *In re Yahoo! Inc. Sec. Litig.*, 2012 WL 3282819, at *22 (N.D. Cal. Aug. 10, 2012) (Breyer, J.). "Taking the time necessary to get things right is both proper and lawful." *Higginbotham* v. *Baxter Int'l Inc.*, 495 F.3d 753, 761 (7th Cir. 2007). This principle equally defeats plaintiff's allegation that failing to take a write-down before November 2012 amounted to securities fraud.

Finally, unable to establish scienter on the part of the HP defendants, plaintiff seeks to impute Lynch's state of mind on the victim of his fraud. That theory fails as a matter of law. To state a fraud claim against HP, plaintiff must allege facts leading to the strong inference that "*those individuals who actually made* the false statements" acted with scienter. *Glazer Capital Mgmt., LP* v. *Magistri*, 549 F.3d 736, 745 (9th Cir. 2008) (emphasis added). Lynch is not alleged to have made any post-closing misstatements in his capacity as an HP officer.

Plaintiff seems to believe that Lynch's state of mind could establish corporate liability because, when HP's officers and directors made general, upbeat statements about Autonomy, Lynch knew better. But this "collective scienter" theory of liability was implicitly rejected by the Ninth Circuit in *Glazer* and expressly rejected in the leading cases of *Makor Issues & Rights, Ltd.* v. *Tellabs Inc.* (*Tellabs II*), 513 F. 3d 702, 707-08 (7th Cir. 2008), and *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). *See also Matrix Capital Mgmt. Fund, LP* v. *BearingPoint, Inc.*, 576 F. 3d 172, 189-90 (4th Cir. 2009).

On the actual facts pleaded, the most compelling, the logical inference is this: Autonomy's executives, who had committed an accounting fraud and cashed out by offloading it on HP, were highly motivated to mask that fraud from their victim as long as they could. They had the opportunity to do so, and they did. Two months elapsed between the announcement and the closing. And after the closing, they maintained day-to-day control of Autonomy, at least while Lynch was at HP. It took another Autonomy person to come forward, and a forensic investigation, for HP to uncover the truth. That narrative does not support a claim against any of the HP defendants.

**ARGUMENT**

**I.      Plaintiff's Scienter Allegations, Viewed As a Whole, Are Inadequate.**

The basic problem with plaintiff's complaint is that its allegations, viewed "holistically" as they must be, are incapable of supporting a "strong inference" of scienter. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 703 (9th Cir. 2012). The most compelling inference here is the innocent one. It is the story CEO Meg Whitman truthfully told on November 20, 2012, when she disclosed that HP had been the victim of a fraud. *See* Compl. ¶ 84.

Plaintiff's complaint seeks to blame the victim. The essential allegation is that HP's officers and directors agreed to spend some $11 billion while knowing that Autonomy had greatly overstated its revenues — or, what amounts to the same, while being deliberately reckless about that fact. *E.g.*, Compl. ¶¶ 40, 42, 58, 69, 163-70. No cogent explanation is given as to why HP would engage in such a suicide mission. HP Br. 23-25. Plaintiff's complaint goes on to allege that, after the acquisition closed, HP "continued" Autonomy's revenue-recognition fraud. Compl. ¶¶ 135-37, 139, 143, 145, 160. How and to what end? Again, the complaint does not say.

Perhaps recognizing that this narrative makes no sense, plaintiff's opposition takes a different tack. The HP defendants were not on a suicide mission, plaintiff now asserts, and they didn't continue Autonomy's accounting fraud, never mind the allegations in the complaint to the contrary. The opposition presents what is in effect Version 2.0 of plaintiff's claim: the HP board was not aware that Autonomy was a fraud, but was "just too exhausted" to oversee Apotheker, then-Chairman Raymond Lane, and then-Chief Strategy and Technology Officer Shane Robison's "reckless abandon to acquire Autonomy." Opp. iii. As to why the three of them would knowingly (or with deliberate recklessness) acquire a company with greatly overstated revenues, the opposition offers only that Apotheker had promised to "transform" HP into a high-margin software business. Opp. 6-9. "[N]ot a 'suicide mission,'" says plaintiff, just "a desperate plea by a desperate new CEO seeking support for an acquisition that he came to believe, however recklessly, would turn HP around." Opp. 7.

Version 2.0 continues with the story that, "almost immediately" after Apotheker left the company, HP's new CEO Meg Whitman discovered that Autonomy had been a fraud. Opp. iii. But HP's financial advisers allegedly told her that Autonomy's fraud could not serve as a basis to back out of the deal due to a technicality of U.K. law. Opp. iii, 4, 11-12. So instead of trying to back out of the deal, Whitman allegedly sought to quietly sweep the problem under the rug by somehow "un-wind[ing] Autonomy's improper accounting practices." Opp. 4, 12-15, 36-37. She hoped and be-lieved nobody would notice — never mind that HP had a "history of leaks," Opp. 51, that she had already told her bankers that Autonomy was a fraud in an effort to find an out, that the market would obviously find out Autonomy's revenues would not meet expectations, and that HP would ultimately need to take a massive write-down to account for revenues that weren't there. According to the lat-est version of the script, Lynch was then fired and blamed for the disappointing revenues at Auton-omy. Opp. 45.

But the story does not end there, because the plaintiff has to explain why HP, supposedly committed to covering up Autonomy's fraud, launched an investigation and then reported the results to the authorities. The explanation for this turn of events? A single Autonomy executive "blew the whistle on Autonomy's improper revenue recognition practices." Opp. 5, 15-16. That purported "whistleblower" "compelled" Whitman to act. Opp. 33 n.47.

Plaintiff says that, under *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), "a tie" between plausible competing narratives must go to it. Opp. 18. But there is no tie here, not even a close call. Despite plaintiff's claims to the contrary, Version 2.0 of the complaint remains anchored on the nonsensical view that the HP defendants were on a suicide mission, that Apotheker was so blinded by his desire to transform HP that he deliberately ignored facts that would have re-vealed his folly, and that the HP board just sat back and let him do it because they were too tired. And in Version 2.0, the mission continues after the deal closed, with executives who supposedly put their professional reputations and personal wealth on the line to cover up someone else's fraud only to turn around and go to the authorities for no clear reason. There is no cogent line of reasoning that would support this fanciful invention.

## II. Plaintiff's Scienter Allegations, Viewed Individually, Are Inadequate.

### A. Plaintiff's Allegations of Pre-Acquisition Scienter Are Deficient.

Plaintiff's allegations, viewed individually, are just as insufficient. The first category of statements that plaintiff challenges from the pre-acquisition period are alleged to be false because they incorporated, are based upon, or optimistically characterized Autonomy's overstated financials from the pre-acquisition period. Plaintiff also challenges statements by Apotheker to the effect that HP's due diligence was "extensive" and claims that HP improperly omitted to disclose a purported effort by Whitman and Lane to find a way out of the Autonomy deal. See pp. 17-22, below.

Plaintiff fails to plead facts supporting the inference that any of these statements were fraudulent. Under *McKesson HBOC*, an acquirer is liable under Section 10(b) for "recapitulat[ing]" the false statements of its target before the deal closes only if the acquirer either (1) "knew" at the time that the statements were false, or (2) "was deliberately reckless to the truth." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1276-77 (N.D. Cal. 2000). And plaintiff must plead particularized facts establishing that "those individuals who actually made the [] statements" at issue acted with scienter. *Glazer Capital Mgmt., LP* v. *Magistri*, 549 F.3d 736, 745 (9th Cir. 2008).[4]

The allegations here do not satisfy these well-established standards.

1. Most fundamentally, plaintiff's complaint fails to plead facts leading to a compelling inference of scienter because it does not provide any motive or explanation as to why any of the HP defendants would ever agree to purchase a hollow company, knowing about or deliberately reckless

---

[4] Plaintiff does not contest the rule articulated in *McKesson*. Opp. 25 n. 33. Instead, plaintiff tries to equate the deliberate recklessness standard to a form of negligence. Opp. 20-23. But deliberate recklessness is "'a form of intentional or knowing misconduct" in which the "danger of misleading buyers or sellers … is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Zucco Partners, LLC* v. *Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999)). "[M]ere recklessness" is not enough. *VeriFone*, 704 F.3d at 701. In other words, the degree of recklessness resulting in Rule 10b-5 liability must "strongly suggest[] actual intent." *Silicon Graphics*, 183 F.3d at 979; *DSAM Global Value Fund* v. *Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002) ("To allege a strong inference of deliberate recklessness, [plaintiff] must state facts that come closer to demonstrating intent, as opposed to mere motive and opportunity." (internal quotation marks omitted)). Citing *VeriFone*, plaintiff says that defendants are wrong to rely on *Silicon Graphics*, which has been "abrogated." Opp. 20. But the Ninth Circuit has never questioned its discussion of "deliberate recklessness" in *Silicon Graphics*.

to the target's accounting improprieties. Comparing plaintiff's complaint to the *Heckmann* case plaintiff cites actually proves the point. Opp. 25.

The court there accepted plaintiff's allegation that Heckmann and its employees fraudulently touted a proposed acquisition of China Water, a Chinese company later revealed to have overstated revenues and engaged in tax evasion. *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 541 (D. Del. 2012). There were specific allegations that defendants had become aware during the due diligence that China Water had intentionally engaged in tax evasion. *Id.* at 529, 531, 539, 541. And unlike here, the defendants had a personal motive to mislead investors, and a strong one at that. *Id.* at 541. Heckmann was a "blank check company" that had no business of its own, raised money from the public to invest in "qualifying" companies, and was required to return IPO proceeds that were not timely invested. *Id.* at 527. Because the individual defendants awarded themselves a significant stake in Heckmann, they personally stood to lose more than $287 million if a deal with China Water did not go through. *Id.* at 527-28. The defendants thus touted China Water as a "qualifying company" and obtained a charter amendment forever eliminating their potential liability upon the close of the merger. *Id.* at 529-30.

Here, neither HP nor its officers or directors are alleged to have been parties to agreements that gave them a financial reason to purchase an impaired asset or to deceive the public about it. No insider trading is alleged.[5] There is just no explanation at all for why HP or any of its officers or directors would want to buy a company known to be massively impaired (or, what is the same, would do so with *deliberate* recklessness). Only the bald allegations that HP's board was "just too exhausted" and that former CEO Apotheker was on a path to "transform" HP. Opp. 51. Plaintiff's allegations just do not cut it.

2. Plaintiff cites public articles and reports that plaintiff labels "red flags" and says that these demonstrate scienter because the allegation "'that significant red flags were ignored[] can suffice to withstand a motion to dismiss.'" Opp. 20-23, 26 (quoting *N.M. State Inv. Council* v. *Ernst & Young*

---

[5] The pre-*Tellabs* case of *Freedman* v. *Value Health, Inc.* (cited at Opp. 25), held that scienter had been alleged only because there was "insider trading." 958 F. Supp. 745, 755 (D. Conn. 1997). The court rejected plaintiff's "circumstantial evidence" as insufficient to meet Rule 9(b).

*LLP*, 641 F.3d 1089, 1102 (9th Cir. 2011)). But plaintiff misquotes the very authority it cites. *Ernst & Young*, which concerned auditor liability for the financial statements of an issuer, says that "red flags" can establish scienter on the part of the auditor when "coupled" with allegations that the auditor failed to comply with Generally Accepted Auditing Standards (GAAS), standards that required the auditor to investigate the "red flags." 641 F.3d at 1102. Similarly, *Howard* v. *Everex Systems, Inc.* (cited at Opp. 26) says only that allegations about "red flags" can suffice where they are "combined" with evidence going to motive. 228 F.3d 1057, 1064 (9th Cir. 2000). Thus, plaintiff's cases do not establish that alleged "red flags" alone can prove scienter.

Moreover, plaintiff has not enumerated "red flags" of the sort that lend support to an inference of scienter. Under the cases, they must be "in your face facts, that cry out, how could [defendants] not have known that the financial statements were false?" *Ernst & Young LLP*, 641 F.3d at 1103 (internal quotation marks omitted) (alteration in original); *VeriFone*, 704 F.3d at 705-06, 709. There are no "in your face" facts alleged in this case. The best that plaintiff can do is point to analyst reports expressing skepticism about Autonomy and its products in the period preceding the announcement of HP's offer for Autonomy.[6] But as plaintiff acknowledges, "there were two narratives about Autonomy" and only one of them was critical of Autonomy. Opp. 22. This defeats plaintiff's reliance on the analyst reports. HP Br. 12-13.[7]

In any event, the complaint is devoid of particularized facts demonstrating which of the HP defendants (if any) were aware of these purported "red flags." The only claim is that Whitman pur-

---

[6] Plaintiff claims that, after the acquisition was announced but before the deal closed, new purported "red flags" came to light, namely a report issued by analyst Peltz-Sharp discussing an anonymous email received from a "Joe Bloggs" questioning Autonomy's reported OEM revenues and an article published in an e-discovery trade publication — alleging that these reports caused the HP defendants to "learn[] that Autonomy OEM was not used nearly as widely or extensively as Autonomy claimed." Opp. 22 (citing Compl. ¶¶ 49, 57). But again, the public reports were part of only one of the two narratives on Autonomy; they were not "red flags" of the type that might support an inference of scienter; and there are no particularized allegations establishing anyone at HP knew of them.

[7] Among the financial analysts, plaintiff singles out Marc Geall, who formerly worked as Autonomy's "head of investor relations." Opp. 2; Compl. ¶ 24. All Geall is alleged to have said, however, is that Autonomy's "[b]usiness model is stretched," and "Autonomy is a big company that is still run as a start-up." Compl. ¶ 24. Similarly, plaintiff says that analyst Paul Morland emailed HP's investor-relations department to tell HP "they were making a big mistake." Opp. 9. But again, the complaint does not say what Morland meant, or specify what the mistake was, still less does it say that Morland was aware Autonomy had committed fraud. Compl. ¶ 67. Meanwhile, Morland later revealed he was *not* accusing Autonomy of fraud. HP Br. 12-13; HP Ex. 12.

REPLY MEM. ISO HP MOT. TO DISMISS
MASTER FILE NO. C-12-5980 CRB

portedly "admitted that she learned about reports accusing Autonomy of questionable accounting practices upon the announcement of the Autonomy deal." Opp. 20. But the so-called admission cannot cure plaintiff's pleading failure. All Whitman said (after the fact) is that blogs critical of the acquisition came to the fore "after [HP] announced the acquisition"; that she did not learn of them before she became CEO; and that "the former management team ran [the blogs] to ground and came up with the conclusion that there was nothing there." HP Ex. 15. Whitman's public statements thus do not demonstrate deliberate recklessness before the transaction closed.[8]

3. Plaintiff next asserts that the purportedly limited nature of HP's due diligence not only demonstrates that certain of the HP defendants were deliberately reckless (or worse) in characterizing HP's due diligence as "extensive," but also supports a claim that they acted with scienter when making optimistic statements about the Autonomy acquisition. Opp. 24-26.[9] But Apotheker did not just describe the diligence as "extensive," he also explained that the basis of HP's due diligence was Autonomy's audited financials:

> Autonomy is a publicly traded company in the UK. And they are, therefore, audited like any other FTSE company, and they're being audited on very professional standards. And, therefore, that's where we pick up the trail and do our due — ***that's the basis of our due diligence***.

Compl. ¶ 41. How could it be alleged that Apotheker intended to mislead the public about the extent of HP's due diligence when he disclosed what HP had done?

As for plaintiff's reliance on the KPMG report, it in fact undercuts its claims. The report says that "[t]he data and access provided to us during due diligence was very limited *but was comparable with other acquisitions involving large U.K. publicly traded companies*." Pl. Ex. D (emphasis added). And there are no allegations in the complaint suggesting the contrary. There is thus no sup-

---

[8]     Plaintiff suggests that, even beyond the "red flags," the HP defendants' "actual knowledge" of the Autonomy fraud may be inferred because Apotheker, Lane, Whitman, and Robison "publicly expressed confidence in Autonomy's … results." Opp. 26. This makes no sense, and the cases plaintiff cites are inapposite, because in both of plaintiff's cases, the complaint had alleged specific facts supporting a strong inference of actual knowledge of the details of the underlying business. *S. Ferry LP, # 2* v. *Killinger*, 687 F. Supp. 2d 1248, 1259-60 (W.D. Wash. 2009); *In re Diamond Foods Inc. Sec. Litig.*, 2012 U.S. Dist. LEXIS 170704, at \*35-37 (N.D. Cal. Nov. 30, 2012).

[9]     Plaintiff concedes that it is not "alleging that Defendants' [purportedly] shoddy due diligence, 'in itself,' demonstrates scienter … , or merely that defendants 'would have learned the truth' if they performed diligence as represented." Opp. 23 n.26.

port for the inference that HP "believed its due diligence had been materially obstructed" or was fatally deficient. And without such an inference, plaintiff cannot demonstrate that any of the HP defendants acted with scienter.

Plaintiff's claim fails on the law as well. Plaintiff asserts that auditors "have strong structural incentives to yield to management on close questions," points out that Deloitte was not HP's auditor, and cites a number of cases in support of the claim that it was allegedly wrong to rely on Autonomy's audited financials. Opp. 23-25 & n.30. But not a single one of plaintiff's cases holds that an acquirer's reliance on the audited financials of its acquisition target supports an inference of securities fraud.[10] Indeed, one of plaintiff's own cases holds that the fact of hiring an outside auditor to assist in due diligence — while not sufficient, "in and of itself," to establish that "'extensive due diligence' was conducted" — undermines a claim of intentional fraud or even deliberate recklessness. *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 996, 999 (S.D. Ohio 2008) (rejecting claim of scienter).

4. Plaintiff next alleges that the HP defendants were aware that the price paid in the acquisition was purportedly too high — by which it attempts to show not only that the HP defendants were reckless as to Autonomy's fraud, but also that Apotheker and Lane acted with scienter when they called the price "fair" and "market." Opp. 22; 27-29. But beyond calling the price "fair," Apotheker also said that it was supported by a discounted-cash-flow analysis; that HP took into account the significant synergies that HP expected to generate in the transaction; and that HP's analysis showed that the transaction would be "accretive to HP" on the day the deal closed. HP Ex. 4 at 5-6.[11] In the ac-

---

[10]     *In re Countrywide Financial Corp. Securities Litigation*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008), was a securities-fraud case brought against a mortgage company, its officers, and its auditors for false statements made by the company in raising capital; at the pages cited by plaintiff, the Court held that the complaint did not adequately plead that the auditor acted with scienter. *Id.* at 1197-98 (cited at Opp. 24 n.30). *Ernst & Young* concerned an auditor's securities-fraud liability for GAAP and GAAS violations in connection with back-dated stock-option grants, and the case recognizes that "[a]lleging a poor audit is not equivalent to alleging an intent to deceive." 641 F.3d at 1098 (cited at Opp. 24 n.30). *Sapirstein-Stone-Weiss Found.* v. *Merkin*, 2013 U.S. Dist. LEXIS 84035, at *16 (S.D.N.Y. June 11, 2013) (cited at Opp. 24 n.28), was a securities-fraud case involving a feeder fund that invested in Bernard Madoff's Ponzi scheme.

[11]     A "discounted cash flow" analysis is a standard technique for valuing a company in a merger-and-acquisition context. Synergies are a measure of the value created in an acquisition. An acquisition is accretive if the earnings-per-share of the acquirer are anticipated to increase following the acquisition.

quisition, HP was advised by not one but two investment banking firms, Barclays Capital and Perella Weinberg. HP Ex. 1 at 5. The board's vote was unanimous. *See* Compl. ¶¶ 92, 101. All these facts lead to a compelling inference of innocence, not scienter.

Plaintiff also asserts that CFO Catherine Lesjak opposed the deal and told the board she believed the acquisition would be "too expensive." Opp. 2, 7, 22-23, 29. But this shows only that *she* believed HP should not be paying the price on offer — not that Apotheker or Lane or "HP" believed the price to be unfair.[12] And, equally important, the allegation that Lesjak opposed the deal actually negates any inference that any of the HP defendants suspected Autonomy's fraud. If she had suspected Autonomy's fraud, she would have said something in the board room not only about the price, but also about Autonomy's accounting. Plaintiff does not allege that she did.

5. Plaintiff finally alleges that Whitman and Lane instructed HP's financial advisers to investigate whether HP could withdraw from the Autonomy deal only to be told that, under U.K. law, HP was stuck. Opp. 32-35 (citing Compl. ¶¶ 68-73, 178). Apart from all of its other infirmities (including the failure to plead plaintiff's basis for this bare allegation on information and belief), the claim fails because it is contradicted by the governing documents, which gave HP an out if it discovered that "any business, financial, or other information" disclosed by Autonomy "either contains a misrepresentation of fact or omits to state a fact necessary to make the information contained therein not misleading." HP Ex. 1 at 39; HP Br. 15-16. The only constraint imposed by the U.K. Takeover Code is that the misrepresentation be "of material significance," as they are alleged to be here. *See* HP Br. 15; HP Ex. 14 § 13.4. Plaintiff's allegation that HP's officers and directors looked for a way out of the deal thus undermines rather than supports a claim of scienter.

Plaintiff's only response is misguided. Citing a pamphlet on U.K. takeover law, plaintiff makes the misleading assertion that "Autonomy's own U.K. lawyers" believed that HP would not have been entitled to withdraw its bid. Opp. 33 (emphasis omitted). But the publicly available "Guide to Takeovers" that plaintiff quotes (written by Autonomy's former lawyers) discusses what

---

[12] That Lesjak did not participate in due diligence or a road show (Opp. 22-23, 25) are thus unsurprising and cannot plausibly support an inference that she was aware of Autonomy's fraud. Moreover, the allegations do not suggest there was anything unusual about Lesjak's non-involvement in HP's acquisition due-diligence efforts (which were not normally led by the CFO).

must be shown to invoke a "no material adverse change" condition. Pl. Ex. A. But as just noted, if anyone had thought of backing out of the deal for the reasons plaintiff imagines, the question would have been whether there was a misrepresentation of fact prior to the time the deal was signed — not whether there was a material adverse change in Autonomy's business after signing. *Cf. In re IBP, Inc., S'holders Litig.*, 789 A. 2d 14, 65-72 (Del. Ch. 2001) (discussing the difference between (1) a breach of a contractual representation concerning a target company's prior financial statements and (2) the breach of a closing condition that there be no "material adverse" change in the target company's business between signing and closing).

**B.    Plaintiff's Allegations of Post-Acquisition Scienter Are Deficient.**

Having abandoned the theory that HP "continued" Autonomy's accounting fraud after the acquisition, Opp. 36-37, plaintiff's allegation of scienter in the post-acquisition period rests on the claim that HP (through Whitman and Lesjak) promptly discovered the pre-acquisition fraud, tried to keep it hidden by quietly "unwinding" it in some unspecified way, and then sought to blame Lynch for the disappointing results by firing him. Faced with a need to explain why the very people who supposedly covered up the fraud then reported it to criminal and regulatory authorities, plaintiff claims that the cover-up fell apart only when a "whistleblower" came forward in late May 2012. There are several problems with this theory of intentional fraud.

1.    The first is common sense. Conducting an investigation into allegations of misconduct "demonstrat[es] a pursuit of truth rather than reckless indifference to the truth." *Higginbotham* v. *Baxter Int'l Inc.*, 495 F.3d 753, 758 (7th Cir. 2007). Plaintiff's only response is the naked assertion that the Autonomy "whistleblower" left the HP defendants no choice but to commence an investigation and go to the authorities. Opp. 5, 15-16, 33 n.47. But there is no factual allegation or explanation supporting plaintiff's nonsensical and illogical claim that any purported scheme to hide the Autonomy fraud fell apart when the whistleblower came forward and told the HP defendants something they allegedly already knew.

2.    The facts pleaded in the complaint also do not lead to the "strong inference" that any of the HP defendants participated in a scheme to "unwind" the pre-acquisition Autonomy fraud (a term plaintiff does not explain). Plaintiff pleads no particularized factual allegations to support its bare

assertion, for instance, that HP began to claw back commissions, still less that it was done as part of a scheme to unwind the pre-acquisition fraud. *See* Compl. ¶ 74. As a matter of pleading, how can anyone logically infer that Whitman, Lane, and Lesjak committed securities fraud to hide someone else's purported screw up? And if the three of them were going to cover up the fraud by unwinding revenues, why would HP turn around six months later and report everything to the authorities?[13]

3. Nor is there any particularized allegation establishing that the HP defendants became aware of the full extent of the pre-acquisition fraud before the PricewaterhouseCoopers (PwC) investigation concluded. The fact that Autonomy's post-acquisition revenues were disappointing establishes only that Autonomy executives, under a new watch, stopped their fraudulent practices. Plaintiff's brief in opposition argues that the HP defendants learned of the pre-acquisition fraud when Paul Curtis, HP's Worldwide Director of Software Recognition, performed a study of Autonomy's practices, and Ernst & Young (E&Y) as well as KPMG undertook "detailed studies of Autonomy's software revenue recognition with a view to *optimising* for US GAAP." Opp. 12, 47. But the complaint does not allege that the HP defendants became aware of the fraud in this way. *See* Compl. ¶¶ 74-79. To the contrary, the complaint actually says that Curtis "*miss[ed]*" the improprieties, Compl. ¶ 137 (emphasis added), and quotes Lynch's letter which *asks* whether Whitman and Lesjak were told what Curtis learned (without saying what that was), Compl. ¶ 100. And although plaintiff seeks to paint the studies in sinister light, they are unsurprising and innocuous. Before the acquisition, Autonomy was subject to the International Financial Reporting Standards (or IFRS). After the acquisition, it became subject to GAAP. It strains credulity to conclude that "optimising" was a euphemism for "unwinding," whatever that may mean.[14]

---

[13] All plaintiff can come up with is the claim that "'the motive of someone associated with a company to have that company succeed … is a pretty powerful motive.'" Opp. 4. But for support, plaintiff quotes only a passing remark made by the court during oral argument in *In re SunPower Securities Litigation*, No. 09-5473, Pl. Ex. E. The argument is squarely foreclosed by Ninth Circuit precedent, which holds that the "motive and opportunity to enhance a company's business prospects" are insufficient. *Lipton* v. *Pathogenesis Corp.*, 284 F. 3d 1027, 1038 (9th Cir. 2002).

[14] Plaintiff argues that the fact that "critical documents were missing from the obvious places" when PwC later conducted an investigation in summer 2012 proves that the Curtis and E&Y revenue studies were sufficiently deficient as to support a strong inference of scienter (Opp. 47 n.74), relying upon *Ernst & Young*, 641 F.3d at 1100-01. But in that case, E&Y had "accepted [] documentation that could not possibly have been valid," "noticed there could be a significant issue with the option grant," and "asked for documentation, but when none was received, E[&]Y still signed off." *Id.* at

REPLY MEM. ISO HP MOT. TO DISMISS
MASTER FILE NO. C-12-5980 CRB

Plaintiff says that Whitman and Lesjak learned about the pre-acquisition fraud during meetings with Autonomy executives, citing the letter Lynch wrote after he was accused of fraud. Opp. 37-38. But again, there is no "there" there. The complaint establishes only the unsurprising fact that HP senior management met with Autonomy management. Neither the Lynch letter nor any part of the complaint alleges any fact about these meetings, including what was said, who was there, or when they occurred — still less about how senior management supposedly came to learn of the pre-acquisition fraud.

Seeking to turn the tables, plaintiff contends that "[d]efendants offer no explanation for how an entity that, according to HP, had previously reported over 50% of its revenues improperly could suddenly cease engaging in those practices without any detection by HP." Opp. 36; *see also* Opp. 51. As a threshold matter, plaintiff's argument is wrong on the arithmetic.[15] But it fails on the alleged facts as well. As the complaint alleges, post-acquisition, Lynch retained "control" of Autonomy, Compl. ¶ 45, so was able to contain the outflow of information.

And, in any event, senior executives at large public companies are not charged with knowing the details of transactions involving business segments with relatively modest revenues. *Higginbotham*, 495 F.3d at 759. HP's annual revenues approximate $120 billion. HP Ex. 3 at 41. In contrast, Autonomy's revenues were under a billion dollars, and they are alleged to have been overstated by $200 million. Opp. 54; Compl. ¶¶ 25, 87. Absent some particularized facts from which to impute scienter, there is no basis to charge that any HP defendant had knowledge of the details of Autonomy's operations, much less that they discovered *why* one of HP's many reporting groups suffered a contraction in expected revenue amounting to 0.2% of HP's overall revenues. *E.g.*, *Hig-*

---

1099. Here, plaintiff does not allege that either Curtis or E&Y did anything of the sort. This is unsurprising, as even under plaintiff's theory these were studies about how HP should report ongoing and future revenues from the Autonomy business, not historical examinations of its pre-acquisition financial statements.

[15] Although plaintiff alleges that over 50% of Autonomy's revenues had been misstated, plaintiff also says that only $200 million had "been recorded improperly or prematurely" for 2009 and 2010. Opp. 54. But according to the complaint, Autonomy's 2010 revenue was $870 million and its 2009 revenue was $737 million. Compl. ¶ 25. Thus, $200 million was approximately 12% of Autonomy's total revenue for the 2009-2010 period, not "over 50%."

*ginbotham*, 495 F.3d at 759; *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087–88 (9th Cir. 2002) (awareness of day-to-day workings does not establish scienter).

And plaintiff cannot save the deficiencies in its complaint by pointing to Whitman's statements that she called the "growth of Autonomy using the distribution capability of HP" "priority number one, two and three for 2012," Compl. ¶ 76 (emphasis omitted); said upon becoming CEO in September 2011 that she would "dive in and have a more informed [] view" about Autonomy, Compl. ¶ 177; and said in May 2012 that HP "did a fairly deep dive" to understand why revenues were "disappointing" after the acquisition and concluded that "Autonomy is a terrific product," that there was "enormous demand for Autonomy," and that it was "not the competition" but rather "classic entrepreneurial Company scaling challenge[s]." Compl. ¶ 191 (emphasis omitted). *See* Opp. 52. Those statements all speak to the prospect that Autonomy would be able to increase sales going forward by leveraging HP's business, not to whether there was some fundamental problem with the revenues reported by Autonomy before the acquisition closed. Especially in light of the fact that Whitman disclosed Autonomy's fraud after the alleged "whistleblower came forward" and after PwC's forensic review was done, Whitman's earlier statements reflecting her lack of knowledge about the underlying fraud at Autonomy cannot be converted into a basis for concluding that she, in fact, ever concealed the fraud.[16]

4. Plaintiff says that certain personnel changes at HP provide further evidence of scienter. Opp. 53. But there is no factual support for the conclusion that Apotheker, Robison, or any other legacy HP employee was let go for misconduct.[17] Plaintiff says that it is significant that Lynch was

---

[16] Plaintiff's cases are not to the contrary. In *Nursing Home Pension Fund* v. *Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004), defendants had specifically admitted to being micromanagers whose style made it reasonable to infer that they became aware of significant ongoing revenue recognition problems leading the company to miss its "projections but for the adjustments." Both *Plumbers Union Local No. 12 Pension Fund* v. *Ambassador's Group*, 717 F. Supp. 2d 1170, 1178–79 (E.D. Wash. 2010), and *In re NorthPoint Communications Group*, 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002), hold only that "it may be inferred that facts critical to a business's core operations or an important transaction are known to a company's responsible officers." No such facts are pleaded here.

[17] The complaint alleges that "Apotheker was terminated … for spearheading the Autonomy acquisition" and that he "learned of his ouster *via* a September 21, 2011 leak to *Fortune*." Compl. ¶ 13. But plaintiff pleads no fact to support plaintiff's belief that Apotheker was terminated on account of the Autonomy deal, much less because of purported misconduct associated with it. And although the *Fortune* article plaintiff cites discusses Autonomy, it places far more emphasis on other

removed around the same time that HP claims it became aware of Autonomy's fraud. Opp. 53. But the complaint accurately says that Lynch was removed *before* the Autonomy "whistleblower" came forward and before the PwC investigation began. Compl. ¶ 80.

5. Plaintiff finally argues that the size of the November 2012 write-down supports an inference of scienter. Opp. 53-54. But that is a classic (and inappropriate) attempt to plead "fraud by hindsight." *Tellabs*, 551 U.S. at 320 (quoting *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)). And "'fraud by hindsight,'" of course, does not "meet the PSLRA's pleading standard." *In re Siebel Sys., Inc. Sec. Litig.*, 2005 WL 3555718, at *14 (N.D. Cal. 2005) (Breyer, J.). Nor is the size of the write-down the most relevant metric here. Autonomy's past revenues had been misstated and its post-closing revenues were disappointing, but when those were measured against those of HP, they were less than 1%. See pp. 11-12 & n.15, above.[18]

## C.  Plaintiff's Effort to Impute Lynch's State of Mind Upon HP Fails.

Unable to allege sufficiently that any of the individual HP defendants committed fraud, plaintiff seeks to hold HP liable for Lynch's "misconduct." Opp. 41-46. Plaintiff's argument is confusing, but however it may be understood it fails.

Plaintiff seems to be claiming that HP could be liable for the fraud that HP accused Lynch of perpetrating before the Autonomy deal closed. Opp. 44; Compl. ¶ 109 ("[T]he fraudulent conduct HP accused [Lynch] of engaging in during the Class Period is imputed to HP by operation of law."). But the doctrine of *respondeat superior* (which plaintiff invokes) is plainly inapposite, given that Lynch was not even an HP employee at the time. *Makor Issues & Rights, Ltd.* v. *Tellabs Inc.* (*Tellabs II*), 513 F. 3d 702, 707-08 (7th Cir. 2008). And the Supreme Court has rejected the doctrine of aiding-and-abetting liability in the Section 10(b) context, *Central Bank of Denver* v. *First Interstate*

---

matters. HP Ex. 16 ("In mid-August, the company announced a vast planned overhaul of its business, agreeing to buy software maker Autonomy Corp. for $10.3 billion, canceling its TouchPad tablet and deciding whether to sell or spin-off its hardware division. The plan, in other words, called for the unraveling of the much-debated 2002 merger with Compaq Computer that helped turn HP into a technology behemoth.").

[18] As plaintiff notes, Opp. 54, the Ninth Circuit explained in *Ernst & Young* that "large GAAP and GAAS violations can play a role in finding scienter" when the scienter of the person who committed the violation is at issue. 641 F.3d at 1100-01. *See also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975 (N.D. Cal. 2009) (same). Here, plaintiff concedes that Autonomy's revenues were overstated by Lynch (not HP) and *only* in the pre-acquisition period.

*Bank of Denver*, 511 U.S. 164 (1994), to say nothing of the fact that it could not be used to impose liability on the victim of the wrong.[19]

Plaintiff's theory may be that HP should be liable because, for example, (1) CEO Whitman made innocent statements on behalf of the corporation that (2) Lynch knew to be misleading or false. This has sometimes been called a "collective scienter" theory of liability, and plaintiff says that the "collective theory" was left open in *Glazer* v. *Magistri*. Opp. 42.

But plaintiff misreads *Glazer*. *Glazer* held that, as a rule, pleading corporate securities fraud requires "plead[ing] scienter with respect to those individuals who actually made the false statements" for the company and on its behalf. 549 F.3d at 745. The Ninth Circuit in *Glazer* did recognize that the Second and the Seventh Circuits had identified an "exception" to this rule because, in certain circumstances, it might be "'possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud.'" *Id.* at 743 (quoting *Tellabs II*, 513 F. 3d at 710 and citing *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). *Glazer* recited the example given by the Seventh Circuit in *Tellabs II*:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*Glazer*, 549 F.3d at 743 (quoting *Tellabs II*, 513 F.3d at 710). But *Glazer* had no occasion to decide "whether we agree with [*Tellabs II*] because the facts of this case are different from the hypothetical in" that case. *Glazer*, 549 F.3d at 745. So the court left this "collective scienter" exception open, and went on to hold that, when the exception does not apply, a complaint must be dismissed unless it pleads that an individual corporate employee committed securities fraud. *Id.*

The "collective scienter" exception that *Glazer* left open is plainly inapplicable here, and plaintiff does not argue otherwise. Instead, plaintiff sponsors a different "exception" — one in

---

[19] For these same reasons, the allegation that Lynch is liable for the "joint August 18, 2011 press release" and (through a theory of attribution) for certain statements made by Apotheker and Robison before the acquisition cannot establish a claim against HP. Opp. 44. Lynch was not employed by HP at the time, and there is no basis to impute his conduct to any HP employee.

which a corporation could be liable even if no employee committed securities fraud. The weight of authority has expressly rejected this Frankenstein of a liability rule. *Tellabs II*, 513 F. 3d at 707-08; *Dynex*, 531 F.3d at 195-96; *Matrix Capital Mgmt. Fund, LP* v. *BearingPoint, Inc.*, 576 F. 3d 172, 189-90 (4th Cir. 2009); *Southland Sec. Corp.* v. *INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004). And *Glazer* implicitly forecloses it. It affirmed the dismissal of a complaint that did not plead a fraud claim against the individual who acted for the corporation. *Glazer* admitted of only one possible "exception" — one that still rests on the theory that *somebody* committed securities fraud; indeed, as the *Dynex* case put it while recognizing the exception *Glazer* left open, "the pleaded facts must create a strong inference that *someone* whose intent could be imputed to the corporation *acted with the requisite scienter*." 531 F.3d at 195 (emphasis added); *see also Tellabs II*, 513 F. 3d at 707-10.

Plaintiff's reliance on *Curry* v. *Hansen Medical, Inc.*, 2012 U.S. Dist. LEXIS 112449 (N.D. Cal. Aug. 10, 2012), is misplaced. Opp. 42-43. There, too, corporate liability was based on the fact that an employee had violated Section 10(b). *Curry*, 2012 U.S. Dist. LEXIS 112449, at *36-37. The employee (a member of the disclosure committee with responsibility for the company's public reports) had allegedly violated Section 10(b) by intentionally and fraudulently manipulating the company's financial results, with the necessary and inevitable result that it would communicate false statements to the public. *Id.* at *12-13. Because the employee was in a position of responsibility with respect to the company's reported financial results and manipulated the company's financial results to further its interests, the court imputed both the employee's actions and state of mind to the company. *Id.* at *36-37. Plaintiff's other cases (Opp. 42-44) are to the same effect; all the cases speak of corporate liability premised on fraud committed by the corporation's agents,[20] and some would permit group pleading where the allegations are of the sort postulated in *Tellabs II*.[21]

---

[20]    *BearingPoint*, 576 F.3d at 189-90 (fraud claim not stated because pleaded facts do not establish strong inference that unnamed "corporate agent[s] acted with scienter," and explaining that "allegations of *corporate* fraud 'must allege facts that support a strong inference of scienter *with respect to at least one authorized agent of the corporation*.'"); *Kyung Cho* v. *UCBH Holdings, Inc.*, 2012 U.S. Dist. LEXIS 123234, at *28 (N.D. Cal. Aug. 29, 2012) (imputing to a bank the state of mind of the bank's vice president and manager of credit policy, on the basis that she had pleaded guilty to "engaging in a conspiracy and fraudulent scheme to deceive the investing public and bank regulators" by making false statements); *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 450-55 (S.D.N.Y. 2009) (explaining that "[t]he Second Circuit — and nearly every other circuit to have

In short, to rely on Lynch's state of mind, plaintiff cannot allege simply that Lynch knew better than HP's senior management; plaintiff must allege, at a minimum, that Lynch committed securities fraud after the acquisition closed and was in a position to decide what HP, as a company, should include or exclude from its reported financial statements. But plaintiff has not alleged that Lynch did anything that violated Section 10(b) after the Autonomy acquisition closed, that HP misreported the financial results for the HP software division, or that Autonomy's post-closing financial results were separately reported, let alone that Lynch committed securities fraud "within the scope of … employment" at HP and "in attempted furtherance of [HP's] goals." *Tellabs II*, 513 F. 3d at 707-08; *see also Curry*, 2012 U.S. Dist. LEXIS 112449, at *36.[22] The only post-closing misconduct that can plausibly be inferred from the facts pleaded in the complaint is that Lynch did not disclose Autonomy's pre-acquisition fraud to HP. But that would not be a scheme "in attempted furtherance of the

---

considered the question — expressly has permitted the application of the common law principle of *respondeat superior* to hold principals liable for Section 10(b) violations by their agents" and holding that there was an issue of material fact as to whether Deloitte Italy was an agent of Deloitte Touche Thomatsu "with respect to the Parmalat engagement"); *McKesson*, 126 F. Supp. 2d at 1277 (holding that McKesson could be liable for fraud committed by legacy HBOC employee who, after the merger, became chairman of the board and "repeated false statements" in that capacity; explaining that "[w]hile McKesson HBOC is not liable as successor to HBOC, it is vicariously liable for *the fraud of its own officers*." (emphasis added)); *Kerr* v. *Exobox Tech. Corp.*, 2012 U.S. Dist. LEXIS 7523, at *41 (S.D. Tex. Jan. 23, 2012) (corporation may be liable for false statements contained in public filings when it is shown that lawyer who owned between 88% and 100% of the company and prepared the filing "had the requisite state of mind when making false statements"); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1193 (N.D. Cal. 2010) (rejecting "group pleading doctrine" and holding that corporation may be liable for false statements of officers when (1) corporation's executive officer had the requisite knowledge and (2) the pleaded facts make it "at least as likely as not that" this officer "would have told other executive officers" who spoke for the corporation that the corporation's statements were false or misleading).

[21] *In re Marsh & Mclennan Co. Sec. Litig.*, 501 F. Supp. 2d 452, 481-83 (S.D.N.Y. 2006); *Pa. Pub. Sch. Empls. Ret. Sys.* v. *Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012), *reconsideration denied* 874 F. Supp. 2d 341, 2012 U.S. Dist. LEXIS 129529 (following *Dynex*); *Allstate Life Ins. Co.* v. *Robert W. Baird & Co.*, 756 F. Supp. 2d 1113, 1144-45 (D. Ariz. 2010) (citing *Glazer* and adopting *Tellabs II* "exception" that *Glazer* left open).

[22] Although plaintiff says that Lynch is liable under Section 10(b) because he "had 'ultimate authority' over the results of HP's Software division, which the Complaint alleges were false and misleading when made" (Opp. 45-46), plaintiff's complaint alleges only that Lynch was in charge of the Autonomy unit, which was only a "part of" the software division. Compl. ¶ 73. Moreover, plaintiff concedes that "[p]laintiff's allegation … is not that particular revenue figures in HP's financial statements were materially false …." Opp. 36-37. If that is so, there can be no claim against HP based on Lynch's purported "control" over Autonomy's "results." And there is no allegation that Lynch had any sort of control over HP's accounting of goodwill (which, as demonstrated below, was not false or misleading).

employer's goals." *Tellabs II*, 513 F.3d at 708. Its only purpose would have been to mask the fraud perpetrated in inducing HP to buy Autonomy.

## III. HP's Pre-Acquisition Statements Were Only False or Misleading to the Extent They Incorporate Autonomy's Pre-Acquisition Financials.

Beyond pleading facts establishing a strong inference of scienter, plaintiff must also plead particularized facts establishing that the HP defendants made materially false or misleading statements. *Dura Pharms., Inc.* v. *Broudo*, 544 U.S. 336, 341-42 (2005). It fails to do so.

### A. Most of the Challenged Pre-Acquisition Statements Are Alleged to Be False Only Because They Recapitulate or Are Based upon Autonomy's Financials.

Substantially all the pre-acquisition HP statements that plaintiff seeks to place in issue are statements of optimism about the proposed acquisition. But the only reason these are alleged to have been false or misleading is that they all were predicated on or otherwise incorporate Autonomy's pre-acquisition financial statements, which were misstated. Opp. 20-23, 27-32.

Take, for instance, Apotheker's statement on August 18, 2011 that HP was "'buying *a very strong business* and we believe that we can extract a lot more out of this business,'" Opp. 21 (quoting Compl. ¶ 164). The only reason this is alleged to be false is that Apotheker was relying upon Autonomy's historic financials. *Id.* As another example, Robison said he believed Autonomy's OEM revenues would continue to grow. Opp. 30; Compl. ¶¶ 174-75, 179. Again, the allegation is not that Robison was not projecting growth but that the statement was predicated upon Autonomy's OEM revenue growth rate, which Autonomy had overstated. Opp. 30. Thus, to state a Section 10(b) claim based on these pre-acquisition statements, plaintiff must allege a factual basis for concluding that the HP defendants who made these statements knew Autonomy's financials were misstated or were deliberately reckless as to that fact. *McKesson*, 126 F. Supp. 2d at 1276-77. Plaintiff fails to do this. See pp. 3-9, above.

To take another example, plaintiff challenges Apotheker's stated opinion that the acquisition price was "fair" and Lane's stated opinion that it was "market." Opp. 27-29, 34 & n.48. As these are statements of opinion, plaintiff must allege facts showing that Apotheker and Lane did not "believe[]" or "sincerely h[o]ld" the opinions when the statements were made. *Virginia Bankshares,*

Inc. v. Sandberg, 501 U.S. 1083, 1093 (1991) ("fair price" is a statement of opinion); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 882 & n.11, 883-84 (9th Cir. 2012).

Plaintiff does not allege facts that meet this exacting standard. Plaintiff says that the price was "11 times revenues[]" and that HP's competitors publicly described the price as "absurdly high." Opp. 28. But these facts, which were known to the public, do nothing to undermine Apotheker's belief that HP's pricing was "fair" because, as the complaint alleges, he stated at the time that it was based on a discounted-cash-flow analysis. See pp. 7-8, above. Lesjak's opposition to the deal, likewise, cannot provide a basis for concluding that Apotheker and Lane had a different opinion about the price, let alone that they fraudulently withheld it from the investing public.[23] So, once more, plaintiff returns to the allegation that Apotheker and Lane could not have thought and did not think the price was fair, given that Autonomy's revenues were later found to have been overstated. That is pure hindsight, because plaintiff alleges no fact establishing that they knew this at the time. See pp. 3-9, above.

**B.     Apotheker's Due-Diligence Statements Were Not False or Misleading.**

Plaintiff's next target in the pre-closing period is Apotheker's statements characterizing HP's diligence as "rigorous," "extensive," and "extremely tight." Opp. 23. Plaintiff alleges that HP relied "on Deloitte's ***previous*** audits of Autonomy's financial[s]" and review of approximately 25 contracts, so that Apotheker "misrepresented the ***extent*** of [HP's] due diligence." Opp. 23-24 & n.26.

---

[23]     Plaintiff cites *Nieman* v. *Duke Energy Corp.*, 2013 WL 4004274 (W.D.N.C. July 26, 2013), to assert that Lesjak's opposition to the deal establishes falsity. Opp. 29. There, the plaintiffs challenged a registration statement filed in connection with a proposed merger between Duke and Progress Energy. According to the complaint in that case, "not 'a single director of Progress would have voted for [the merger]' had [Progress CEO] Johnson not been named CEO" of the postmerger entity. *Nieman*, 2013 WL 4004274, at *1. So, to obtain the vote of Progress's board and stockholders, Duke represented publicly that Johnson would serve as CEO of the combined entity and retain the job in the long term. *Id.* at *2. But in actuality, "opposition" to Progress CEO Johnson continued to mount within the Duke board room. *Id.* It is this boardroom opposition that helped to establish the falsity of the representation that Johnson would serve as CEO of the combined entity in the long term: "Defendants' statements regarding Johnson's role as CEO were false" because "[p]laintiffs have pled facts establishing that Defendants had mounted significant yet undisclosed opposition to Johnson" and "have also sufficiently pled Defendants' determination that Johnson's position as CEO was transitory and necessary only to gain the merger's approval." *Id.* at *7. The case is therefore inapposite.

1        1.   There was nothing misleading about Apotheker's statements. As earlier explained, Apotheker disclosed what he meant by the vague words "rigorous" and "extensive": "The basis of [HP's] due diligence," Apotheker told investors, is the fact that "Autonomy is a publicly traded company" and, as such, "being audited on very professional standards." Compl. ¶ 41; HP Br. 10.

Plaintiff's response to this point is to obfuscate. Plaintiff asserts, for instance, that the complaint alleges that Autonomy refused to provide back-up documentation; KPMG's engagement was "limited"; the Board's Finance Committee "suspiciously" did not "review and approve" the Autonomy deal (never mind that the *full* board, which includes the members of the committee, met repeatedly to consider and then unanimously approved the deal); and, after the fact, Deloitte (Autonomy's auditors) confirmed it was not engaged by anyone "to provide any due diligence in relation to the acquisition." Opp. 23-24 (citing Compl. ¶¶ 16-17, 34, 36, 37). But HP never said anything to the contrary, and this mish mash of allegations does not show that HP misrepresented the extent of its diligence. HP said its diligence was based on Autonomy's audited financials.[24]

Similarly unavailing are plaintiff's allegations that Deloitte alerted HP that a whistleblower had, 18 months earlier, charged that Autonomy had engaged in accounting improprieties, and that Deloitte had told HP that it had investigated the claim and found it meritless. Opp. 25 n.32. Again, Apotheker said that HP had relied on Deloitte's audit work; that work, by definition, included investigations into any and all material issues that came to its attention. The fact that HP relied on this aspect of Deloitte's work did not make Apotheker's accurate description false.[25]

---

[24]    Plaintiff argues that Apotheker created the "highly misleading" impression that HP had ruled out the possibility, raised by certain third parties, that Autonomy had engaged in accounting improprieties and that Autonomy's financials were misstated. Opp. 20 n.23; Opp. 22. Plaintiff does not explain how that could be, given that Apotheker said nothing of the sort and had identified Autonomy's audited financials as "the basis" of HP's due diligence.

[25]    Plaintiff's reliance on *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 371 (D.N.J. 1999), (Opp. 25 & n.32) is misplaced. In *Cendant*, as plaintiff acknowledges, the statement was that the acquirer had done "all the due diligence that one does when one buys a public company." *See* Opp. 23-25 & n.32. Here, the statement was that the due diligence was "rigorous," and "the basis" of that "tight" diligence was Autonomy's audited financials. If plaintiff's argument is that the words "rigorous due diligence" mean that one has done "all the due diligence that one does when one buys a public company," *Cendant*, 60 F. Supp. at 371, the KPMG report that plaintiff cites defeats the claim, because it states that HP's diligence was "comparable with other acquisitions involving large U.K. publicly traded companies." Pl. Ex. D; see pp. 6-7, above.

Plaintiff's next tack is to argue that HP's due diligence was not "rigorous" because it did not discover the Autonomy fraud. *E.g.*, Opp. iv-v, 3. This sort of fraud-by-hindsight argument is meritless: "the fact that a due diligence investigation turned out to reach results that ultimately proved to be incorrect does not mean that a statement by a company that it had performed extensive due diligence was false at the time it was made." *NECA-IBEW Pension Trust Fund* v. *Bank of Am. Corp.*, 2012 WL 3191860, at *19 (S.D.N.Y. Feb. 9, 2012); *see also Shields*, 25 F.3d at 1129.

2. Plaintiff's attempt to state a fraud claim by taking Apotheker's words out of context also fails because nebulous words like "rigorous," "professional," and "tight" are not actionable as a matter of law. HP Br. 28. Thus, the court in *City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*, held that words describing due-diligence efforts as "exhaustive," "very detailed," and "in-depth" "do not rise to the level of an actionable misstatement" but instead are inactionable "puffery." 2013 WL 1174017, at *16 (S.D.N.Y. Mar. 22, 2013).[26]

In response, plaintiff says, purportedly quoting the *Psychiatric Solutions* case, that "'statements of [HP's] 'rigorous due diligence' are hard facts because these allegations are capable of empirical verification.'" Opp. 29; *see also* Opp. 30. But plaintiff misquotes the court's opinion. The opinion actually reads as follows: "Defendants' statements of their 'rigorous due diligence' *in monitoring PSI's facilities and PSI's highly trained and coordinated staff* … are hard facts because these allegations are capable of empirical verification *by PSI's internal documents that reflect Defendants' monitoring and training as well as the qualifications of staff.*" *Garden City Emps.' Ret. Sys.* v. *Psychiatric Solutions, Inc.*, 2011 U.S. Dist. LEXIS 35661, at *133-34 (M.D. Tenn. Mar. 31, 2011) (emphasis added). The full quotation makes clear that the court did not hold the vague word "rigorous" in the abstract to be "capable of empirical verification" — and thus "actionable."

---

[26] *See also In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("[w]hen valuing corporations, however, investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers"); *Philco Invs., Ltd.* v. *Martin*, 2011 WL 4595247 (N.D. Cal. Oct. 4, 2011) ("'tremendous value' and 'important investment' are general and mere puffery"); *In re Yahoo! Inc. Sec. Litig.*, 2012 WL 3282819, at *18 (N.D. Cal. Aug. 10, 2012) (phrases such as "great investment" and "bright future" and "[a]djectives such as 'fantastic,' 'tremendous,' and 'good' do not rise to a level of materiality that would be actionable when taken as a general statement of enthusiasm by the company's executives").

Plaintiff next argues that the word "rigorous" cannot amount to puffery because it was part of a "specific statement[] made to quell investor concern[s]." Opp. 29-30. For support, plaintiff cites *Warshaw* v. *Xoma Corp.*, 74 F.3d 955 (9th Cir. 1996). But that case holds no such thing. The pharmaceutical company there knew that its drug "might not work and would never be approved by the FDA" and, "in response to market fears about FDA-approval," the company president "flatly stated that 'everything [was] going fine.'" 74 F.3d at 959. The court held that "general statements of optimism, *when taken in context*, may form a basis for a securities fraud claim." *Id.* (emphasis added). The point was that the investor question gave specific meaning to a statement that was otherwise vague; the court did not hold, as plaintiff would have it, that statements that "quell investor concern" are automatically actionable.[27]

---

[27] The other case cited for the blanket rule that a statement of optimism is actionable when part of an answer to an investor question merely stands for the same, more-modest proposition that context can give specificity to a vague statement. *In re Ligand Pharms., Inc., Sec. Litig.*, 2005 U.S. Dist. LEXIS 44911, at *61-62 (S.D. Cal. Sept. 27, 2005); *see also S. Ferry LP, # 2* v. *Killinger*, 399 F. Supp. 2d 1121, 1129-30 (W.D. Wash. 2005) (optimism about "ability to integrate ... acquisitions and to hedge ... operation[s]" not puffery because "either immediately preceded or followed by very specific statements of fact that supposedly justify or supply a foundation for the optimism.").

Not one of plaintiff's remaining cases is relevant. In *In re RAIT Financial Trust Securities Litigation* (cited at Opp. 30 n.41), the court held that a representation to the effect that "credit underwriting involves an extensive due diligence process" was not puffery because the plaintiff alleged that the speaker "did not conduct *any meaningful ongoing credit analysis whatsoever*." 2008 U.S. Dist. LEXIS 103549, at *25-26 (E.D. Pa. Dec. 22, 2008) (emphasis added). There is nothing like that here. In *Freedman* v. *Value Health, Inc.*, 958 F. Supp. 745 (D. Conn. 1997) (cited at Opp. 25), the court held that the acquirer falsely stated it had conducted a "full review" while the acquirer's CEO conceded after the fact that the acquirer had "bl[own] it" and that there had been "'shortcomings' in due diligence." *Id.* at 757. In *In re DDi Corp. Securities Litigation*, 2005 U.S. Dist. LEXIS 28216, at *53-54 (C.D. Cal. July 20, 2005), the statements "related to DDi's historical financial results, the number of its customers, and its success in the fourth quarter of 2000," and included the representation that "DDi had 'over 2000 customers,'" when "DDi actually had only 500 customers." *Id.* at *45. Those are specific, false statements, not general ones. *In re New Century*, 588 F. Supp. 2d at 1226-27, held actionable the statement that a subprime mortgage lender "observed standards of high-quality credit and underwriting" because there are recognized "basic standards of good lending practice" and because the plaintiff made "detailed allegations of practices that utterly failed to meet." And *Morgan* v. *AXT* concerned specific rather than "generalized" statements, statements such as "VGF gallium arsenide and indium phosphide substrates continue to offer superior features for manufacturers of high quality electronic and opto-electronic devices." 2005 U.S. Dist. LEXIS 42346, at *29-31 (N.D. Cal. Sept. 21, 2005).

Finally, neither *SEC* v. *Mozilo* nor *Stocke* v. *Shuffle Master* nor *Batwin* v. *Occam Networks* addressed the puffery doctrine. *SEC* v. *Mozillo*, 2009 U.S. Dist. LEXIS 104689, at *25-26 (C.D. Cal. Nov. 3, 2009) (addressing argument that "misstatements and omissions were not material or misleading as a matter of law in light of [other] extensive disclosures and the context of the alleged misstatements or omissions."); *Stocke* v. *Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (discussing whether plaintiff had sufficiently pleaded scienter); *Batwin* v. *Occam Networks, Inc.*, 2008 U.S. Dist. LEXIS 52365, at *40-41 (C.D. Cal. July 1, 2008) (same).

### C. HP's Non-Disclosure that Lane and Whitman Allegedly Sought to Rescind the Offer Is Not Actionable.

In the pre-acquisition period, the only remaining charge is that Lane and Whitman violated the securities laws because they failed to disclose a purported attempt to back out of the acquisition after the announcement and before the deal closed — allegedly in response to "market reaction" and because they "learned that HP had drastically overpaid for Autonomy." Opp. 32-35 & n.45.

The complaint does not identify any statement rendered misleading by the alleged omission. It is well established that an omission will violate Section 10(b) only if disclosure of the omitted information is necessary to render some other statement not false or misleading. *Matrixx Initiatives, Inc.* v. *Siracusano*, 131 S. Ct. 1309, 1321-22 (2011); HP Br. 33. Plaintiff, which does not dispute this standard, says that the alleged omission was misleading because Lane and Whitman "began defending the deal to investors" by telling investors on September 22, 2011 that the price was "'market'" and that "'the [Autonomy] strategy is right.'" Opp. 34 (citing Compl. ¶¶ 177-78).

But assuming Lane and Whitman did "instruct[] HP's financial advisors to see whether HP could back out of the deal in September 2011," Opp. 32, the failure to disclose that fact does not render false or misleading the optimistic statements of opinion that plaintiff has identified. Lane and Whitman could logically believe that the strategy was "right" for HP and the price "market" even if they had also explored the company's options in response to some investors' concerns about the deal. And the complaint actually pleads facts demonstrating that the market was not misled. "[O]n September 23, 2011," it alleges, "FBN Securities noted that '[i]ncoming CEO Whitman stated that for now she is supportive of the'" Autonomy deal "'but she noted that she will be evaluating the[] decision[] closely (implying some reversal possibility, in opinion)' and that 'with Autonomy, there is a contractual commitment, but there is the possibility of a negotiated solution.'" Compl. ¶ 178.[28]

---

[28] Plaintiff's claim is based on a few words plucked from the following statement made by Whitman: "I will review a number of these strategic initiatives" announced on August 18 and "I will obviously step back and take a hard look at this but from what I know now, *I think the strategy is right*, the initiatives we undertook on August 18 are right, and I'll dive in and have a more informed point of view for you probably at our next earnings call." Whitman Ex. 2 (emphasis added).

**IV.    HP's Post-Acquisition Statements Were Not False or Misleading.**

Plaintiff fares no better at pleading the falsity of statements in the post-acquisition period.  To begin with, plaintiff concedes that Autonomy's revenues in the post-closing period were not misstated.  Opp. 36-37.  Plaintiff's challenge is two-fold:  first, plaintiff alleges that Whitman and Lesjak discovered the Autonomy pre-acquisition fraud and improperly failed to disclose it before November 2012; and second, plaintiff alleges that HP improperly measured goodwill in its financial statements.  Plaintiff fails to identify a false or misleading statement on either score.

**A.    The Pre-"Whistleblower" Statements Were Not False or Misleading.**

Plaintiff alleges that, in the period between the close of the Autonomy transaction and the time a "whistleblower" came forward in May 2012, the HP defendants discovered and were busy unwinding the pre-acquisition accounting improprieties at Autonomy.  Plaintiff claims that the failure to disclose that fact violated Section 10(b).  Opp. 35-38.

The first problem with plaintiff's claim is the absence of particularized facts substantiating plaintiff's bare allegations that the HP defendants discovered the pre-acquisition fraud before May 2012 or that they worked to conceal it.  Plaintiff pleads nearly no fact to support its belief — let alone the particularized facts required under the PSLRA.  See pp. 9-13, above.

The second and equally fatal problem is that plaintiff does not identify any statement rendered misleading by the challenged omission.  Plaintiff says that HP's results for the software segment were rendered false or misleading.  Opp. 37.  But plaintiff concedes that those results were properly recorded and conformed to GAAP, and points to no fact suggesting that the purported omission rendered them misleading.  Opp. 36-37.  That means there was no misleading statement.

Instead, plaintiff says that the omission rendered false or misleading the general statements of optimism made by Whitman and Lesjak in February 2012 to the effect that "[t]he Autonomy acquisition is going well" and that HP was "pleased with the Autonomy acquisition."  Opp. 37.[29]  These

---

[29]    The complaint contends that Whitman and Lesjak made misleading statements in November 2011, Compl. ¶ 76, and the opposition brief identifies these statements as among the statements that are "alleged to have been misleading."  *See* Opp. 18.  Plaintiff's brief, however, does not explain why the statements are false or misleading, and seems to have abandoned the point.  *See* Opp. 35-38.  In any event, for the reasons stated in the text, the statements are truthful and not misleading.

REPLY MEM. ISO HP MOT. TO DISMISS
                                                  MASTER FILE NO. C-12-5980 CRB

statements are inactionable puffery and, in context, not misleading at all. And, as the complaint alleges, at the same time that HP executives expressed optimism, they also cautioned that there was "some weakness in the portfolio" and that "License Revenue didn't grow like we wanted it to." Compl. ¶ 189 (emphasis omitted). Moreover, because they are statements of opinion, plaintiff must allege a factual basis for concluding that Whitman and Lesjak did not sincerely hold those beliefs. *Rigel*, 697 F.3d at 882 & n.11, 883-84. But there are no such particularized allegations.

Plaintiff says Whitman had "direct conversations" with "HP/Autonomy's senior executives" about "significant problems with the integration" as early as December 2011, and that Whitman and Lesjak attended quarterly business reviews. Opp. 37-38 (citing Compl. ¶ 102). But this is not "inconsistent" with the supposedly false or misleading statements. *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003). The fact that there may have been setbacks does not demonstrate that HP did not believe the acquisition to be "going well" in general. "People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Shields*, 25 F.3d at 1129-30; *see also Ronconi* v. *Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).[30]

## B. The Post-"Whistleblower" Statements Were Not False or Misleading.

Plaintiff's next assertion is that the HP defendants improperly failed to disclose until November 2012 that, in May 2012, a "whistleblower" came forward alerting HP to the Autonomy pre-acquisition fraud. Opp. 38-41. Plaintiff does not say that the omission breached a "duty to correct" or a "duty to update" statements that had been made in the past. Opp. iv n.4; Opp. 41. Instead, plaintiff asserts only that the omission rendered misleading certain statements made while the HP defendants were aware of the accusations under investigation. Opp. 38-41.[31] The claim fails.

---

[30] Lesjak's opposition to the deal in August 2011 on price grounds before it was signed cannot establish that HP (or Lesjak) was not pleased with the business prospects of the acquired company after the deal closed.

[31] One of plaintiff's footnotes says that Item 303 of SEC Regulation S-K required disclosing the "whistleblower's" allegations in HP's Form 10-Qs because it required disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or incoming from continuing operations." Opp. 39 n.57. This claim is nowhere made in the complaint. And, in any event, it fails. HP did dis-

As shown in the opening brief, the law does not conflate accusations with fact and thus recognizes that a company has "'no duty to disclose to shareholders unsubstantiated allegations'" of misconduct. *In re Browning-Ferris Indus., Inc. S'holder Deriv. Litig.*, 830 F. Supp. 361, 368 (S.D. Tex. 1993) (quoting *Bolger* v. *First State Fin. Serv.*, 759 F. Supp. 182, 194 (D.N.J. 1991)). Rather, "[c]ourts have found that taking time to investigate a situation prior to disclosing the situation to the investing public is not fraudulent." *In re Yahoo! Inc. Sec. Litig.*, 2012 WL 3282819, at *22 (N.D. Cal. Aug. 10, 2012) (Breyer, J.); *see also Higginbotham*, 495 F.3d at 761 ("Taking the time necessary to get things right is both proper and lawful."). As of early June 2012, the "whistleblower's" accusations were just that — mere accusations.

In order to overcome *Yahoo!* and the remaining authority defendants cite, plaintiff claims that Whitman's statements on May 23, 2012 and June 5, 2013 were materially misleading because she did not disclose that HP had received the whistleblower's allegations. Opp. 39-40.[32] To begin with, there is no basis to conclude that Whitman was already aware of the "whistleblower's" allegations on May 23 (or even on June 5) — when she told investors that HP had done a "deep dive" and concluded that Autonomy's disappointing revenues were due to "scaling." Plaintiff offers no basis to question Whitman's November 20, 2012 representation that the "whistleblower" "came forward following the departure of Mike Lynch on May 23," 2012, Compl. ¶ 84 (emphasis omitted), or that he went to General Counsel John Schultz first (who, in turn, informed Whitman). Compl. ¶ 80. Plaintiff says Whitman was alerted to the accusations in May, Compl. ¶ 80, but offers no factual support

---

close, post-closing, that Autonomy's revenues were not meeting expectations. The only thing that was not disclosed until later was that Autonomy's earlier fraudulent recognition of revenues was a root cause of the failure to meet expectations, something that the company did not fully appreciate until it was revealed through the PwC investigation.

[32]    In a footnote, plaintiff quotes Whitman's August 2012 statements that "Autonomy still requires a great deal of attention and we've been aggressively working on that business" and that HP had "a lot of work to do over the next several quarters to improve Autonomy performance." Opp. 40 n.60. Plaintiff's opposition brief does not contend that these statements are false and seems to abandon the claim. In any event, they are not rendered false by the fact that HP was at the time conducting an investigation into Autonomy's pre-acquisition financials. Plaintiff also quotes, again without claiming that the statement is false or explaining why, a September 2012 statement to the effect that, as of October 2011, "the fair value of Autonomy approximated the carrying value." Opp. 40 n.60. To the extent that plaintiff still challenges the statement, the claim fails because plaintiff alleges no facts showing that by September 2012, HP had both substantiated the accusations *and* concluded that the alleged accounting fraud had materially inflated HP's valuation of Autonomy's goodwill prior to the October 2011 acquisition.

at all — in the form of a confidential source, a document, or anything else — to support this bald allegation made on information and belief. It is entitled to no weight.

Still less is there a factual basis to conclude that when Whitman learned of the accusations, she immediately (1) believed that they were anything but accusations or (2) realized the scale of the fraud.[33] Plaintiff does not even say what the "whistleblower" told GC Schultz or what GC Schultz told Whitman, let alone that the "whistleblower" revealed sufficient details that would enable HP, then and there, to understand the nature and scope of Autonomy's fraud. This pleading defect is fatal under the PSLRA.

Nor does plaintiff explain why the failure to disclose the "whistleblower's" allegations, even if known, rendered false Whitman's statement that she "believed" Autonomy's problems were due to "scaling," that "Autonomy is a terrific product," or that Autonomy could thrive under new leadership.[34] These are all statements of opinion, and plaintiff fails to plead any facts from which to conclude that Whitman did not believe them.[35]

### C. HP's Accounting of Goodwill Was Not False or Misleading.

Finally, plaintiff asserts that HP's "goodwill statements" were false when made because HP failed to take an "impairment loss for goodwill and purchased intangible assets" before November 2012. Opp. 46-50.[36] When one company acquires another, the acquirer records "any excess of the

---

[33] Plaintiff does not question HP's disclosure that PwC's investigation took some time because "critical documents were missing from the obvious places." Compl. ¶ 87. This further undermines plaintiff's allegation that Whitman or any other HP defendant was fully aware as early as June 5, 2012 (1) that there were accounting improprieties or (2) that the scale of these was significant.

[34] Autonomy's past accounting improprieties have no bearing on the last two statements, which are in any event inactionable puffery. Plaintiff says the statements are not puffery because they were made in response to analyst questions. Opp. 40 n. 59. As explained above at pp. 21 & n.27, however, this argument proceeds from a misreading of the law.

[35] Although plaintiff's complaint challenges statements made by Lesjak on May 23 and August 22, 2012, plaintiff's brief abandons the claim and does not seek to establish that any of these statements were actionable. In any event, the statements were truthful. HP Br. 34-35.

[36] Plaintiff also says that the HP financial statements "materially misrepresented HP/ Autonomy's revenue recognition policies"; "failed to disclose that a material amount of the deferred revenue acquired in the Autonomy Acquisition was improperly recorded"; "materially misrepresented HP/Autonomy's disclosures for the Software Segment"; and "failed to disclose known trends and uncertainties in HP Software Segment, which included Autonomy." Opp. 47. Plaintiff does not explain what these bare and vague allegations mean, still less what plaintiff's basis is for the charge. The allegations thus fail to plead particularized facts supporting allegations made on information and belief. To the extent that plaintiff simply reiterates the assertion that HP knew about the fraud at Au-

---

REPLY MEM. ISO HP MOT. TO DISMISS
MASTER FILE NO. C-12-5980 CRB

purchase price over the fair value of the assets acquired and the liabilities assumed" as an asset on its balance sheet, an asset characterized as "goodwill or 'excess purchase price.'" *Fait* v. *Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011). But as explained in the opening brief, because goodwill depends on the acquirer's assessment of the "fair value" of the acquired assets and assumed liabilities, the acquirer's measure of goodwill is an opinion that is based on complex business and accounting judgments. *Id.* So plaintiff must show that the officers who calculated and disclosed HP's goodwill did not honestly believe the representations and deliberately misled the public. *Id.* at 111.

Here, there is no basis to conclude that goodwill was miscalculated at the outset, given that there is no reason to conclude that HP acquired Autonomy while knowing about its accounting improprieties (or even being deliberately reckless about them). See pp. 3-9, above. The mere fact that HP later took an impairment does nothing to show that the earlier calculations were false. "In order to allege the circumstances constituting fraud, plaintiff must set forth facts explaining why the difference between the earlier and later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood [by the defendant]." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (en banc);[37] *In re Remec, Inc., Sec. Litig.*, 388 F. Supp. 2d 1170, 1175 (S.D. Cal. 2005).

So plaintiff must show that the failure to take an earlier write-down was a fraud. Plaintiff's theory seems to be that (1) the HP defendants discovered the Autonomy fraud long before November 2012, which (2) triggered an obligation to update HP's goodwill because HP had told investors it would "evaluate" its goodwill "whenever events, changes in circumstances or changes in management business strategy indicate that there may be a potential indicator of impairment." Opp. 48.

But plaintiff must show, at a minimum, that the HP defendants were aware of facts making it "'more likely than not'" that "'the fair value of a reporting unit'" should be reduced "'below its car-

---

tonomy soon after the acquisition and failed to make a disclosure, that claim fails for the reasons given above. See pp. 9-13, 23-26, above.

[37] Plaintiff says that that HP's "reliance" on *GlenFed* is "unavailing," arguing only that the Ninth Circuit ultimately concluded in that case that falsity was adequately pleaded. Opp. 48. But in *GlenFed*, the plaintiffs alleged particularized facts establishing that statements made at board meetings and in the company's strategic plan directly contradicted statements in the company's Form 10-Q. *See GlenFed*, 42 F.3d at 1550. There is nothing like that here.

rying amount.'" *Fait* v. *Regions Fin. Corp.*, 712 F. Supp. 2d 117, 121 (S.D.N.Y. 2010). The only thing that plaintiff points to is the flimsy allegations about Curtis and E&Y conducting revenue-recognition studies as well as Whitman and Lesjak meeting with Autonomy executives (as claimed by Lynch). Opp. 47-48. These are unavailing. See pp. 10-12, above.

Alternatively, says plaintiff, the HP defendants discovered the fraud "[a]t the very latest" when the "whistleblower" came forward in May 2012. Opp. 47. But plaintiff's allegations do not establish, as plaintiff asserts, that the HP defendants were "armed with knowledge of an accounting fraud at Autonomy," as opposed to being "armed with knowledge" of accusations. Opp. 47. All the complaint alleges is that, upon learning of the "whistleblower's" allegations, HP promptly commissioned a forensic investigation into the accusations. HP was entitled to wait until it had a full story to disclose. See pp. 9, 24-26, above. And, quite obviously, HP could not assess the "fair value" of Autonomy until it understood both that Autonomy's historic results had been misstated and by how much — and what that meant for the future prospects of Autonomy.

The complaint also demonstrates that, far from being motivated to mask their honest belief about HP's balance sheets, HP's officers and directors were quite willing to take impairment charges when appropriate. HP took an unrelated impairment in August 2012. At that point, Lesjak told stockholders that HP may take additional "impairment charge[s]" in the next quarter (*i.e.*, in November 2012) while expressly noting that HP's "largest balance for goodwill is in the Software segment." Compl. ¶ 201. Plaintiff does not provide a factual basis to conclude that HP was *not* evaluating Autonomy's goodwill along the way, or was *not* trying to get things right. Instead, given Lesjak's August 2012 disclosure, the only logical inference is that HP *was* conducting interim analyses of goodwill. All these facts negate the inference that any of the HP defendants misstated their true opinion about the carrying value of Autonomy's goodwill.[38]

_____

[38]     The decision in *In re Remec Inc. Securities Litigation*, 702 F. Supp. 2d 1202, 1237 (S.D. Cal. 2010), is inapposite. Opp. 48-49. The complaint there "quoted several Confidential Witnesses stating that [the company's CEO and CFO] were directly involved in critical events and had personal knowledge of key facts." *Remec*, 702 F. Supp. 2d at 1237. The complaint here offers no factual allegations supporting plaintiff's assertion that the HP defendants fraudulently delayed taking an impairment charge or deliberately delayed "evaluating" goodwill. The other cases plaintiff cites in support of its claim demonstrate the failings of plaintiff's complaint. Opp. 50. In *IBEW Local 90 Pension Fund* v. *Deutsche Bank AG*, 2013 WL 1223844, at *13 (S.D.N.Y. Mar. 27, 2013), the court inferred scienter based on the complaint's "multiple references to information available to senior

Thus, the complaint cites no internal conversations, meetings, documents, or anything else about HP's goodwill "evaluation" — or really any fact at all that would establish that any of the HP defendants (or anyone at HP responsible for HP's goodwill evaluations) had concluded at any time that HP's opinion on the goodwill attributed to the Autonomy acquisition was materially misstated. The complaint says nothing about who was involved, what was discussed, or what assumptions were made. In short, it establishes only that after the "whistleblower" came forward, HP engaged in a time-consuming and serious effort to uncover the full extent of Autonomy's fraud and to assess the implications of the newfound information on the carrying value of the business that HP had acquired. Lesjak disclosed in August that HP might take an impairment charge. And then HP disclosed the results of its investigation and took the charge in November. None of that is fraud.

## V. The Section 20(a) Claim Must Be Dismissed.

Plaintiff does not dispute that, "'[i]n order to prove a prima facie case under § 20(a), plaintiff must prove: (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator.'" *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 991 (N.D. Cal. 2007) (quoting *Howard*, 228 F.3d at 1065); Opp. 54. "Accordingly, the failure of a plaintiff to state a claim for primary securities fraud violations under Section 10(b) or Rule 10b-5 *necessarily* constitutes a failure to state a claim for control-person liability under Section

---

management, specific questions asked by, and presentations made to senior management, all of which contradicted the public-facing statements" of the bank about its derivative products. In *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 U.S. Dist. LEXIS 7667, at *25-28 (S.D. Cal. May 1, 2003), the court found falsity sufficiently pleaded in light of factual allegations of a meeting with the Food and Drug Administration and drug-trial results that contradicted the company's public statements. In *Stratte-McClure* v. *Morgan Stanley*, 784 F. Supp. 2d 373, 387 (S.D.N.Y. 2011), the court denied a motion to dismiss because "Plaintiffs describe[d] a strong link between Morgan Stanley's swap position and the ABX Index" and alleged that Morgan Stanley did not sufficiently adjust its swap valuations after a steep decline in that index. Finally, the court in *In re New Century*, 588 F. Supp. 2d 1206, 1236 (C.D. Cal. 2008), found a strong inference of scienter based on the fact that KPMG did not "obtain the necessary evidence" to test the company's goodwill valuation.

Plaintiff also cites *In re Pilgrim's Pride Corp. Sec. Litig.*, 2010 U.S. Dist. LEXIS 84260, at *2-9, 102-03 (E.D. Tex. Aug. 17, 2010) and *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 592 (S.D.N.Y. 2010), Opp. 48 — cases in which the plaintiff had adequately pleaded claims for negligent misrepresentation under Section 11 of the 1933 Securities Act. The cases are not instructive because, unlike the Section 10(b) claims asserted here, Section 11 claims "are not subject to the heightened pleading requirements of Rule 9(b)" or the PSLRA. *Pilgrim's Pride*, 2010 U.S. Dist. LEXIS 84260, at *102; *see also Citigroup*, 723 F. Supp. 2d at 587 (Plaintiffs' "complaint must meet only the pleading requirements of Rule 8(a).").

20(a)." *Pilgrim's Pride*, 2010 U.S. Dist. LEXIS 84260, at \*93 (emphasis added) (cited at Opp. 48). That rule disposes of plaintiff's Section 20(a) claim.

CONCLUSION

For the foregoing reasons and the reasons stated in the HP defendants' motions to dismiss, the complaint should be dismissed with prejudice. The many fatal problems in plaintiff's complaint cannot be cured by amendment, and so leave to amend should be denied.

WACHTELL, LIPTON, ROSEN & KATZ

By: _____     Dated:   __October 2, 2013_____
Marc Wolinsky
George T. Conway III
Rachelle Silverberg
Vincent G. Levy
David Zhou
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

FARELLA BRAUN & MARTEL, LLP
Neil A. Goteiner
Thomas B. Mayhew
235 Montgomery Street
San Francisco, CA  94104
Telephone:  (415) 954-4400
Facsimile:  (415) 954-4480

*Attorneys for Defendant Hewlett-Packard Company*