1  STEVEN M. SCHATZ, State Bar No. 118356
   sschatz@wsgr.com
2  KATHERINE L. HENDERSON, State Bar No. 242676
   khenderson@wsgr.com
3  BRYAN J. KETROSER, State Bar No. 239105
   bketroser@wsgr.com
4  BRIAN DANITZ, State Bar No. 247403
   bdanitz@wsgr.com
5  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
6  650 Page Mill Road
   Palo Alto, CA 94304-1050
7  Telephone: (650) 493-9300
   Facsimile: (650) 565-5100

8  Attorneys for Defendant
9  Catherine A. Lesjak

10                       UNITED STATES DISTRICT COURT

11                      NORTHERN DISTRICT OF CALIFORNIA

13 | IN RE HP SECURITIES LITIGATION, ) Master File No. C-12-5980 CRB
14 | This Document Relates To: All Actions ) <u>CLASS ACTION</u>
15 |                                      ) **DEFENDANT CATHERINE A.**
                                          ) **LESJAK'S REPLY IN SUPPORT OF**
16 |                                      ) **MOTION TO DISMISS**
                                          ) **CONSOLIDATED COMPLAINT**
17 |                                      )
18 |                                      ) Date:   November 8, 2013
                                          ) Time:   10:00 AM
19 |                                      ) Dept:   Courtroom 6, 17th Floor
                                          ) Before: Hon. Charles R. Breyer

**TABLE OF CONTENTS**

Page

STATEMENT OF ISSUES (Civil L.R. 7-4(a)(3)) ..................................................................iv

SUMMARY OF ARGUMENT ............................................................................................iv

ARGUMENT .........................................................................................................................1

I. THE COMPLAINT FAILS TO PLEAD SCIENTER AS TO MS. LESJAK ....................1

    A. The Complaint Fails Adequately To Allege That Ms. Lesjak Knew Of Accounting Improprieties At Autonomy ..................................................................1

    B. The Complaint Fails Adequately To Allege That Ms. Lesjak Knew HP's Goodwill Was Impaired ...........................................................................................3

    C. Ms. Lesjak Had No Motive To Commit Securities Fraud ......................................4

    D. The Remaining Allegations Do Not Create A Strong Inference Of Scienter .........5

II. THE COMPLAINT FAILS TO PLEAD FALSITY AS TO MS. LESJAK ......................9

III. THE COMPLAINT FAILS TO PLEAD A SECTION 20(a) CLAIM .............................11

CONCLUSION ....................................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*,
   No. 11-01016 SC, 2012 WL 685344 (N.D. Cal. Mar. 2, 2012) .............................................. 4

*City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012) .................................................................................................. 4

*Ezra Charitable Trust v. Tyco Int'l, Ltd.*,
   466 F.3d 1 (1st Cir. 2006) ................................................................................................... 4

*Glazer Capital Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) .............................................................................................. 7

*Greenberg v. Cooper Cos.*,
   No. 11-CV-05697 YGR, 2013 WL 2403648 (N.D. Cal. May 31, 2013) ............................ 4

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ......................................................................................... 8, 11

*In re Boston Sci. Corp. Sec. Litig.*,
   686 F.3d 21 (1st Cir. 2012) ................................................................................................. 8

*In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.*,
   830 F. Supp. 361 (S.D. Tex. 1993) ................................................................................... 11

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   654 F. Supp. 2d 1037 (N.D. Cal. 2009) ......................................................................... 2, 6

*In re Diamond Foods, Inc.*,
   No. C 11-05386 WHA, 2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ............................. 5

*In re Downey Sec. Litig.*,
   No. CV 08-3261-JFW, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ............................ 11

*In re Immersion Corp. Sec. Litig.*,
   No. C-09 4073 MMC, 2011 WL 871650 (N.D. Cal. Mar. 11, 2011) ................................. 2

*In re IMPAX Labs., Inc. Sec. Litig.*,
   No. C 04-04802 JW, 2006 WL 6361942 (N.D. Cal. Mar. 1, 2006) .................................... 7

*In re LDK Solar Sec. Litig.*,
   584 F. Supp. 2d 1230 (N.D. Cal. 2008) .............................................................................. 6

*In re Nvidia Corp. Sec. Litig.*,
   No. 08-CV-04260-RS, 2010 WL 4117561 (N.D. Cal. Oct. 19, 2010) ........................... 1, 6

*In re SunPower Sec. Litig.*,
   No. C 09-5473 RS, 2011 WL 7404238 (N.D. Cal. Dec. 19, 2011) .................................... 5

*In re Taleo Corp. Sec. Litig.*,
   No. C 09-00151 JSW, 2010 WL 597987 (N.D. Cal. Feb. 17, 2010) ............................ 2, 11

| | |
|---|---|
| *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173 (N.D. Cal. 2007) | 6 |
| *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407 (9th Cir. 1994) | 8 |
| *In re Yahoo! Inc. Sec. Litig.*, No. C 11-02732 CRB, 2012 WL 3282819 (N.D. Cal. Aug. 10, 2012) | v, 11 |
| *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329 (S.D.N.Y. 2012) | 9 |
| *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172 (4th Cir. 2009) | 7 |
| *McGann v. Ernst & Young*, 102 F.3d 390 (9th Cir. 1996) | 5 |
| *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008) | 3, 5 |
| *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35 (1st Cir. 2008) | 8 |
| *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) | 8 |
| *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) | 9 |
| *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) | v, 5, 6 |
| *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902 (N.D. Cal. 2012) | 5 |
| *Westley v. Oclaro, Inc.*, No. C-11-2488 EMC, 2013 WL 2384244 (N.D. Cal. May 30, 2013) | 6 |
| *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) | 2 |

**STATEMENT OF ISSUES (Civil L.R. 7-4(a)(3))**

1. Should the claims asserted against Ms. Lesjak under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 be dismissed for failure to plead particularized factual allegations giving rise to a strong inference of scienter?

2. Should the claims asserted against Ms. Lesjak under Section 10(b) and Rule 10b-5 be dismissed for failure to plead sufficiently that she made an actionable false or misleading statement or omission?

3. Should the claims asserted against Ms. Lesjak under Section 20(a) of the Exchange Act be dismissed?

**SUMMARY OF ARGUMENT**

Plaintiff is of two minds when it comes to Catherine A. Lesjak ("Ms. Lesjak"), Chief Financial Officer of Hewlett-Packard Company ("HP" or the "Company"). On the one hand, Plaintiff paints Ms. Lesjak – whose "vehement" opposition to the Autonomy transaction (¶¶ 38, 42, 173) is a central theme in the Complaint – as the ignored voice of reason. At the same time, Plaintiff lumps her in with all of the other Defendants, including Michael Lynch. As Ms. Lesjak's Motion to Dismiss Consolidated Complaint ("Opening Brief" or "Mot.") explained, the result is a claim that fails to plead either scienter or falsity.

Plaintiff's consolidated Opposition to Defendants' Motion to Dismiss ("Opposition" or "Opp.") highlights the weakness of the claims against Ms. Lesjak. With respect to scienter, the Opposition admits that Ms. Lesjak did not know about Autonomy's accounting issues prior to deal close, and fails to specify a single meeting, document or conversation in which Ms. Lesjak was told about the accounting issues prior to late May 2013 when "Whistleblower No. 4" came forward; indeed, Plaintiff cannot even specify the month in which Ms. Lesjak supposedly learned of the problem. Nor can the Opposition explain why a "longtime HP stalwart" (¶ 6) who did not sell a single HP share during the putative class period and who "challenged" her boss, then-CEO Leo Apotheker, in front of the full HP Board (Opp. at 7), would commit fraud just to cover up a mess created by others. In short, Plaintiff's allegations against Ms. Lesjak – which, Plaintiff emphasizes, must be considered "holistically" (id. at 18-19) – make no sense, and certainly do

not raise a "cogent and compelling" inference of an intent to defraud. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Plaintiff also fails to explain how any of the statements it attributes to Ms. Lesjak were false or misleading. Plaintiff argues that the goodwill estimates in HP's financial reports were misleading but, as explained more fully in HP's reply brief, offers no facts suggesting that HP was required to write off goodwill prior to 4Q12, and the Opposition itself highlights several "indicators of impairment" that were not present until late in fiscal 2012. The Opposition also fails to rebut Ms. Lesjak's argument that her November 2011 statement that the Autonomy integration was "going well thus far" and her February 2012 statement that HP was "pleased with the Autonomy acquisition" were both true and immaterial puffery. And the Opposition does not even assert that the remaining "qualitative" statements attributed to Ms. Lesjak – largely <u>negative</u> comments about the business made in May 2012 and August 2012 – were false, instead merely suggesting that the statements were misleading because the Company did not disclose the end-of-May 2012 whistleblower allegations and ensuing investigation until November 2012. But the Opposition fails to show how the omitted facts rendered Ms. Lesjak's statements misleading in any way, and as this Court has recognized, "'[p]rudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention.'" *See In re Yahoo! Inc. Sec. Litig.*, No. C 11-02732 CRB, 2012 WL 3282819, at *22 (N.D. Cal. Aug. 10, 2012) (citation omitted). Indeed, Plaintiff's contention that HP should have accepted the whistleblower's allegations as true, and that it should have written off billions of dollars of goodwill, prior to investigating flies in the face of common sense.

Because the Complaint does not plead a Section 10(b) claim against Ms. Lesjak, and because Plaintiff alleges no basis for holding her liable as a control person, the claims against Ms. Lesjak should be dismissed in their entirety.

# ARGUMENT

## I. THE COMPLAINT FAILS TO PLEAD SCIENTER AS TO MS. LESJAK

### A. The Complaint Fails Adequately To Allege That Ms. Lesjak Knew Of Accounting Improprieties At Autonomy

Although the Complaint alleges repeatedly that Ms. Lesjak opposed the Autonomy transaction for <u>business reasons</u>, there is not a single fact, such as a confidential witness, internal report, or meeting, to suggest that she knew – or even suspected – there were any <u>accounting issues</u> at Autonomy before the whistleblower came forward. Mot. at 3.[1] Indeed, the Complaint alleges (¶ 38) that Ms. Lesjak was "stripped" of her ability to scrutinize due diligence. As a result, Plaintiff abandons any claim that Ms. Lesjak knew of, or was deliberately reckless in failing to uncover, fraud at Autonomy prior to the acquisition.

Plaintiff's new position is that Ms. Lesjak learned of the fraud "between October 2011 and December 2011." Opp. at 4; *see also id*. at 13 ("[b]y December 2011").[2] None of Plaintiff's allegations demonstrate such knowledge. Indeed, the fact that Plaintiff cannot even specify the <u>month</u> in which Ms. Lesjak supposedly learned of the fraud, much less the circumstances, confirms that it has not met its pleading burden. *See, e.g.*, *In re Nvidia Corp. Sec. Litig.*, No. 08-CV-04260-RS, 2010 WL 4117561, at *5 (N.D. Cal. Oct. 19, 2010) ("None of these alleged facts . . . establish the 'who, what, where, when, and how' required by Rule 9(b) or the specificity or particularity required by the PSLRA to survive a motion to dismiss.").

For instance, Plaintiff argues that "Defendant[s] Whitman and Lesjak held quarterly business meetings with Autonomy management to discuss Autonomy's financial performance . . . including at the end of 1Q[12]." Opp. at 37. But as noted (Mot. at 3), the Complaint fails to allege Ms. Lesjak was told of any accounting improprieties at that (or any other) meeting, let alone the

---

[1] The sole confidential witness referenced in the Complaint is alleged to have left Autonomy in July 2011, and is not alleged to have had any contact with Ms. Lesjak. ¶¶ 50-56.

[2] Accordingly, any pre-acquisition "red flag" allegations are irrelevant as to Ms. Lesjak. Similarly irrelevant is Plaintiff's continued focus on an August 2011 road show that Ms. Lesjak did not attend. Plaintiff acknowledges her absence was not surprising given her opposition to the deal and simply changes the subject. Opp. at vi; Mot. at 3 n.2.

particulars of what she was told or by whom. *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 994, 998 (9th Cir. 2009) (allegation CFO attended meetings and "'had to have known what was going on with respect to . . . accounting manipulation'" insufficient).[3]

Plaintiff's emphasis on the work by HP and others to bring the UK company's accounting in line with US GAAP fares no better. The Opposition asserts that "HP's Worldwide Director of Software Revenue Recognition, Paul Curtis, confirmed . . . that Autonomy **had** artificially inflated its growth and future prospects *via* improper revenue recognition practices." Opp. at vi-vii (citing ¶¶ 74-79, 100, 134-141); *see also id*. at 12-13 ("Either Defendants knew that Mr. Curtis had discovered . . . or were severely reckless in not knowing that he had discovered . . . Autonomy's improper bogus revenue recognition practices as of January 2012."). The Complaint, however, says only that Mr. Curtis undertook "studies" of Autonomy's practices; it does not allege that Mr. Curtis (or anyone else) uncovered any improprieties, let alone what, if anything, Mr. Curtis (or anyone else) communicated to Ms. Lesjak regarding his work. *See, e.g.*, ¶ 75. Indeed, the Complaint suggests that Mr. Curtis did <u>not</u> discover the accounting issues,[4] and the allegation regarding Mr. Curtis's "studies" itself is taken from a <u>post-hoc</u> defense letter (¶ 100) in which Mr. Lynch <u>asks</u> whether HP's CEO and CFO knew about Mr. Curtis's work. *See, e.g.*, *In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1047-48 (N.D. Cal. 2009) ("[T]he CW reports do not provide any concrete allegations that Individual Defendants actually knew about the accounting errors . . . ."). Plaintiff's assertions about reviews conducted by E&Y and KPMG in late 2011 similarly fail to raise an inference of scienter because they do not allege what, if anything, E&Y or KPMG discovered and/or relayed to Ms. Lesjak. *See* Opp. at 13, 47.

---

[3] *See also In re Immersion Corp. Sec. Litig.*, No. C-09 4073 MMC, 2011 WL 871650, at *5 (N.D. Cal. Mar. 11, 2011) (allegation that "certain of the defendants attended quarterly or weekly management meetings are insufficient to give rise to an inference of scienter" (internal citation omitted)); *In re Taleo Corp. Sec. Litig.*, No. C 09-00151 JSW, 2010 WL 597987, at *8 (N.D. Cal. Feb. 17, 2010) (contrasting allegations of "'attendance at monthly meetings'" with "'detailed and specific allegations about . . . exposure to factual information'" (citations omitted)).

[4] "Given that HP's own Chief of Software Recognition – Paul Curtis – was pouring over Autonomy's financial statements starting in October 2011 . . . HP was severely reckless at best in <u>missing this material discrepancy</u>." ¶ 137 (emphasis added).

1  **B.  The Complaint Fails Adequately To Allege That Ms. Lesjak Knew HP's Goodwill Was Impaired**

Plaintiff's failure to plead particularized facts showing Ms. Lesjak's knowledge of Autonomy's accounting problems is equally fatal to its claim that she knew HP's goodwill was impaired. Mot. at 4-5. The Opposition responds that HP's FY12 Form 10-K "admitted" that HP knew in late 2011 of the accounting improprieties because it stated that "'subsequent to the Autonomy purchase price allocation period, which concluded *in the first quarter of fiscal 2012* [January 31, 2012] . . . **HP identified certain indicators of impairment**.'" Opp. at vi-vii (alterations in original) (citing ¶ 147). The argument is specious.

That there were "indicators of impairment" after 1Q12 does not mean they existed before 4Q12, and indeed, the three seized upon by Plaintiff suggest the opposite. *First*, "lower than expected revenue and profitability levels **over a sustained period of time**" (¶ 147) implies that it was not a disappointing 2Q12 or 3Q12 alone that indicated impairment, but disappointing figures over several quarters. *Second*, "the trading values of HP stock" (*id*.) did not indicate impairment in early 2012; HP shares closed at $22.20 on the day the Autonomy transaction closed (October 3, 2011), and still were trading above $22 in early June 2012 (mid-3Q12), whereas by November 2012, the shares were trading below $14. *See* Supp. Danitz Decl., Ex. E[5]; Codification of Accounting Standards and Regulations § 350-20-35-3C (Fin. Accounting Found. 2013) (HP Mot., Ex. 13) ("a sustained decrease in share price" is a potential indicator of impairment). *Third*, HP's FY12 Form 10-K itself makes clear that the "downward revisions" to management's Autonomy forecasts "coincided with the timing of HP's overall forecasting process . . . which is completed each year in the fourth fiscal quarter in conjunction with the annual goodwill impairment analysis." HP Mot., Ex. 3 at 107.

Moreover, Plaintiff cannot point to a single contemporaneous document or conversation that supposedly informed Ms. Lesjak that HP's goodwill was impaired prior to 4Q12. Indeed,

---

[5] A public company's historic stock prices are proper subjects of judicial notice. *See, e.g., Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).

the fact that HP announced in 3Q12 that it would take "an $8 billion goodwill impairment charge in connection with . . . EDS" (¶ 27 n.13) demonstrates that Ms. Lesjak and HP were prepared to write down goodwill when they believed it was appropriate to do so and supports an inference that an interim impairment analysis was conducted in 3Q12 and a goodwill writedown was not then required with respect to Autonomy.

Accordingly, Plaintiff has failed "plausibly [to] demonstrate that [Ms. Lesjak] knew, [or] even had reason to know, at any specific time [prior to 4Q12] that it was more likely than not that interim impairment testing would reveal that the goodwill of [Autonomy] was overvalued." *City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012).

### C. Ms. Lesjak Had No Motive To Commit Securities Fraud

Plaintiff does not dispute that a lack of motive "may significantly undermine a plaintiff's theory of fraud." *Cement Masons & Plasterers Joint Pension Trust v. Equinix, Inc.*, No. 11-01016 SC, 2012 WL 685344, at *8 (N.D. Cal. Mar. 2, 2012).[6] Yet despite talk of Defendants' "various" and "varying" motives (Opp. at ii, 51), Plaintiff cannot explain why Ms. Lesjak would have committed securities fraud. Putting aside the inherent illogic of Plaintiff's theory, Plaintiff does not suggest that Ms. Lesjak was "desperate" to "transform" HP (*id*. at 7) or that she was "just too exhausted" to oversee the acquisition (*id*. at iii).

Instead, Plaintiff merely asserts that Ms. Lesjak "opted to quietly clean up the mess Apotheker and Lynch left behind in the hopes that it would never come to light." *Id*. at 51. But why would the "longtime HP stalwart" (¶ 6) who did not keep quiet – who, in fact, put her career on the line by, "without prior warning," challenging her boss, the CEO, in front of the Board (¶ 32) – commit fraud to cover up for him? Especially after that boss had been terminated "for spearheading the Autonomy Acquisition" (¶ 3), which she "vehemently opposed" (¶ 38)?[7] Plaintiff's conclusory

---

[6] *See also Greenberg v. Cooper Cos.*, No. 11-CV-05697 YGR, 2013 WL 2403648, at *8 n.11 (N.D. Cal. May 31, 2013) ("While the absence of a motive allegation is not fatal, it is a consideration in the 'holistic' review of the complaint." (citation omitted) (internal quotation marks omitted)).

[7] *Cf. Ezra Charitable Trust v. Tyco Int'l, Ltd.*, 466 F.3d 1, 10-11 (1st Cir. 2006) ("Further, this case is different from those relied upon by the plaintiffs. Here, the defendants were not acting to conceal their own errors or justify their past strategic decisions.").

allegation is nonsensical and fails to raise any inference of scienter, much less one that is "cogent and compelling." *Tellabs*, 551 U.S. at 324.

The absence of insider trading allegations against Ms. Lesjak further rebuts any inference of scienter. Plaintiff gives the back of the hand to this fact, calling it "meaningless." Opp. at 52 (citing *McGann v. Ernst & Young*, 102 F.3d 390, 396 (9th Cir. 1996)).[8] But as Plaintiff's own authority (Opp. at 31) recognizes, "the presence or absence of insider trading is a fact that [can] be considered by the Court as a part of its holistic approach" to analyzing a complaint's scienter allegations. *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 929 (N.D. Cal. 2012); *see also Metzler*, 540 F.3d at 1067 ("Digiovanni meanwhile sold nothing at all, suggesting that there was no insider information from which to benefit.").[9]

### D. The Remaining Allegations Do Not Create A Strong Inference Of Scienter

The Opening Brief explained (Mot. at 6-9) that Plaintiff's remaining allegations, alone or *in toto*, fail to make up for the lack of particularized facts demonstrating Ms. Lesjak's purported knowledge of the Autonomy fraud. The Opposition does nothing to remedy this fatal deficiency.

**Necessary Post-Acquisition Accounting Adjustments**. Plaintiff does not dispute that prior to the acquisition, Autonomy was subject to International Financial Reporting Standards ("IFRS"), which differ from US GAAP. *Id.* at 7. Nor does Plaintiff dispute that this necessitated adjustments. How, then, does Plaintiff defend its bald assertion that the "'acquisition-related integration costs and accounting adjustments'" demonstrate scienter (¶ 191)? It doesn't.

Instead, Plaintiff tries to dodge the issue, stating in a footnote that "[t]he PSLRA, 'in no way

---

[8] *McGann* is inapplicable as it analyzed whether an outside auditor could be liable as a primary violator for preparing a fraudulent audit report. The court did not discuss scienter.

[9] Neither *In re Diamond Foods, Inc.*, No. C 11-05386 WHA, 2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) nor *In re SunPower Securities Litigation*, No. C 09-5473 RS, 2011 WL 7404238 (N.D. Cal. Dec. 19, 2011) are to the contrary. In *Diamond Foods*, the court found that the defendants' lack of stock sales did not negate scienter because "plaintiff alleges that Diamond and the individual defendants were motivated to inflate share prices in order to complete the acquisition of Pringles, which would have presumably resulted in even higher prices." 2012 WL 6000923, at *7. Plaintiff alleges no such anticipated stock price bump in this case. In *SunPower*, the court noted that "'the absence of a motive allegation is not fatal,'" but simultaneously acknowledged that "'motive can be a relevant consideration.'" 2011 WL 7404238, at *5 n.4 (citation omitted).

turns FRCP 12 into a trial-type, papers-only proceeding, much less one in which defendants get the benefit of every conceivable doubt, including credibility calls.'" Opp. at 37 n.53 (quoting *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1260 (N.D. Cal. 2008)). But that is a straw man; Ms. Lesjak has raised no "credibility calls." There is no dispute that Autonomy was subject to IFRS prior to its acquisition, and the PSLRA places the burden on Plaintiff to <u>plead particularized facts</u> demonstrating that its malevolent "optimisation" theory (Opp. at 12-13) is "at least as compelling" as the inference that HP made necessary and proper accounting adjustments in light of Autonomy's conversion from IFRS to GAAP. *See Tellabs*, 551 U.S. at 314. Indeed, the complaint in Plaintiff's *LDK Solar* case detailed a number of emails and oral communications in which the company's former controller explained the alleged accounting issues to the CFO. 584 F. Supp. 2d at 1248-49, 1260. Thus, *LDK Solar* is a perfect example of the type of allegation missing here. What accounting improprieties, if any, were uncovered by HP personnel, E&Y, or KPMG between October and December 2011 when conducting the acquisition-related accounting adjustments? What, if anything, was communicated to Ms. Lesjak during that period? The Complaint does not say, and its failure to do so is fatal to the claims against Ms. Lesjak. *See, e.g.*, *Nvidia*, 2010 WL 4117561, at *5.

**"Hands-on" Management**. Plaintiff next argues that Mr. Apotheker and Ms. Whitman admitted to being "hands-on" managers. Opp. at 52-53. "But there are no allegations in the [Complaint] supporting [Ms. Lesjak] being a hands-on manager." *Westley v. Oclaro, Inc.*, No. C-11-2488 EMC, 2013 WL 2384244, at *7 (N.D. Cal. May 30, 2013). In any event, "'[a] complaint does not adequately plead scienter by claiming that key officers knew the true facts by virtue of their 'hands-on' positions.'"[10] *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1207

---

[10] Similarly deficient is Plaintiff's citation to executive resignations because Plaintiff fails to show that they were suspicious or that Ms. Lesjak was involved. Opp. at 53; *Cadence*, 654 F. Supp. 2d at 1050. The departures of Messrs. Apotheker and Robison in late 2011 hardly are suspicious, given the market's "overwhelmingly negative response to HP's August 18, 2011 announcement" of the transaction, and Mr. Lynch's April 2012 departure followed "disappointing" results in 1Q12 and 2Q12. Opp. at v; ¶¶ 45, 186, 195.

DEF. LESJAK'S REPLY ISO MOTION TO DISMISS     -6-
MASTER FILE NO.: C-12-5980 CRB

(N.D. Cal. 2007) (citation omitted); *see also Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 746 (9th Cir. 2008) (similar).[11]

**Amount of Revenue Involved.** Plaintiff asserts HP "admitted that $200 million of Autonomy's 2009 and 2010 revenue had been recorded improperly or prematurely – <u>over 50% of Autonomy's revenue for that period</u>." Opp. at 54 (emphasis added); *see also id*. at 36, 48. Plaintiff's effort to stretch the facts is belied by the Complaint, which alleges that "[f]or all of 2010, Autonomy reported recorded revenue of $870 million, an 18% increase over its 2009 revenues [$737 million]" (¶ 25). Thus, $200 million would represent approximately <u>12% of Autonomy's revenue</u> for the 2009-2010 period, not "over 50%." In any event, because Plaintiff is suing <u>HP's CFO</u>, not <u>Autonomy's CFO</u>, the relevant comparison is between the overstated revenues and HP's revenues. Even $200 million in one year would represent less than 0.2% of HP's revenues, which were approximately $114.6 billion in 2009 (Danitz Decl., Ex. A at 38) and $126.0 billion in 2010 (*id.*).[12] *See, e.g.*, *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 184-85 (4th Cir. 2009) ("[T]he size of BearingPoint's revenue stream does bear on whether the misstatements of net income were of a size that BearingPoint officers must have known about them."; restatement extinguished $97 million in profits in one year but company was

---

[11] The Opposition also suggests Ms. Lesjak's scienter can be imputed from "[Ms.] Whitman's representation that Autonomy would be 'HP's priority number one, two and three' in 2012." Opp. at 53 n.83 (quoting ¶¶ 74-76). What Ms. Whitman actually said was that the "growth of Autonomy using the distribution capability of HP is priority number one, two and three for 2012." ¶ 76. A CEO's emphasis on growth of a new acquisition through the acquirer's distribution capability does not make it "absurd to suggest" that the CFO was unaware of pre-acquisition revenue recognition issues with that business. *See, e.g.*, *Glazer*, 549 F.3d at 747 ("Based on the allegations made in this case, it would not be 'absurd to suggest' that [CEO] Magistri was unaware of the details of payments made through foreign sales agents in Asia."); *see also* HP Rep. at 12.

[12] Plaintiff argues that scienter can be inferred because Autonomy's CFO (Sushovan Hussain) reported to Ms. Lesjak (Opp. at 13), but as explained in Section I.A, *supra*, the Complaint fails to allege what was discussed during the "quarterly business reviews" (¶ 114), nor does Plaintiff allege any other communications between Mr. Hussain and Ms. Lesjak, let alone ones in which he disclosed historical accounting improprieties. *See, e.g.*, *In re IMPAX Labs., Inc. Sec. Litig.*, No. C 04-04802 JW, 2006 WL 6361942, at *5 (N.D. Cal. Mar. 1, 2006) (allegation that "several departments reported directly to Dr. Hsu" "insufficient to support a strong inference of scienter" in revenue inflation case involving a "relatively small company" of 453 employees).

"a global corporation" with more than $800 million in revenues per quarter).[13]

***Briody* matter**.  The Opposition all but ignores *Briody*, except to assert that HP could have discovered the emails submitted in that matter "had HP done even the most cursory due diligence." Opp. at 3.  This assertion – which is in any event without substance – is irrelevant to Ms. Lesjak, who was "stripped" of the ability to scrutinize due diligence (¶ 38), and the Complaint fails to allege what, if anything, Ms. Lesjak was told of the *Briody* matter after the deal closed.  Mot. at 8.

**"Whistleblower."**  Finally, the Opposition suggests that, because the whistleblower "wasn't just 'anyone'" but rather was a "'senior member of Autonomy's U.S. leadership team'" (Opp. at iv), Defendants knew the allegations must be true.  But "[HP] could not simply assume that the initial report of bad news was accurate." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007) ("Knowing enough to launch an investigation . . . is a very great distance from convincing proof of intent to deceive.").[14]  The Complaint alleges no more than that in late May 2012, a whistleblower alleged historical improprieties at Autonomy, not that Ms. Lesjak knew the allegations were true, much less that she knew they would require an impairment charge.  Moreover, while the Opposition criticizes that HP did not warn of a "potential impairment" (Opp. at 47), the Complaint admits (¶ 82) that Ms. Lesjak did just that when, on August 22, 2012, she "warned that [HP] could record a goodwill impairment" in the Software segment following its annual testing.[15]

---

[13] *See also In re Boston Sci. Corp. Sec. Litig.*, 686 F.3d 21, 29, 32 (1st Cir. 2012)  ("$100 million sounds like a large number, but . . . Boston Scientific projected 2010 revenues of $8.1 billion to $8.5 billion, making the projected loss just over one percent of revenues."; no inference of scienter where losses "extremely modest in relation to [company] revenues").

[14] *See also N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 58 (1st Cir. 2008) ("The company would have behaved irresponsibly (and possibly in violation of the securities laws) if it had made a public announcement which was possibly inaccurate because the situation . . . had not yet been adequately investigated.").

[15] *See, e.g.*, *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) ("'defendants' provision of adverse information to the public by way of disclosures negates an inference that they acted with an inten[t] to defraud'" (alteration in original) (citation omitted)); *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) ("[T]he allegation that defendants behaved recklessly is weakened by their disclosure of certain financial problems prior to the deadline to file its financial statements.").

## II. THE COMPLAINT FAILS TO PLEAD FALSITY AS TO MS. LESJAK

The Opening Brief explained (Mot. at 9-11) that Plaintiff fails to plead any actionable "qualitative" statement by Ms. Lesjak.[16] The Opposition responds by insisting that Ms. Lesjak's admittedly-subjective November 21, 2011 and February 22, 2012 statements were false, and that her admittedly-true May 23, 2012 and August 22, 2012 statements were misleading absent disclosure of the May 2012 whistleblower and resultant investigation. Plaintiff is mistaken.

Plaintiff argues (Opp. at 15, 37) that Ms. Lesjak's November 21, 2011 statement that "[t]he [Autonomy] integration is going well *thus far*"[17] was false because by May 2012 (i.e., five months later), "'roughly 250 Autonomy employees [had] quit,'" and because Mr. Lynch said that "'[t]he former management of Autonomy began alerting Ms Whitman *as early as December 2011* [i.e., one month later] to significant problems with the integration.'" Opp. at 15, 37 (citations omitted). Neither allegation suggests integration problems in November 2011, much less problems of sufficient quality or quantity to make a lie out of a statement as "puffy" as "[t]he integration is going well." *See, e.g.*, *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 341-42 (S.D.N.Y. 2012) ("'[i]ntegration of RBS is progressing well'" not actionable (alteration in original) (citation omitted)); Mot. at 10.[18]

Plaintiff next argues (Opp. at vi, 37) that Ms. Lesjak's February 22, 2012 statement that "HP was 'pleased with the Autonomy acquisition'" was false because she "previously told the

---

[16] HP explained (HP Mot. § II.B.2) why Plaintiff's "quantitative" allegations about HP's goodwill estimates fail to establish falsity. As explained in HP's reply brief (HP Rep. § IV.C), the Opposition fails to remedy this deficiency. And Plaintiff admits its position "is not that particular revenue figures in HP's financial statements were materially false." Opp. at 36-37.

[17] Ms. Lesjak made this statement on November 21, 2011, not February 22, 2012 as the Opposition (Opp. at 15) mistakenly asserts. Whitman Mot., Ex. 3.

[18] Plaintiff seeks to distinguish some of the authorities cited in the Opening Brief on this point by suggesting it has demonstrated that Ms. Lesjak did not actually believe that the integration was "going well." Opp. at 37 n.54. As noted above, however, alleging that integration problems existed by May 2012, or even December 2011, does not suggest that they existed on November 21, 2011 (a mere seven weeks after the transaction closed), much less that Ms. Lesjak both knew about them and felt that they meant the integration was not "going well." *See, e.g.*, *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements.").

full HP Board in July 2011" that she believed the acquisition was "'not in the best interests of the company.'" *Id.* (citations omitted). To begin with, as Plaintiff acknowledges (¶ 185; Opp. at 37), Ms. Lesjak said that HP was "pleased," not Ms. Lesjak personally, and this statement is quintessential puffery. Mot. at 10.[19] In any event, the Complaint pleads no facts suggesting that by February 2012, Ms. Lesjak and HP were not, in fact, pleased with the acquisition (regardless of Ms. Lesjak's initial feelings on the cost of the acquisition).

The Opposition fails to argue there was anything false about the remaining statements by Ms. Lesjak, made on May 23, 2012 and August 22, 2012, which are not even bolded or italicized in the Complaint (Plaintiff's marker for "false and/or misleading").[20] Both HP (HP Mot. § II.B.3) and Ms. Lesjak (Mot. at 8, 11) explained that Defendants were not required to disclose the whistleblower's allegations until they were substantiated. Plaintiff responds by stating "this is not a 'duty to disclose' or 'duty to update' case like *Yahoo!*," by referencing the truism that a corporate officer who chooses to speak must be truthful, and by spilling much ink discussing how the <u>CEO</u>'s statements about "scaling" issues with Autonomy supposedly were misleading. Opp. at iv n.4, 38-41.

As an initial matter, the whistleblower did not even come forward until <u>after</u> the May 23, 2012 challenged statements (¶ 84), so Plaintiff's argument is irrelevant to those statements. Moreover, Ms. Lesjak did not make the "scaling" statements – not that there was anything wrong with them anyway (HP Rep. § IV.B) – and Plaintiff fails to show how the aforementioned, <u>negative</u> statements that she did make (*see supra* at n.20) were misleading, particularly since Ms. Lesjak alerted the market to a possible goodwill writedown. That failure, in conjunction with

---

[19] "<u>We</u> are pleased with the Autonomy acquisition, the pipeline is strong and the level of lead generation we are seeing across HP for Autonomy software and services is compelling." Whitman Mot., Ex. 5 at 5 (emphasis added).

[20] *See* ¶¶ 191 ("'[s]ales execution was a challenge, and big deals are taking longer to close'"), 200 (HP had "'a lot of work to do over the next several quarters to improve Autonomy's performance'"), 202 (HP "'expect[s] to see well below normal seasonality when you go from Q3 to Q4 in revenue,'" in part "due to . . . our challenge in getting our Software license growth where it needs to be'" (alterations in original)), 201 (HP would conduct its "'annual review of the carrying value of goodwill during the fourth quarter of each fiscal year,'" with the "'largest balance for goodwill [being] in the Software segment'").

DEF. LESJAK'S REPLY ISO MOTION TO DISMISS    -10-
MASTER FILE NO.: C-12-5980 CRB

cases such as this Court's decision in *Yahoo!*, is fatal to Plaintiff's position. *See Yahoo!*, 2012 WL 3282819, at *22 ("taking time to investigate a situation prior to disclosing the situation to the investing public is not fraudulent").[21]

## III. THE COMPLAINT FAILS TO PLEAD A SECTION 20(a) CLAIM

As explained in the Opening Brief (Mot. at 11-12), Plaintiff's Section 20(a) claim against Ms. Lesjak fails both because there has been no violation of Section 10(b) and because Plaintiff has not pled Ms. Lesjak's control over any other defendant. Plaintiff concedes Ms. Lesjak did not control any of the other individual defendants, but argues that she controlled HP. Opp. at 54 n.85. Plaintiff's generic allegation that "Insider Defendants acted as controlling persons of HP" (*id.* (citing ¶¶ 119, 124, 240)), is deficient because allegations that a defendant "by reason of their position . . . had the power to cause" the alleged conduct do not suffice. *In re Downey Sec. Litig.*, No. CV 08-3261-JFW (RZx), 2009 WL 2767670, at *15 (C.D. Cal. Aug. 21, 2009) ("'[E]ven a CEO is not automatically a "controlling person" under Section 20(a)'" (alteration in original) (citations omitted)). That principle is particularly salient here, where Ms. Lesjak allegedly was "stripped" of her ability to scrutinize due diligence, which resulted in the acquisition of an entity headquartered overseas that comprises less than 1% of the Company's revenues. In these circumstances, something more is needed to state a claim under Section 20(a).[22]

---

[21] *See also Higginbotham*, 495 F.3d at 760-61 ("Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention."); *In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.*, 830 F. Supp. 361, 368 (S.D. Tex. 1993) (company has "no duty to disclose to shareholders unsubstantiated allegations" of misconduct (citation omitted) (internal quotation marks omitted)).

[22] Contrary to Plaintiff's assertion, courts in this Circuit continue to hold that Rule 9(b) applies where the Section 20(a) claim is predicated on an underlying violation of Section 10(b). *See, e.g., Taleo*, 2010 WL 597987, at *6; *Downey*, 2009 WL 2767670, at *15.

**CONCLUSION**

For the forgoing reasons, the Complaint should be dismissed as to Ms. Lesjak.

DATED: October 2, 2013                   Respectfully submitted,

                                                    WILSON SONSINI GOODRICH & ROSATI
                                                    PROFESSIONAL CORPORATION
                                                    STEVEN M. SCHATZ
                                                    KATHERINE L. HENDERSON
                                                    BRYAN KETROSER
                                                    BRIAN DANITZ

                                                          /s/
                                                    STEVEN M. SCHATZ


                                                    650 Page Mill Road
                                                    Palo Alto, CA  94304-1050
                                                    Telephone:  (650) 493-9300
                                                    Facsimile:   (650) 565-5100

                                                    *Attorneys for Defendant*
                                                    *Catherine A. Lesjak*