IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE HP SECURITIES LITIGATION<br>This Document Relates to All Actions<br>_____ / | Master File    No. C 12-05980 CRB<br>CLASS ACTION<br>**ORDER RE MOTIONS TO DISMISS** |

Defendant Hewlett-Packard ("HP") and seven individual defendants who are current and former HP directors and executives, (collectively "Defendants") move the Court, collectively and individually, to dismiss this securities class action. The suit stems from HP's acquisition of British software company Autonomy Corporation plc ("Autonomy") and the subsequent write-down of approximately $9 billion of HP's assets. The motions to dismiss argue, in brief, that: (1) the complaint fails to allege facts supporting a strong inference of fraudulent intent; (2) the complaint fails to allege facts showing that Defendants' statements were false when made; and (3) the claim under § 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") fails to plead a primary violation of § 10(b) by HP and the complaint fails to establish that the individual defendants exercised actual power or control over HP, the other defendants, or their challenged statements during the class period. Lead Plaintiff, PGGM Vermogensbeheer B.V. ("Plaintiff"), opposes the motions. In addition, there are nine requests for the Court to take judicial notice of myriad documents relating to this litigation. The Court GRANTS the unopposed requests to take judicial notice. The Court GRANTS the motion to dismiss as to Defendants Apotheker, Lane, Lynch, Murrin, and Robison because Plaintiff has failed to plead facts establishing a strong inference of scienter or a primary violation of § 10(b). The Court DENIES the motions to dismiss as to HP and Whitman only with regard to statements and omissions made beginning on May 23, 2012.

# BACKGROUND

In August 2011 HP acquired Autonomy for over $11 billion. Compl. (dkt. 100) ¶ 44. On November 20, 2012, HP announced that it had been the victim of a fraud in the Autonomy deal and wrote down approximately 85 percent of the purchase price. Id. ¶ 84. The Autonomy deal and the resulting write-down of $8.8 billion caused a significant decline in the value of HP's stock price. Id. ¶ 90. Litigation ensued. On March 4, 2013, this Court consolidated three categories of cases: "derivative shareholder suits, nonderivative securities class actions, and ERISA suits" which all "share[d] common facts." Order Consolidating Cases, Appoint Lead Plaintiffs, and Appointing Lead Counsel and Interim Lead Counsel (dkt. 90) at 1-2. The class period in this case runs from August 19, 2011 through November 20, 2012, inclusive. Compl. ¶ 3. The details of the fraud, acquisition, and write-down are complicated and lengthy but necessary background here.

## I. The Players

HP is a Delaware corporation headquartered in Palo Alto, California. Comp. ¶ 108. HP is a computer, technology, and software company servicing individual consumers, businesses of all sizes, and the government. Id. HP's common stock trades on the NASDAQ exchange with the ticker HPQ. Id.

Autonomy was a software company based in the United Kingdom. Id. ¶ 15. Autonomy was founded by Defendant Michael R. Lynch in 1996. Id. Prior to HP's acquisition, Autonomy was traded publically on the LSE exchange. Id.

Lead Plaintiff, PGGM, is a Dutch pension administrator in the healthcare and social work sector managing over $1.5 billion of pension assets for more than 2.5 million Dutch participants. Id. ¶ 107. Plaintiff bought HP stock during the class period and lost money as a result. Id.

Plaintiff also names seven individual defendants who were officers or members of the Board of Directors ("Board"). These individual defendants allegedly "participated and had exclusive authority and control over the content of HP's false and misleading statements, financial results," and more, during the class period. Id. ¶ 120. Each of the individual

defendants filed a separate motion to dismiss making similar arguments. See dkts. 127, 131, 136, 147, 130, 142, 139.

Michael R. Lynch was founder and CEO of Autonomy before the acquisition. Id. ¶ 15. After the acquisition Lynch became HP's Executive Vice President of Information Management, a position he held for less than six months. Id. ¶ 109. As Executive Vice President of Information Management, Lynch was one of HP's 15 top executive officers. Id. Lynch allegedly earned $800 million in cash by selling his company to HP. Id. ¶ 45.

Leo Apotheker was HP's CEO and President from November 2010 until he was ousted on September 22, 2011. Id. ¶ 112. Apotheker took the lead on arranging the acquisition of Autonomy, and personally negotiating the deal with Lynch. Id. ¶ 31. Apotheker was ousted before the Autonomy deal was finalized. Apotheker signed HP's quarterly reports and participated in investor conference calls during the class period before his ouster. Id. ¶ 112.

Margaret C. Whitman is, and has been since September 22, 2011, HP's President, CEO and Director. Id. ¶ 110. Whitman took over as CEO immediately after Apotheker left HP and has been a Board member since January 2011. Id. Whitman signed various of HP's regulatory reports, and participated in investor conference calls and interviews during the class period. Id. ¶ 111.

Catherine A. Lesjak is, and was throughout the Class Period, HP's CFO and Executive Vice President. Id. ¶ 113. Lesjak has been at HP for more than 24 years. Id. Lesjak was one of the only Board members to speak out against the Autonomy acquisition at the July 2011 Board meeting. Id. ¶ 6. Lesjak signed various of HP's regulatory reports and participated in investor conference calls during the class period. Id. ¶ 114.

Raymond J. Lane was HP's Executive Chairman from September 2011 until he stepped down in April 2013. Id. ¶ 115. Lane served on HP's Board in other capacities beginning in November 2010. Id. Lane signed various of HP's regulatory reports and participated in a conference call announcing Apotheker's termination and an annual investor meeting during the class period. Id.

James T. Murrin was Senior Vice President Controller and Principal Accounting Officer at HP from March 2007 until May 2012. Id. ¶ 116. Murrin worked at HP for 24 years and was listed as one of the company's 15 top executives in the 2011 Annual Report. Id. Murrin signed various of HP's regulatory reports and participated in an investor conference during the class period. Id. Murrin is a named defendant solely as a control person under §20(a) of the Exchange Act. Id.

Shane V. Robison was HP's Executive Vice President and Chief Strategy and Technology Officer from May 2002 to November 2011. Id. ¶ 117. Robison was, allegedly, one of the HP executives most actively supporting the Autonomy acquisition. Id. ¶ 33. Robison participated in an investor conference during the class period. Id. ¶ 117.

## II.   The Moves

In September 2010, HP announced that it had hired Apotheker as the new CEO. Id. ¶ 26. Apotheker was hired with the unanimous approval of HP's Board, despite the fact that the majority of Board members had not yet met him in person. Id. An HP director explained the "highly unusual" procedure saying "we were just too exhausted from all the infighting." Id. Four months after taking over as CEO, Apotheker announced that he intended to quickly "transform" HP from a hardware producer into a software and services provider. Id. ¶ 27.

In April 2011 Apotheker and Lynch met to discuss a possible acquisition of Autonomy. Id. ¶ 31. In May 2011, HP's Board approved Apotheker's proposal to look into the acquisition and hired Barclays Bank PLC and Perella Weinberg Partners to evaluate the possible deal. Id. According to the complaint, Apotheker aggressively pushed the acquisition on the Board over Lesjak's objections. Id. ¶ 32. In July 2011, Apotheker and Lynch agreed to a deal-in-principal for HP's acquisition of Autonomy. Id. ¶ 33. Due diligence on the deal occurred between July 28 and August 18, 2011. Id. The due diligence conducted by KPMG LLC was allegedly limited to Autonomy's publicly-reported financial statements (which had been previously audited by Deloitte Touche Tohamtsu Limited) and approximately 25 sales contracts. Id. ¶¶ 34, 36. According to the complaint, this due diligence failed to thoroughly investigate various "whistleblower" allegations as to

4

Autonomy's accounting practices that had surfaced in the 18 months prior to the acquisition. Id. ¶ 39. On August 18, 2011, HP and Autonomy released a joint press release announcing the planned acquisition. Id. ¶ 44.

Plaintiff alleges that prior to HP's announcement of the acquisition, the individual defendants had access to information concerning Autonomy's accounting improprieties and overvaluation. Id. ¶ 42. Specifically, Plaintiff alleges that the Insider Defendants knew or should have known:

> (i) corporate governance firms, auditors, media and analysts had questioned Autonomy's market value due to concerns about its accounting practices, and whether its reported growth rates and margins had been artificially inflated; (ii) Autonomy only was providing HP limited information in the form of approximately 25 or so sales contracts during HP's three-week due diligence; (iii) the enormous 11 times revenue premium that HP was paying for Autonomy despite its aggressive accounting practices; (iv) Defendant Lesjak vehemently opposed the acquisition to the full HP Board in July 2011 stating, in part, "I'm putting a line down. This is not in the best interests of the company;" and (v) red flags were raised during HP's Autonomy due diligence, including Whistleblower No. 1's allegations that Autonomy was manipulating its revenue recognition practices.

Id.

The day after the acquisition announcement, on August 19, 2011 HP's stock price dropped by approximately 20 percent. Id. ¶ 45. This was the first day of the class period. In the weeks and months that followed, other whistleblower allegations emerged suggesting that HP had overpaid for Autonomy. Id. ¶¶ 47-57. Apotheker responded to the market's negative reaction at an investor conference by making assurances that HP had been "very conservative" and "rigorous" in evaluating the Autonomy deal. Id. ¶ 58.

On September 22, 2011, a week before the Autonomy deal closed, Whitman replaced Apotheker as CEO. Id. ¶ 68. Plaintiff alleges that Whitman and other HP executives sought to withdraw the offer to purchase Autonomy. Id. ¶ 69. Plaintiff alleges that HP's executives were told that the United Kingdom's "takeover rules made [withdrawing the offer] impossible." Id. ¶ 72. Meanwhile, HP executives continued to publically endorse the deal. Id. ¶ 76. The Autonomy acquisition closed in October 2011. Id. ¶ 74.

5

### III. The End Game

After the transaction closed, HP began studying Autonomy's software revenue recognition practices to optimize for US Generally Accepted Accounting Practices ("GAAP"). Id. ¶ 75. It turned out that Autonomy's earnings and growth numbers were not what they had seemed: integrating Autonomy into HP did not result in the revenue or growth anticipated. Id. ¶¶ 77-79. In an earnings conference call with investors in February 2012, Lesjak attributed weak revenue numbers to "acquisition-related integration costs and accounting adjustments, as well as [a] lower mix of license revenue in the quarter." Id. ¶ 79. In April 2012, Lynch was terminated from HP. Id.

In May 2012, "Whistleblower No. 4," a senior member of Autonomy's leadership team came forward to raise concerns about Autonomy's accounting improprieties with HP's General Counsel. Id. ¶ 80. Whitman learned of the allegations and immediately authorized hiring PricewaterhouseCoopers LLP ("PwC") to do an investigation. Id. While the investigation was still ongoing, HP reported that its software segment results were worsening and that it might record a goodwill impairment. Id. ¶ 82. The news was followed by a drop of over 11 percent in the value of HP's stock in a single day. Id.

On November 20, 2012, HP announced the results of the PwC investigation. Id. ¶ 87. HP conceded that hundreds of million of dollars of Autonomy's pre-acquisition revenue had been improperly recorded, that key Autonomy documents were missing, that HP had substantially overpaid for Autonomy, and that, as a result, HP would write down 85 percent of Autonomy's purchase price. Id. ¶¶ 80-85. HP's stock dropped another 12 percent on this news. Id. ¶ 90. HP's announcement pointed the finger at Apotheker and Lynch. Id. ¶¶ 85-86. This was the final day of the class period.

## LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal may be based on either "the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir.

6

1990). For purposes of evaluating a motion to dismiss, a Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

Claims for fraud must meet the pleading standard of Federal Rule of Civil Procedure 9(b), which requires a party "alleging fraud or mistake [to] state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) "requires an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted). Security fraud claims must also meet the heightened pleading requirements of the Private Securities Litigation Reform Act (PSLRA): "[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C.A. § 78u-4(b)(1).

A section 10(b) claim under the PSLRA has six elements: a statement, falsity, scienter, reliance, loss causation, and damages. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42. The PSLRA requires plaintiffs to state with particularity facts giving rise to a strong inference of defendants' scienter–"that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." See 15 U.S.C. § 78u-4(b)(2); Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 987 (9th Cir. 2008) (internal quotation and citations omitted). "The inference of scienter must be more than merely 'reasonable' or 'permissible'" – "it must be cogent and at least as compelling as any opposing inference one could draw from the facts alleged." See Tellabs v. Makor Issues &

7

Rights, Ltd., 551 U.S. 308, 324 (2007). Therefore, a court "must consider plausible nonculpable explanations for the defendant's conduct." Id.

**DISCUSSION**

**I.    Section 10(b)**

A section 10(b) claim under the PSLRA has six elements: a statement, falsity, scienter, reliance, loss causation, and damages. Dura Pharm., Inc., 544 U.S. at 341-42. Defendants argue Plaintiff's 10(b) claim should be dismissed for two reasons: (1) failure to plead facts giving rise to a "strong inference" of scienter; and (2) failure to plead facts sufficient to establish that Defendants' public statements were materially false or misleading when made. Here, the Court's ruling hinges primarily on the issue of scienter.

**A.    The Complaint Fails to Plead Facts Supporting a Strong Inference of Scienter in Statements Made Before May 23, 2012**

The Court first considers whether the complaint pleads facts sufficient to support a strong inference that Defendants acted with scienter in making their statements prior to May 23, 2012. "In a § 10(b) action, scienter refers to a mental state embracing intent to deceive, manipulate, or defraud." Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 648 (2010) (internal quotation and citation omitted). "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009) (internal quotations and citations omitted). To establish deliberate recklessness "the plaintiff must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Id. (internal quotation and citation omitted). Here, Plaintiff has failed to plead facts that meet the high standard for establishing a strong inference of scienter.

The complaint details numerous statements attributed to Defendants before May 23, 2012. See generally Compl. ¶¶ 126-200. These statements amount to little more than restatements of the information provided by Autonomy as to Autonomy's market

8

dominance,[1] its financial results,[2] and its growth rate.[3] Id. ¶¶ 163-174. Other statements pertain to Defendants' motivations for acquiring Autonomy,[4] and the due diligence process.[5] Id. ¶¶ 172-178. The complaint fails to allege any facts showing that any defendant disbelieved either the information they regurgitated from Autonomy, or the optimistic opinions they expressed about HP's due diligence and growth outlook.[6]

In an attempt to establish scienter, Plaintiff makes four main arguments: (1) Defendants had a motive; (2) Defendants were "hands-on" managers; (3) HP's Autonomy-related purge is evidence of scienter; and (4) the size of the write-down supports scienter. See Opp'n to Mot. to Dismiss (dkt. 168) at 51-56. These arguments largely fail.

First, the complaint fails to establish any coherent motive as to why Defendants would knowingly purchase a company for several times its actual value or that they knew Autonomy's accounting was problematic. Second, that Whitman and Apotheker were allegedly "monitoring every detail about Autonomy's acquisition and/or integration into HP," Opp'n to Mot. to Dismiss at 52, is not inconsistent with the inference that they simply failed to act prudently, or even that they acted recklessly.[7] Plaintiff's theory requires an inference of conspiracy which is less plausible. The Ninth Circuit has held that "mere

---

[1] See, e.g., Compl. ¶ 168 (Autonomy is "basically a de facto industry standard.") (quoting Apotheker's statement on August 18, 2011 conference call).

[2] See, e.g., Compl. ¶ 163 ("Autonomy has a consistent track record of double-digit revenue growth, with 87 percent gross margins and 43 percent operating margins in calendar year 2010") (quoting August 18, 2011 Press Release).

[3] See, e.g., Compl. ¶ 172 ("So the IDOL growth year on year is about 17%.") (quoting Robison's statement at the September 13, 2011 conference).

[4] See, e.g., Compl. ¶ 164 ("We're buying a very strong business and we believe that we can extract a lot more out of this business by combining it with HP") (quoting Apotheker's statement on August 18, 2011 conference call).

[5] See, e.g., Compl. ¶ 172 ("We have a pretty rigorous process inside HP that we follow for all of our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this.") (quoting Apotheker's statement at the September 13, 2011 conference).

[6] See Glen Holly Entm't, Inc. v. Tektronix Inc., 352 F.3d 367, 379 (9th Cir. 2003) ("The statements were generalized, vague and unspecific assertions, constituting mere 'puffery'").

[7] Nor does it shed any light on specifically when they became aware of HP's over-payment for Autonomy.

9

recklessness or a motive to commit fraud and opportunity to do so . . . are not sufficient to establish a strong inference of deliberate recklessness." In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir. 1999) abrogated on other grounds by South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008).

Nor do the "red flags" Plaintiff emphasizes, Opp'n to Mot. to Dismiss at 12, 20-22, suffice to establish scienter. Plaintiff relies heavily on New Mexico State Inv. Council v. Ernst & Young LLP for the proposition that "the more likely an auditor would have discovered the truth if a reasonable audit had been conducted, the stronger the scienter inference." 641 F.3d 1089, 1098 (9th Cir. 2011). Opp'n to Mot. to Dismisss at 26. However, Ernst & Young concerned auditor liability for the financial statements of a company it audited–a significantly different situation than the one here. In Ernst & Young, the Ninth Circuit's reversal of the district court's order granting a motion to dismiss relied on the fact that Ernst & Young had ignored red flags in the context of allegations of failure to comply with Generally Accepted Auditing Standards (GAAS), and allegations of "in your face facts that cry out, 'how could [defendants] not have known.'" 641 F.3d at 1102 (*quoting* In re Oxford Health Plans Inc. Sec. Litig., 51 F. Supp. 2d 290, 294 (S.D.N.Y. 1999)). Not so here. The complaint fails to establish with sufficient clarity when exactly any particular defendant actually became aware of these red flags. Thus, it is a reasonable inference that no defendant was aware of the red flags, or at least that they were not taken seriously at the time the statements were made. See Tellabs, 551 U.S. at 324 ("The inference of scienter . . . must be cogent and at least as compelling as any opposing inference one could draw from the facts alleged."). On balance, Plaintiff's theory is less compelling.

Third, that Apotheker and other HP executives left before the Autonomy deal even closed, or shortly thereafter, fails to establish the requisite strong inference of scienter as to pre-May 23, 2012 statements. Even assuming that the executive terminations occurred solely as a result of the Autonomy acquisition, the 20 percent decline in the value of HP's stock the day after the Autonomy acquisition was announced, Compl. ¶ 45, provides a cogent explanation for reshuffling the company's leadership even absent any knowledge of HP's

overpayment. Tellabs, 551 U.S. at 324. So, too, does the negative market reaction provide a compelling explanation for Whitman and Lane's alleged efforts to rescind the offer while simultaneously making positive statements about Autonomy. See Opp'n to Mot. to Dismiss at 32-33. Rather, it is implausible that had Defendants known about the fraud being perpetrated on them before the deal closed that they would have gone ahead with the deal. Plaintiff's arguments in the papers and at hearing about the difficulties of withdrawing an offer under the laws of the United Kingdom fail to persuade the Court that, had Defendants known of the fraud being perpetrated before the deal closed, Defendants would have gone ahead with the acquisition. Finally, Plaintiff rightly points out that the size of the write-down was massive–85 percent of the value HP attributed to Autonomy. Opp'n to Mot. to Dismiss at 53. However, Plaintiff fails to plead facts establishing when exactly any particular defendant knew the full extent of the overpayment for Autonomy prior to the conclusion of the PwC investigation.

      Additionally, many of Defendants' qualitative statements made during the class period amount to mere puffery. See, e.g., Compl. ¶ 171 (Autonomy "gives us the opportunity to really provide a return very quickly for our shareholders") (quoting Apotheker). In Philco, this Court discussed generally the non-actionable nature of vague expressions of enthusiasm. Philco Inv., Ltd. v. Martin, No. 10–2785, 2011 WL 500694 (N.D. Cal. Feb. 9, 2011). "[T]erms like 'strong' and 'spectacular' are not actionable under the securities laws." Id. at *6. See also Glen Holly Entm't Inc., 352 F.3d at 379 (a reasonable consumer cannot rely on "generalized, vague and unspecific assertions, constituting mere 'puffery'"). This sort of optimistic language, even in the context of answering specific questions, is not actionable absent a strong inference of scienter.

      Even assuming that all of Defendants' pre-May 23, 2012 statements were materially false or misleading, Plaintiff has failed to plead facts with sufficient specificity so as to establish a strong inference of scienter. Therefore the Court GRANTS the motions to dismiss as to all pre-May 23, 2012 statements by all Defendants.

11

## B. Statements Made Beginning on May 23, 2012

The Court next considers whether the complaint pleads facts sufficient to support a strong inference that Defendants acted with scienter in making their statements from May 23, 2012 until the end of the class period. Here the issue is a closer one. Plaintiff fails to meet the standards of the PSLRA as to post-May 23, 2012 statements by most Defendants, because the complaint falls short of establishing "that the defendants made false or misleading statements either intentionally or with deliberate recklessness." Zucco Partners, 552 F.3d at 991 (internal quotations and citations omitted). However, Plaintiff's claims survive as to statements made by Whitman and HP beginning on May 23, 2012.

The complaint details numerous statements attributed to Defendants after May 23, 2012. See generally Compl. ¶¶ 154-58, 190-200. These statements fall into two broad categories: quantitative financial statements[8] (including management's affirmations that the quantitative reports were accurate and complete),[9] and qualitative statements explaining the lackluster performance[10] or discussing the integration of Autonomy into HP.[11]

Plaintiff makes a variety of piecemeal arguments which ultimately fail. Plaintiff's attempt to burden shift–"HP does not plausibly explain how it could possibly have missed Autonomy's problems by [year-end 2011]"–fails to compensate for the absence of specific

---

[8] See, e.g., Compl. ¶ 154 ("HP['s third quarter 2012 financial statements] reported goodwill of approximately $6.8 billion (including $224 million of goodwill that HP added during the nine months ended July 31, 2012, as a result of a change in the allocation of purchase price to the fair value of purchased intangibles for the Autonomy Acquisition) and purchased intangibles of approximately $4.2 billion.").

[9] See, e.g., Compl. ¶ 155 ("In the opinion of management, the accompanying Consolidated Condensed Financial Statements of Hewlett-Packard Company and its consolidated subsidiaries ("HP") *contain all adjustments, including normal recurring adjustments, necessary to present fairly* HP's financial position") (emphasis in original).

[10] See, e.g., Compl. ¶ 191 ("second-quarter operating profit for software was $172 million, or 17.7% of revenue, *unfavorably impacted by acquisition-related integration costs and accounting adjustments, as well as a lower mix of license revenue in the quarter*.") (emphasis in original) (quoting Lesjak's statements from a May 23, 2012 conference call).

[11] See, e.g., Compl. ¶ 194 ("My view was that we needed to make a change to someone who can take Autonomy to the next level. *I have every confidence that Autonomy will be a very big and very profitable business*.") (emphasis in original) (quoting Whitman's statements from a June 5, 2012 interview).

12

1  pleadings establishing a strong inference of scienter.[12]  Opp'n to Mot. to Dismiss at 13.
2  Similarly, the exodus of "roughly 250 Autonomy employees" in the months after the
3  acquisition, id. at 15 citing Compl. ¶ 81, could be a sign of major problems but also could be
4  a planned part of the integration of Autonomy into HP.  Both explanations are plausible.  The
5  departures, then, fail to establish a strong inference that Defendants intended to deceive when
6  they announced that the integration efforts were "going well."  Id. citing Compl. ¶ 185.  See
7  Tellabs, 551 U.S. at 324 ("The inference of scienter . . . must be cogent and at least as
8  compelling as any opposing inference one could draw from the facts alleged.").  Plaintiff
9  notes that "the Complaint also alleges that HP's due diligence team was made aware of
10 specific allegations of potential misconduct at Autonomy."  Opp'n to Mot. to Dismiss at 25.
11 This pleading is insufficient, even assuming the falsity of all statements, to establish that a
12 particular defendant *knew* that the specific allegations held water prior to making a statement
13 in question.

14      Eventually, on November 20, 2012, HP did announce a substantial write-down of the
15 Autonomy related assets.  Compl. ¶ 217.  The question, then, is when did Defendants learn
16 the true value of Autonomy?  The complaint does not answer this question as Plaintiff fails to
17 make particularized allegations that Defendants became aware of the full extent of HP's
18 overpayment for Autonomy before the PwC investigation concluded.  The parties also
19 addressed this question at length during the hearing but no clear answer emerged.  Notably
20 absent from the complaint are references to any emails, internal reports, documents, or
21 specific meetings establishing when each defendant became aware of the extent to which HP
22 had overpaid for Autonomy.

23      To the extent the complaint establishes with any certainty that Defendants knew
24 during the class period HP had overpaid for Autonomy, it is only beginning with
25 Whistleblower No. 4.  Whistleblower No. 4 was a senior member of Autonomy's leadership

---

[12] For example, the fact that HP began making changes to Autonomy's accounting practices in order to optimize for GAAP is insufficient to establish that any defendant, even those charged with signing off on the accounting changes, comprehended the fact or the extent of Autonomy's fraud. See, e.g., Opp'n to Mot. to Dismiss at 13.

13

team who raised concerns about Autonomy's accounting improprieties with HP's General Counsel. Compl. ¶ 80. Whitman learned of the allegations and immediately authorized hiring PwC to do an investigation. Id. The complaint establishes that after Whistleblower No. 4 came forward, at least some Defendants may have thought that HP had substantially overpaid for Autonomy. The complaint is vague as to when in May Defendants learned of the allegations and initiated the PwC investigation. The complaint quotes Whitman as saying that Whistleblower No. 4 came forward *after* Lynch was fired on May 23. Compl. ¶ 84. This suggests that the earliest possible date Whitman could have learned of Whistleblower No. 4's allegations would have been May 23. Construing the pleadings in the light most favorable to Plaintiff, the Court assumes that some Defendants knew of the allegations on May 23. Thus, the Court addresses in turn each of the allegedly false statements made beginning on May 23, 2012.

### 1.     Statements on May 23 and June 5, 2012

HP published a press release and held a conference call on May 23, 2012 to accompany its filing of SEC Form 8-K announcing financial results for the second quarter of 2012. Compl. ¶ 190. These materials did not make any reference to Whistleblower No. 4's allegations or the PwC investigation, id., which Defendants would have only learned about that day, at the earliest.

During the May 23 call, Lesjak stated that HP's "second-quarter operating profit for software was $172 million, or 17.7% of revenue, ***unfavorably impacted by acquisition-related integration costs and accounting adjustments, as well as a lower mix of license revenue in the quarter***." Id. ¶ 191. There is nothing actionable in this statement: Lesjak made a factual representation about profit and problems impacting the software segment of HP's business. While Lesjak omitted any direct reference to the major problems with Autonomy's valuation, the complaint does not allege that Lesjak would have known about Whistleblower No. 4's allegations by this point, nor was her comment in a context that would have a required a statement about the overall valuation of Autonomy assets. Lesjak was not asked about, nor did she choose to comment on Autonomy's performance.

14

On the same call, Whitman answered a question about Autonomy's weakness. Whitman said:

> [w]hen Autonomy turned in disappointing results, ***[HP] actually did a fairly deep dive*** to understand what had happened here. And in my view, this is not the product. Autonomy is a terrific product. It's not the market. There is an enormous demand for Autonomy. It's not the competition. I was wondering, is there a competitor that we didn't see, and the answer to that is no. ***This is classic entrepreneurial [c]ompany scaling challenges***.

Id. A couple weeks later, during a press interview on June 5, 2012, Whitman similarly stated:

> In my view, this is the classic case of scaling a business [Autonomy] ***from startup*** to grownup.[43] Going through that barrier of a billion dollars in sales is not easy because you can't run the organization at $1.5 billion the same way you did at $500 million. ***You just can't***. And for many entrepreneurs, ***processes and discipline are dirty words***, and you have to have those things, especially within the context of HP. ***I know exactly how this world [works]***. My view was that we needed to make a change to someone who can take Autonomy to the next level. ***I have every confidence that Autonomy will be a very big and very profitable business***. It's taking advantage of a big shift in the industry toward big data and unstructured data. But we needed different leadership to age Autonomy, and by that I mean age ***it kind of like wine***.

Id. ¶ 194. In making these two sets of statements, Whitman chose to speak about Autonomy's weak performance: she could have declined to offer a specific explanation in answer to the questions.[13] Once Whitman decided to speak on the topic, she omitted material information which the complaint alleges she possessed at the time, namely that she was considering accounting fraud at Autonomy as the explanation for its weak performance. Whitman knew that if Whistleblower No. 4's allegations were true, the fraud would explain Autonomy's under performance rather than "classic entrepreneurial [c]ompany scaling challenges." Whitman was not required to speak about Autonomy's weakness at this stage. Nor was Whitman required to reveal every detail of what she knew about Whistleblower No.

---

[13] Nor is this a Hobson's choice. Whitman could have honestly answered the question by saying she did not know the explanation for Autonomy's under performance but was actively investigating its cause.

15

4's allegations, nor that she had authorized a PwC investigation. However, Whitman's decision to put forward entrepreneurial challenges as an explanation while choosing not even to mention the alternative possibility of accounting fraud, which she knew to be plausible, constitutes a material omission. The PSLRA treats pleadings as to statements and omissions similarly. See 15 U.S.C.A. § 78u-4(b)(1) ("the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."). Context matters. Whitman's May 23 comment was on an investor conference call to accompany HP's filing of SEC Form 8-K announcing financial results for the second quarter of 2012. Whitman's qualitative comments on that call provided crucial context for investors and analysts seeking to understand the SEC filing. Whitman's June 5 statement was in response to question about Autonomy and the news that Lynch had left HP. The context of Whitman's statements would have called for her to either decline to answer the question with any specific explanation or to at least mention the possibility that something other than entrepreneurial scaling challenges explained Autonomy's lackluster performance.[14] Therefore, Defendants' motions are DENIED as to these statements.

### 2. Second Quarter 2012 SEC 10-Q Form

HP's second quarter 2012 SEC Form 10-Q, filed on June 8, 2012 reported that:

> For the three and six months ended April 30, 2012, Software earnings from operations as a percentage of net revenue decreased by 2.1 percentage points and 0.9 percentage points, respectively. The operating margin decrease for both periods was due ***primarily to a lower mix of license revenue, higher deferred revenue write-downs and integration costs associated with the Autonomy acquisition***, the effect of which was partially offset by rate increases in hosted license services and lower integration costs associated with our fiscal 2010 acquisitions. . . .

---

[14] On May 23, 2012, Whitman did mention and rule out various other explanations–"this is not the product. Autonomy is a terrific product. It's not the market. There is an enormous demand for Autonomy. It's not the competition." Compl. ¶ 191. However, Whitman omitted any mention of accounting fraud, a possible explanation for Autonomy's weak results which she then knew to be plausible.

16

> ***Software net revenue increased 21.7%*** (21.4% when adjusted for currency) ***and 25.9%*** (25.1% when adjusted for currency) for the three and six months ended April 30, 2012, respectively. The net revenue increase for both periods ***was due to revenues from acquired companies, primarily Autonomy,*** as well as modest growth in the organic business, including solid growth in our security support offerings. For the three months ended April 30, 2012, net revenue from services, support and licenses increased by 72%, 17% and 7%, respectively. For the six months ended April 30, 2012, net revenue from services, support and licenses increased by 89%, 19% and 10%, respectively.

Compl. ¶ 197. At the time of these quantitative statements in regular SEC filings, PwC's investigation was ongoing. This Court has found that "taking time to investigate a situation prior to disclosing the situation to the investing public is not fraudulent." In re Yahoo! Inc. Sec. Litig., No. 11-02732, 2012 WL 3282819 at *22 (N.D. Cal. Aug. 10, 2012) citing Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 760-61 (7th Cir. 2007); Slayton v. Am. Express Co., 604 F.3d 758, 763-64, 774, 777 (2d Cir. 2010); N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 57-58 & n.23 (1st Cir. 2008). Whistleblower No. 4's allegations required time to investigate–the PwC investigation took approximately six months. Compl. ¶ 141. "Taking the time necessary to get things right is both proper and lawful. Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal." Higginbotham, 495 F.3d at 761. Defendants have no obligation to prematurely report allegations, even if well-founded; nor would Defendants have been able to accurately determine the true amount of the required write-down absent a thorough investigation. See Acito v. IMCERA Grp., Inc., 47 F.3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."). Accordingly, Defendants' motions are GRANTED as to the statements in HP's Second Quarter SEC form 10-Q.

### 3.  Third Quarter 2012 SEC 8-K Form and Investor Call

HP filed third quarter 2012 results on SEC Form 8-K and an accompanying press release on August 22, 2012. Compl. ¶ 199. On the same day, HP executives held a conference call with investors in which Whitman revealed that "***Autonomy still requires a***

17

*great deal of attention and we've been aggressively working on that business.*" Id. ¶ 200. During the same call, Lesjak stated:

> With that context, we expect fiscal year 2012 non-GAAP EPS to be between $4.05 and $4.07, at the low end of our previous outlook for the fiscal year. From a GAAP perspective, we expect a full-year GAAP loss per share to be in the range of $2.23 to $2.25. We typically conduct an annual review of the carrying value of goodwill during the fourth quarter of each fiscal year.
>
> Any one of these factors or any combination thereof may require us to record in Q4 an additional impairment charge against the carrying value of the goodwill in the HP portfolio. Our largest balance for goodwill is in the Software segment.

Id. ¶ 201. Here, the Court GRANTS the motions as to Whitman's statement because her statement accurately reflected the fact that Autonomy "require[d] a great deal of attention" and that HP continued to focus on it. Whitman did not proffer any particular explanation for Autonomy's shortcomings, nor was she required, at this stage, to reveal the fraud allegations or the PwC investigation. "[T]aking time to investigate a situation prior to disclosing the situation to the investing public is not fraudulent." In re Yahoo! Inc. Sec. Litig., No. 11-02732, 2012 WL 3282819 at *22 (N.D. Cal. Aug. 10, 2012).

The Court GRANTS Lesjak's motion because Lesjak accurately alerts the market to the danger of a write-down in the software segment: "Any one of these factors or any combination thereof may require us to record in Q4 an additional impairment charge against the carrying value of the goodwill in the HP portfolio. Our largest balance for goodwill is in the Software segment." Id. While Lesjak stopped short of a full disclosure, her statements accurately foreshadowed the write-down of goodwill from the Autonomy acquisition.

### 4. Third Quarter 2012 SEC 10-Q Form

HP's third quarter 2012 SEC Form 10-Q, released on September 10, 2012, reported that:

> During its fourth quarter of fiscal 2012, HP will perform its annual goodwill impairment review for all of its reporting units as of August 1, 2012. If there are changes in HP's stock price, ***or significant changes in the business climate or operating results of its reporting units***, HP may incur additional goodwill impairment charges. The Software segment includes $14.6 billion of goodwill, of which ***$7.7 billion relates to the legacy HP software business and $6.9 billion relates to the Autonomy acquisition***. Based on HP's last annual goodwill

18

> impairment review completed as of August 1, 2011, the excess of fair value over carrying value of the legacy HP software business was 38% of the carrying value, which is lower than that of HP's other reporting units. At the time of the Autonomy acquisition in October 2011, ***the fair value of Autonomy approximated the carrying value***.

Id. ¶ 204. This filing went too far when it stated: "At the time of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the carrying value." This statement was misleading. By September 2012, Defendants knew there was a real possibility that HP had substantially overpaid for Autonomy. While there was no obligation for Defendants to announce the investigation or choose a specific dollar amount for the write-down until the PwC investigation was completed, "[m]anagers cannot tell lies." Higginbotham, 495 F.3d at 761. Defendants may not have known for certain that HP had overpaid for Autonomy as of that date, but they did know that a credible alternative explanation was under investigation. For that reason, it could not be asserted with certainty and without qualification that as of the date of acquisition, "the fair value of Autonomy approximated the carrying value." Accordingly, Defendants' motions are DENIED as to this statement in HP's Second Quarter SEC form 10-Q.

## II.     Section 20(a)

Section 20(a) allows recovery against persons who exercise control over primary violators of Section 10(b). Zucco, 552 F.3d at 990. Because the Court finds that Plaintiff failed to plead a primary violation under section 10(b) as to all Defendants except for Whitman and HP, the Court finds that the Section 20(a) claim also fails as to all Defendants except for Whitman and HP.

/
/
/
/
/
/
/

19

**CONCLUSION**

For the foregoing reasons, the Court GRANTS the motions to dismiss except as to Whitman and HP. The Court GRANTS the unopposed requests for judicial notice.

**IT IS SO ORDERED.**

Dated: November 26, 2013

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE