1

KESSLER TOPAZ MELTZER
   & CHECK, LLP

2

ELI R. GREENSTEIN (Bar No. 217945)
STACEY M. KAPLAN (Bar No. 241989)

3

PAUL A. BREUCOP (Bar No. 278807)
One Sansome Street, Suite 1850

4

San Francisco, CA 94104
Telephone: (415) 400-3000

5

Facsimile: (415) 400-3001
egreenstein@ktmc.com

6

skaplan@ktmc.com
pbreucop@ktmc.com

7

8

-and-

9

DAVID KESSLER (pro hac vice)

10

DARREN J. CHECK (pro hac vice)
ANDREW L. ZIVITZ (pro hac vice)

11

GREGORY M. CASTALDO (pro hac vice)
JOSHUA A. MATERESE (pro hac vice)

12

280 King of Prussia Road
Radnor, PA 19087

13

Telephone: (610) 667-7706
Facsimile: (610) 667-7056

14

dkessler@ktmc.com
dcheck@ktmc.com

15

azivitz@ktmc.com
gcastaldo@ktmc.com

16

jmaterese@ktmc.com

17

*Counsel for Lead Plaintiff PGGM Vermogensbeheer B.V.
and Lead Counsel for the Proposed Class*

18

19

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

20

SAN FRANCISCO DIVISION

21

22

IN RE HP SECURITIES LITIGATION,

23

This Document Relates To: All Actions

24

25

26

27

28

MASTER FILE NO. 3:12-CV-05980-CRB

**CLASS ACTION**

**LEAD PLAINTIFF'S NOTICE OF
MOTION, MOTION FOR CLASS
CERTIFICATION AND MEMORANDUM
OF POINTS AND AUTHORITIES IN
SUPPORT THEREOF**

Date:       February 20, 2015
Time:       10:00 a.m.
Judge:      Hon. Charles R. Breyer
Courtroom:  6, 17th Floor

REDACTED VERSION
OF DOCUMENT
SOUGHT TO BE
SEALED

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that, on February 20, 2015, at 10:00 a.m., before the Honorable Charles R. Breyer, movant will and hereby does respectfully request an order: (i) certifying this matter as a class action pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and (b)(3); (ii) appointing Lead Plaintiff PGGM Vermogensbeheer B.V. ("PGGM" or "Lead Plaintiff") as Class Representative and; (iii) approving PGGM's selection of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz" or "Lead Counsel") as Class Counsel. This motion is supported by the following memorandum of points and authorities, all pleadings and papers filed herein, the arguments of counsel, and any other matters properly before the Court.

**STATEMENT OF ISSUES TO BE DECIDED**

1.  Whether this action should be certified as a class action pursuant to Rules 23(a) and (b)(3).

2.  Whether PGGM should be appointed as Class Representative.

3.  Whether Kessler Topaz should be appointed as Class Counsel.

**SUMMARY OF ARGUMENTS**

In the Ninth Circuit, the requirements of Federal Rules 23(a) and 23(b)(3) are "liberally construed in a securities fraud context" and "[t]he availability of the class action to redress such frauds has been consistently upheld, in large part because of the substantial role that the deterrent effect of class actions plays in accomplishing the objectives of the securities laws." *In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 642 (C.D. Cal. 2009) (citing *Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir. 1975)). Indeed, the "ultimate effectiveness of the federal remedies in this area may depend in large measure on the applicability of the class action device." *Id.* As a result, courts in this Circuit have consistently certified securities fraud class actions. Here, all of the requirements for class certification are satisfied.

1)  LEAD PLAINTIFF SATISFIES RULE 23(a)

As set forth in §III.B. of the attached memorandum of law, Lead Plaintiff has established the four requisite elements of Rule 23(a): Numerosity, Commonality, Typicality and Adequacy. In fact, Defendants conceded several of these elements in response to Lead Plaintiff's First Set of Requests for Admissions to Defendants.

*First*, Defendants admit that "the Class contains more than one hundred (100) members" and "that the Class is so numerous that joinder of all members of the Class would be impracticable." Ex. 1 at 3.[1] Thus, numerosity is established. *See, e.g., In re Celera Corp. Sec. Litig.*, No. 5:10-CV-02604-EJD, 2014 U.S. Dist. LEXIS 25098, at *6-7 (N.D. Cal. Feb. 25, 2014) ("[I]f the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the numerosity requirement is satisfied.")

*Second*, to establish commonality, "even a single [common] question will suffice." *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011). Here, Defendants admit that three elements of a Rule 10b-5 action, "scienter, materiality, and falsity," each "involve questions of law and/or fact common to all Class Members." Ex. 1 at 4. Moreover, loss causation is not a proper inquiry at class certification. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011) ("*Halliburton I*") ("The question presented in this case is whether securities fraud plaintiffs must also prove loss causation in order to obtain class certification. We hold that they need not."). As a result, the commonality element is satisfied here. *Dufour v. BE LLC*, 291 F.R.D. 413, 418 (N.D. Cal. 2013) (Breyer, J.) ("Plaintiffs have identified a common question of fact central to the resolution of their claims, which is all that is necessary to satisfy Rule 23(a).").

*Third*, Lead Plaintiff's claims are typical of the proposed Class. "Like commonality, typicality is a permissive standard and the focus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff." *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 110 (N.D. Cal. 2008) (Breyer, J.). Here, Lead Plaintiff's claims arise from the same fraudulent course of conduct that gives rise to the claims of other Class members, and are based on the same legal theory. In other words, Plaintiff and members of the Class "all purchased [HP's common stock] at artificially inflated prices caused by Defendants' misconduct and false and misleading statements during the Class Period, and suffered losses when [the Company's] stock price declined after [its] true condition was partially revealed to the market." *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 266 (N.D. Cal. 2011). Accordingly, typicality is satisfied here.

---

[1]      All references to "Ex. ___" are to the exhibits attached to the Declaration of Eli R. Greenstein in Support of Lead Plaintiff's Motion for Class Certification.

1    *Fourth*, as one of the largest pension asset managers in the world, PGGM is precisely the

2    type of institutional investor that Congress sought to empower when enacting the PSLRA.  *In re*

3    *Providian Fin. Corp. Sec. Litig.*, No. C01-03952 CRB, 2004 U.S. Dist. LEXIS 31107, at *12-13

4    (N.D. Cal. Jan. 15, 2004) (Breyer, J.) ("The PSLRA was designed to increase the likelihood that

5    institutional investors will serve as lead plaintiffs.").   Further, PGGM has demonstrated its

6    adequacy and commitment to vigorously prosecute this action on behalf of the Class by retaining

7    experienced counsel, actively supervising the litigation, participating in strategic decisions and

8    engaging in comprehensive discovery efforts.  PGGM also has extensive experience as a fiduciary

9    on behalf of a class of investors, having been certified as a class representative in *In re Bank of*

10   *America Corp. Sec. Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012), which ultimately resulted in a

11   $2.425 billion recovery for the class.  Likewise, Lead Counsel Kessler Topaz is highly experienced

12   in complex securities class actions of this nature and has steadfastly litigated this case from its

13   inception.  Accordingly, PGGM's selection of Kessler Topaz as Class Counsel should be approved.

14            In sum, all of the elements of Rule 23(a) are satisfied.

15       2)  THIS ACTION SATISFIES THE PREDOMINANCE AND SUPERIORITY REQUIREMENTS OF
16           RULE 23(b)(3)

17            As set forth in §III.C.1., Lead Plaintiff also has demonstrated that common issues

18   "predominate," and indeed overwhelm, any individual issues that may arise.  For example, the

19   primary Section 10(b) elements of falsity, materiality, scienter and loss causation are all subject to

20   common proof that clearly predominates over individualized issues.  Additionally, Lead Plaintiff

21   has demonstrated that common issues of reliance predominate pursuant to two alternative

22   presumptions.  First, Lead Plaintiff has established a classwide presumption of reliance under

23   *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972) because Lead Plaintiff's

24   claims here "primarily involve omissions" of material fact by Defendants who were subject to a

25   duty to disclose.  *See Desai v. Deutsche Bank Secs. Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009).  As this

26   Court previously observed, the thrust Defendants' misconduct here involved omissions.  Ex. 2 at

27   19:20-21:23 ("I looked at it as an omission.").

28

---

Alternatively, classwide reliance is presumed under the fraud-on-the-market doctrine established by the Supreme Court in *Basic v. Levinson*, 485 U.S. 224, 241 (1988), and recently reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407-13 (2014) ("*Halliburton II*"). As set forth in §III.C.1. of the memorandum and in the Expert Report of Chad Coffman, C.F.A. (the "Coffman Report"), the requirements for invoking the presumption—publicity, market efficiency and market timing—are easily met here. Defendants' actionable statements and/or omissions occurred in public conference calls, interviews, SEC filings and other public sources, thereby establishing the "publicity" requirement. Additionally, Lead Plaintiff and other Class members purchased HP common stock between the time of the actionable misstatements and omissions and the November 20, 2012 disclosure of the $8.8 billion Autonomy write-down, thereby establishing market timing. Finally, the Coffman Report establishes that the market for HP common stock was efficient throughout the Class Period, as evidenced by the application of the "*Cammer* Factors" and other metrics utilized by the Ninth Circuit to determine market efficiency. *See Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989)). In fact, Defendants have admitted that "to date, they have not identified ***any*** facts indicating that the market for HP common stock was ***not efficient*** throughout the Class Period." Ex. 1 at 12-13. Accordingly, classwide reliance is presumed and common issues predominate.

Lead Plaintiff also has clearly demonstrated that common issues of damages predominate. As the Coffman Report explains, damages in Section 10(b) actions are subject to a common and well-settled "out-of-pocket" methodology and formula for measuring damages that can be applied classwide, irrespective of individual differences in trading information. *See*, *e.g.*, *In re Diamond Foods, Inc*., 295 F.R.D. 240, 251 (N.D. Cal. 2013).

Finally, the class action device is a vastly "superior" method for fairly and efficiently adjudicating this action. Given the large number of HP investors who purchased common stock during the Class Period, it would be far too costly and inefficient for each individual Class member to file and litigate separate actions in a fragmented manner. There also are no management difficulties which would preclude this action from being maintained as a class action because the

facts, legal issues, and evidence are predominantly common to the Class.   Indeed, managing hundreds or thousands of individual investor lawsuits would pose far greater difficulties than adjudicating this action in a single, uniform litigation before one experienced tribunal.   *See, e.g.*, *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995) ("[I]t is difficult to imagine a case where class certification would be more appropriate.   Without it, thousands of identical complaints by [] shareholders would have to be filed—the very result the class action mechanism was designed to avoid.").

Because this action meets all of the requirements for certification under Rule 23, Lead Plaintiff respectfully requests that the Court grant its Motion for Class Certification, appoint PGGM as Class Representative and approve PGGM's selection of Kessler Topaz as Class Counsel.

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................ 1

II.  HIGHLIGHTED FACTS COMMON TO THE CLASS ........................................ 3

III. ARGUMENT .................................................................................................. 8

　　A.   Securities Cases Are Particularly Well-Suited for Class Action Treatment .............. 8

　　B.   The Proposed Class Satisfies Rule 23(a) ........................................................ 9

　　　　1.   This Action Satisfies the Numerosity Requirement ........................................ 9

　　　　2.   Questions Of Law And Fact Are Common To Members Of The Class ....... 10

　　　　3.   Lead Plaintiff's Claims Are Typical Of The Class ..................................... 11

　　　　4.   Lead Plaintiff And Lead Counsel Are Adequate ......................................... 12

　　C.   The Proposed Class Satisfies Rule 23(b)(3) ................................................ 14

　　　　1.   Common Questions Of Law And Fact Predominate Over Individual
　　　　　　Questions ................................................................................................ 14

　　　　　　a.   HP Common Stock Was Listed and Traded on the NYSE, A
　　　　　　　　Presumptively Efficient Market ....................................................... 18

　　　　　　b.   The *Cammer* Factors Confirm Market Efficiency ........................... 18

　　　　　　　　(1)   High Weekly Volume (*Cammer* Factor 1) ........................... 19

　　　　　　　　(2)   Significant Analyst Coverage (*Cammer* Factor 2) ............... 19

　　　　　　　　(3)   Market Makers/Arbitrage Activity (*Cammer* Factor 3) ........ 19

　　　　　　　　(4)   SEC Form S-3 Eligibility (*Cammer* Factor 4) ..................... 20

　　　　　　　　(5)   Cause And Effect Relationship (*Cammer* Factor 5) ............. 20

　　　　　　c.   Common Issues Of Damages Predominate ...................................... 22

　　　　2.   A Class Action Is Superior To Any Other Method To Resolve This
　　　　　　Controversy ............................................................................................. 24

IV.  CONCLUSION ................................................................................................ 25

1
2

## **TABLE OF AUTHORITIES**

3

Page(s)

CASES

4

*Affiliated Ute Citizens of Utah v. United States,*
5     406 U.S. 128 (1972) ...........................................................................3, 16, 21, 22

6
*Amchem Products, Inc. v. Windsor,*
7     521 U.S. 591 (1997) .................................................................................... 14

8
*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
    133 S. Ct. 1184 (2013) ............................................................................passim
9

10 *Armstrong v. Davis,*
    275 F.3d 849 (9th Cir. 2001) ........................................................................ 11

11 *Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ...................................................................16, 17, 18, 21
12

13 *Berner v. Lazzaro,*
    730 F.2d 1319 (9th Cir. 1984) ........................................................................ 8
14

15 *Binder v. Gillespie,*
    184 F.3d 1059 (9th Cir. 1999) .................................................................17, 18

16 *Blackie v. Barrack,*
    524 F.2d 891 (9th Cir. 1975) ....................................................................passim
17

18 *Butler v. Sears, Roebuck & Co.,*
    727 F.3d 796 (7th Cir. 2013) ........................................................................ 24
19

20 *Cammer v. Bloom,*
    711 F. Supp. 1264 (D.N.J. 1989) ...........................................................18, 19, 20

21 *Cartwright v. Viking Indus., Inc.,*
    2009 U.S. Dist. LEXIS 83286 (E.D. Cal. 2009) .................................................. 16
22

23 *City of Livonia Emps.' Ret. Sys. v. Wyeth,*
    284 F.R.D. 173 (S.D.N.Y. 2012).................................................................... 18

24 *Comcast Corp. v. Behrend,*
25     133 S. Ct. 1426 (2013) ........................................................................22, 23, 24

26 *Conn. Ret. Plans & Trust Funds v. Amgen Inc.,*
    660 F.3d 1170 (9th Cir. 2011) ...................................................................... 16
27

28 *Desai v. Deutsche Bank Secs. Ltd.,*
    573 F.3d 931 (9th Cir. 2009) ...................................................................16, 21

*Dodona I, LLC v. Goldman, Sachs & Co.*,
    296 F.R.D. 261 (S.D.N.Y. 2014) ............................................................... 22

*Dufour v. BE LLC*,
    291 F.R.D. 413 (N.D. Cal. 2013) ............................................................... 10

*Ellsworth v. U.S. Bank, N.A.*,
    2014 U.S. Dist. LEXIS 81646 (N.D. Cal. 2014) ....................................... 23

*Epstein v. MCA, Inc.*,
    50 F.3d 644 (9th Cir. 1995) .................................................................. 2, 25

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    131 S. Ct. 2179 (2011) ("*Halliburton I*") ........................................... 14, 15

*Gaudin v. Saxon Mortg. Servs. Inc.*,
    297 F.R.D. 417 (N.D. Cal. 2013) ............................................................... 23

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ("*Halliburton II*") ......................................... passim

*Hanlon v. Chrysler Corp*,
    150 F.3d 1011 (9th Cir. 1998) ............................................. 10, 11, 12, 14

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ..................................................................... 11

*Harris v. Palm Springs Alpine Estates, Inc.*,
    329 F.2d 909 (9th Cir. 1964) ................................................................. 9, 24

*Hester v. Vision Airlines, Inc.*,
    2009 U.S. Dist. LEXIS 122287 (D. Nev 2009) ......................................... 11

*Hodges v. Akeena Solar, Inc.*,
    274 F.R.D. 259 (N.D. Cal. 2011) ......................................................... passim

*Hootkins v. Chertoff*,
    2009 U.S. Dist. LEXIS 3243 (C.D. Cal. 2009) ......................................... 12

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
    2014 U.S. Dist. LEXIS 108409 (D. Minn. 2014) ...................................... 22

*In re 2TheMart.com, Inc. Sec. Litig.*,
    114 F. Supp. 2d 955 (C.D. Cal. 2000) ....................................................... 19

*In re Accredo Health, Inc., Sec. Litig.*,
    2006 U.S. Dist. LEXIS 97621 (W.D. Tenn. 2006) .................................... 20

*In re Adobe Sys., Inc. Sec. Litig.*,
    139 F.R.D. 150 (N.D. Cal. 1991) ................................................................. 8

*In re Alstom SA Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) ........................................................................... 20

*In Re AutoZone, Inc.*,
   289 F.R.D. 526 (N.D. Cal. 2012) ......................................................................... 24

*In re Bank of Am. Corp. Sec., Deriv., and ERISA Litig.*,
   281 F.R.D. 134 (S.D.N.Y. 2012) .............................................................. 3, 13, 19

*In re Boston Sci. Corp. Sec. Litig.*,
   604 F. Supp. 2d 275 (D. Mass. 2009) ................................................................... 20

*In re Computer Sci. Corp. Sec. Litig.*,
   288 F.R.D. 112 (E.D. Va. 2012) ........................................................................... 18

*In re Connetics Corp. Sec. Litig.*,
   257 F.R.D. 572 (N.D. Cal. 2009) ..................................................................... 2, 19

*In re Cooper Cos. Sec. Litig.*,
   254 F.R.D. 628 (C.D. Cal. 2009) .................................................................. passim

*In re Countrywide Fin. Corp. Sec. Litig.*,
   273 F.R.D. 586 (C.D. Cal. 2009) ........................................................................... 3

*In re Diamond Foods, Inc. Sec. Litig.*,
   295 F.R.D. 240 (N.D. Cal. 2013) .................................................................. 21, 22

*In re DJ Orthopedics, Inc. Sec., Litig.*,
   2003 U.S. Dist. LEXIS 21534 (S.D. Cal. 2003) ................................................. 25

*In re DVI, Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008) .................................................................... 19, 20

*In re DVI, Inc. Sec. Litig.*,
   639 F.3d 623 (3d Cir. 2011) ........................................................................... 15, 18

*In re Emulex Corp. Sec. Litig.*,
   210 F.R.D. 717 (C.D. Cal. 2002) ......................................................................... 15

*In re Groupon, Inc. Sec. Litig.*,
   2014 U.S. Dist. LEXIS 137382 (N.D. Ill. 2014) ................................................ 22

*In re Heckmann Corp. Sec. Litig.*,
   2013 U.S. Dist. LEXIS 79345 (D. Del. 2013) ..................................................... 22

*In re Hienergy Techs., Inc. Sec. Litig.*,
   2006 U.S. Dist. LEXIS 99265 (C.D. Cal. 2006) ................................................. 12

*In re Juniper Networks Sec. Litig.*,
   264 F.R.D. 584 (N.D. Cal. 2009) .................................................................. passim

*In re LDK Solar Sec. Litig.*,
    255 F.R.D. 519 (N.D. Cal. 2009) ...................................................................passim

*In re Magma Design Automation Sec. Litig.*,
    2007 U.S. Dist. LEXIS 62641 (N.D. Cal. 2007) ........................................... 2, 24, 25

*In re Merck & Co., Sec., Derivative & ERISA Litig.*,
    2013 U.S. Dist. LEXIS 13511 (D.N.J. 2013) ....................................................... 18

*In re Micron Techs., Inc. Sec. Litig.*,
    247 F.R.D. 627 (D. Idaho 2007) ......................................................................... 16

*In re Nature's Sunshine Product's Inc. Sec. Litig.*,
    251 F.R.D. 656 (D. Utah 2008) ........................................................................... 19

*In re Novatel Wireless Sec. Litig.*,
    2010 U.S. Dist. LEXIS 49543 (S.D. Cal. 2010) .................................................. 10

*In re Online DVD Rental Antitrust Litig.*,
    2010 U.S. Dist. LEXIS 138558 (N.D. Cal. 2010) .................................................. 8

*In re Pfizer Sec. Litig.*,
    282 F.R.D. 38 (S.D.N.Y. 2012) ........................................................................... 23

*In re PHP Healthcare Corp.*,
    128 F. Appx. 839 (3d Cir. 2005) ......................................................................... 18

*In re Providian Fin. Corp. Sec. Litig.*,
    2004 U.S. Dist. LEXIS 31107 (N.D. Cal. 2004) .................................................. 13

*In re Surebeam Corp. Sec. Litig.*,
    2003 U.S. Dist. LEXIS 25022 (S.D. Cal. 2004) .................................................. 11

*In re THQ Inc. Sec. Litig.*,
    2002 U.S. Dist. LEXIS 7753 (C.D. Cal. 2002) ..................................................... 2

*In re UTStarcom, Inc. Sec. Litig.*,
    2010 U.S. Dist. LEXIS 48122 (N.D. Cal. 2011) ...............................................passim

*In re VeriSign, Inc. Sec. Litig.*,
    2005 U.S. Dist. LEXIS 10438 (N.D. Cal. 2005) ........................................ 2, 10, 16

*Jimenez v. Allstate Ins. Co.*,
    2014 U.S. App. LEXIS 17174 (9th Cir. 2014) .................................................... 23

*Jones v. Conagra Foods, Inc.*,
    2014 U.S. Dist. LEXIS 81292 (N.D. Cal. 2014) .................................................... 9

*Kanawi v. Bechtel Corp.*,
    254 F.R.D. 102 (N.D. Cal. 2008) ....................................................................... 11

*Lapin v. Goldman Sachs & Co.*,
   254 F.R.D. 168 (S.D.N.Y. 2008) ...................................................................18

*Leyva v. Medline Industries, Inc.*,
   716 F.3d 510 (9th Cir. 2013) ........................................................................23

*Morangelli v. Chemed Corp.*,
   2011 U.S. Dist. LEXIS 69000 (E.D.N.Y.2011) .............................................25

*Moreno v. Autozone, Inc.*,
   251 F.R.D. 417 (N.D. Cal. 2008) ..................................................................21

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) ...................................................................10, 11

*Perez-Funez v. District Director, Immigration & Naturalization Service*,
   611 F. Supp. 990 (C.D. Cal. 1994) ..................................................................9

*Rivera v. Bio Engineered Supplements & Nutrition, Inc.*,
   2008 U.S. Dist. LEXIS 95083 (C.D. Cal. 2008) ...........................................11

*Rosado v. China N.E. Petroleum Holdings, Ltd.*,
   692 F.3d 34 (2d Cir. 2012) ............................................................................22

*Schleicher v. Wendt*,
   618 F.3d 679 (7th Cir. 2010) ..................................................................passim

*Smilovits v. First Solar, Inc.*,
   295 F.R.D. 423 (D. Ariz. 2013) .....................................................................10

*Tatz v. Nanophase Techs. Corp.*,
   2003 U.S. Dist. LEXIS 9982 (N.D. Ill. 2003) ...............................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................8

*Tokoshima v. Pep Boys - Manny Moe & Jack*,
   2014 U.S. Dist. LEXIS 58769 (N. D. Cal. 2014) ..........................................23

*Vathana v. EverBank*,
   2010 U.S. Dist. LEXIS 35665 (N.D. Cal. 2010) ...........................................14

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ..................................................................................10

*Wang v. Chinese Daily News*,
   737 F.3d 538 (9th Cir. 2013) ...................................................................10, 14

*Wolin v. Jaguar Land Rover N. Am., LLC*,
   617 F.3d 1168 (9th Cir. 2010) .......................................................................11

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010) ................................................................................24


STATUTES AND RULES

15 U.S.C. §78u-4(a)(3)(B)(i) ......................................................................................12

FED. R. CIV. P. 23 ................................................................................................passim


OTHER AUTHORITIES

H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679 ......................3, 9, 13

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.      INTRODUCTION

Lead Plaintiff PGGM Vermogensbeheer B.V. ("PGGM" or "Lead Plaintiff") seeks to certify a class pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure ("Rules") on behalf of itself and all other persons or entities who purchased or otherwise acquired Hewlett-Packard Company ("HP" or the "Company") common stock from May 23, 2012 to November 20, 2012 (the "Class Period"), inclusive and who were damaged thereby (the "Class"). Lead Plaintiff further requests that the Court appoint PGGM as Class Representative and approve its selection of Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") as Class Counsel.

This securities class action against HP and Individual Defendant Margaret C. Whitman (collectively, "Defendants") involves material misrepresentations and omissions regarding HP's disastrous $11 billion acquisition of Autonomy Corporation plc ("Autonomy") in the fall of 2011 (the "Acquisition").  During the Class Period, despite having knowledge of or access to numerous explicit warnings by a parade of internal and external whistleblowers—including Autonomy's own former ███████████████████████ *and U.S. Chief Financial Officer*—indicating that Autonomy was engaged in suspect accounting practices and that HP had massively overpaid, Defendants deliberately concealed those facts and falsely assured HP investors that Autonomy's dismal financial results were due to "classic entrepreneurial…scaling challenges" and temporary growing pains.  Defendants also falsely represented that Autonomy was fairly valued at the time of the Acquisition and did not need any write-down of goodwill, while deliberately omitting the fact that HP had been ███████████████████████████████ ████, after a *fourth* whistleblower ████████████████████████ came forward and confirmed a number of improper Autonomy accounting practices—███████████████ ████████████████████

On November 20, 2012, HP abruptly changed its story about Autonomy's purported "scaling challenges" and announced that it would write off $8.8 billion of the $11 billion Autonomy purchase price due to "serious accounting improprieties, disclosure failures and outright

misrepresentations" by Autonomy that were allegedly concealed from HP.  ¶217.[2]  Preliminary discovery thus far, however, reveals that Defendants ████████████████████████████ ██████████████████████████████████████  *See* §II, *infra*.  Defendants' misconduct and the announcement of the Autonomy write-down caused HP's stock to plummet 11.92% in a single trading day, resulting in significant damages to Lead Plaintiff and the Class.

In this Circuit, "[i]t is well recognized that Rule 23 is to be liberally construed in a securities fraud context because class actions are particularly effective in serving as private policing weapons against corporate wrongdoing."  *In re Cooper Cos. Sec. Litig.*, 254 F.R.D. 628, 642 (C.D. Cal. 2009) (citing *Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir. 1975)); *see also Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995) ("it is difficult to imagine a case where class certification would be more appropriate"), *rev'd on other grounds*, 516 U.S. 367 (1996)).[3]  Indeed, this action is similar to the numerous securities cases certified in this district.  *See, e.g., In re Magma Design Automation Sec. Litig.*, No. C 05–2394 CRB, 2007 U.S. Dist. LEXIS 62641, at *2 (N.D. Cal. Aug, 16, 2007) (Breyer, J.) ("As in almost all lawsuits by shareholders of public companies, the investors in this case easily satisfy the requirements of Rule 23."); *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259 (N.D. Cal. 2011); *In re UTStarcom, Inc. Sec. Litig.*, No. C 04-04908 JW, 2010 U.S. Dist., LEXIS 48122 (N.D. Cal. May 12, 2010); *In re Juniper Networks Sec. Litig.*, 264 F.R.D. 584 (N.D. Cal. 2009); *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572 (N.D. Cal. 2009).

This action satisfies all of the certification requirements of Rule 23.  First, the Class is comprised of thousands of investors who purchased HP common stock during the Class Period and were injured by Defendants' conduct. Accordingly, joinder of all Class members would be

---

[2]     All citations to "¶__" or "¶¶__" are references to the Consolidated Complaint for Violation of the Federal Securities Laws (Dkt. No. 100), unless otherwise noted.  All emphasis is added and internal citations are omitted unless otherwise indicated.

[3]     *See also In re VeriSign, Inc. Sec. Litig.*, No. C 02-02270 JW, 2005 U.S. Dist. LEXIS 10438, at *31-32 (N.D. Cal. Jan. 13, 2005) ("Class actions are particularly well-suited in the context of securities litigation, wherein geographically dispersed shareholders with relatively small holdings would otherwise have difficulty in challenging wealthy corporate defendants."); *In re THQ Inc. Sec. Litig.*, No. CV00-1783 AHM (Ex), 2002 U.S. Dist. LEXIS 7753, at *8-9 (C.D. Cal. March 22, 2002) ("[L]ower courts have recognized that the law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws.").

1   impracticable, if not impossible.  Additionally, there are numerous questions of law and fact

2   common to the Class, including whether Defendants violated the federal securities laws, and Lead

3   Plaintiff's claims are typical of other class members' claims.  Moreover, as an experienced

4   fiduciary and sophisticated institutional investor, PGGM is not only adequate to serve as Class

5   Representative but is precisely the type of class representative that Congress envisioned to lead

6   securities litigation of this nature. *See* H.R. Conf. Rep. No. 104-369 at 34 (1995), *reprinted in* 1995

7   U.S.C.C.A.N. 679, 690; *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 601 (C.D. Cal.

8   2009) ("[I]nstitutional investors are favored by the PSLRA's structure."); *In re Bank of Am. Corp.*

9   *Sec.*, *Deriv.*, *and ERISA Litig.*, 281 F.R.D. 134, 139 (S.D.N.Y. 2012) (PGGM appointed Class

10  Representative; $2.425 billion class recovery).

11          Finally, this action satisfies the "predominance" requirement of Rule 23(b)(3).  As

12  demonstrated below and in the accompanying Expert Report of Chad Coffman, C.F.A., ("Coffman

13  Report"), common questions in this action overwhelmingly predominate over individual questions.

14  With respect to the "reliance" element, for example, under *Affiliated Ute Citizens of Utah v. United*

15  *States*, 406 U.S. 128 (1972), reliance is presumed where, as here, a plaintiff's claim is based on a

16  defendant's failure to disclose material information.  *Id.* at 153 (In cases "involving primarily a

17  failure to disclose, positive proof of reliance is not a prerequisite to recovery.")  Alternatively, Class

18  members are entitled to a classwide presumption of reliance under the fraud-on-the-market doctrine

19  because empirical evidence demonstrates that the market for HP common stock was informationally

20  efficient throughout the Class Period.  *See* §III.C, *infra*; *Halliburton Co. v. Erica P. John Fund,*

21  *Inc.*, 134 S. Ct. 2398, 2407-13 (2014) ("*Halliburton II*").  Accordingly, common issues predominate

22  and a class action is superior to any other available method for fairly and efficiently adjudicating

23  this action.

24          For all of the reasons stated herein, Lead Plaintiff respectfully submits that the Court should

25  grant its motion for class certification, appoint PGGM as Class Representative, and approve

26  PGGM's selection of Kessler Topaz as Class Counsel.

27  **II.      HIGHLIGHTED FACTS COMMON TO THE CLASS**

28          On August 18, 2011, HP announced that it would acquire Autonomy for $11 billion.  ¶44.

Just over a year later, on November 20, 2012, HP disclosed that it would write down $8.8 billion (roughly 85%) of Autonomy's purchase price.  ¶217.  According to HP, the "majority" of the write-down was due to "fraudulent" accounting and disclosure practices by Autonomy and its executives that were allegedly concealed from HP.  *Id.*  Even the limited discovery taken to date, however, demonstrates that ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████

For example, in November 2012, Defendants blamed the $8.8 billion write-down primarily on several fraudulent accounting and disclosure practices that were allegedly hidden from HP, including: (i) Autonomy's reliance on negative-margin hardware sales to inflate software growth; (ii) improper revenue recognition on sales to Value-Added-Resellers ("VARs") prior to actual sales to end-users; (iii) improper accounting for hosting deals and R&D costs; and (iv) inflating Autonomy's reported "IDOL OEM" revenue.  ¶91.  Evidence now confirms that ████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ Ex. 3.[4] ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████████

_____

[4]      For example, contrary to HP's claim that it was defrauded by Autonomy's practice of "inappropriately recogniz[ing] revenue from certain transactions with value-added resellers (VARs)… in some cases creating revenue where no end-user customer existed at the time of sale" (¶91), ██████████████████████████████████████████████████████████████████████████ ██████████████████████████ Ex. 3 at 13.  Likewise, although HP claimed Autonomy concealed "fraudulent" recognition of revenue where the risks or rewards of ownership had not been transferred at the time the revenue was recognized, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ *Id.* at 13. ████████████████████████████████████████████████████████████████████████████ ███████ *Id.* at 9, 16.

1 ███████████████████████████████████████████████████

2 ███████████████████████████████ *Id.* at 2, 12. ████████████

3 ███████████████████████████████████████████████████

4 ████████████ Ex. 3 at 14 ████████████████████████████

5 ███████████████████████████████████████████████████

6 ███████████████████████████████████████████████████

7 ███████████████████████████████████████████████████

8 ███████████████████████████████████████████████████

9 ████████████████████ *Id.*[5]

Additionally, HP's manufactured story that it was unaware of Autonomy's "reli[ance] on meaningful hardware sales to boost its revenue" and that 10-15% of Autonomy's reported revenue came from hardware sold at a loss (¶91) is belied by evidence produced to date.  Contrary to HP's claim that "Autonomy does not appear to have made any appropriate disclosure of these hardware sales either as externally reported or to HP" which purportedly "severely impacted HP management's ability to fairly value Autonomy" (¶85), in early November 2011, shortly after the deal closed, HP's auditor, Ernst & Young LLP ("E&Y") explicitly raised the hardware issue to "HP management."   Ex. 4 at 40 ("E&Y's November 2-4, 2011 review of Deloitte's workpapers identified areas of audit risk and also ***identified Autonomy's hardware revenue, which EY reported to HP***…."); *Id.* at 57 ("E&Y noted that ***Autonomy had sold material quantities of hardware***…. ***E&Y reported its observation to HP management***.").  Documents recently leaked to the press also confirm HP's knowledge of Autonomy's hardware sales practices long before May 2012.[6]

---

[5] ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████

[6]     For example, the *Financial Times* cited internal HP documents demonstrating that "HP was *put on notice* about the existence of hardware sales at Autonomy in the seven months between when it closed the deal and May 2012, when it says its attention was first drawn to the transactions by a whistleblower."  Ex. 6.  The report cited evidence showing that "[l]arge sales of hardware were

Similarly, evidence now confirms that HP was aware of allegations regarding Autonomy's inflation of reported "IDOL OEM" revenue, as reported by an anonymous whistleblower "Joe Bloggs" (Whistleblower No. 2) in an August 2011 email that was subsequently forwarded to the U.K. Serious Fraud Office and the *Financial Times* by securities analyst Alan Pelz-Sharp. ¶48. In fact, HP was so concerned about the OEM allegations, which this Court called a "fairly robust assertion of fraud" (Ex. 2 at 50:13-51:4), that in late-August 2011, HP instructed its financial advisor, Perella Weinberg Partners ("Perella"), to "prepare[] a presentation for HP regarding potential responses to the Joe Bloggs attack on Autonomy." Ex. 4 at 55. Around the same time, HP instructed Perella to determine whether the Company could back out of the Autonomy deal altogether. Ex. 4 at 54-55; Answer at ¶¶69, 73 ("HP asked certain of its advisors **whether HP could back out of the deal and was told that it could not**."). None of these facts were disclosed to investors during the Class Period.

In addition to the chorus of suspect accounting and disclosure practices ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and November 2011, evidence now confirms that HP was also expressly told in August 2011 that an Autonomy executive (Whistleblower No. 1)—who now has been revealed to be Autonomy's former ***U.S. Chief Financial Officer***—expressly raised issues regarding Autonomy's accounting and revenue recognition practices months before the deal closed. In fact, HP has admitted that Autonomy's auditor, Deloitte LLP ("Deloitte") informed HP about Whistleblower No. 1 during a call on ***August 17, 2011***, only a week after KPMG's report flagged many of the same questionable accounting practices. Ex. 4 at 32. HP has also admitted that E&Y reviewed Deloitte's workpapers in November 2011. ¶75; Ex. 4 at 40 (noting "E&Y's November 2-

---

***routinely acknowledged*** in Autonomy audit reports" and "***the audit reports were available to HP management*** after the acquisition…" The report also cited e-mails showing that "executives, in one instance ***up to the level of chief executive Meg Whitman***, were included in communications that referred to hardware sales by the UK company." *Id.* *Bloomberg* reported that "[e]-mails among Autonomy officials, [HP's] finance team and auditors dating to November 2011 show [HP] ***had been informed*** of the hardware sales and how they were accounted for…." Ex. 7. Documents confirming HP's knowledge also have been posted online by former Autonomy executives. Ex. 8 ("Documents show that ***senior officers of Hewlett-Packard*** were, in fact, ***well aware*** of Autonomy's hardware sales, and the accounting of these, from day one almost a year before the announcement of its write down of Autonomy.").

---

1    4, 2011 review of Deloitte's workpapers").   Notwithstanding this knowledge, HP recklessly

2    disregarded the information and made representations about Autonomy while omitting material

3    facts regarding Autonomy's practices and inflated valuation.

4        Finally, in May 2012, after Autonomy's results missed expectations for a second straight

5    quarter, yet another whistleblower, ████████████████████████ (Whistleblower

6    No. 4), came forward and reiterated many of the same troubling accounting practices that

7    Defendants ████████████████████████ including that "Autonomy had

8    historically restructured its monthly hosting subscriptions to recognize upfront license fees, had sold

9    hardware at a loss, and had engaged in transactions involving value-added resellers ('VARs') that

10   could pose questions under US [GAAP]."  Ex. 4 at 2.  He also reiterated to HP that "Autonomy's

11   former US Chief Financial Officer had previously made allegations through Autonomy's

12   whistleblower channels regarding revenue recognition in certain contracts and other management

13   practices."  Id.[7] ████████████████████████████

14   ████████████

15       Despite HP's knowledge of Autonomy's improper accounting practices and ██████████,

16   on May 23 and June 5, 2012, Defendants deliberately concealed this information from investors and

17   falsely reassured the market that Autonomy's negative results were due to "classic entrepreneurial

18   [c]ompany scaling challenges," while knowingly omitting that HP ██████████████████

19   ████████████████████████—most of which had been flagged long before May 2012.

20   ¶¶172, 191.  After concealing this information for another three months and recklessly failing to

21   write down Autonomy's obviously impaired goodwill, on September 10, 2012, Defendants

22   misleadingly told investors that "[a]t the time of the Autonomy Acquisition in October 2011, the

23   fair value of Autonomy approximated the carrying value."  ¶204.  Even based on the limited pre-

24   discovery record before this Court, it found that at the time of the September 2012 statement,

_____

[7]  Defendants have now admitted that ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████ Id.

Defendants "knew there was a real possibility that HP had substantially overpaid for Autonomy." Dkt. No. 201 at 19. Indeed, just two months later, Defendants admitted that "Autonomy was substantially overvalued ***at the time of its acquisition***." ¶85. Now, the evidence overwhelmingly confirms Lead Plaintiff's allegations and the Court's holding. All of these facts are common to the Class.

## III.   ARGUMENT

### A.   Securities Cases Are Particularly Well-Suited for Class Action Treatment

Courts routinely endorse the use of the class action device to resolve claims brought under the federal securities laws. *See*, *e.g.*, *Akeena Solar*, 274 F.R.D at 266; *Cooper*, 254 F.R.D. at 642. Any doubt as to the propriety of certification should be resolved in favor of certifying the class because denial will almost certainly terminate the action and be detrimental to the class's interests. *See Blackie*, 524 F.2d at 901; *In re Online DVD Rental Antitrust Litig.*, M 09-2029 PJM, 2010 U.S. Dist. LEXIS 138558, at *41 (N.D. Cal. Dec. 23, 2010) ("[W]hen courts are in doubt as to whether certification is warranted, courts tend to favor class certification."). Indeed, "class actions commonly arise in securities fraud cases as the claims of separate investors are often too small to justify individual lawsuits, making class actions the only efficient deterrent against securities fraud. Accordingly, the Ninth Circuit and courts in this district hold a liberal view of class actions in securities litigation." *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 152-53 (N.D. Cal. 1991); *see also Cooper*, 254 F.R.D. at 642 ("The availability of the class action to redress such frauds has been consistently upheld, in large part because of the substantial role that the deterrent effect of class actions plays in accomplishing the objectives of the securities laws.") (quoting *Blackie*, 524 F.2d at 903).

In addition, as a matter of policy, both the Supreme Court and the Ninth Circuit have repeatedly recognized that private securities class actions are an important enforcement mechanism to supplement governmental regulation of the securities markets. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 313 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions."); *Berner v. Lazzaro*, 730 F.2d 1319, 1322-23 (9th Cir.

1984) ("The resources of the Securities Exchange Commission are adequate to prosecute only the most flagrant abuses. . . .  To this end, private actions brought by investors have long been viewed as a necessary supplement to SEC enforcement actions."), *aff'd*, 472 U.S. 299 (1985).  In enacting the PSLRA, Congress also stressed the importance of private enforcement of the securities laws:

> Private securities litigation is an indispensable tool with which defrauded investors can recover their losses without having to rely upon government action.  Such private lawsuits ***promote public and global confidence in our capital markets and help to deter wrongdoing*** and to guarantee that corporate officers, auditors, directors, lawyers and others properly perform their jobs.

H.R. Conf. Rep. No. 104-369, at 26 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 730.  Hence, in securities actions, "class certification is routine."  *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010) (Easterbrook, J.).  For the reasons set forth below, class action treatment is appropriate here.

### B.      The Proposed Class Satisfies Rule 23(a)

A party seeking class certification must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  FED. R. CIV. P. 23(a).  Each of these prerequisites is satisfied here.

#### 1.      This Action Satisfies the Numerosity Requirement

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is "impracticable."   The Ninth Circuit has stated that "'impracticability' does not mean 'impossibility,' but only the difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc*., 329 F.2d 909, 913-14 (9th Cir. 1964); *Perez-Funez v. District Director, Immigration & Naturalization Service*, 611 F. Supp. 990, 995 (C.D. Cal. 1994) (class of 25 members sufficiently numerous).  The exact size of the class need not be known if "general knowledge and common sense indicate that it is large."  *Id.  See also Jones v. Conagra Foods, Inc.*, No. C12-01633 CRB, 2014 U.S. Dist, LEXIS 81292, at *19 (N.D. Cal. June 13, 2014) (Breyer, J.).

---

Motion for Class Certification              9              Master File No. 3:12-cv-05980-CRB

Here, Defendants have admitted that "the Class contains more than one hundred (100) members" and "that the Class is so numerous that joinder of all members of the Class would be impracticable." Ex. 1 at 3. Thus, the numerosity element is established.

2.     Questions Of Law And Fact Are Common To Members Of The Class

The standard for establishing commonality has often been characterized as "minimal" and "less rigorous" than the other elements of Rule 23. *Hanlon v. Chrysler Corp*, 150 F.3d 1011, 1019-20 (9th Cir. 1998). Indeed, the Supreme Court has explained that to satisfy the commonality requirement, "even a single [common] question" will suffice. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2556 (2011); *see also Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (quoting *Wang v. Chinese Daily News*, 737 F.3d 538, 544 (9th Cir. 2013) (Breyer, J., sitting by designation)).

Defendants in this action have admitted that at least three of the six primary elements of Section 10(b) are common to the class. Ex. 1 at 4 ("Defendants admit that the elements of scienter, materiality, and falsity involve questions of law and/or fact common to all Class Members."). Other common questions include, *inter alia*, whether the price of HP common stock was artificially inflated, whether the alleged stock price declines are causally connected to Defendants' omissions and/or misrepresentations, and whether Class members were damaged by Defendants' misconduct. ¶229. *See UTStarcom*, 2010 U.S. Dist. LEXIS 48122, at *30-31; *Dufour v. BE LLC*, 291 F.R.D. 413, 418 (N.D. Cal. 2013) (Breyer, J.) ("Plaintiffs have identified a common question of fact central to the resolution of their claims, which is all that is necessary to satisfy Rule 23(a). Variations in the other facts [defendant] highlights might affect the amount of money each plaintiff is entitled to recover, but they would not preclude a finding of breach and liability."); *VeriSign*, 2005 U.S. Dist. LEXIS 10438, at *17 ("commonality is easily met in cases where class members all bought or sold the same stock in reliance on the same disclosures made by the same parties, even when damages vary").[8] Thus, commonality is established.[9]

---

[8]     *See also Blackie*, 524 F.2d at 903, n.19, 905-08 ("Thus, even when unrelated misrepresentations are alleged as part of a common scheme, class members may share common factual questions, and trial in the same forum avoids duplicative proof. That is a major purpose of a class action; the 'common question' requirement should be interpreted to obtain that objective."); *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 428 (D. Ariz. 2013) (same).

### 3.   Lead Plaintiff's Claims Are Typical Of The Class

Under Rule 23(a)(3)'s "'permissive standard'" for typicality, "'representative claims are "typical" if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Parsons*, 754 F.3d at 685 (quoting *Hanlon*, 150 F.3d at 1020); *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 110 (N.D. Cal. 2008) (Breyer, J.) ("Like commonality, typicality is a permissive standard and the focus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff."). Thus, the Ninth Circuit does not require the named plaintiffs' injuries to be "'identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same injurious course of conduct.'" *Parsons*, 754 F.3d at 685 (quoting *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001)); *see also Hester v. Vision Airlines, Inc.*, No. 2:09-CV-00117-RLH-RJJ, 2009 U.S. Dist. LEXIS 122287, at *12 (D. Nev. Dec. 15, 2009); *Juniper Networks*, 264 F.R.D. at 589.

The purpose of the typicality requirement "'is to assure that the interest of the named representative aligns with the interests of the class.'" *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "Therefore, 'differences in the amount of damages, the size or manner of [stock] purchaser, the nature of the purchaser, and even the specific document influencing the purchase will not render a claim atypical in most securities cases.'" *In re Surebeam Corp. Sec. Litig.*, No. 03 CV 1721 JM (POR), 2003 U.S. Dist. LEXIS 25022, at *18 (S.D. Cal. Jan. 5, 2004).

Here, Lead Plaintiff's claims arise from the same core events and fraudulent course of conduct that give rise to claims of other Class members, and the claims asserted are based on the same legal theory. *Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, No. SACV 07-1306 JVS(RNBX), 2008 U.S. Dist. LEXIS 95083, at *18 (C.D. Cal. Nov. 13, 2008). Indeed, PGGM, like the other Class members, purchased HP common stock during the Class Period at artificially

---

[9]   *See also Akeena Solar*, 274 F.R.D. at 266 ("for each member of the putative class, the core factual and legal issues are the same"); *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 530 (N.D. Cal. 2009) ("all class members are unified by an interest in proving the same common course of conduct regarding [defendants'] allegedly fraudulent . . . representations"); *In re Novatel Wireless Sec. Litig.*, No. 08-CV-1689 (RBB), 2010 U.S. Dist. LEXIS 49543, at *13 (S.D. Cal. May 12, 2010).

inflated prices and suffered damages when the relevant truth concealed by Defendants' omissions and misrepresentations was disclosed to the market, causing HP's stock price to decline. Accordingly, Lead Plaintiff's claims are typical of those of the Class.  *See Akeena Solar*, 274 F.R.D. at 266-67 ("All members of the putative class were allegedly injured by the same course of conduct, even if not to the same degree."); *Cooper*, 254 F.R.D. at 635-36.

4.      Lead Plaintiff And Lead Counsel Are Adequate

In determining whether class representatives can fairly and adequately protect the class under Rule 23(a)(4), two questions arise: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Hootkins v. Chertoff*, No. CV-07-5696 CAS (MANx), 2009 U.S. Dist. LEXIS 3243, at *20 (C.D. Cal. Jan. 6, 2009) (citing *Hanlon*, 150 F.3d at 1020).  Here, those requirements are easily satisfied.

First, there is no conflict or antagonism between Lead Plaintiff and the absent Class members, all of whom suffered losses due to their purchases of HP common stock at artificially inflated prices during the Class Period.[10]  *See In re Hienergy Techs., Inc. Sec. Litig*., No. 8:04-CV-01226 DOC (JTLx), 2006 U.S. Dist. LEXIS 99265, at *11 (C.D. Cal. Sept. 25, 2006) (class representative adequate because its "interests are compatible with those of the entire Plaintiff Class, derive from the same legal theories, and [they] allege the same operative facts."). It is clearly in PGGM's interest to vigorously prosecute this action on behalf of itself and the Class.  Indeed, in appointing PGGM as Lead Plaintiff, the Court made a preliminary determination of its adequacy. Dkt. No. 90.[11]  Moreover, PGGM has demonstrated its vigor and commitment to supervise the prosecution of this action on behalf of the Class by, *inter alia*, retaining experienced counsel, supervising the litigation, participating in strategic decisions and actively engaging in

---

[10]      *See Cooper*, 254 F.R.D. at 636 ("There is considerable overlap between the typicality prerequisite of *Rule 23(a)(3)* and the adequate representation requirement of *Rule 23(a)(4)*. Although a court may consider potential conflicts of interest, the Ninth Circuit has observed that courts generally decline to consider conflicts at the outset, unless the conflict is apparent and at the very heart of the suit.").

[11]      *See* 15 U.S.C. §78u-4(a)(3)(B)(i) ("the court shall . . . appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of class members  . . . the 'most adequate plaintiff'").

comprehensive discovery efforts.  PGGM also has extensive experience acting as a fiduciary on behalf of a class of investors, having been certified as a class representative in *Bank of America*, 281 F.R.D. at 139, which ultimately resulted in a $2.425 billion resolution, the single largest recovery under Section 14(a) of the Securities Act of 1933 since its enactment.

Additionally, as one of the largest asset managers in the world with approximately €141 billion under management, PGGM is precisely the type of institutional investor that Congress sought to empower when enacting the PSLRA.  *See* H.R. Rep. No. 104-369, at 28 (1995) (Conf. Rep.); *In re Providian Fin. Corp. Sec. Litig.*, No. C01-03952 CRB, 2004 U.S. Dist. LEXIS 31107, at *12 (N.D. Cal. Jan. 15, 2004) (Breyer, J.) ("The PSLRA was designed to increase the likelihood that institutional investors will serve as lead plaintiffs.").  Accordingly, PGGM should be appointed as Class Representative.

Further, Lead Counsel is highly experienced in litigation of this nature and amply qualified to serve as counsel for the proposed Class.  Kessler Topaz has vigorously prosecuted the Class's claims by, *inter alia*:   identifying and investigating potential claims on behalf of the Class; defeating in part Defendants' motions to dismiss; and engaging in substantial discovery efforts. Indeed, Lead Counsel has steadfastly pursued numerous sources of discovery by, among other things, serving subpoenas on myriad third parties, including HP's auditors, consultants and advisors, noticing the Company's Rule 30(b)(6) deposition, and serving Defendants with multiple document requests, interrogatories and requests for admission.  Lead Counsel also has substantial experience handling class actions and complex securities cases; possesses substantial knowledge of all applicable law; has the resources necessary to continue representing the Class; and will fairly and adequately represent the interests of the Class.  FED. R. CIV. P. 23(g).

Lead Counsel also possesses extensive experience in the area of securities litigation and has successfully prosecuted numerous high-profile securities fraud class actions and other complex actions, recovering billions of dollars on behalf of injured investors across the country.  *See, e.g., In re Tyco Int'l, Ltd. Sec. Litig.*, No. 02-1335-B (D.N.H. 2002) ($3.2 billion recovery); *Bank of America*, Master File No. 09 MD 2058 (PKC) (S.D.N.Y. 2012) ($2.425 billion recovery); *In re Southern Peru Copper Corp. Derivative Litigation,* Consol. CA No. 961-CS (Del. Ch. 2012) ($1.3

billion judgment); *In re Tenet Healthcare Corp. Sec. Litig.*, No. CV-02-8462-RSWL (Rx) (C.D. Cal. 2002) ($280 million recovery).  *See* Kessler Topaz Firm Resume, Ex. 10.  Kessler Topaz also has substantial experience in this District and was involved in the prosecution of *In re Brocade Sec. Litig.*, No. 3:05-CV-02042 CRB (N.D. Cal. 2005) before this Court, obtaining a $160 million recovery for aggrieved investors.  *See also In re Sunpower Secs. Litig.*, No. C 09-5473 RS, 2011 U.S. Dist. LEXIS 152920, (N.D. Cal. 2011) (Seeborg, J.) ($19.7 million recovery).  Accordingly, Kessler Topaz should be appointed Class Counsel pursuant to Rule 23(g).

## C.   The Proposed Class Satisfies Rule 23(b)(3)

In addition to meeting the prerequisites of Rule 23(a), this case also satisfies Rule 23(b)(3), which requires that the proposed class representative establish that common questions of law or fact "predominate" over individual issues, and that a class action is "superior" to other available methods of adjudication. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) ("*Halliburton I*"); *Vathana v. EverBank*, No. C 09-02338 RS, 2010 U.S. Dist. LEXIS 35665, at *9 (N.D. Cal. March 15, 2010) (noting that "subsection [23(b)(3)] encompasses 'those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results'").  As demonstrated below, both requirements are satisfied here.

### 1.   Common Questions Of Law And Fact Predominate Over Individual Questions

The Supreme Court has held that the "essential element[s]" of a 10b-5 claim are subject to common proof.  *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191, 1196, 1200 (2013).  Indeed, "[w]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *UTStarcom*, 2010 U.S. Dist. LEXIS 48122, at *30 (quoting *Hanlon*, 150 F.3d at 1022).  The predominance requirement is meant to "tes[t] whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  *Accord Wang*, 737 F.3d at 545.

Importantly, the predominance requirement does *not* require Plaintiff to establish the absence of *any* individualized issues or prove that 100% of the issues in the case are identical for each class member. *See, e.g.*, *LDK Solar*, 255 F.R.D. at 530 ("Here, although class members might favor differing interpretations, for example, regarding the extent to which [a report] disclosed the fraud or [a press release] re-inflated the stock price, all class members are unified by an interest in proving the same common course of conduct regarding LDK's allegedly fraudulent [] representations."). The requirement simply seeks to ensure that the common issues sufficiently outweigh issues affecting only individual members such that it is more judicially efficient to proceed as a unified class action rather than litigating thousands of separate individual investor lawsuits. Accordingly, where a complaint alleges a "common course of conduct" of misrepresentations, omissions, and other wrongdoing that affects all members of the class in the same manner, common questions of law and fact predominate. *See Amgen*, 133 S. Ct. at 1196.

As discussed in §III.B.2., *supra*, there are numerous common questions of law and fact that clearly predominate over individual questions and affected all Class members in the same manner. *See, e.g.*, *Cooper*, 254 F.R.D. at 632 ("The common questions of whether misrepresentations were made and whether Defendants had the requisite scienter predominate over any individual questions of reliance and damages."); *LDK Solar*, 255 F.R.D. at 530; *UTStarcom*, 2010 U.S. Dist. LEXIS 48122, at *15; *In re Emulex Corp. Sec. Litig.*, 210 F.R.D. 717, 721 (C.D. Cal. 2002) ("The predominant questions of law or fact at issue in this case are the alleged misrepresentations Defendants made during the Class Period and are common to the class.").[12] Indeed, all six elements of a Section 10(b) claim are subject to issues that "affect investors alike," and whose proof "can be made on a class-wide basis" because they "affect[] investors in common." *Schleicher*, 618 F.3d at 682, 685, 687.[13] Accordingly, the Ninth Circuit has held that "[t]he *only* elements a plaintiff must

---

[12]   Notably, the Supreme Court has held that Plaintiffs need not prove materiality or loss causation to attain certification because those issues are uniformly common to the Class. *See Amgen*, 133 S. Ct. at 1192 ("materiality need not be proved prior to Rule 23(b)(3) class certification."); *Halliburton I*, 131 S. Ct. at 2185-86 (loss causation).

[13]   *See also id.* at 687 ("Falsehood and materiality are issues on the merits; whether a statement is materially false is a question common to all class members and therefore may be resolved on a class-wide basis after certification."); *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 640 n.23 (3d Cir. 2011) ("[A]s a typical securities fraud action where 'the plaintiff shareholder alleges that a

prove at the class certification stage are whether the market for the stock was efficient and whether the alleged misrepresentations were public . . . ."  *Conn. Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1177 (9th Cir. 2011).

Here, as in most Section 10(b) cases, Defendants' material omissions and misrepresentations during the Class Period "affect[ed] [all] investors alike" and proof of falsity, materiality, scienter, and causation will "be made on a class-wide basis." *Schleicher*, 618 F.3d at 682, 685, 687; *LDK*, 255 F.R.D. at 530; *Cooper*, 254 F.R.D. at 641; *In re Micron Techs., Inc. Sec. Litig.*, 247 F.R.D. 627, 633-34 (D. Idaho 2007).   Additionally, whether Defendants' omissions artificially inflated or maintained HP's stock price are also common to the Class.  As a result, common questions of law and fact predominate.  *See VeriSign*, 2005 U.S. Dist. LEXIS 10438, at *32 ("Here, the issues common to the class – namely, the nature and extent of Defendants' alleged misrepresentations and the like – are predominant.").

Similarly, common issues of "reliance" predominate over individualized issues.  As an initial matter, in cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153.   In this Circuit, the *Affiliated Ute* presumption applies to Rule 10b-5(b) cases that "***primarily*** alleg[e] omissions." *Desai v. Deutsche Bank Secs. Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009); *see also Cartwright v. Viking Indus., Inc.*, No. 2:07-CV-02159-FCD-EFB, 2009 U.S. Dist. LEXIS 83286, at *38 (E.D. Cal. Sept. 11, 2009) ("A presumption of reliance is appropriate in cases sounding in fraud where the plaintiffs 'have primarily alleged omissions, even though the [p]laintiffs allege a mix of misstatements and omissions.'").  Here, Lead Plaintiff expressly invoked the *Affiliated Ute* presumption in the operative Complaint (¶225) and this Court made clear that this case primarily involves omissions.  Indeed, regarding Defendants' actionable May 23 and June 5, 2012 representations, the Court stated that "***I looked at it as an omission***." Ex. 2 at 19:20-21:23.  Accordingly, the Class is entitled to a presumption of reliance under *Affiliated Ute*.

---

fraudulent misrepresentation or omission has artificially inflated the price of a publicly-traded security, with the plaintiff investing in reliance on the misrepresentation or omission,' . . . damages as well as loss causation are susceptible of determination through evidence common to the class . . . .").

Alternatively, classwide reliance may also be presumed under the fraud-on-the-market doctrine, first established by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988), and recently reaffirmed in *Halliburton II*.  In affirming this long-standing presumption, Chief Justice Roberts, writing for the majority, held:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a pubic, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.  We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.

*Halliburton II*, 134 S. Ct. at 2417.  *See also Amgen*, 133 S. Ct. at 1192.  Thus, "*Basic* ... establishes that a plaintiff satisfies that burden [of proving common issues of reliance] by proving the prerequisites for invoking the presumption – namely, publicity, materiality[14], market efficiency, and market timing." *Id*.

The fraud-on-the-market presumption is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . .  Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Juniper Networks*, 264 F.R.D. at 591 (quoting *Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999) and *Basic*, 485 U.S. at 241-42).  Indeed, "it is hard to imagine that there ever is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?" *Basic*, 485 U.S. at 246-47.

Here, the prerequisites for invoking the fraud-on-the-market presumption—publicity, market efficiency and market timing—are easily met. Defendants' omissions and misrepresentations occurred during conference calls and public interviews, and were reflected in SEC filings and news stories, all of which were disseminated to the investing public.  ¶¶191-94, 205.  Lead Plaintiff and members of the Class also purchased HP common stock after the actionable

---

[14]   *Halliburton II* also reiterated the Supreme Court's prior holding in *Amgen* that Plaintiffs are not required to establish materiality at the class certification stage.  134 S. Ct. at 2412 ("[t]he burden of proving [the] prerequisites [to invoke the reliance presumption] still rests with plaintiffs and (*with the exception of materiality*) must be satisfied before class certification.").

statements/omissions were made and before the disclosure of the relevant truth concealed by Defendants. *See* Dkt. No. 40-1 (PGGM certification of transactions in HP common stock). Finally, as detailed below, the market for HP common stock was efficient throughout the Class Period.

a. HP Common Stock Was Listed and Traded on the NYSE, A Presumptively Efficient Market

At all relevant times, HP's common stock was listed and actively traded on the NYSE, "one of the most efficient capital markets in the world." *In re PHP Healthcare Corp.*, 128 F. Appx. 839, 848 (3d Cir. 2005). *See* Coffman Rpt., ¶¶25, 41. Courts consistently find that the NYSE "is a presumptively efficient market." *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 181-82 (S.D.N.Y. 2012); *see also In re Computer Sci. Corp. Sec. Litig.*, 288 F.R.D. 112, 119-20 (E.D. Va. 2012) ("It is not surprising that no other federal courts have concluded that common shares traded on the NYSE are not traded in an efficient market."); *Lapin v. Goldman Sachs & Co.*, 254 F.R.D. 168, 183 (S.D.N.Y. 2008) ("no argument could be made that the New York Stock Exchange is not an efficient market") (citing *Basic*, 485 U.S. at 249 n.29). Indeed, courts have held that the fact that a particular stock traded on the NYSE, *standing alone*, establishes market efficiency. *See In re Merck & Co., Sec., Derivative & ERISA Litig.*, MDL No. 1654 (SRC), 2013 U.S. Dist. LEXIS 13511, at *60 (D.N.J. Jan. 30, 2013); *DVI*, 639 F.3d at 634 ("[t]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency.").

b. The *Cammer* Factors Confirm Market Efficiency

In addition to assessing whether a stock traded on a national market, the Ninth Circuit has utilized the five-factor test for evaluating market efficiency set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989). *See Binder*, 184 F.3d at 1065. The *Cammer* factors are: (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC Registration Form S-3; and (5) whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *See Cammer*, 711 F. Supp. at 1287; *Akeena Solar*, 274 F.R.D. at 269; *Juniper Networks*, 264 F.R.D. at 591.

As alleged in the Complaint (¶¶223-24) and confirmed in the attached Coffman Report, an

empirical analysis of the *Cammer* factors demonstrates that HP's common stock traded in an efficient market throughout the Class Period.[15]   Mr. Coffman also examined the following supplemental factors, which further support market efficiency: (i) market capitalization; (ii) the bid-ask spread; (iii) institutional ownership; (iv) autocorrelation; and (v) options.  *See* Coffman Rpt., ¶¶62-72; *LDK Solar*, 255 F.R.D. at 527.

(1)      High Weekly Volume (<em>Cammer</em> Factor 1)

During the Class Period, millions of HP shares traded on the NYSE every week, with an average *daily* trading volume of 24.8 million shares, and an average weekly trading volume of 6.3% of total outstanding shares.  Coffman Rpt., ¶28.   This clearly "justif[ies] a strong presumption that the market for the security is an efficient one."   *Cammer*, 711 F. Supp. at 1286 ("Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption[.]"); *In re 2TheMart.com, Inc. Sec. Litig.*, 114 F. Supp. 2d 955, 965 n.6 (C.D. Cal. 2000) (average weekly trading volume of 1% supported market efficiency).

(2)      Significant Analyst Coverage (<em>Cammer</em> Factor 2)

Significant analyst coverage also supports a finding of market efficiency because it shows that the company is closely reviewed by investment professionals, who in turn make buy/sell recommendations to investors. *Cammer*, 711 F. Supp. at 1286.  Here, HP was covered by at least 21 analysts during the Class Period, who issued more than 139 reports on HP stock, a clear indicator of market efficiency.  Coffman Rpt., ¶34; Ex. 1 at 3 (Defendants' admit that "no fewer than twenty (20) securities analysts covered HP during the Class Period.").  *See also In re Nature's Sunshine Product's Inc. Sec. Litig.*, 251 F.R.D. 656, 663 (D. Utah 2008) (coverage by four analysts sufficient); *Juniper Networks*, 264 F.R.D. at 591 (same).

(3)      Market Makers/Arbitrage Activity (<em>Cammer</em> Factor 3)

During the Class Period, HP's common stock traded on the NYSE, an exchange that employs a single "specialist" that acts as the market maker for a given security.  *See* Coffman Rpt.,

---

[15]     *See Connetics*, 257 F.R.D. at 579 (finding a presumption of reliance where "lead plaintiff cites the declaration of expert Chad Coffman, who opines that the market for Connetics common stock was efficient during the class period"); *Bank of America*, 281 F.R.D. at 138, 143 (same).

¶41.   Accordingly, this factor is inapplicable to the inquiry here.  *See, e.g., In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 210 (E.D. Pa. 2008) ("Because market makers are used only for securities traded on the NASDAQ or in the over-the-counter market, this factor is not relevant [to stocks traded on the NYSE]."); *In re Boston Sci. Corp. Sec. Litig.*, 604 F. Supp. 2d 275, 284 (D. Mass. 2009) (same).  As an alternative, some courts look to the number of institutional investors holding a stock, finding that "because these investors could easily buy and sell [the] securities on exchanges such as the NYSE . . . they have likely acted as arbitrageurs and facilitated the efficiency of the market."  *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008).  Here, Defendants admit that "as of the end of each fiscal quarter during the Class Period, institutional investors owned at least 70% of outstanding HP common stock."  Ex. 1 at 9.  This is a strong indicator that HP common stock was traded efficiently.  *See*  Coffman Rpt., ¶67.[16]

(4)   SEC Form S-3 Eligibility (*Cammer* Factor 4)

A publicly-traded company's eligibility to file an abbreviated SEC Form S-3, which is only available to certain established issuers, is highly probative of market efficiency.  Indeed, companies "entitled to issue new securities using SEC Form S-3 would almost by definition involve stocks trading in an 'open and developed' market."  *Cammer*, 711 F. Supp. at 1277.  Here, Defendants admit that HP was S-3 eligible and "filed a Form S-3 Registration Statement with the SEC on May 24, 2012."  Ex. 1 at 10.  This further supports market efficiency.  *In re Accredo Health, Inc. Sec. Litig.*, No. 03-2216 DP, 2006 U.S. Dist. LEXIS 97621, at *24 n.4 (W.D. Tenn. March 7, 2006).

(5)   Cause And Effect Relationship (*Cammer* Factor 5)

The "cause and effect factor" is the "essence of an efficient market and the foundation for the fraud-on-the-market theory."  *Cammer*, 711 F. Supp. at 1287; *Akeena Solar*, 274 F.R.D. at 269; *Amgen*, 133 S. Ct. at 1199.  This factor simply focuses on whether new, company-specific information tends to rapidly impact a company's stock price, thereby illustrating an efficient, orderly market that reflects material public information.

---

[16]      *See DVI*, 249 F.R.D. at 212 n.26 ("pricing inefficiencies are more likely to be found where a company's stock is not widely held by institutional investors"); *Tatz v. Nanophase Techs. Corp.*, No. 01-C 8440, 2003 U.S. Dist. LEXIS 9982, at *21 (N.D. Ill. June 12, 2003) (institutional ownership of 11% to 13% supported market efficiency).

1    Here, empirical facts demonstrate a clear cause-and-effect relationship between the

2 disclosure of new, unexpected company-specific information and a rapid response in the stock

3 price. Coffman Rpt., ¶¶45-61. Mr. Coffman performed an "event study" that examines the

4 movement of HP's stock price in reaction to news about the Company. *Id.* ¶¶48-60. An event

5 study is a well-established and universally accepted methodology to determine whether a particular

6 stock rapidly incorporates new information in an unbiased, statistically significant manner. *See In*

7 *re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 251 (N.D. Cal. 2013) (Alsup, J.) ("The event

8 study method is an accepted method for the evaluation of materiality [and] damages to a class of

9 stockholders in a defendant corporation."); *Halliburton II*, 134 S. Ct. at 2415. Mr. Coffman's event

10 study here demonstrates "a clear cause-and effect relationship between new material news and rapid

11 changes in the market price of HP's Common Stock." Coffman Rpt., ¶60.

12    Because Lead Plaintiff has established market efficiency for HP common stock during the

13 Class Period, classwide reliance is presumed. *See Halliburton II*, 134 S. Ct. at 2412, 2423 ("Under

14 *Basic*, plaintiffs who invoke the presumption of reliance (by proving its predicates) are deemed to

15 have met the predominance requirement of Rule 23(b)(3).").[17]  Tellingly, despite having access to

16 the same publicly available information and data utilized by Lead Plaintiff's expert since the

17 Complaint was filed in August 2013, "defendants admit that, to date, they have not identified ***any***

18 ***facts*** indicating that the market for HP common stock was not efficient throughout the Class

19 Period." Ex. 1 at 13.

20    Alternatively, reliance is presumed classwide under *Affiliated Ute* because Plaintiffs

21 "primarily alleg[e] omissions" by Defendants who unquestionably were subject to a duty to disclose

22 material information to HP shareholders. *Affiliated Ute*, 406 U.S. at 153-54; *Desai*, 573 F.3d at

23 939-40. Thus, "[t]he predominance requirement is satisfied . . . because common questions

24 represent a significant aspect of the case." *Moreno v. Autozone, Inc.*, 251 F.R.D. 417, 426 (N.D.

25 Cal. 2008) (Breyer, J.).

26 _____

27 [17]    The Supreme Court also squarely held that "plaintiffs need not directly prove price impact
to invoke the *Basic* presumption…." and "the Court recognizes that it is ***incumbent upon the***

28 ***defendant*** to show the absence of price impact…." *Id.* at 2417. "The Court's judgment, therefore,
should impose no heavy toll on securities-fraud plaintiffs with tenable claims." *Id.*

c.      Common Issues Of Damages Predominate

Common issues of damages also clearly predominate over individualized issues.  As the Coffman Report explains, damages here—as in virtually all §10(b) actions—are subject to the well-settled "out-of-pocket" methodology that can easily be applied using a common formula.  *See* Coffman Report ¶¶73-74; *Dodona I*, *LLC v. Goldman*, *Sachs & Co.*, 296 F.R.D. 261, 271 (S.D.N.Y. 2014) ("[I]n light of the class-wide methodology for calculation of damages, any necessary individual inquiries are a far cry from the scope of individualized issues of proof that would defeat a finding of predominance . . .."); *Affiliated Ute*, 406 U.S. at 155 (adopting the out-of-pocket measure of damages); *Rosado v. China N.E. Petroleum Holdings, Ltd.* 692 F.3d 34, 38 (2d Cir. 2012) ("damages consist[] of the difference between the price paid and the 'value' of the stock when bought").

The Supreme Court's decision in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013)—an antitrust case involving four disparate theories of liability and damages—is not to the contrary.  In fact, courts have uniformly rejected defendants' attempts to exploit *Comcast* to defeat class certification in securities cases on the basis of damages.  *See*, *e.g.*, *Diamond Foods*, 295 F.R.D. at 251-52 (rejecting *Comcast*-based challenge and stating "[w]hether plaintiff will ultimately prevail in proving damages is not necessary to determine at this stage."); *In re Groupon*, *Inc. Sec. Litig.*, No. 12 CV 2450, 2014 U.S. Dist. LEXIS 137382, at *8-9 (N.D. Ill. Sept. 23, 2014) ("*Comcast* was an antitrust class action brought by subscribers against the cable company and is ***inapposite in a securities fraud class action*** such as this."); *In re Heckmann Corp. Sec. Litig.*, C.A. No. 10-378-LPS-MPT, 2013 U.S. Dist. LEXIS 79345, at *43 (D. Del. June 6, 2013) ("plaintiff correctly points out that while *Comcast* addresses class action certification, it was not in regard to a securities fraud litigation, which have generally been certified for class status").

As one court recently held, citing the Seventh Circuit's decision in *Schleicher*: "[w]hile there will likely be issues regarding the timing of a particular investor's purchase in relation to the fraudulent statements, these issues will not predominate over the common ones." *IBEW Local 98 Pension Fund v. Best Buy Co.*, No. 11-429 (DWF/FLN), 2014 U.S. Dist. LEXIS 108409, at *23 (D. Minn. Aug. 6, 2014).  Indeed, as Judge Easterbrook aptly explained:

> There will be some person-specific issues, such as when (and how many shares) a given investor purchased or sold. Timing of each person's transactions, in relation to the timing of the supposedly false statements, determines how much a given investor lost (or gained) as a result of the fraud. ***But these questions can be resolved mechanically. A computer can sort them out using a database of time and quantity information***.

*Schleicher*, 618 F.3d at 681.[18]  *See also Gaudin v. Saxon Mortg. Servs. Inc*., 297 F.R.D. 417, 429 (N.D. Cal. 2013) (Tigar, J.) ("Courts in every circuit have . . . uniformly held that the [Rule] 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations.").   These holdings are consistent with the Ninth Circuit's seminal decision in *Blackie*: "The amount of damages is invariably an individual question and does not defeat class action treatment.   Moreover, in this situation we are confident that should the class prevail the amount of price inflation during the period can be charted and the process of computing individual damages ***will be virtually a mechanical task***."  524 F.2d at 905.

More recently, "the Ninth Circuit has clarified that individualized damage calculations alone cannot defeat class certification."  *Tokoshima v. Pep Boys - Manny Moe & Jack*, No. C-12-4810-CRB, 2014 U.S. Dist. LEXIS 58769, at *25-27 (N.D. Cal. April 28, 2014) (Breyer, J.) (quoting *Leyva v. Medline Industries, Inc*., 716 F.3d 510, 513 (9th Cir. 2013) (holding that denial of class certification based on misreading of *Comcast* was an "abuse of discretion").   *Accord Jimenez v. Allstate Ins. Co*., No. 12-56112, 2014 U.S. App. LEXIS 17174, at *15-17 (9th Cir., June 4, 2014) ("[s]o long as the plaintiffs were harmed by the same conduct, disparities in how or by how much they were harmed did not defeat class certification."); *Ellsworth v. U.S. Bank, N.A*., No. C12-02506 LB, 2014 U.S. Dist. LEXIS 81646, at *87 (N.D. Cal. June 13, 2014) (Beeler, J.) ("disagreements about damages calculations [] do not defeat certification.").   Indeed, in *Tokoshima*, this Court granted class certification even though "individualized damages determinations [are] present in nearly all wage-and-hour class actions" because "to decertify a class on the issue of damages or restitution may well be effectively to sound the death-knell of the class action device." U.S. Dist. LEXIS 58169, at *25-26.   It reasoned that "as in *Leyva*, if putative class members prove

---

[18]   *Schleicher* was cited with approval by the Supreme Court in *Halliburton II*, 134 S. Ct. at 2410.  *See also In re Pfizer Sec. Litig*., 282 F.R.D. 38, 52 (S.D.N.Y. 2012) ("All of these [10(b)] elements, other than reliance … are subject to class wide proof in securities litigation").

[Defendants'] liability, damages will be calculated based on the wages each employee lost due to [Defendants'] unlawful practices." *Id.* "Accordingly, individual damages issues do not prohibit class certification." *Id.* at *27.[19]

Here, "[u]nlike the situation in *Comcast*, there is no possibility in this case that damages could be attributed to acts of the defendants that are not challenged on a class-wide basis." *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) (Posner, J.). Given the well-settled and uniformly applied out-of-pocket measure of damages in Section 10(b) cases, there is no question that damages are subject to a common approach that predominates over individualized issues.[20] Accordingly, the predominance requirement of Rule 23(b)(3) is satisfied.

### 2. A Class Action Is Superior To Any Other Method To Resolve This Controversy

Rule 23(b)(3) also requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." As to securities fraud class actions "'it has been suggested that the ultimate effectiveness of the federal remedies in this area may depend in large measure on the applicability of the class action device.'" *Cooper*, 254 F.R.D. at 642 (quoting *Harris*, 329 F.2d at 913); *see also Blackie*, 524 F.2d at 903. Thus, "adjudicating this matter as a class action is a superior method to resolve the parties' controversy because it avoids not only the dangers of duplicate discovery and trials, but also the unfairness of inconsistent findings and judgments." *Cooper*, 254 F.R.D. at 632; *UTStarcom*, 2010 U.S. Dist. LEXIS 45122, at *29-31.[21]

---

[19]     *See also Blackie* 524 F.2d at 905 ("[t]he amount of damages is invariably an individual question and does not defeat class action treatment."); *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010) ("The potential existence of individualized damage assessments . . . does not detract from the action's suitability for class certification."); *Magma Design*, 2007 U.S. Dist. LEXIS 62641, at *8 ("To the extent that any difference exists among shareholders in terms of their actual reliance on the alleged misrepresentations, or the damages they suffered as a result of that reliance, such issues may be addressed during subsequent phases of the trial.").

[20]     *See also Schleicher*, 618 F.3d at 685 ("The possibility that individual hearings will be required for *some* plaintiffs to establish damages does not preclude certification."); *In Re AutoZone, Inc.*, 289 F.R.D. 526, 535 (N.D. Cal. 2012) ("That class members will need to individually prove their damages might be daunting, but it is not a bar to certification.").

[21]     *See also Magma Design*, 2007 U.S. Dist. LEXIS 62641, at *3 ("the Court has little trouble concluding that, as with most suits against public companies, a class action is maintainable in this case because [defendant] treated its all of its shareholders in the same fashion, which both raises the specter of inconsistent or varying adjudications with respect to individual members of the class, and

1          In assessing superiority, Rule 23(b)(3) enumerates the following factors that courts must

2  consider: (i) the class members' interest in individually controlling the prosecution of separate

3  actions; (ii) the extent and nature of any litigation concerning the controversy already begun by or

4  against class members; (iii) the desirability of concentrating the litigation of the claims in the

5  particular forum; and (iv) the likely difficulties in managing a class action.  Each of these factors is

6  satisfied here.  The number of Class members is far too numerous, and the typical recovery is

7  generally too small for each individual Class member to maintain a separate action. *See In re DJ*

8  *Orthopedics, Inc., Sec. Litig.*, No. 01-CV-2238-K (RBB), 2003 U.S. Dist. LEXIS 21534, at *29

9  (S.D. Cal. Nov. 17, 2003).  Further, the nationwide geographical dispersion of Class members

10  makes it desirable to litigate Lead Plaintiff's claims in this forum. *Juniper Networks*, 264 F.R.D. at

11  592 (citing *Epstein*, 50 F.3d 644, 668 (9th Cir. 1995)).  Finally, there are no management

12  difficulties that would preclude this action from being maintained as a class action—and, in any

13  event, potential management problems are not, standing alone, grounds for denying certification.

14  *See Magma Design*, 2007 U.S. Dist. LEXIS 62641, at *3; *Morangelli v. Chemed Corp.*, No. 10 Civ.

15  0876 (BMC), 2011 U.S. Dist. LEXIS 69000, at *53 (E.D.N.Y. June 17, 2011).  Thus, the class

16  action device is the superior method for fairly and efficiently adjudicating this action.

## IV.    <u>CONCLUSION</u>

18          For all of the foregoing reasons, the Court should certify this action as a class action

19  pursuant to Rule 23, appoint PGGM as Class Representative, and approve PGGM's selection of

20  Kessler Topaz as Class Counsel.

21  DATED:  November 4, 2014         Respectfully submitted,

                              KESSLER TOPAZ

22                                MELTZER & CHECK, LLP

23                              */s/ Eli R. Greenstein*

                              ELI R. GREENSTEIN

24                              STACEY M. KAPLAN

                              PAUL A. BREUCOP

25                              One Sansome Street, Suite 1850

                              San Francisco, CA 94104

26                              Telephone:  (415) 400-3000

                              Facsimile:  (415) 400-3001

28  makes a class action superior to other available methods for the fair and efficient adjudication of the controversy.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

egreenstein@ktmc.com
skaplan@ktmc.com
pbreucop@ktmc.com

-and-

KESSLER TOPAZ MELTZER
   & CHECK, LLP
DAVID KESSLER
DARREN J. CHECK
ANDREW L. ZIVITZ
GREGORY M. CASTALDO
JOSHUA A. MATERESE
280 King of Prussia Road
Radnor, PA  19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056
dkessler@ktmc.com
dcheck@ktmc.com
azivitz@ktmc.com
gcastaldo@ktmc.com
jmaterese@ktmc.com

*Counsel for Lead Plaintiff PGGM Vermogensbeheer
B.V. and Lead Counsel for the Proposed Class*