1  WACHTELL, LIPTON, ROSEN & KATZ
   MARC WOLINSKY (*pro hac vice*)
2  GEORGE T. CONWAY III (*pro hac vice*)
   CARRIE M. REILLY (*pro hac vice*)
3  VINCENT G. LEVY (*pro hac vice*)
   51 West 52nd Street
4  New York, NY 10019
   Tel./Fax: 212.403.1000/2000
5  MWolinsky@wlrk.com
   GTConway@wlrk.com
6  CMReilly@wlrk.com
   VGLevy@wlrk.com
7
   FARELLA, BRAUN & MARTEL, LLP
8  NEIL A. GOTEINER, State Bar No. 83524
   235 Montgomery Street, 17th Floor
9  San Francisco, CA 94104
   Tel./Fax: 415.954.4400/4480
10 NGoteiner@fbm.com
11
   *Attorneys for Defendant Hewlett-Packard Company*
12
   COOLEY LLP
13 STEPHEN C. NEAL, State Bar No. 170085
   JOHN C. DWYER, State Bar No. 136533
14 JEFFREY M. KABAN, State Bar No. 235743
   Five Palo Alto Square
15 3000 El Camino Real
   Palo Alto, CA 94306
16 Tel./Fax: 650.843.5000/849.7400
   NealSC@cooley.com
17 DwyerJC@cooley.com
   JKaban@cooley.com
18
   *Attorneys for Defendant Margaret C. Whitman*
19
             IN THE UNITED STATES DISTRICT COURT
20          FOR THE NORTHERN DISTRICT OF CALIFORNIA
21
   IN RE HP SECURITIES LITIGATION          Master File No. 12-CV-5980 CRB
22
                                           **CLASS ACTION**
23
                                           **DEFENDANTS' OPPOSITION TO**
24 This Document Relates to:  All Actions   **LEAD PLAINTIFF'S MOTION FOR**
                                           **CLASS CERTIFICATION**
25
                                           Date:  February 20, 2015
26                                         Time:  10:00 a.m.
                                           Dept.: Courtroom 6, 17th Floor
27                                         Judge: Hon. Charles R. Breyer
28

REDACTED VERSION OF
DOCUMENT SOUGHT TO BE
SEALED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

TABLE OF ABBREVIATIONS ........................................................................................... v

SUMMARY OF ARGUMENT ............................................................................................ i

STATEMENT OF ISSUES TO BE DECIDED ................................................................... vi

COUNTERSTATEMENT OF COMMON ISSUES ............................................................ 1

ARGUMENT ........................................................................................................................ 6

I.      PGGM'S CLAIMS ARE ATYPICAL, AND IT IS AN INADEQUATE REPRESENTATIVE. .................................................................................................. 6

II.     PGGM HAS NOT SHOWN THAT DAMAGES CAN BE CALCULATED ON A CLASS-WIDE BASIS CONSISTENT WITH ITS THEORY OF LIABILITY. ................... 11

        A.     PGGM Does Not Try To Satisfy *Comcast*. .............................................. 12

        B.     Plaintiff Has Not Addressed The Questions That Are Critical To Satisfying *Comcast*. .................................................................................................. 16

III.    THE PROPOSED CLASS DEFINITION IS OVERBROAD. ....................................... 24

CONCLUSION ..................................................................................................................... 26

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Amgen* v. *Conn. Ret. Plans and Trust Funds,*
   133 S. Ct. 1184 (2013).................................................................................................... i

*Brazil* v. *Dole Packaged Foods, LLC,*
   2014 WL 5794873 (N.D. Cal. Nov. 06, 2014) ...................................................... 14 n.16

*Butler* v. *Sears, Roebuck and Co.,*
   727 F.3d 796 (7th Cir. 2013) ................................................................................ 15 n.17

*Comcast Corp.* v. *Behrend,*
   133 S. Ct. 1426 (2013)................................................................................................ passim

*Dura Pharmaceuticals, Inc.* v. *Broudo,*
   544 U.S. 336 (2005)................................................................................................... 9 n.11

*Frank* v. *Dana Corp.,*
   237 F.R.D. 171 (N.D. Ohio 2006) .................................................................... ii n.2, 7 n.8

*Gaudin* v. *Saxon Mortg. Servs. Inc.,*
   297 F.R.D. 417 (N.D. Cal. 2013)........................................................................... 15 n.18

*Halliburton Co.* v. *Erica P. John Fund, Inc.* ("*Halliburton II*"),
   134 S. Ct. 2398 (2014)..................................................................................... i, 12 n.14

*Hanon* v. *Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) ...................................................................................... 6, 9

*IBEW Local 98 Pension Fund* v. *Best Buy Co.,*
   2014 U.S. Dist. LEXIS 108409 (D. Minn. Aug. 6, 2014) ...................................... 15 n.18

*In re Bausch & Lomb Inc. Sec. Litig.,*
   244 F.R.D. 169 (W.D.N.Y. 2007).......................................................................... ii n.2, 7

*In re BP p.l.c. Sec. Litig.* ("*BP I*"),
   2013 WL 6388408 (S.D. Tex. Dec. 6, 2013)............................................................ passim

*In re BP p.l.c. Sec. Litig.* ("*BP II*"),
   2014 WL 21112823 (S.D. Tex. May 20, 2014) ................................................. vi, 19, 20

*In re Cardinal Health, Inc. Sec. Litig.,*
   226 F.R.D. 298 (S.D. Ohio 2005) ...................................................................... ii n.2, 7 n.8

*In re Comdisco Sec. Litig.,*
   150 F. Supp. 2d 943 (N.D. Ill. 2001) ................................................................ ii n.2, 7 n.8

*In re Diamond Foods, Inc. Sec. Litig.,*
   295 F.R.D. 240 (N.D. Cal. 2013) .................................................................. 15 n.18, 16 n.19

*In re Discovery Zone Sec. Litig.,*
   169 F.R.D. 104 (N.D. Ill. 1996) .................................................................................... 10

*In re Goodyear Tire & Rubber Co. Sec. Litig.,*
   2004 WL 3314943 (N.D. Ohio 2004) .................................................................. ii n.2, 7 n.8

*In re Groupon, Inc. Sec. Litig.,*
   2014 U.S. Dist. LEXIS 137382 (N.D. Ill. Sept. 23, 2014) ........................................... 14

*In re Heckmann Corp. Sec. Litig.,*
   2013 U.S. Dist. LEXIS 79345 (D. Del. June 6, 2013) .................................................. 14

*In re HP Sec. Litig.,*
   2013 WL 6185529 (N.D. Cal. Nov. 26, 2013) ......................................... 1, 2 & n.5, 4, 9, 17 & n.20

*In re IMAX Sec. Litig.,*
   272 F.R.D. 138 (S.D.N.Y. 2010) ........................................................................ 10, 11 n.13

*In Re Juniper Networks, Inc. Sec. Litig.,*
   264 F.R.D. 584 (N.D. Cal. 2009) .................................................................................... 25

*In re McKesson HBOC, Inc. Sec. Litig.,*
   97 F. Supp. 2d 993 (N.D. Cal. 1999) ....................................................................... ii n.2, 7 n.8

*In re Oracle Corp. Sec. Litig.,*
   627 F.3d 376 (9th Cir. 2010) ........................................................................................... 8

*In re Party City Sec. Litig.,*
   189 F.R.D. 91 (1999) ..................................................................................................... 10

*In re Rail Freight Surcharge Antitrust Litig.,*
   725 F.3d 244 (D.C. Cir. 2013) ............................................................................. i, iv, v, 15

*In re UTStarcom, Inc. Sec. Litig.,*
   2010 WL 1945737 (N.D. Cal. May 12, 2010) ................................................................ 25

*Jones v. ConAgra Foods, Inc.,*
   2014 WL 2702726 (N.D. Cal. June 13, 2014) ........................................................... passim

*Leyva v. Medline Indus., Inc.,*
   716 F.3d 510 (9th Cir. 2013) ............................................................. 12, 15 & nn. 17-18

*Loos v. Immersion Corp.,*
   762 F.3d 880 (9th Cir. 2014) .................................................................................. v, 8, 17

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
   256 F.R.D. 586 (N.D. Ill. 2009) ................................................................................. ii, 7

*Meyer v. Greene,*
   710 F.3d 1189 (11th Cir. 2013) ...................................................................................... 8

*Nicolow v. Hewlett Packard Co.,*
   2013 WL 792642 (N.D. Cal. Mar. 4, 2013) ............................................................... 7 n.9

DEFTS' OPP. TO MOT. FOR CLASS CERT.
MASTER FILE NO. 12-CV-5980 CRB

*Perlmutter* v. *Intuitive Surgical, Inc.*,
   2011 WL 566814 (N.D. Cal. Feb. 15, 2011) ................................................................ 6, 8

*Schwartz* v. *Harp*,
   108 F.R.D. 279 (C.D. Cal. 1985) ........................................................................................ 9

*Shields* v. *Washington Bancorporation*,
   1991 WL 221940 (D.D.C. Oct. 10, 1991) ..................................................... iii, 11 & n.13

*Staton* v. *Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ........................................................................................ 6, 8

*Tokoshima* v. *The Pep Boys*,
   2014 U.S. Dist. LEXIS 58769 (N.D. Cal. Apr. 28, 2014) ...................................... 12, 14, 15 & n.17

*Valley Drug Co.* v. *Geneva Pharms., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) ...................................................................................... 10

*Wal-Mart Stores, Inc.* v. *Dukes*,
   131 S. Ct. 2541 (2011) ...................................................................................................... i

*Weisz* v. *Calpine Corp.*,
   2002 WL 32818827 (N.D. Cal. 2002) ................................................................. ii n.2, 7 n.8

1

**TABLE OF ABBREVIATIONS**

2

3    Coffman Dep.          Transcript of the Deposition of Chad Coffman (Dec.
                           3, 2014), submitted as Defendants' Exhibit 2.
4
     Coffman Report       Expert Report of Chad Coffman (Nov. 4, 2014),
5                          submitted as Exhibit 11 to the Declaration of Eli
                           Greenstein (Docket #235-12).
6
     Def. Ex. __          Exhibit __ to the Declaration of Marc Wolinsky
7                          submitted in support of this opposition.

8    Hendriks Dep.        Excerpts of the Transcript of the Deposition of
                           Femke Hendriks under Rule 30(b)(6), submitted as
9                          Defendants' Exhibit 3.

10   Lehn Report          Declaration of Professor Kenneth M. Lehn (Decem-
                           ber 15, 2014), submitted as Defendants' Exhibit 1.
11
     Pl. Br.              Plaintiff's brief in support of its Motion For Class
12                         Certification (Docket #235).

13   Pl. Ex. __           Exhibit __ to the Declaration of Eli Greenstein
                           (Docket No. 235-2).
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

1

**SUMMARY OF ARGUMENT**

2   As the Supreme Court has repeatedly emphasized, class-action treatment is the exception, not

3   the rule. *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1432 (2013). "To come within the exception,

4   a party seeking to maintain a class action 'must affirmatively demonstrate [its] compliance' with

5   Rule 23." *Id.* (quoting *Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541, 2551 (2011)). Courts must

6   conduct a "rigorous analysis" of the plaintiff's claims to ensure compliance *in fact* with all the pre-

7   requisites of Rule 23(a) and at least one of the provisions of Rule 23(b). *Wal-Mart*, 131 S. Ct. at

8   2551 (citation and internal quotation marks omitted). That is a demanding review, and plaintiff's

9   motion cannot survive it.

10   Indeed, PGGM makes little effort to meet this exacting standard. Instead, PGGM's basic ar-

11   gument is that a class should be certified because it is a large pension fund, its lawyers are respected,

12   and HP's shares trade on the New York Stock Exchange. In effect, PGGM contends that the "rigor-

13   ous analysis" requirement of Rule 23 does not apply here because this is a securities case. Citing a

14   handful of precedents from bygone days, PGGM asserts that Rule 23 should be applied liberally,

15   with certification seemingly automatic in securities cases. Pl. Br. 2, 8-9. But the Supreme Court's

16   recent jurisprudence rejects this casual approach to class certification in securities cases. It applies

17   the same standards to securities cases as it does in other cases, and requires that "a court's class-

18   certification analysis must be 'rigorous'" always. *Amgen* v. *Conn. Ret. Plans and Trust Funds*, 133

19   S. Ct. 1184, 1194 (2013). It emphasizes that "Rule 23 does not set forth a mere pleading standard."

20   *Wal-Mart*, 131 S. Ct. at 2550.

21   Accordingly, the Supreme Court's "decisions have made clear that plaintiffs wishing to pro-

22   ceed through a class action must actually *prove* at the class certification stage — not simply plead —

23   that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predom-

24   inance requirement of Rule 23(b)(3)." *Halliburton Co.* v. *Erica P. John Fund, Inc.* ("*Halliburton

25   II*"), 134 S. Ct. 2398, 2412 (2014). Rule 23 "commands" a "hard look" at the facts. *In re Rail

26   Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013).

27   PGGM fails in at least two ways to meet Rule 23's demanding requirements.

28

1        1. *Adequacy and typicality are lacking because, assuming that PGGM's allegations are true,*

2 *PGGM profited from the conduct it seeks to challenge.*  Plaintiff asserts that Rule 23(a) is satisfied

3 because PGGM is a large institutional investor that alleges the same misconduct as other class mem-

4 bers and suffered a similar kind of loss.[1]  But in fact — *unlike* the absent class members that PGGM

5 seeks to represent — PGGM suffered *no* losses whatsoever.  The certified purchase and sale infor-

6 mation that PGGM provided with its complaint inescapably leads to the conclusion that PGGM

7 *made* money by selling HP shares at an allegedly inflated price. ▓▓▓▓▓▓▓▓▓▓▓▓

8 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9        PGGM's profits defeat its motion.  As this Court held in denying class certification in the

10 *ConAgra* case, "'[n]amed plaintiffs who represent a class must allege and show that they personally

11 have been injured, not that injury has been suffered by other, unidentified members of the class to

12 which they belong and which they purport to represent.'"  *Jones* v. *ConAgra Foods, Inc.*, 2014 WL

13 2702726, at \*3 (N.D. Cal. June 13, 2014) (Breyer, J.).  Here, the simple fact that PGGM is subject to

14 the defense that it profited from the alleged misconduct, and therefore lacks standing, is sufficient to

15 defeat certification.  *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 256 F.R.D. 586, 600 (N.D. Ill.

16 2009).  Further, the effort of establishing its standing "is likely to consume [PGGM's] time," which

17 also "rais[es] the potential for conflict with [its] duty to represent the class."  *Id.*  Plaintiff's profits

18 thus defeat both typicality and adequacy, and also throw into doubt plaintiff's interests in prosecut-

19 ing this case.  *Id.*[2]

20        That by itself defeats class certification under Rule 23(a). ▓▓▓▓▓▓▓▓▓▓

21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

23 [1]    Defendants do not dispute that numerosity and commonality are satisfied here.

24 [2]    *See also, e.g.*, *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173-74 (W.D.N.Y. 2007) ("Courts have consistently rejected applications for lead plaintiff status made by 'net sellers'

25 and 'net gainers,' recognizing that they may in fact have profited, rather than suffered, as a result of the inflated stock prices" (citing *Frank* v. *Dana Corp.*, 237 F.R.D. 171, 172 (N.D. Ohio 2006); *In re*

26 *Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 308 (S.D. Ohio 2005); *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 2004 WL 3314943, \*4 (N.D. Ohio 2004); *Weisz* v. *Calpine Corp.*, 2002 WL

27 32818827, at \*7 (N.D. Cal. 2002); *In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 946 (N.D. Ill. 2001); *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 996-97 (N.D. Cal. 1999))).

28



2. *Without a class-wide model of damages, plaintiff has not shown that common issues predominate.*  Beyond this, Rule 23(b)(3) independently requires denial of class certification here. PGGM has made no attempt to carry, and has not carried, its burdens under *Comcast* to show that (1) "damages are capable of measurement on a classwide basis," and (2) plaintiff's methodology is consistent with its theory of liability and "measure only those damages attributable to that theory." 133 S. Ct. at 1432-33.

PGGM's expert, Chad Coffman, asserts that "damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole" — namely, a statistical regression model known as an "event study." Coffman Report ¶ 74. But his assertion is purely conclusory, and devoid of analysis. As the court explained in the *BP* securities case, in which Coffman served as the expert and made a similarly unsupported claim, this unadorned incantation is insufficient under Rule 23(b)(3). "Prior to *Comcast*, the Court may have been satisfied that [p]laintiff['s] invocation of the event study methodology alone showed the predominance of common issues." *In re BP p.l.c. Sec. Litig.* ("*BP I*"), 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013). But "[s]imply invoking the event study methodology ... does not assuage the Court that the class-wide damages

methodology proposed will track [p]laintiffs' theories of liability, as the Supreme Court expressly required in *Comcast* before a class may be certified." *Id.*

And that is all Coffman has done here — conclusorily invoke an event study. In his deposition in this case, Coffman conceded that he has done nothing more. To calculate damages, Coffman proposes to use his event study to estimate share-price "inflation" — or the difference between the market price of HP stock on any given day and the price it would have had on that day absent the alleged wrongdoing. The "*sine qua non*" of this approach, he acknowledged, is "to have some method ... of estimating inflation throughout the class period." Coffman Dep. 159:2-17.

"[S]ome method" — but *what* method? Coffman could not say. He candidly acknowledged that he did not have this "*sine qua non*," this essential ingredient of a damages analysis: "I have not been asked to, and I have not engaged in any analysis on" "what method [I] would use to determine what the inflation was for each day of the class period." *Id.* 167:2-6. Coffman couldn't even hazard what the alleged inflation might look like: "whether it was constant or growing or narrowing, I don't know," Coffman said; "I have not analyzed that." *Id.* 166:9-18. Coffman also "ha[d] not thought about what method would be used or would be appropriate to disaggregate" confounding information about HP (such as a poor future earnings forecast or losses in other segments of the business) that could have affected HP's stock price during the class period. *Id.* 112:7-113:3. Again, "[t]hat's not something [he had] even been asked to think about." *Id.* 110:12-111:4. He similarly refused to "speculate whether the most appropriate method would allow you to" have any statistical confidence in the results. *Id.* 114:21-115:11. PGGM's attorneys objected that questions about Coffman's methodology "call[ed] for speculation." *Id.* 52:22-53:3. Indeed they do, because Coffman and PGGM have made no effort to define the damages methodology they will employ as required under *Comcast.*

These failings defeat PGGM's motion for class certification. "Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance — the rule commands it." *Rail Freight*, 725 F.3d at 255. Under *Comcast*, plaintiff has the burden to tie its statistical model to its theory of liability. Thus, in the *ConAgra* case, this Court denied class certification in

1    a consumer-fraud case because plaintiffs' model of damages — which proposed to calculate the dif-

2    ference between the market price and the value of the product absent the fraud (*i.e.*, the inflation) —

3    did not account for confounding information. 2014 WL 2702726, at *20. Similarly, in *BP*, the court

4    denied certification because plaintiffs had not explained how they proposed to use an event study to

5    calculate the inflation. *BP I*, 2013 WL 6388408, at *17. These rulings doom PGGM's motion be-

6    cause the law is clear: "No damages model, no predominance, no class certification." *Rail Freight*,

7    725 F.3d at 253. So it is here.

8         PGGM's and Coffman's attempt to avoid "speculating" about how they might compute infla-

9    tion and damages is no accident. Although Coffman could not provide any of the specifics, he sug-

10   gested that the starting point for his analysis would be to use (*x*) the amount of the price drop on No-

11   vember 20, 2012, when HP revealed that it had been the victim of fraud, to calculate (*y*) the amount

12   by which the stock was allegedly inflated by HP's failure to disclose in May 2012 that it was inves-

13   tigating fraud.[3] There is, however, no apparent relationship between *x* and *y*. In May 2012, the most

14   that HP could have disclosed was that it had undertaken an investigation — nothing more. But "any

15   decline in [HP's] share price [that would have] follow[ed] the announcement of an investigation

16   [could] *only* be attributed to market speculation about whether fraud has occurred." *Loos* v. *Immer-*

17   *sion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (emphasis added). Thus, Coffman and PGGM need to

18   come up with a methodology for tying the price movement on the corrective disclosure date to actual

19   — as opposed to speculative — inflation during the class period. But, again, Coffman was clueless

20   as to how this could be done.

21         This sort of disconnect between the alleged inflation and the ultimate price decline is precise-

22   ly what caused the court in the *BP* securities case to deny certification twice despite Coffman's ef-

23   forts. *BP* ruled that a methodology that proposed to compensate investors for the full amount of a

24   price drop following a corrective disclosure failed to pass the *Comcast* test where the plaintiff's alle-

25

26    [3]    Coffman Report ¶ 74 ("[T]he most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth

27   ...."): Coffman Dep. 158:3-8 ("I also observed that the methods that you usually use to estimate in-flation were available here, so the event study method that is the starting point for measuring the in-flation based on the price movement on the corrective disclosures ....").

28

1  gation is that defendants committed securities fraud by "understat[ing] a known risk." *BP I*, 2013

2  WL 6388408, at *17; *see also In re BP p.l.c. Sec. Litig.* ("*BP II*"), 2014 WL 2112823, at *11-12

3  (S.D. Tex. May 20, 2014) ("the amount [stockholders] overpaid [for their BP shares] was the un-

4  priced [and undisclosed] risk, not its consequences").  This Court should similarly deny PGGM's

5  motion because there is the same disconnect here.  And as set forth below, the use of an event study

6  to calculate damages in this case promises to result in countless other complications.  Coffman may

7  be confident that he will be able to address these issues.  But PGGM's and Coffman's "burden [un-

8  der *Comcast*] is not met by asking the Court simply to trust them." *Id.* at *12.

9         3.  *The proposed class is overbroad.*  Finally, although PGGM has not demonstrated that a

10  class should be certified, if the Court should nonetheless grant plaintiff's motion, the Court should

11  narrow plaintiff's overbroad class definition.  The class period should begin on June 6, 2012 at the

12  earliest, not on May 23, and it should exclude "net sellers" and "in-out" traders who suffered no

13  losses.

14                          **STATEMENT OF ISSUES TO BE DECIDED**

15         1.     Whether PGGM is an adequate class representative with typical claims notwithstand-

16  ing that, based on the allegations in the complaint, PGGM *made* money from the conduct it chal-

17  lenges in this suit, and its counsel is in the business of funding PGGM's overseas plaintiffs actions?

18         2.     Whether plaintiffs have established a class-wide damages theory as required by the

19  Supreme Court in *Comcast*?

20         3.     Whether the proposed class is overbroad in view of the facts that Whistleblower No.

21  4 did not come forward until May 25 and that the proposed class improperly includes net sellers and

22  in-out traders?

23

24

25

26

27

28

                                        vi          DEFTS' OPP. TO MOT. FOR CLASS CERT.
                                                    MASTER FILE NO. 12-CV-5980 CRB

1

## COUNTERSTATEMENT OF COMMON ISSUES

2       Plaintiff's description of the case is tendentious, irrelevant, and wrong.  It seeks to distract

3   from the issues at hand by focusing on claims the Court has dismissed.  And it is basically silent on

4   the main issues that matter here:  (1) whether PGGM is an appropriate class representative, and

5   (2) whether common questions of law or fact predominate over issues requiring individualized proof.

6   Nevertheless, it does warrant a response, because it misrepresents the issues that remain in the case,

7   and misstates the theory of liability on which class certification should be tested.

8       PGGM commenced this action alleging a broad theory of liability:  that HP knew Autonomy

9   was engaging in fraud since at least August 2011; that it spent $11 billion to acquire the company

10  anyway; and that defendants concealed what they knew for over a year, until HP announced, on No-

11  vember 20, 2012, that it was taking an $8.8 billion write-down of the goodwill associated with Au-

12  tonomy, the majority of which was attributable to the pre-acquisition fraud.

13      The Court found PGGM's conspiracy theory completely "implausible" and dismissed most

14  of the complaint.  *In re HP Sec. Litig.*, 2013 WL 6185529, at *6 (N.D. Cal. Nov. 26, 2013).  The

15  Court held that PGGM failed to plausibly plead that any defendant knew about the fraud at Autono-

16  my before May 2012, when a senior Autonomy executive (dubbed "Whistleblower No. 4") ex-

17  pressed concern about some of Autonomy's historical business practices.  Consequently, the Court

18  narrowed the case to just three allegedly misleading misstatements: (1) Whitman's statement during

19  an earnings call on May 23, 2012 that she believed Autonomy's disappointing results were the result

20  of "scaling" challenges; (2) Whitman's repetition of the same opinion in a June 5, 2012 interview

21  with *AllThingsD*; and (3) HP's statement in its September 2012 Form 10-Q filing that "[a]t the time

22  of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the carrying

23  value."

24      PGGM now apparently seeks to relitigate the Court's decision, devoting a substantial portion

25  of its brief to the conspiracy theory that the Court rejected.  Pl. Br. 3-8.  This discussion has little

26  bearing on the issues now before the Court, and it is seriously misguided.

27      In its attempt to circumvent the Court's ruling, PGGM insists that new evidence supports its

28

1  broader theory of liability.  Yet it points to no new *facts* that suggest that any defendant knew any-

2  thing about the fraud at Autonomy before Whistleblower No. 4 came forward.  PGGM continues to

3  argue, for instance, that an August 2011 KPMG diligence report demonstrates that HP knew about

4  the fraud before it bought Autonomy.[4]  But the Court already considered the report on the motion to

5  dismiss.  And the broader document confirms that KPMG's report did not alert HP to fraud at Au-

6  tonomy; the "headline[]" of that report on "revenue recognition" was that "[t]he majority of [Auton-

7  omy's] revenue recognition policies appear to be consistent with U.S. GAAP and HP policies" and

8  that any "differences ... should only have a short term impact" during the transition period.  Pl. Ex. 3

9  at 7.  There was no suggestion of a long-term impact, let alone an outright fraud.  Beyond that, as the

10  Court held on the motions to dismiss, it is simply illogical to suggest that HP would have proceeded

11  with the acquisition if it knew that Autonomy executives were defrauding HP.  *In re HP Sec. Litig.*,

12  2013 WL 6185529, at *6.[5]

13      In that context, the Court might wonder why plaintiff has so little to say about the claims that

14  remain in the case.  After all, one of the questions now before the Court is whether plaintiff has met

15  its burden of providing a model of damages that can calculate class-wide damages consistent with

16  the theory of liability that the Court sustained.  The reason for PGGM's silence is simple:  the dis-

17  covery record demonstrates conclusively that those claims are without merit, and so plaintiff has

18  made no effort to comply with the requirements of Rule 23.

19      The first statement that remains in the case survived only because the Court assumed, on the

20  pleadings, that Whistleblower No. 4 alerted HP to the possibility of fraud on May 23, 2012, the date

21  of the first alleged misstatement.  But the discovery record establishes that Whistleblower No. 4

22  _____

23  [4]     PGGM apparently finds it significant that someone emailed Whitman a copy of the KPMG report in March 2012.  *See* Pl. Br. 5.  But if the report failed to alert HP to the fraud before the acquisition, why would it have been enough to alert Whitman to the fraud after the fact?

24  [5]     The other purported "red flags" that plaintiff discusses were considered and rejected by the Court on the pleadings, even while the Court evaluated the claims in the light most favorable to

25  plaintiff.  It is telling that PGGM's brief identifies no new facts, just documents *confirming* prior allegations that HP had access to certain information regarding Autonomy prior to May 23.  *See* Pl. Br.

26  at 4 ("Evidence now confirms ...."); *id.* at 5 ("Documents leaked to the press also confirm ...."); *id.* at 6 ("Similarly, evidence now confirms ....").  But, as the Court ruled, this information was insuffi-

27  cient to alert HP to the actual fraud.  *See HP Sec. Litig.*, 2013 WL 6185529, at *6 ("Nor do the 'red flags' Plaintiff emphasizes ... suffice to establish scienter.").

28

1    came forward on May 25, 2012, two days later. Pl. Ex. 9 at 11. Plaintiff avoids addressing this un-

2    disputed fact, and seeks to certify a class beginning on May 23 in spite of it.

3         The discovery record also shows that claims based on the second alleged misstatement will

4    fare no better. The June 5 statement was an expression of Whitman's opinion. And contemporane-

5    ous documents show that Whitman *did* believe Autonomy's problems were entrepreneurial in nature,

6    just as she told the market. She first learned that Autonomy was going to miss its revenue targets on

7    April 29, 2012.[6] Whitman promptly sent her top lieutenants to England to meet with Autonomy's

8    management and identify the reasons for the miss. On May 8, 2012, Autonomy's management (sans

9    Lynch) presented the results of that review to Whitman in England. She was advised that Autono-

10   my's problems stemmed from poor execution by the sales team and Autonomy management, name-

11   ly, numerous "slipped deals." Whitman reported back to the HP board on May 17, and provided

12   HP's directors the same headline she provided to the market on May 23 and June 5: Autonomy's

13   problems were due to "execution." Def. Ex. 5 at 3.

14        Over the next weeks, Whitman received a number of emails about the problems at Autono-

15   my; those emails uniformly blamed Autonomy's problems on leadership and challenges in "scaling

16   the business where the systems and process were breaking down given its current scale." *See, e.g.*,

17   Def. Exs. 6, 7. Nothing in the documents even remotely suggests that Whitman believed Autono-

18   my's woes were attributable to any pre-acquisition fraudulent activities at the time she spoke on June

19   5 or that she changed her opinion — which is, in the end, all she expressed — as to what was the

20   root cause of Autonomy's underperformance.

21        Finally, the discovery record conclusively disposes of the third statement — that "[a]t the

22   time of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the

23

---

24   [6]    Plaintiff points to an April 29, 2012 email exchange between Whitman and CFO Cathie
     Lesjak concerning issues at Autonomy. Pl. Ex. 5. These issues have nothing to do with the fraud
25   that HP later uncovered. Consistent with what she said to the public on May 23 and June 5, she also
     remarked upon the execution issues at Autonomy, stating that "[t]he opportunity to improve is end-
26   less." *Id.* And far from establishing that Whitman suspected fraud, she defended Autonomy's exec-
     utives who had just alerted her to the earnings miss: "Be nice," Whitman told her CFO, "Shushovan
27   is under tremendous pressure." *Id.* "Be nice" is not something you would expect the victim of a
     fraud to say. If anything, the email further negates plaintiff's already implausible theory.

28

1   carrying value." That statement was an accounting truism, as plaintiff's own expert admits: under

2   the applicable accounting rules, the "fair value" of an acquired company at the time of an acquisition

3   is *always* equal to the price paid for it, and it is also equal to the "carrying value" at that time. Coff-

4   man Dep. 27-28. The statement, therefore, was incapable of being false.

5         Beyond that, the record irrefutably shows that the HP executives who authored the statement

6   had the express purpose of highlighting the risk of a write-down at Autonomy. HP's CFO Cathie

7   Lesjak had already flagged on HP's 3Q12 earnings call that HP might be "'require[d] … to record in

8   Q4 an … impairment charge against the carrying value of the goodwill in the HP portfolio'"; she

9   added that HP's "'largest balance for goodwill is in the Software segment,'" which included both

10  Autonomy and the legacy software business. *In re HP Sec. Litig.*, 2013 WL 6185529, at *11. As

11  the Court recognized, this disclosure "accurately foreshadowed the write-down of goodwill from the

12  Autonomy acquisition." *Id.* And indeed, after the earnings call, one analyst wrote, "We see the po-

13  tential for a goodwill writedown of Autonomy in FY Q4." Def. Ex. 8 at 3. A second analyst called

14  the Autonomy acquisition a "lemon," Def. Ex. 9 at 1, while another called it "a bust" and "nothing

15  short of a disaster," Def. Ex. 10 at 2, 8.

16        When it came time to draft the Form 10-Q, HP's executives and auditors sought to highlight

17  the risk of a write-down at Autonomy, just as Lesjak had done on the earnings call. They focused on

18  an SEC "interpretation[] and guidance" advising public issuers on how to flag impairment risks.

19  Def. Ex. 14. For reporting units that are "at risk" of a write-down, the SEC opines, public compa-

20  nies should disclose:

21              ➢  "the amount of goodwill allocated to the reporting unit" and

22              ➢  "[t]he percentage by which the fair value of the reporting unit exceeds its carrying

23                 value at the date of the last impairment test."

24  *Id.* Consistent with these instructions, an initial draft of the Form 10-Q disclosed the results of HP's

25  last impairment test for its software segment. Def. Ex. 12 at 4. But the problem was that the last

26  impairment test had not included Autonomy, because HP had "not yet acquired Autonomy" at the

27  time. Def. Ex. 15. Thus, HP's executives and auditors were concerned that the draft disclosure

28

---

DEFTS' OPP. TO MOT. FOR CLASS CERT.
                                        MASTER FILE NO. 12-CV-5980 CRB

would signal to the market that the legacy software segment (which excluded Autonomy) was at risk of impairment — when it was Autonomy that was particularly at risk. Def. Ex. 12-15.

So, for the express purpose of "highlight[ing] the impairment risk for Autonomy," HP's executives added to the Form 10-Q the third statement that remains in this case. Def. Exs. 12-15. The statement was intended to, and did, "*highlight* the low 'cushion' for both legacy [Software] *and Autonomy*." Def. Ex. 13 (emphasis added). Without the sentence, the Form 10-Q would have implied that the impairment risk centered on the legacy software business, *i.e.*, the software business that HP owned before it acquired Autonomy. But with the sentence, the Form 10-Q disclosed a low cushion (38%) at the legacy software business and an even lower cushion (0%) — and greater risk of impairment — at Autonomy. By saying that Autonomy's carrying value was the purchase price at the time of the acquisition, HP was emphasizing the fact that there was no excess of fair value over carrying value — so that if HP found *any* decline in fair value at the next impairment test, Autonomy would have to be written down. HP's auditors at Ernst & Young signed off on the disclosure, which they believed accurately flagged the risk of an impairment at Autonomy and "actually read[] most appropriately for the circumstances." Def. Ex. 13.

And again, nobody was misled:  after HP filed its Form 10-Q, analysts continued to remark upon the risk of a write-down at Autonomy.  Barclays, for instance, wrote on September 28 that it "expect[ed] some major writedowns to be forthcoming in the goodwill associated with several acquisitions, including Autonomy," and specifically asked not *whether*, but "*When Is Autonomy Going To Be Written Down?*"  Def. Ex. 16 at 11.  Coffman's event study confirms that no one was misled:  it finds that HP's Form 10-Q did not result in a statistically significant movement in HP's stock price.  Coffman Report, Exhibit 8; Lehn Report ¶ 18.

In short, nothing in the discovery record supports plaintiff's theory of liability, let alone the broader conspiracy theory that the Court has already considered and rejected.[7]  What is most relevant here, however, is that this record underscores PGGM's failure to demonstrate that damages can be

---

[7]      If plaintiff believes otherwise, it is free to seek leave to amend its complaint.  In the meantime, the Court's order on defendants' motions to dismiss controls.

1    calibrated to the theory of liability the Court actually sustained, as PGGM is required to do under

2    Rule 23(b)(3). Thus, Coffman testified that he had not yet analyzed the *sine qua non* of any damag-

3    es analysis — the method to determine inflation. Coffman Dep. 167:2-6. Nor had he been "asked to

4    think about" other problems that will inevitably complicate any calculation of damages. *Id.* 110-11.

5    He even admitted that he had not relied in any way upon the Court's opinion dismissing the majority

6    of the complaint. *Id.* 126. But when Coffman's proposed approach is measured against the claims

7    that the Court sustained, the shortcomings in Coffman's approach are unavoidable.

8                                             **ARGUMENT**

9    **I.    PGGM'S CLAIMS ARE ATYPICAL, AND IT IS AN INADEQUATE
           REPRESENTATIVE.**
10

11          To justify class treatment, PGGM has the burden to establish, among other things, that its

12   claims are typical and that it is an adequate class representative under Rule 23(a). *Comcast Corp.* v.

13   *Behrend*, 133 S. Ct. 1426, 1432 (2013). "'The test of typicality is whether other members have the

14   same or similar injury, whether the action is based on conduct which is not unique to the named

15   plaintiffs, and whether other class members have been injured by the same course of conduct.'"

16   *Perlmutter* v. *Intuitive Surgical, Inc.*, 2011 WL 566814, at *12 (N.D. Cal. Feb. 15, 2011) (quoting

17   *Hanon* v. *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test for adequacy asks

18   whether the class representative and his counsel 'have any conflicts of interest with other class

19   members' and whether the class representative and his counsel will 'prosecute the action vigorously

20   on behalf of the class.'" *Perlmutter*, 2011 WL 566814, at *12-13 (quoting *Staton* v. *Boeing Co.*, 327

21   F.3d 938, 957 (9th Cir. 2003)). PGGM fails both tests.

22          **A.** PGGM cannot satisfy the elements of typicality and adequacy under Rule 23(a) because

23   — by a very large margin — it was a net seller of HP shares during the putative class period. Ac-

24   cording to the certification attached to its amended complaint, PGGM sold many times more shares

25   at (allegedly) inflated prices than it bought. As a result, assuming that PGGM's allegations are true,

26   PGGM handsomely *profited* from the supposed fraud of which it complains.

27          This fact alone disposes of PGGM's motion; PGGM cannot represent the class under Rule

28

23(a). "Courts have consistently rejected applications for lead plaintiff status made by 'net sellers' and 'net gainers,' recognizing that they may in fact have profited, rather than suffered, as a result of the inflated stock prices." *In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173-74 (W.D.N.Y. 2007).[8] In this respect the plaintiff's claims are hardly typical of the other members of the class. *Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*, 256 F.R.D. 586, 600 (N.D. Ill. 2009). Courts have also recognized that, when the proposed class representative profits from an alleged fraud, "the issue of standing is likely to consume [the class representative's] time," which "rais[es] the potential for conflict with [its] duty to represent the class." *Id.* And this risk defeats the element of adequacy. *Id.*

The evidence that PGGM profited from the conduct it now challenges is ineluctable.[9] During the putative Class Period, it purchased 237,845 HP shares and sold 1,881,827 HP shares, or *eight times more*. It has identified two corrective disclosures (on August 22 and November 20, 2012) and asserts that members of the class "suffered damages when the relevant truth … was disclosed" on those dates and the price of HP stock fell. Pl. Br. 11-12. If that is true, and if the full extent of the price drop on those dates reflects the amount of inflation in HP's stock price before those dates, then PGGM made approximately $2.3 million during the class period by selling HP stock at allegedly inflated prices. Lehn Report ¶ 20. Indeed, even PGGM's expert concedes the point. Presented with a hypothetical situation mirroring the facts here, Coffman conceded that, "[a]s a matter of economics," the party trading the stock would receive a "net economic benefit" rather than suffer a loss. Coffman Dep. 133:17-135:10.

And so, as Professor Lehn's report shows, any effort by PGGM to demonstrate loss is bound for failure. Plaintiff could conceivably contend that most of its sales occurred after the first allegedly corrective disclosure in August 2012, and the relative correction that followed each purportedly

---

[8]    Citing *Frank* v. *Dana Corp.*, 237 F.R.D. 171, 172 (N.D. Ohio 2006); *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 308 (S.D. Ohio 2005); *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 2004 WL 3314943, *4 (N.D. Ohio 2004); *Weisz* v. *Calpine Corp.*, 2002 WL 32818827, at *7 (N.D. Cal. 2002); *In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 946 (N.D. Ill. 2001); and *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 996-97 (N.D. Cal. 1999).

[9]    The Court first considered whether PGGM was a net seller on PGGM's application for lead-plaintiff status. At the time, the Court concluded that "PGGM was neither a 'net seller' nor a 'net gainer.'" *Nicolow* v. *Hewlett Packard Co.*, 2013 WL 792642, at *5 (N.D. Cal. Mar. 4, 2013). But the Court has since confined the class period, and in the narrower period, PGGM *was* a "net seller."

1   corrective disclosure is not yet known.  But as the math works out, PGGM can show an economic

2   loss only if the alleged correction in HP's stock price that occurred on November 20, 2012 was less

3   than or equal to just *4.5%* of the alleged correction that occurred on August 23, 2012.  Lehn Report

4   ¶ 21 and Exhibit D.[10]  This means that to establish its standing, PGGM will have to show that the

5   alleged correction that occurred in November 2012 — when HP disclosed that it had been defrauded

6   and took the write-down — was *de minimis*.  PGGM will have every incentive to maximize the im-

7   pact of the alleged August 2012 correction and to minimize the impact of the alleged November

8   2012 correction.  *Id.*  Indeed, PGGM's losses are at their maximum if the November 20 correction

9   was *zero*.  *Id.* ¶ 23.  That creates a clear "'conflict[] of interest with other class members,'" and it

10   independently defeats adequacy.  *Perlmutter*, 2011 WL 566814, at *12-13 (quoting *Staton* v. *Boeing*

11   *Co.*, 327 F.3d at 957).

12        In any event, although the complaint did allege two corrective statements, only the Novem-

13   ber 2012 correction remains in the case, and with only that corrective disclosure in the case, any al-

14   legation that PGGM suffered a loss is implausible.  Thus, for a statement to be "corrective," it must

15   "'reveal to the market that a company's previous statements were false or fraudulent.'"  *Loos* v. *Im-*

16   *mersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (quoting *Meyer* v. *Greene*, 710 F.3d 1189, 1201

17   (11th Cir. 2013)).  Negative financial news is not "corrective" absent some disclosure "suggest[ing]

18   that the company had engaged in fraudulent ... practices."  *Id.* at 888; *see also In re Oracle Corp.*

19   *Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) ("loss causation is not adequately pled unless a plain-

20   tiff alleges that the market learned of and reacted to the practices the plaintiff contends are fraudu-

21   lent, as opposed to merely reports of the defendant's poor financial health generally").  The state-

22   ments that HP made on August 22, 2012 are not corrective under this standard, because HP did not

23   then disclose that it suspected fraud at Autonomy (or that Autonomy executives had committed

24   fraud).  Tellingly, when Coffman's report described the reasons for the price drop that occurred fol-

25   lowing HP's August 22 announcements, he did not even describe news related to Autonomy.  Coff-

26

---

27   [10]   This assumes that the inflation was constant, but the result described in the text would hold
     even if the inflation ribbon looked different. Lehn Report ¶ 22.

28

man Report ¶ 56 (stating that on August 22, 2012, HP "reported revenues that missed expectations and lowered [its] guidance for Q4 2012"). So only the November 2012 corrective disclosure remains in the case. And with only one corrective disclosure, PGGM cannot possibly show a loss. Lehn Report ¶ 23.

[11]

**B.** Rule 23(a) precludes certification here for other reasons as well. PGGM has basically acknowledged that it does not share the same interests as absent class members. For PGGM, prosecuting this case is not about litigating the securities claims the Court sustained. In fact, "[i]n PGGM's view," this case isn't about securities fraud at all; it concerns HP's alleged "fail[ure] to conduct a proper due diligence" before the acquisition. Def. Ex. 18 at 44. "As well as recovering [our] financial loss," PGGM has told its clients, "our aim with these proceedings was to improve HP's corporate governance structure. After all, as an institutional investor with a long-term horizon,

---

[11]    Although this case raises issues similar to those of the *BP* securities case (see Section II, below), the net-seller issue here must be decided differently. For starters, unlike in *BP*, the calculations showing PGGM's profits are straightforward and do not require "substantive merits determinations." *See In re BP p.l.c. Sec. Litig.* ("*BP I*"), 2013 WL 6388408, at *8 (S.D. Tex. Dec. 6, 2013). Indeed, the numbers are so stark here that PGGM's profits cannot seriously be disputed. Beyond that, there was no suggestion in the *BP* case of a conflict of interest like the one presented here, where any attempt to show an economic loss will pit the class representative against absent class members. Finally, it bears emphasis that the *BP* court, in relying on *Dura Pharmaceuticals, Inc.* v. *Broudo*, overlooked the fact that a securities plaintiff must have "suffered actual economic loss." 544 U.S. 336, 344 (2005). As *Dura* makes clear, the fact that an investor acquires shares at an inflated price does not, by itself, cause loss.

1   we want to continue to be able to invest in this company." *Id.* at 43.

2       In contrast, many absent class members, especially those who no longer **own HP shares,**

3   "have one focus: maximizing their recovery" on the claims the Court sustained. *In re Party City*

4   *Sec. Litig.*, 189 F.R.D. 91, 108 (1999); *see also Valley Drug Co.* v. *Geneva Pharms., Inc.*, 350 F.3d

5   1181, 1190 (11th Cir. 2003) (class certification is inappropriate where the "economic interests and

6   objectives" of the class representative "differ significantly from the economic interests and objec-

7   tives of unnamed class members").

23  12



[13]

The unique circumstances here — that PGGM is a net seller and turned a profit, that it is pursuing corporate-governance objectives at variance with the goal of damages recovery, and ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ — each independently, and taken together, preclude certification under Rule 23(a).

## II.   PGGM HAS NOT SHOWN THAT DAMAGES CAN BE CALCULATED ON A CLASS-WIDE BASIS CONSISTENT WITH ITS THEORY OF LIABILITY.

Plaintiff's motion should also be denied because plaintiff has not satisfied its burden to show that common issues predominate under Rule 23(b)(3). The Supreme Court has cautioned that Rule 23(b)(3) is "an 'adventuresome innovation,' … designed for situations in which 'class-action treatment is not as clearly called for.'" *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1432 (2013). This Court, therefore, has the "duty to take a 'close look' at whether common questions predominate over individual ones." *Id*. A "close look" here reveals that predominance is lacking.

[13]

### A.   PGGM Does Not Try To Satisfy *Comcast*.

PGGM's motion should be denied because PGGM has not even attempted to discharge its burdens under *Comcast*. There, the Supreme Court held that "Rule 23(b)(3)'s predominance criteri-on" requires courts to conduct a "'rigorous analysis'" at the class-certification stage to ascertain not only (1) whether "'damages are capable of measurement on a classwide basis,'" but also (2) whether the plaintiff's methodology proposes to "measure only those damages attributable to [the plaintiff's] theory" of liability. 133 S. Ct. at 1432-33. The Court went on to hold that certification was inap-propriate in *Comcast* because the plaintiffs' damages "methodology … identifie[d] damages that [we]re not the result of the wrong" that the plaintiffs complained about. *Id.* at 1434.

PGGM's expert Chad Coffman opines that "damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole" — the use of an "event study." Coffman Report ¶ 74.[14] In other words, he seeks (albeit unsuccessfully) to satisfy the "first half of *Comcast*'s test." *In re BP p.l.c. Sec. Litig.* ("*BP I*"), 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013).

But Coffman makes no effort to satisfy the second half of the *Comcast* test, namely that "'damages [calculated through the model] stemmed from the defendant's actions that created the le-gal liability.'" *Tokoshima* v. *The Pep Boys*, 2014 U.S. Dist. LEXIS 58769, at *26 (N.D. Cal. Apr. 28, 2014) (Breyer, J.) (quoting *Leyva* v. *Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).

And as the *BP* court held, "[s]imply invoking the event study methodology" as plaintiff has done here is not enough to satisfy a securities plaintiff's burdens under *Comcast*. *BP I*, 2013 WL 6388408, at *17. "It does not assuage the Court that the class-wide damages methodology proposed will [also] track Plaintiffs' theories of liability" and only compensate the class for damages stem-ming from the class claims, "as the Supreme Court expressly required in *Comcast*." *Id.*; *see also*

---

[14]    An "event study" is a "regression analys[i]s that seek[s] to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." *Halliburton Co.* v. *Erica P. John Fund, Inc.* ("*Halliburton II*"), 134 S. Ct. 2398, 2415 (2014). The regression analysis seeks to isolate price changes caused by company-specific events by controlling for market and industry factors, and then to use statistical testing to ascertain whether these price changes can be explained by either (1) random events or (2) the company-specific news. Coffman Report ¶¶ 46-47; Coffman Dep. 47:23-49:17.

1   *Jones* v. *ConAgra Foods, Inc.*, 2014 WL 2702726 (N.D. Cal. June 13, 2014) (Breyer, J.) (denying

2   motion for class certification under *Comcast*).

3         During his deposition, Coffman all but admitted that he had not sought to meet the second

4   half of *Comcast*. To begin with, Coffman repeatedly disavowed any reliance upon this Court's deci-

5   sion on the motions to dismiss in forming his opinion as to whether "damages can be calculated on a

6   … common basis." Coffman Dep. 34:5-18; *see also id.* at 35:17-21, 154:14-20. He did not list the

7   Court's opinion when he enumerated the "[d]ocuments [r]elied [u]pon" in forming his views. Coff-

8   man Report, Appendix A. Coffman even declined to express a view as to what the Court's decision

9   meant for plaintiff's damages theory. Coffman Dep. 126 ("I read the judge's order. I don't have a

10   view as to what it – how to interpret it for what it means plaintiffs can and can't allege going for-

11   ward."). By explicitly conceding that he has ignored the Court's decision, Coffman has implicitly

12   conceded that he cannot opine that his proposed methodology is consistent with the claims that re-

13   main in this case. This is fatal to plaintiff's motion.

14         Beyond that, Coffman also acknowledged that he had not identified a methodology for calcu-

15   lating the key variable needed to calculate damages — the inflation allegedly caused by defendants'

16   purportedly fraudulent conduct:

17         ➢ Coffman stated that damages suffered in any purchase would be calculated by looking

18            at the amount by which the stock price was inflated and netting any profits from the

19            sale of stock at an inflated price. Coffman Dep. 156-57.

20         ➢ Coffman acknowledged that the "*sine qua non*" of his damages calculation is "to have

21            some method … of estimating inflation throughout the class period." *Id.* 159:2-17;

22            *id.* 157:1-14 ("*[I]f* you could determine the inflation that existed on each day," *then*

23            "there's a well settled, common methodology [of] damages." (emphasis added)).

24         ➢ Coffman also testified that he "ha[d] not determined what the method would be in this

25            case" for "calculating inflation," and, in fact, "ha[d] not been asked to." *Id.* 167:2-6,

26

27

28

    DEFTS' OPP. TO MOT. FOR CLASS CERT.
MASTER FILE NO. 12-CV-5980 CRB

1    174:20-176:12.[15]

2          Given the little that PGGM and its expert have offered, PGGM's position seems to be that it

3    should not have to meet this burden because this is a securities case. Indeed, in its brief, PGGM

4    cites two out-of-circuit cases in which district courts held, without any reasoning, that *Comcast* ap-

5    plies only in antitrust cases. *See* Pl. Br. 22 (citing *In re Groupon, Inc. Sec. Litig.*, 2014 U.S. Dist.

6    LEXIS 137382 (N.D. Ill. Sept. 23, 2014), and *In re Heckmann Corp. Sec. Litig.*, 2013 U.S. Dist.

7    LEXIS 79345 (D. Del. June 6, 2013)). But the Supreme Court explained in *Comcast* that its deci-

8    sion "turn[ed] on the straightforward application of class-certification principles" — *not* "substantive

9    antitrust law." 133 S. Ct. at 1433. And most courts, including this Court, have applied *Comcast* out-

10   side the antitrust context, including in securities cases. *E.g.*, *ConAgra*, 2014 WL 2702726, at *1.[16]

11         In *ConAgra*, for instance, this Court denied certification in a consumer fraud case because the

12   plaintiff had not provided a model of damages that reliably measured the difference between the

13   price paid and the true value of the product the consumer had purchased in a manner that was con-

14   sistent with the theory of liability. *Id.* In this case, PGGM has provided even less than the plaintiffs

15   in *ConAgra*. Just as in *ConAgra*, PGGM has proposed to calculate damages by looking at inflation

16   (*i.e.*, the difference between the price paid and the true value of the stock) and has proposed using a

17   statistical regression for that calculation. But unlike the plaintiffs in *ConAgra*, PGGM has not both-

18   ered to explain how it would calculate inflation based on its regression.

19         PGGM cites a handful of cases that stand for the well-established rule that "individualized

20   damage calculations alone cannot defeat class certification." *Tokoshima*, 2014 U.S. Dist. LEXIS

21   58769, at *25. It is true, of course, that a case can proceed as a class action notwithstanding varia-

22   tions that result from mechanically plugging the individual characteristics of class members into a

---

[15]   *See id.* 167:2-6 (testifying that he "ha[d] not been asked to, and [he] ha[d] not engaged in any analysis" to determine "what method [he] would use to determine what the inflation was for each day of the class period."); *id.* 169:25-170:10, 171:17-20 (refusing to "speculate about" how he would calculate inflation caused by the first two alleged misstatements, and testifying that he had not "de-termin[ed] how to calculate inflation in this case" or what "precise method" he would use); 177:8-10 ("I'm not opining on … how one would determine the inflation input into that model.").

[16]   *See also*, *e.g.*, *Brazil* v. *Dole Packaged Foods, LLC*, 2014 WL 5794873 (N.D. Cal. Nov. 06, 2014) (decertifying class under *Comcast*; consumer fraud); *BP I*, 2013 WL 6388408, at *17 (denying certification; securities fraud).

damages model (*e.g.*, "the investor's purchase and sale history for the security," Coffman Report ¶ 74). But the issue here is plaintiff's complete failure to provide the Court with the "*sine qua non*" of its damages calculation — namely, how PGGM's model of damages is tied to any action by defendants that allegedly "'created the legal liability.'" *Tokoshima*, 2014 U.S. Dist. LEXIS 58769, at *26 (quoting *Leyva*, 716 F.3d at 514).[17] And contrary to PGGM's assertions, none of the other cases PGGM cites absolves it of its burden under *Comcast*.[18] In short, PGGM and Coffman don't have to tell the Court what the damages are here, but they do have to tell the Court how they would compute them. And they don't.

Fundamentally, PGGM's argument on damages is predicated on precisely the "logic" that *Comcast* rejected — that "at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Comcast*, 133 S. Ct. at 1433. "Prior to *Comcast*, the Court may have been satisfied that Plaintiffs' invocation of the event study methodology alone showed the predominance of common issues." *BP I*, 2013 WL 6388408, at *17. But "*Comcast* signals a significant shift." *Id.* And after *Comcast*, PGGM must do more. *Id.*; *see ConAgra*, 2014 WL 2702726. After *Comcast*, it is clear that "Rule 23 not only authorizes a hard look at the soundness of statistical models that purport to show predominance — the rule commands it." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013). PGGM must tie its methodology to its case with specificity. And this, PGGM has

---

[17] This was not a problem in *Tokoshima*, because the plaintiffs' model of damages estimated the injury to the class (*i.e.*, the amount the class was underpaid) resulting from the defendants' misconduct (*i.e.*, wage and hour violations and unfair business practices). It was also not a problem in *Leyva*, in which plaintiffs' model calculated damages "based on the wages each employee lost due to [defendant's] unlawful practices." 716 F.3d at 514. Similarly, in another case cited by PGGM, the Seventh Circuit found no *Comcast* issue with the plaintiffs' damages models because "all members of the mold class attribute their damages to mold and all members of the control-unit class to a defect in the control unit." *Butler* v. *Sears, Roebuck and Co.*, 727 F.3d 796, 800 (7th Cir. 2013) (cited at Pl. Br. 24). Thus, unlike here, plaintiffs estimated the damages stemming from the problems giving rise to the defendants' liability.

[18] *See In re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 251-52 (N.D. Cal. 2013) (holding that *Comcast* was satisfied in securities case, not that it did not apply); *IBEW Local 98 Pension Fund* v. *Best Buy Co.*, 2014 U.S. Dist. LEXIS 108409, at *21-23 (D. Minn. Aug. 6, 2014) (holding that *Comcast* was satisfied in securities case, not that it did not apply); *Leyva*, 716 F.3d at 514 (holding that *Comcast* was satisfied in wage case, not that it did not apply); *Gaudin* v. *Saxon Mortg. Servs. Inc.*, 297 F.R.D. 417, 428-29 (N.D. Cal. 2013) (*Comcast* satisfied).

1    not done.

2    **B.    Plaintiff Has Not Addressed The Questions That Are Critical To Satisfying**
           ***Comcast.***

3

4         Plaintiff's failure to identify a method for calculating damages consistent with its theory of

5    liability is reason enough to deny PGGM's motion.  Beyond that, however, even a cursory analysis

6    of the little that PGGM does offer reveals a number of problems that should preclude class certifica-

7    tion.

8         In describing his methodology, Coffman says he will "perform an event study" to "quantify

9    artificial inflation" by "measur[ing] price reactions to disclosures that revealed the relevant truth ...."

10   Coffman Report ¶¶ 73-74.  This raises more questions than it answers.[19]

11        1.  The first question is how Coffman proposes to use (*x*) the price drop that resulted when

12   HP revealed the results of its investigation and the fact that it was taking a write-down to measure

13   (*y*) the purported inflation that resulted when defendants failed to disclose the risk of fraud or the

14   risk of a write-down.  Because here, $x \neq y$.

15        All the claims that remain in the case allege that defendants artificially inflated HP's stock

16   price by misleading the market about *risks*:  first, that on May 23 and June 5, 2012, HP misleadingly

17   blamed Autonomy's weak performance on "scaling" issues despite allegedly believing there was a

18   *risk* of pre-acquisition fraud; and second, that on September 10, 2012, HP misleadingly stated that as

19   of the date of the acquisition, Autonomy was worth what HP had paid for it without disclosing the

20   *risk* of a write-down.

21        Coffman has not explained how he would calculate the amount of inflation caused by these

22   alleged misstatements.  Instead, he said that he would refer to the full amount of the price drop that

23   resulted after HP revealed that, *in fact*, (a) there had been a fraud at Autonomy, (b) this fraud (and

24   other factors) required a write-down, and (c) the write-down was worth billions of dollars.  Coffman

25   ───────────────

     [19]     This case is therefore unlike *Diamond Foods*, which held that, as required by *Comcast*, the
26   plaintiffs' event study had "identif[ied] the economic loss caused by [the] alleged fraud." 295
     F.R.D. at 251-52.  The Court emphasized the absence of "any specific complications that would
27   make [plaintiffs'] calculation impossible or ill-advised in this case." *Id.* at 252.  By contrast, here,
     PGGM has offered an event study that promises to suffer from crippling complications.
28

─────────────────────────────────────────
                                16        DEFTS' OPP. TO MOT. FOR CLASS CERT.
                                          MASTER FILE NO. 12-CV-5980 CRB

Report ¶¶ 73-74. But this approach does not grapple with the Court's holding that the defendants had no obligation to disclose any of "the details" of Whistleblower No. 4's allegations or to provide "a specific dollar amount for the writedown" before November 2012. *In re HP Sec. Litig.*, 2013 WL 6185529, at *9, 12.[20]

Still less does it address the fundamental disconnect between the amount of inflation and the purported reasons for the price drop following the corrective disclosures. And as the Ninth Circuit has held, "any decline in a corporation's share price following the announcement of an investigation can *only* be attributed to market speculation about whether fraud has occurred." *Loos* v. *Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (emphasis added). That is because, "at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal." *Id.* In short, the price drop that results after a company announces an investigation has no apparent relationship — and certainly does not measure — the price drop that would result from a company's disclosure of the results of the investigation. Lehn Report ¶ 12.

When asked how he would bridge this gap, Coffman hedged and testified that, "hypothetical-ly," "[t]here *might* be a statistical way to" calculate "how much you think the stock price would de-cline just on" the "announcement[] of the possibility" of a fraud, by looking at how other companies react to similar announcements. Coffman Dep. 175:3-16 (emphasis added). But he quickly added that he did not "want to speculate about all the different ways one might be able to or might not be able to" measure inflation, and he "ha[d] not determined what the method would be in this case." *Id.* 175:21-23, 176:7-12. Indeed, Coffman testified that he had no idea what the inflation would even look like: "whether it was constant or growing or narrowing, I don't know," Coffman said; "I have not analyzed that." *Id.* 166:9-18.

And at the conclusion of his deposition, when Coffman again confirmed that he had no methodology for calculating inflation, the only thing he was willing to say was that he had described a method to calculate "the *maximum* amount of inflation" that could have resulted during the class

---

[20] Thus, the Court held that in May and June 2012, Whitman could simply have stated that "she did not know the explanation for Autonomy's underperformance but was actively investigating its cause." *Id.* at *9 n.13.

period. Coffman Dep. 178:3-5 (emphasis added). This apparent slip was in effect a concession that his method for calculating damages promises to overcompensate investors — which is precisely what *Comcast* held plaintiff's methodology could not do. And without a methodology to analyze *actual* inflation, the Court obviously could not determine whether PGGM proposes to calculate damages in a manner that is consistent with the theory of liability that the Court sustained.

Coffman's silence here can be explained by his apparent recognition that he has the same problem in this case as he had in the *BP* securities case. In *BP*, plaintiffs alleged that the defendants had "understated a known risk" in the period before the Deepwater Horizon explosion in the Gulf of Mexico. *BP I*, 2013 WL 6388408, at *16-17. Coffman, who was also the plaintiffs' expert in the *BP* case, stated — just as he has done here — that he would calculate damages using an event study; he did not specify a method to calculate inflation. *Id.* at *15. Defendants argued that Coffman's approach "appear[ed] to equate the amount of a stock price-drop on a given corrective disclosure day (after adjusting for confounding events, such as general market movement) with the 'inflation' created by a preceding misrepresentation." *Id.* at *7, 17. The *BP* court held that this approach would not satisfy plaintiffs' burdens under Rule 23(b)(3) as it would "compensate[] investors for the full value of the stock price drop from the materialization of [the understated] risk." *Id.* at *16-17. In other words, the class would recover the losses related to the spill itself, even though the defendants had merely failed to disclose the risk of a spill — which would "overcompensate[] investors." *Id.*[21]

Plaintiffs responded that they would provide an event study that would remedy these issues at

---

[21] The *BP* court explained (*Id.* at *16 n.15):

Imagine that a company announced that it was going to draw a marble from an urn of 100 marbles, of which 99 were black and one was red. If a company drew a red marble, it would have to pay $1 million. Prior to finding out the outcome, the company's market value would reflect the expected loss from this lottery of 1% of $1 million, or $10,000. If the company subsequently drew a red marble, the market value would have fallen $990,000 to reflect the new information—the certainty of a $1 million loss. If, however, contrary to the company's statement, there were two red marbles (increasing the probability of drawing a red marble), the share price would *still* have fallen when the company drew a red marble. In order to understand the value implication of the company's misstatement that there was only one red marble, the relevant issue is what the market value would have been prior to the drawing, had the company told the truth. In this case, the market value would have reflected an expected loss of $20,000, only $10,000 lower than the actual market value, not the $990,000 less that would be implied by looking at the reaction to the drawing of the red marble.

---

DEFTS' OPP. TO MOT. FOR CLASS CERT.
MASTER FILE NO. 12-CV-5980 CRB

1   trial, but they never described the specifics. *Id.* That was enough for the court to deny the motion

2   for class certification because the court — mindful that it was *plaintiffs'* burden to specify a model

3   for calculating inflation — could not determine whether plaintiffs' model would suffer from the

4   problems defendants identified. *Id.*

5          When the *BP* plaintiffs moved for certification a second time, they still had not cured the

6   problem, and the court again denied certification in the pre-spill period. The court explained that

7   plaintiffs' new methodology, although more detailed than the conclusory opinion Coffman had of-

8   fered in *BP I*, still did not account for the undeniable fact that "the amount [stockholders] overpaid

9   [for their BP shares] was the unpriced [and undisclosed] risk, not its consequences":

10              when the corrective event is the materialization of an understated risk, the stock price
                movement on the date of correction (*i.e.*, on the date that the risk materialized) will
11              not equate to inflation on the date of purchase unless the probability of the risk mate-
                rializing was 100 percent. If the probability is less than 100 percent, the stock price
12              correction after the risk materializes will be *larger* than the pre-materialization infla-
                tion.

13
    *In re BP p.l.c. Sec. Litig.* ("*BP II*"), 2014 WL 2112823, at *10-12 (S.D. Tex. May 20, 2014). And in
14
    the absence of a model of damages that addressed this issue, the *BP* court instructed, there could be
15
    no showing that damages could be calculated consistent with plaintiffs' theory of liability or even
16
    the fraud-on-the-market presumption — and thus no showing that common issues predominated. *Id.*
17
           At the end of the day, Coffman's opinion in this case is basically a rehash of the conclusory
18
    opinion he offered in *BP I*, an opinion the court rejected as insufficient.[22] Coffman acknowledges
19
    that there is a "real sort of economic difference in how to think about" cases like *BP*, as opposed to
20
    the mine-run securities case. Coffman Dep. 162:13-14. He declines to provide a methodology that
21
    could address the "economic difference[s]" that both *BP* and this case present. For all we know,
22
    Coffman proposes to calculate damages in precisely the way that the court held would be improper
23

24   [22]     Coffman's opinion in *BP I* was similar to the opinion he offers here: "Class-wide damages in
    this matter can be calculated using a common methodology. The methodology and evidence for es-
25   tablishing the inflation per share in the market price on each day during the class period is common
    to the class. In particular, plaintiffs would seek to quantify harm to class members by performing
26   event study analysis to link declines in the stock price to revelation of corrective information. Dam-
    ages for each class member can then be calculated based upon a common formula (e.g. inflation at
27   time of purchase less inflation at time of sale)." Def. Ex. 19 (Opinion of Chad Coffman, *In re BP
    plc Sec. Litig.*, No. 10-md-02185 (S.D. Tex. June 14, 2013) (Pacer Doc. # 652-5)), at 32.

28

1   in the *BP* case. But we don't know. And this fact "only crystallize[s] [the] point that [PGGM and its

2   expert] have failed to meet *their burden* of showing that damages can be measured on a class-wide

3   basis consistent with their theories of liability." *BP I*, 2013 WL 6388408, at *17. "That burden is

4   not met by asking the Court simply to trust them." *BP II*, 2014 WL 2112823, at *12.

5          2. Next, even assuming it would be appropriate to use the price drop following a "corrective

6   disclosure" as a proxy (or a starting point) for measuring inflation, plaintiff must explain how it pro-

7   poses to account for confounding information disclosed on the alleged "corrective disclosure" dates.

8          In describing his damages methodology, Coffman states that he would use "an event study

9   that measures price reactions to disclosures that revealed the relevant truth" previously obscured by

10  fraud. Coffman Report ¶ 74. But Coffman's event study does not measure this price reaction at all.

11  Instead, his event study was designed "to determine whether HP's Common Stock reacted to com-

12  pany-specific" news as opposed to market- or industry-specific news. *Id.* ¶ 48. To that end, Coff-

13  man "control[led] for market and industry factors." *Id.* But Coffman's event study did not control

14  for HP-specific news unrelated to the alleged fraud. *Id.*

15         And that is the source of plaintiff's second problem under *Comcast*. Whenever HP allegedly

16  disclosed "corrective information" about Autonomy in this case, HP also disclosed negative infor-

17  mation about other aspects of its business. For instance, Coffman opines that, according to his event

18  study, "there is a swift and statistically significant stock price decline following HP's announcement

19  of the $8.8 billion Autonomy write down on November 20, 2012." *Id.* ¶ 61. But HP is a complicat-

20  ed company "with many different [business] segments." Coffman Dep. 76:24-77:7. On the same

21  date, HP also revealed that it had "missed consensus revenues" and "guided well below consensus

22  for FY Q1 EPS [earnings per share]." Def. Ex. 20 at 1.[23]

23         Citing just two analysts, Coffman apparently seeks to justify using the entire extent of the

24  November 20 price drop as a basis to calculate inflation. Coffman Report ¶ 61 & n.55. But other

25

26  [23]    *See also* CNN Money, *HP takes $8.8 billion writedown on Autonomy* (Nov. 20, 2012) ("It
        was a tough quarter across the board for HP. Sales of PCs to consumers fell by 16%. Sales in HP's
27      cash cow printing unit fell by 5%. HP's services business sales declined by 6%, and server revenues
        sank by 9%. Only sales in HP's software unit—the company's smallest—rose.") (Def. Ex. 21).

28

1   analysts took precisely the opposite view. One analyst stated, for instance, that "[t]he big question

2   ... is whether Q1 EPS guidance – which calls for a 40% sequential decline in EPS and is historically

3   unprecedented by a long shot – is conservative or that HP's business will experience a significant

4   incremental step down in Q1." Def. Ex. 20 at 2. As for the Autonomy impairment charge, the ana-

5   lyst noted that it was "sobering" but that it "*should not be newsworthy* to investors": "HP had indi-

6   cated that it would likely take a write-down for Autonomy this quarter on its Q3 call, and the write-

7   down largely reinforces what most investors already knew – that Autonomy ranks among the poorest

8   technology acquisitions in history." *Id.* (emphasis added).[24]

9       Coffman's event study does not tell us which analyst had it right. The only conclusion that

10  can be drawn is that, with 95% certainty, the November 20 price decline was caused by HP-specific

11  news (whether fraud-related or not) as opposed to randomness. Coffman Report ¶ 53; Coffman Dep.

12  110-14. Indeed, Coffman admitted that the event study did not "rule out the possibility that compa-

13  ny-specific information ... not related to Autonomy or the fraud caused *the entirety* of the decline on

14  November 20th, 2012." *Id.* 151:21-152:3.[25]

15      At his deposition, Coffman testified that he "ha[d] not thought about what method would be

16  used or would be appropriate to disaggregate" confounding information in this case. Coffman Dep.

17  112:7-113:3; *see also id.* 110-11 ("That's not something I've even been asked to think about, so I

18  don't know as I sit here."). Although Coffman stated that he was familiar with several methods, he

19  did not know "whether the most appropriate method" in this case "would allow you to say with 95

20  percent confidence" what the effect of the confounding information was. *Id.* at 111-13. In fact, "the

---

21  [24] *See also, e.g.*, Adam Levine-Weinberg, *HP's Big Autonomy Flap: Much Ado About Not*
22  *Much News* (Nov. 29, 2012) ("The 'news' about the problems at Autonomy was not really newswor-
    thy from a shareholder perspective. By last week, HP investors already knew (or should have
23  known) that the company massively overpaid for Autonomy. There is no compelling argument for
    assigning HP shares a lower valuation based on last week's allegations [about Autonomy].") (Def.
24  Ex. 22).
    [25] Similarly, Coffman could not say whether Autonomy-related news had anything to do with
25  the decline in HP's stock price that followed HP's announcement of the Autonomy acquisition.
    Thus, Coffman's event study identified a statistically significant price decline on August 19, 2011.
26  Coffman testified that he did not know one way or the other whether the market was reacting to Au-
    tonomy-related news; that he was aware HP disclosed other information that day; and that "it could
27  be that Autonomy accounted for none ... or virtually none of [the August 19, 2011 price decline]."
    *Id.* 39-41.

28

1   most appropriate method" here may not be able to provide an answer with any level of confidence.

2   The most common methodology may not even work in this case, given how complicated a company

3   HP is. Lehn Report ¶ 14.

4       Plaintiff's failure to present a scientifically reliable method for dealing with confounding in-

5   formation is similar to the problem that precluded class certification in *ConAgra*. There, the plain-

6   tiffs brought a consumer fraud action asserting that ConAgra's products were fraudulently misbrand-

7   ed. As damages, they sought to recover "'the difference in the price of the ConAgra products from

8   comparable products without the misbranding statement[s].'" 2014 WL 2702726, at *20. This

9   Court denied certification, explaining that "[o]ne cannot assume that the entire price difference be-

10  tween ... [products] is attributable to the alleged misstatements" when there were a number of con-

11  founding factors. *Id.*[26] And without an explanation as to how plaintiff proposed to account for the

12  confounding factors, this Court held that certification was inappropriate. *Id.* The same reasoning

13  applies here. Plaintiff has the burden to supply at least a methodology for addressing confounding

14  information. It has not done so.

15      3. The third question that plaintiff's method will have to address is related to the second:

16  Coffman's event study does not (and could not) distinguish "corrective" Autonomy-related news re-

17  garding the alleged fraud from Autonomy-related news that, although not disclosed before, did not

18  "correct" anything that plaintiff alleges to be actionable under the securities laws. In the circum-

19  stances of this case, that is significant, because when HP took a write-down related to Autonomy in

20  November 2012, HP attributed only a portion of the write-down to improprieties that, according to

21  plaintiff, HP should have flagged earlier. Def. Ex. 23.

22      Even a cursory review of the analyst commentary following HP's November 20, 2012 an-

23  nouncement reveals that the effort to untangle fraud-specific disclosures will be rife with complica-

24  tion. For example, analysts commenting on the Autonomy write-down expressed concern that HP

25  had just written down the EDS acquisition by $8 billion in August 2012. So it appears that part of

26  the decline in HP's stock price following the November 20, 2012 announcement can be explained by

27

28  [26] For example, there were a number of product lines and varieties within each product line.

1   the fact that it was HP's second write-down in a short time.  In other words, investors were down-

2   grading HP's value based on the frequency of the write-downs, not the specifics of the Autonomy

3   write-down, let alone the alleged misconduct that is the subject of this suit.  Lehn Report ¶ 17.

4          4. Finally, the confounding information that HP disclosed on corrective disclosure dates also

5   tends to obscure critical events that occurred during and even before the class period that Coffman's

6   methodology will need to address.  For example, Coffman has not explained how he plans to calcu-

7   late damages given that the market wrote down a significant portion of the Autonomy acquisition

8   before the class period even began.  Coffman's event study identified a statistically significant de-

9   cline in HP's stock price on August 19, 2011, following HP's announcement of the acquisition.

10  PGGM's complaint alleges that the price declined because HP had "massively overpa[id]" for Au-

11  tonomy.  Compl. ¶¶ 44-46.  Thus, before the acquisition even closed, analysts reported that "5-8% of

12  [HP's] value was destroyed by overpaying for Autonomy plc (by $3-5 billion)."  Def. Ex. 11 at 1.

13  Then, following the acquisition, HP disclosed negative results at Autonomy, which apparently led

14  the market to write down the acquisition even more.  *E.g.*, Def. Ex. 4 at 1 ("While we were not ex-

15  pecting a large initial contribution from Autonomy, we were still somewhat surprised that software

16  revenue increased only $124m since the Jul-Q which did not have any Autonomy revenue in the mix

17  (deal closed in early October)." (February 2012)).  In an efficient market, this information would al-

18  ready have been reflected in HP's share price at the outset of the class period.

19         But Coffman's method does not account for this fact.  Thus, when HP took the Autonomy

20  write-down in November 2012, it attributed approximately $5 billion to the pre-acquisition fraud and

21  the balance to the *recent* trading value of HP's stock.  But if the market had *already* written down

22  the Autonomy acquisition "by $3-5 billion" in 2011, Def. Ex. 11 at 1, how, exactly, does Coffman

23  plan to measure the extent of the declines in HP's stock price that are attributable to the undisclosed

24  pre-acquisition fraud at Autonomy?  He does not say.  Indeed, he stated that he had not even begun

25  to analyze this problem.  Coffman Dep. 39-41.

26         Coffman's methodology will also need to take into account events that occurred during the

27  class period.  For example, he has not explained how he proposes to calculate the purported inflation

28

---

23                          DEFTS' OPP. TO MOT. FOR CLASS CERT.
                            MASTER FILE NO. 12-CV-5980 CRB

1   caused by the September 10, 2012 statement given the fact that HP had already disclosed in August

2   2012 that Autonomy was at risk of impairment.  Under Coffman's theory of market efficiency, the

3   market price for HP's shares already reflected the risk of a write-down at Autonomy when HP filed

4   its Form 10-Q statement in September 2012.  If the September 2012 statement had somehow disa-

5   bused the market of its view that Autonomy would be written down, as PGGM claims, one would

6   expect a statistically significant increase in HP's stock price.  But Coffman's event study shows that

7   there was no statistically significant movement in HP's stock price following the filing of HP's Form

8   10-Q. Lehn Report ¶ 18; *see* Coffman Report, Exhibit 8.  Thus, far from conforming to plaintiff's

9   theory of liability, Coffman's event study actually *contradicts* the theory of liability that the Court

10  sustained. Lehn Report ¶ 18.  Coffman does not explain how he plans to address this additional fail-

11  ing with his approach.

12                                    *       *       *

13      *Comcast* requires PGGM to provide a sound methodology for addressing certain core issues

14  on damages.  "Plaintiff[] cannot avoid th[e] hard look [that *Comcast* requires] by refusing to provide

15  the specifics of [its] proposed methodology." *BP I*, 2013 WL 6388408, at *17.  That is especially

16  true in a case like this one — where an event study suffers from precisely the flaws that rendered

17  class certification inappropriate in *ConAgra*, *BP* and *Comcast*:  Coffman's event study is nothing

18  more than "a methodology that [promises to] identif[y] damages that are not the result of the [al-

19  leged] wrong." *Comcast*, 133 S. Ct. at 1434.

20  **III.    THE PROPOSED CLASS DEFINITION IS OVERBROAD.**

21      Although class treatment is inappropriate here, if the Court does grant PGGM's motion, the

22  Court should modify the proposed class definition in two respects.

23      *First*, the class period should begin on June 6 rather than on May 23, 2012.  The Court sus-

24  tained the May 23 statement on the assumption that Whistleblower No. 4 had already come forward

25  at that time.  But he came forward on May 25, 2012, two days later. Pl. Ex. 9 at 11.  There is there-

26  fore no basis for certifying a class beginning on May 23, 2012.

27      *Second*, the definition of the class should expressly exclude anyone who, like PGGM, was a

28

1   "net seller" in the class period, as well as all "in-out traders" — that is, "investors who either sold

2   their stock before the first corrective disclosure or bought and then sold their stock between any two

3   corrective disclosures." *In re UTStarcom, Inc. Sec. Litig.*, 2010 WL 1945737, at *11 (N.D. Cal. May

4   12, 2010) (excluding in-out traders from class definition). Indeed, net sellers and "in-out traders"

5   "could not logically have been damaged by the defendant[s'] conduct" and therefore do not belong

6   in the class. *Id.* (citing *In Re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal.

7   2009)). Here, HP's August 22, 2012 statements did not correct anything that the Court held poten-

8   tially actionable on the motions to dismiss. See pp. 8-9, above. The only alleged corrective disclo-

9   sure that remains in the case, therefore, is the November 20, 2012 disclosure. For that reason, the

10   class definition should exclude all persons who sold at least as many HP shares as they bought dur-

11   ing the class period. In addition, the class definition should exclude all persons whose profits from

12   the sale of Autonomy shares exceeded their purported losses.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CONCLUSION

2     For all these reasons, plaintiff's motion to certify a class should be denied.  The motion fails

3 to satisfy Rule 23(a) because PGGM profited from the alleged fraud.  And it fails to satisfy Rule

4 23(b)(3) because PGGM has not met its burden of demonstrating that damages can be calculated us-

5 ing a common methodology that is consistent with the theory of liability that the Court sustained.

6

7 Dated:  December 15, 2014          WACHTELL, LIPTON, ROSEN & KATZ

8                                   By:  _____

9                                        Marc Wolinsky
                                         George T. Conway III
10                                       Carrie M. Reilly
                                         Vincent G. Levy
11                                       51 West 52nd Street
                                         New York, NY  10019
12                                       Telephone:  (212) 403-1000
                                         Facsimile:  (212) 403-2000
13
14                                       FARELLA BRAUN & MARTEL, LLP
                                         Neil A. Goteiner
15                                       235 Montgomery Street
                                         San Francisco, CA  94104
16                                       Telephone:  (415) 954-4400
                                         Facsimile:  (415) 954-4480
17
18                                  *Attorneys for Defendant Hewlett-Packard Company*

19
20 Dated:  December 15, 2014          COOLEY LLP

21                                   By:  ___/s/ John C. Dwyer_____
22                                        Stephen C. Neal
                                         John C. Dwyer
23                                       Jeffrey M. Kaban
                                         Five Palo Alto Square
24                                       3000 El Camino Real
                                         Palo Alto, CA  94306
25                                       Telephone:  (650) 843-5000
                                         Facsimile:  (650) 849-7400
26
27                                  *Attorneys for Defendant Margaret C. Whitman*

28

## ECF ATTESTATION

I, Marc Wolinsky, am the ECF User whose ID and Password are being used to file this Notice of Motion, Motion to Dismiss, and Supporting Memorandum.

In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that all signatories hereto have concurred in this filing.

Dated:  December 15, 2014                    WACHTELL, LIPTON, ROSEN & KATZ

By: _____
                    Marc Wolinsky

DEFTS' OPP. TO MOT. FOR CLASS CERT.
MASTER FILE NO. 12-CV-5980 CRB