KESSLER TOPAZ MELTZER
  & CHECK, LLP
ELI R. GREENSTEIN (Bar No. 217945)
STACEY M. KAPLAN (Bar No. 241989)
PAUL A. BREUCOP (Bar No. 278807)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
egreenstein@ktmc.com
skaplan@ktmc.com
pbreucop@ktmc.com

-and-

DAVID KESSLER (*pro hac vice*)
DARREN J. CHECK (*pro hac vice*)
ANDREW L. ZIVITZ (*pro hac vice*)
GREGORY M. CASTALDO (*pro hac vice*)
JOSHUA A. MATERESE (*pro hac vice*)
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
dkessler@ktmc.com
dcheck@ktmc.com
azivitz@ktmc.com
gcastaldo@ktmc.com
jmaterese@ktmc.com

*Counsel for Lead Plaintiff PGGM Vermogensbeheer B.V.*
*and Lead Counsel for the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE HP SECURITIES LITIGATION,<br><br>This Document Relates To: All Actions | MASTER FILE No. 3:12-CV-05980-CRB<br><br>**CLASS ACTION**<br><br>**LEAD PLAINTIFF'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF ITS MOTION FOR CLASS CERTIFICATION**<br><br>Date: February 20, 2015<br>Time: 10:00 a.m.<br>Judge: Hon. Charles R. Breyer<br>Courtroom: 6, 17th Floor |

1

2

## <u>TABLE OF CONTENTS</u>

TABLE OF ABBREVIATIONS ...................................................................................... viii

SUMMARY OF ARGUMENT ........................................................................................ i

    1.   Lead Plaintiff Satisfies the Typicality Requirement of Rule 23(a)........................ ii

    2.   Lead Plaintiff and Lead Counsel Are Adequate Under Rule 23(a) ...................... iii

    3.   Common Issues of Law and Fact Predominate Under Rule 23(b)(3)................... iv

I.     ARGUMENT .......................................................................................................... 1

  A.   PGGM's Claims Are Typical................................................................................. 1

  B.   Defendants Fail to Prove Any Actual Conflict of Interest...................................... 4

  C.   Common Questions of Law and Fact Predominate Under Rule 23(b)(3) .............. 7

     1.   Securities Fraud Cases Are Subject to a Well-Settled Damages Methodology.. 8

     2.   Plaintiff's Comprehensive Damages Methodology Satisfies *Comcast* ............ 16

II.    CONCLUSION..................................................................................................... 25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### TABLE OF AUTHORITIES

2

Page(s)

CASES

3

4

*Affiliated Ute Citizens v. U.S.*,
406 U.S. 128 (1972) ...................................................................................................10

5

*Allen v. Hyland's Inc.*,
300 F.R.D. 643 (C.D. Cal. 2014) ........................................................................ iii, 5

6

7

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
133 S. Ct. 1184 (2013) ..............................................................15, 20, 23, 25

8

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ........................................................................... i, 14

9

10

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) ...................................................... passim

11

12

*Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*,
793 F. Supp. 2d 1138 (C.D. Cal. 2011) ...................................................................4

13

*Comcast Corp. v. Behrend*,
133 S. Ct. 1426 (2013) ...................................................... passim

14

*Cummings v. Connell*,
316 F.3d 886 (9th Cir. 2003) ....................................................................5

15

16

*Dodona I, LLC v. Goldman, Sachs & Co.*,
296 F.R.D. 261 (S.D.N.Y. 2014) ............................................... v, vii, 21

17

18

*Epstein v. MCA, Inc.*,
50 F.3d 644 (9th Cir. 1995) ..................................................... vii

19

*Erica P. John Fund, Inc. v. Halliburton Co.*,
131 S. Ct. 2179 (2011) ("*Halliburton I*") ..................................... passim

20

21

*FindWhat Investor Grp. v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ...................................................................16

22

23

*Frank v. Dana Corp.*,
237 F.R.D. 171 (N.D. Ohio 2006) ........................................................................2

24

*Gutierrez v. Kovacevich "5" Farms*,
2004 U.S. Dist. LEXIS 29476 (E.D. Cal. 2004)...................................................5

25

26

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) ("*Halliburton II*") ..................................... passim

27

28

Lead Plaintiff's Reply in Further Support of Its        ii        Master File No. 3:12-cv-05980-CRB
Motion for Class Certification

*Hodges v. Immersion Corp.*,
2009 U.S. Dist. LEXIS 122565 (N.D. Cal. 2009) ...................................................................2

*Huberman v. Tag-It Pac., Inc.*,
314 Fed. Appx. 59 (9th Cir. 2009)........................................................................................5

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
2014 U.S. Dist. LEXIS 108409 (D. Minn. 2014) ................................................. v, vii, 19, 20

*In re Apollo Grp. Inc. Sec. Litig.*,
509 F. Supp. 2d 837 (D. Ariz. 2007) ...................................................................................16

*In re BP p.l.c. Sec. Litig.*
("*BP II*") (S.D. Tex. 2014) ......................................................................................... passim

*In re BP p.l.c. Sec. Litig.*,
2013 U.S. Dist. LEXIS 173303 (S.D. Tex. 2013) .............................................................2, 4

*In re BP p.l.c. Sec. Litig.*,
2014 U.S. Dist. LEXIS 69900 (S.D. Tex. 2014) ("*BP II*")............................................. passim

*In re Brocade Commc'ns, Sys., Inc. Sec. Litig.*,
No. C 05-02042 CRB, Civil Minutes, Dkt. No. 392 (N.D. Cal. Oct. 12, 2007).......................1

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001)...................................................................................................7

*In re Cendant Corp. Sec. Litig.*,
109 F. Supp. 2d 235 (D.N.J. 2000) ......................................................................................16

*In re Connetics Corp. Sec. Litig.*,
257 F.R.D. 572 (N.D. Cal. 2009)...........................................................................................3

*In re Cooper Cos. Inc. Sec. Litig.*,
254 F.R.D. 628 (C.D. Cal. 2009) .................................................................................. iii, iv

*In re Corinthian Colleges S'holder Derivative Litig.*,
2012 U.S. Dist. LEXIS 188623 (C.D. Cal. 2012)...................................................................5

*In re CornerStone Propane Ptnrs., L.P. Sec. Litig.*,
2006 U.S. Dist. LEXIS 25819 (N.D. Cal. 2006) ....................................................................3

*In re Countrywide Fin. Corp. Sec. Litig.*,
273 F.R.D. 586 (C.D. Cal. 2009)..........................................................................................16

*In re Credit Suisse-AOL Sec. Litig.*,
253 F.R.D. 17 (D. Mass. 2008)...............................................................................................1

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) ....................................................................................... iv, 15

*In re Diamond Foods, Inc., Sec. Litig.,*
   295 F.R.D. 240 (N.D. Cal. 2013) .................................................................. passim

*In re Elec. Books Antitrust Litig.,*
   2014 U.S. Dist. LEXIS 42537 (S.D.N.Y. 2014) ...................................................10

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.,*
   529 F. Supp. 2d 644 (S.D. Tex. 2006) ................................................................11

*In re Facebook, Inc., IPO Sec. and Derivative Litig.,*
   288 F.R.D. 26 (S.D.N.Y. 2012) ................................................................... iii, 7

*In re Groupon, Inc. Sec. Litig.,*
   2014 U.S. Dist. LEXIS 137382 (N.D. Ill. 2014) .................................................v, 14

*In re Heckmann Corp. Sec. Litig.,*
   2013 U.S. Dist. LEXIS 79345 (D. Del. 2013) ....................................................v, 14

*In re Imperial Credit Indus, Inc. Sec. Litig.,*
   252 F. Supp. 2d 1005 (C.D. Cal. 2003) .........................................................16, 17

*In re Juniper Networks, Inc. Sec. Litig.,*
   264 F.R.D. 584 (N.D. Cal. 2009) .......................................................................4

*In re LDK Solar Sec. Litig.,*
   255 F.R.D. 519 (N.D. Cal. 2009) ..............................................................3, 22, 24

*In re Magma Design Automation, Inc. Sec. Litig.,*
   2007 U.S. Dist. LEXIS 62641 (N.D. Cal. 2007) .............................................. passim

*In re McKesson HBOC, Inc. Sec. Litig.,*
   97 F. Supp. 2d 993 (N.D. Cal. 1999) ...................................................................2

*In re MGM Mirage Sec. Litig.,*
   2010 U.S. Dist. LEXIS 120061 (D. Nev. 2010) .......................................................2

*In re Northern Telecom LTD. Sec. Litig.,*
   116 F. Supp. 2d 446 (S.D.N.Y. 2000) ................................................................17

*In re Novatel Wireless Sec. Litig.,*
   2013 U.S. Dist. LEXIS 154599 (S.D. Cal. 2013) ....................................................16

*In re NTL Sec. Litig.,*
   2006 U.S. Dist. LEXIS 5346 (S.D.N.Y. 2006) ........................................................1

*In re Oracle Corp. Sec. Litig.,*
   627 F.3d 376 (9th Cir. 2010) ..........................................................................21

*In re Oracle Corp. Sec. Litig.,*
   2005 U.S. Dist. LEXIS 35723 (N.D. Cal. 2005) ......................................................5

*In re Oracle Sec. Litig.*,
829 F. Supp. 1176 (N.D. Cal. 1993) ...................................................................17

*In re Party City Sec. Litig.*,
189 F.R.D. 91 (D.N.J. 1999)...............................................................................7

*In re Providian Fin. Corp. Sec. Litig.*,
2004 U.S. Dist. LEXIS 31107 (N.D. Cal. 2004) ........................................... iii, 4, 6

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) .........................................................................10

*In re Schering-Plough Corp. Sec. Litig.*,
2003 U.S. Dist. LEXIS 26297 (D.N.J. 2003) ......................................................1

*In re St. Jude Med. Inc. Sec. Litig.*,
2014 U.S. Dist. LEXIS 169354 (D. Minn. 2014) ................................... v, vii, 22, 23

*In re Static Random Access Memory Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009)................................................................. iii, 5

*In re UTStarcom, Inc. Sec. Litig.*,
2010 U.S. Dist. LEXIS 48122 (N.D. Cal. 2010) ...............................................1, 4

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ....................................................... iv, 8, 15, 25

*Jones v. ConAgra Foods, Inc.*,
2014 U.S. Dist. LEXIS 81292 (N.D. Cal 2014) ...........................................24, 25

*Kanawi v. Bechtel Corp.*,
254 F.R.D. 102 (N.D. Cal. 2008)................................................................ ii, 1

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ....................................................... iv, 12, 15, 25

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ...........................................................................21

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
256 F.R.D. 586 (N.D. Ill. 2009)................................................... iv, 2, 3, 4

*McIntire v. China MediaExpress Holdings, Inc.*,
2014 U.S. Dist. LEXIS 113446 (S.D.N.Y. 2014)........................................v, 10

*Miller v. Thane Int'l, Inc.*,
2005 WL 5957833 (C.D. Cal. 2005)...................................................................16

*Moreno v. Autozone, Inc.*,
251 F.R.D. 417 (N.D. Cal. 2008) ................................................................... vii

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010).................................................................................. iii, 5, 6

*Mortensen v. Snavely*,
  145 Fed. Appx. 218 (9th Cir. 2005).................................................16

*O'Shea v. Epson Am., Inc.*,
  2011 U.S. Dist. LEXIS 105504 (C.D. Cal. 2011)...................................5

*Perlmutter v. Intuitive Surgical, Inc.*,
  2011 U.S. Dist. LEXIS 16813 (N.D. Cal. 2011) ...................................3

*Randall v. Loftsgaarden*,
  478 U.S. 647 (1986).................................................................10

*Richardson v. TVIA, Inc.*,
  2007 U.S. Dist. LEXIS 28406 (N.D. Cal. 2007) ...................................2

*Schleicher v. Wendt*,
  618 F.3d 679 (7th Cir. 2010) ...................................................10, 12, 23

*Schwartz v. Harp*,
  108 F.R.D. 279 (C.D. Cal. 1985) ...............................................3

*Soc. Servs. Union, Local 535 v. Cnty. of Santa Clara*,
  609 F.2d 944 (9th Cir. 1979) ...................................................5

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ...................................................3

*U.S. v. Schiff*,
  602 F.3d 152 (3d Cir. 2010).....................................................16

*Valley Drug Co. v. Geneva Pharms., Inc.*,
  350 F.3d 1181 (11th Cir. 2003) .................................................7

*Wallace v. Intralinks*,
  302 F.R. D. 310 (S.D.N.Y. 2014) .............................................v, 20

*White v. Experian Info. Solutions, Inc.*,
  803 F. Supp. 2d 1086 (C.D. Cal. 2011) ........................................7

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
  594 F.3d 1087 (9th Cir. 2010) .................................................25

1

<u>Rules</u>

2

Fed. R. Civ. P. 23 ................................................................................................ passim

3

Fed. R. Civ. P. 23(a) ........................................................................................... passim

4

Fed. R. Civ. P. 23(b)(3) ....................................................................................... passim

5

Fed. R. Civ. P. 30(b)(6) .......................................................................................... viii

6

7

<u>Other Authorities</u>

8

Prof. Dr. Ianika N. Tzankova, *Funding of Mass Disputes: Lessons From The Netherlands*
8 J. L. Econ. & Pol'y 549, 573 (2012) ...........................................................6

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| Ex. __ | Ex. __ attached to the Declaration of Eli R. Greenstein in Support of Lead Plaintiff's Reply Memorandum of Points and Authorities in Further Support of Its Motion for Class Certification. |
| Coffman Dep. | Transcript of the Deposition of Chad Coffman (Dec, 3, 2014), submitted as Exhibit 2 (Docket No. 244-2) to the Declaration of Marc Wolinsky. |
| Coffman Rbtl. | Expert Rebuttal Report of Chad Coffman, submitted as Ex. 1. |
| Coffman Rpt. | Expert Report of Chad Coffman (Nov. 4, 2014), submitted as Exhibit 11 (Docket No. 235-12) to the Declaration of Eli R. Greenstein in Support of Lead Plaintiff's Motion for Class Certification. |
| FIFO | First in, first out. |
| Hendriks Decl. | Declaration of Femke Hendriks in Support of Lead Plaintiff's Reply Memorandum of Points and Authorities in Further Support of Its Motion for Class Certification, submitted as Ex. 2. |
| Hendriks Dep. | Excerpts from the deposition transcript of Femke Hendriks (Nov. 14, 2014) as representative of PGGM under Rule 30(b)(6), submitted as Ex. 8. |
| HP | Defendant Hewlett-Packard Company. |
| Defendants | Defendant Hewlett-Packard Company and individual Defendant Chief Executive Officer Margaret C. Whitman, collectively. |
| KTMC | Court-appointed Lead Counsel Kessler Topaz Meltzer & Check, LLP. |
| Lehn Dep. | Excerpts from the deposition transcript of Professor Kenneth M. Lehn (January 19, 2015), submitted as Ex. 6. |
| Lehn Rpt. | Declaration of Professor Kenneth M. Lehn (December 15, 2014), submitted as Exhibit 1 (Docket No. 244-1) to the Declaration of Marc Wolinsky. |
| LIFO | Last in, first out. |
| LP Br. | Lead Plaintiff's Memorandum of Points and Authorities in Support of Its Motion for Class Certification (Docket No. 235). |
| Opp. | Defendants' Opposition to Lead Plaintiff's Motion for Class Certification (Docket No. 243). |
| PGGM | Court-appointed Lead Plaintiff PGGM Vermogensbeheer B.V. |
| PSLRA | Private Securities Litigation Reform Act of 1995. |
| Rule | Federal Rules of Civil Procedure. |

**SUMMARY OF ARGUMENT**

The threshold premise of Defendants' Opposition is that Plaintiff purportedly "made *no effort* to comply with the requirements of Rule 23."  Opp. at 2.  This argument is risible on its face.  Plaintiff's motion for class certification provides comprehensive empirical evidence, controlling legal authority, and robust expert analysis establishing that Plaintiff has satisfied each and every element of Rule 23(a) and 23(b)(3).  Notably, in response to this alleged "no effort," Defendants *conceded* most of the key elements of Rule 23 and have not even *attempted* to rebut the vast majority of Plaintiff's arguments, evidence, and expert opinions, as summarized below.

*First*, Defendants readily concede that the "numerosity" and "commonality" requirements of Rule 23(a) have been satisfied.  *Second*, Defendants admit that this class action is "superior" to prosecuting thousands of individual actions and that no management difficulties or "ascertainability" problems exist that would preclude class treatment.  *Third*, Defendants concede that HP's stock traded in an efficient market and that the Class is entitled to the fraud-on-the-market presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and recently reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*").  *Fourth*, Defendants do not and cannot dispute that their alleged fraud had a "price impact"—*i.e.*, inflated the price of HP's common stock during the Class Period.  *Fifth*, and perhaps most importantly, Defendants admit that *five of the six* elements of Plaintiff's fraud claims—(i) falsity, (ii) materiality, (iii) scienter, (iv) loss causation, and (v) reliance (*i.e.*, *all* of the liability elements)—can be adjudicated on a classwide basis.

Faced with this compendium of facts and law supporting class certification, Defendants seek to deflect attention by raising speculative, peripheral arguments that ignore bedrock Rule 23 principles and are fundamentally at odds with decades of class certification jurisprudence.  For example, they attack the adequacy of Lead Plaintiff and Lead Counsel with unsupported accusations and innuendo regarding some unexplained "specter" or "possibility" of "conflict" without providing a shred of evidence to support their claim.  They contend that PGGM is "atypical" because it is a "net seller" during the Class Period, while utterly ignoring the well-settled rule that net sellers who are also net *losers* are adequate class representatives.  Finally, under the guise of challenging

1   classwide damages pursuant to *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), Defendants

2   advance premature, merits-based **loss causation** arguments regarding "disaggregation," that are

3   foreclosed by *Halliburton I* and have been uniformly rejected by courts in the Ninth Circuit and

4   across the country.  *See, e.g.*, *In re Diamond Foods, Inc*., *Sec. Litig*., 295 F.R.D. 240, 251 (N.D. Cal.

5   2013); *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2183 (2011) ("*Halliburton I*").

6   Simply put, Defendants have provided no basis to deny certification.

7   **1.   Lead Plaintiff Satisfies the Typicality Requirement of Rule 23(a)**

8          As this Court has held, "typicality is a permissive standard and the focus should be on the

9   defendants' conduct and plaintiff's legal theory, *not* the injury caused to the plaintiff."  *Kanawi v.*

10  *Bechtel Corp.*, 254 F.R.D. 102, 110 (N.D. Cal. 2008) (Breyer, J.).[1]  Ignoring this guiding principle

11  altogether, Defendants focus entirely on "the injury caused to the plaintiff" and attack PGGM's

12  individual loss calculations, arguing that it is a "net seller." *Id*.   This argument fails on its own

13  terms.  First, Defendants do not and cannot dispute that PGGM is a "net loser" and suffered damages

14  on its *Class Period purchases* of HP stock—the only purchases at issue in this litigation.  As

15  Plaintiff's expert demonstrates, PGGM suffered damages on its Class Period purchases under both

16  the FIFO and LIFO methods.  *See* Coffman Rbtl. ¶¶8, 37-43.  Indeed, PGGM's last purchase during

17  the Class Period (15,478 shares on October 9, 2012) was held through the November 20, 2012

18  corrective disclosure alleged by Plaintiff, thereby indisputably generating damages.

19         Second, Defendants' expert's calculations of PGGM's damages are based on flawed

20  assumptions that seek to improperly sweep in HP stock purchases that occurred *before* the Class

21  Period began, none of which are part of this lawsuit.  In any event, even under Defendants' flawed

22  pre-Class Period methodology, their expert admits that PGGM has suffered damages under certain

23  loss causation scenarios that have yet to be tested by either expert.  Lehn Rpt. ¶21.  The fact that

24  Defendants may ultimately *disagree* with those scenarios when the parties exchange loss causation

25  expert reports following merits discovery, does nothing to undermine PGGM's typicality under Rule

26  23.  *In re Magma Design Automation*, *Inc. Sec. Litig*., 2007 U.S. Dist. LEXIS 62641, at *3-6 (N.D.

27

28
   ---
   [1]       Unless otherwise noted, all emphasis is added and internal citations are omitted.

Cal. 2007) (Breyer, J.) ("Defendants' argument may ultimately carry the day, knock out part of the lawsuit, and reveal that the lead plaintiff is ineligible for relief. But the proper vehicle for presenting this argument is on a motion for partial summary judgment. It is not a reason for denying class certification."). Ultimately, what is dispositive here is that PGGM's claims "arose from the same set of events and course of conduct that gave rise to the claims of other class members, thus satisfying the typicality requirement…." *In re Providian Fin. Corp. Sec. Litig*., 2004 U.S. Dist. LEXIS 31107, at *16 (N.D. Cal. 2004) (Breyer, J.).

### 2.  Lead Plaintiff and Lead Counsel Are Adequate Under Rule 23(a)

To defeat "adequacy" under Rule 23(a), Defendants must demonstrate actual conflict that goes to the "very heart of the suit." *In re Cooper Cos. Inc. Sec. Litig*., 254 F.R.D. 628, 636 (C.D. Cal. 2009); *In re Static Random Access Memory Antitrust Litig*., 264 F.R.D. 603, 609 (N.D. Cal. 2009) ("The mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not hypothetical."). Here, Defendants speculate about "risk" and "possibility" of some unknown "specter of concern" without providing a single fact, document, or affidavit proving *any* conflict, let alone conflict going to the heart of the suit. *See Allen v. Hyland's Inc*., 300 F.R.D. 643, 665 (C.D. Cal. 2014) ("*[T]he specter of a conflict of interest is too speculative* to warrant denying Plaintiffs' class certification motion on adequacy grounds.").

Moreover, contrary to Defendants' unseemly (and unsupported) innuendo, PGGM's participation in foreign securities litigation is not part of some secretive "business partnership" or "investment venture" with Lead Counsel, KTMC. Rather, PGGM is just one of hundreds of institutional investors, including CalSTRS and CalPERS, who have banded together after the Supreme Court's decision in *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010), to seek redress in foreign courts for losses suffered on foreign exchanges. Hendriks Decl. ¶¶7-8. The fact that KTMC provides legal services and guidance to PGGM and its foreign counsel (as well as many other institutional investors) regarding both U.S. and foreign securities litigation post-*Morrison* in no way compromises PGGM's duties and responsibilities here. *Id*. ¶9. To the contrary, PGGM's representative, who has actively supervised this action since its inception, has sworn under oath that those litigations have *no* impact whatsoever on this case. *Id*. ¶¶3-6, 9-10; *In re Facebook, Inc., IPO*

*Sec. and Derivative Litig.*, 288 F.R.D. 26, 39-41 (S.D.N.Y. 2012) ("[L]ead plaintiff's declared intent to vigorously prosecute an action is sufficient to dispense with 'baseless conjecture' about conflicts based on business relationships."). Simply put, Defendants' adequacy argument is a sideshow. They fail to provide a single concrete fact to support their baseless accusations and come nowhere close to establishing that PGGM and KTMC are inadequate.

### 3. Common Issues of Law and Fact Predominate Under Rule 23(b)(3)

As noted above, Defendants readily concede that five of the six elements of Plaintiff's fraud claims—***all*** of the elements of liability—can be adjudicated on a classwide basis. Faced with this unavoidable truth, Defendants seek to latch onto Justice Scalia's majority opinion in *Comcast*, 133 S. Ct. at 1433-1435, arguing that individualized damages questions will somehow "overwhelm" these core liability issues and foreclose classwide treatment. In §10(b) cases, however, individualized damages questions are "peripheral, and substantially outweighed by the class members' common interests" in establishing "the *sine qua non—**liability***[.]" *Blackie v. Barrack*, 524 F.2d 891, 909-10 (9th Cir. 1975).[2] Indeed, "[*Comcast*] has no impact on cases such as the present one, in which predominance [is] based not on common issues of damages but on the numerous common issues of liability." *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167-69 (9th Cir. 2014) (explaining that *Deepwater Horizon* is "compelling" and "consistent with our circuit precedent in *Leyva*").

Just last summer, in *Halliburton II*, the Supreme Court likewise reaffirmed that, in §10(b) cases, predominance turns on these foundational liability elements and—in particular—on the critical element of reliance. 134 S. Ct. at 2416. Indeed, notwithstanding *Comcast*, even Justice Scalia agreed that after *Halliburton II*, "***[securities] plaintiffs who invoke the presumption of reliance (by proving its predicates) are deemed to have met the predominance requirement of Rule 23(b)(3)***." *Id.* at 2423-24. Here, it is undisputed that Plaintiff has proven the predicates of the

---

[2]    *See, e.g.*, *Cooper*, 254 F.R.D. at 632 ("The common questions of whether misrepresentations were made and whether Defendants had the requisite scienter predominate over any individual questions of [] damages."); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 596-97 (N.D. Ill. 2009) ("The common questions [of falsity, materiality and scienter] bind class members with more force than the varying questions related to price inflation drive them apart.").

presumption of reliance.  As a result, Plaintiff has "***shown predominance as a matter of law***…."  *Id.  See also In re Groupon, Inc. Sec. Litig.*, 2014 U.S. Dist. LEXIS 137382, at *7-9 (N.D. Ill. 2014) ("In a securities fraud class action, the fraud-on-the-market doctrine makes it rather easy for a lead plaintiff to establish that common questions predominate over individual ones.").

In any event, Plaintiff has independently satisfied *Comcast*.  Damages in §10(b) actions—unlike antitrust, food-labeling and other non-securities cases—are subject to a well-established "out-of-pocket" damages methodology through which "the process of computing individual damages will be virtually a ***mechanical task***."  *Blackie*, 524 F.2d at 905, 908-11.  It is no surprise, therefore, that courts have consistently certified securities class actions post-*Comcast*:

| Plaintiff's Post-*Comcast* Securities Cases | Defendants' Post-*Comcast* Securities Cases |
| --- | --- |
| • *In re Diamond Foods, Inc. Sec. Litig.* (N.D. Cal. 2013)<br>• *In re Heckmann Corp., Sec. Litig.* (D. Del. 2013)<br>• *Wallace v. Intralinks* (S.D.N.Y. 2014)<br>• *Dodona I, LLC v. Goldman, Sachs & Co.* (S.D.N.Y. 2014)<br>• *In re Groupon, Inc. Sec. Litig.* (N.D. Ill. 2014)<br>• *IBEW Local 98 Pension Fund v. Best Buy Co., Inc.* (D. Minn. 2014)<br>• *McIntire v. China MediaExpress Holdings, Inc.* (S.D.N.Y. 2014)<br>• *In re St. Jude Med. Inc. Sec. Litig.* (D. Minn. 2014)<br>• *In re BP p.l.c.  Sec. Litig.* ("*BP II*") (S.D. Tex. 2014) (post-explosion subclass) | • *In re BP p.l.c. Sec. Litig.* ("*BP II*") (S.D. Tex. 2014) (pre-explosion subclass) |

Notably, Defendants do not cite a *single* post-*Comcast* securities case that denied class certification based on the out-of-pocket damages methodology employed here.  In fact, Defendants' sole post-*Comcast* securities authority squarely supports certification.  In *In re BP p.l.c. Sec. Litig.*, 2014 U.S. Dist. LEXIS 69900 (S.D. Tex. 2014) ("*BP II*"), the Court ***granted*** class certification based upon the *same* out-of-pocket damages methodology, using the *same* event study model, submitted by the *same* expert (Chad Coffman, C.F.A.) retained by Plaintiff here.  Remarkably, despite Defendants' exclusive reliance on *BP* over a dozen times in their briefing, they fail to inform the Court that the class of investors utilizing the out-of-pocket method of damages (the same theory

1   employed here) was certified.  *Id.* at *90-92.  Instead, Defendants inexplicably focus on the subclass

2   in *BP II* that "***expressly eschew[ed]***" the traditional out-of-pocket damages method advanced here

3   (*id.* at *82-85) while misleadingly asserting that the court in *BP* "den[ied] certification *twice* despite

4   Coffman's efforts."   Opp. at v.   Defendants' inaccurate presentation of *BP II* is not altogether

5   surprising, however, as the omitted holding razes Defendants' arguments and endorses the very

6   damages approach proffered by Plaintiff in this case.

7            Notwithstanding Defendants' complete absence of applicable securities law precedent, they

8   also fail to credibly undermine Plaintiff's damages methodology.  Plaintiff's expert has provided a

9   detailed event study and regression analysis that determines with over 95% confidence that new

10  information released by HP, as opposed to market or industry factors, caused HP's stock declines on

11  the two alleged corrective disclosure dates.  *See* Coffman Rpt. ¶¶53-60; *Diamond Foods*, 295 F.R.D.

12  at 251-52 (*Comcast* satisfied where "Plaintiff's expert [] provided an event study that analyzes the

13  impact of [the company's] disclosures on the share price" because "[t]he event study method is an

14  accepted method for the evaluation of materiality damages to a class of stockholders in a defendant

15  corporation").   Importantly, neither Defendants nor their expert have challenged Mr. Coffman's

16  event study, regression analysis, or its statistical results.  In fact, Defendants' own expert actually

17  ***applied*** Mr. Coffman's out-of-pocket damages model in an attempt to formulaically calculate

18  PGGM's damages in this action under certain hypotheticals.   Although Plaintiff and its expert

19  disagree with certain assumptions and inputs used by Defendants' expert in applying Mr. Coffman's

20  damages model, the fact that Defendants' expert has conceded that the model can be applied

21  mechanically in a classwide manner—regardless of what the loss causation/disaggregation analysis

22  ultimately yields—confirms that common issues "predominate" under Rule 23(b)(3).

23           Defendants' ancillary argument, that Plaintiff's model is insufficient for failure to

24  "disaggregate" "confounding information," is a classic loss causation challenge that cannot be

25  squared with *Halliburton I*, 131 S. Ct. at 2183, which held that plaintiffs need not establish loss

26  causation at class certification.   Indeed, "class certification is not the appropriate stage of the

27  litigation to determine loss causation" and "when the appropriate time comes for [lead plaintiff] to

28  prove the merits of the issue of loss causation, common issues of generalized proof will

predominate." *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270-71 (S.D.N.Y. 2014). For that reason, post-*Comcast* securities opinions consistently reject these same types of merits-based loss causation arguments. *See BP II*, 2014 U.S. Dist. LEXIS 69900, at *65-71 (rejecting argument that plaintiffs' damages methodology failed to disaggregate because it "concern[s] loss causation"); *In re St. Jude Med. Inc. Sec. Litig.*, 2014 U.S. Dist. LEXIS 169354, at *15-25 (D. Minn. 2014) (rejecting argument that plaintiff's expert "made no effort to disaggregate"); *Diamond Foods*, 295 F.R.D. at 251-52 (same); *IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 2014 U.S. Dist. LEXIS 108409, at *20-24 (D. Minn. 2014) (same). Ultimately, as the Ninth Circuit explained, "we are confident that the jury will be able to trace a graph delineating the actual value of the stock throughout the class period. When compared with a comparable graph of the price the stock sold at, the determination of damage will be a mechanical task for each class member." *Blackie*, 524 F.2d at 908-11. *See also* Coffman Rbtl. ¶7(e) ("Whatever percentage…is determined to be reasonable, it can be applied on a class-wide basis within the general damages methodology already described[.]").

In sum, Defendants concede that the Class shares an "overriding common interest in establishing the existence and materiality of misrepresentations," among other common liability elements. *Blackie*, 524 F.2d at 909. And, where "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Moreno v. Autozone, Inc.*, 251 F.R.D. 417, 426 (N.D. Cal. 2008) (Breyer, J.).[3] Defendants' attempt to ensure that the Courthouse doors will effectively be closed to thousands of HP shareholders who seek to cohesively adjudicate their claims should be rejected. At the end of the day, "[i]t is difficult to imagine a case where class certification would be more appropriate. Without it, thousands of identical complaints by [] shareholders would have to be filed—the very result the class action mechanism was designed to avoid." *Epstein v. MCA, Inc.*, 50 F.3d 644, 668 (9th Cir. 1995) (securities fraud class actions fit Rule 23 "like a glove").

---

[3] *See also Magma*, 2007 U.S. Dist. LEXIS 62641, at *3 ("[Defendant] treated [] all of its shareholders in the same fashion, which both raises the specter of inconsistent or varying adjudications with respect to individual members of the class, and makes a class action superior to other available methods for the fair and efficient adjudication of the controversy.").

# I.    <u>ARGUMENT</u>

## A.    PGGM's Claims Are Typical

As noted above, "typicality is a permissive standard and the focus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff." *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 110 (N.D. Cal. 2008) (Breyer, J.).  Here, Defendants do not dispute that PGGM's claims arise from the same fraudulent conduct that gives rise to the claims of other Class members, based on the same legal theory.  Defendants nevertheless focus exclusively on "the injury caused to the plaintiff," claiming that PGGM is a "net seller" rendering it atypical.  Opp. at ii, 6-9.  This Court, however, previously rejected the very same arguments regarding "net sellers," purported "gains" from pre-Class Period purchases, and intra-class conflicts, made by the very same defense counsel here.  *See In re Brocade Commc'ns, Sys., Inc. Sec. Litig.*, No. C 05-02042 CRB, Civil Minutes, Dkt. No. 392 (N.D. Cal. Oct. 12, 2007) (Breyer, J.) (Ex. 3) (certifying class representative); Dkt. No. 319 (Ex. 4) (brief arguing that plaintiff was a net seller and net gainer); Dkt. No. 405 (Ex. 5) at 6:10-8:12 ("I also find that the class representative is adequate and typical. I don't subscribe to the arguments contrary to that.").

In any event, Defendants' "net seller" argument fails for multiple reasons.  First, Defendants disregard that PGGM is a "net *loser*" and indisputably suffered damages under both LIFO and FIFO for its Class Period purchases of HP stock.  *See* Coffman Rbtl. ¶¶8, 37-38.  As Defendants' own authority makes clear, when a plaintiff has suffered a LIFO or FIFO loss, it is typical regardless of whether it was also a "net seller."  *See* Opp. at 24-25; *In re UTStarcom, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 48122, at *19-20 (N.D. Cal. 2010) (Ware, J.) (rejecting argument that lead plaintiff was an atypical "net seller" and "net gainer" because, "under a [FIFO] calculation, Plaintiff [] suffered a net loss").[1]   Indeed, courts consistently hold that the mere fact that plaintiff is a "net

---

[1]      *See also In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23-25 (D. Mass. 2008) (appointing net seller with LIFO and FIFO losses because "[g]iven the formulaic nature of damages calculations in securities fraud cases, it is unlikely that the issues raised by defendants will either cause [lead plaintiff's] interests to diverge from those of other class members or be a major focus at trial"); *In re NTL Sec. Litig.*, 2006 U.S. Dist. LEXIS 5346, at *37-41 (S.D.N.Y. 2006) (same); *In re Schering-Plough Corp. Sec. Litig.*, 2003 U.S. Dist. LEXIS 26297, at *25-27 (D.N.J. 2003) (same).

1    seller" does not suggest that it cannot prove damages.[2]  *See MGM*, 2010 U.S. Dist. LEXIS 120061,

2    at *11-12 ("[C]ourts will allow net sellers who are also net losers to be appointed lead plaintiff, as

3    they normally have no problem proving damages."); *Hodges v. Immersion Corp.*, 2009 U.S. Dist.

4    LEXIS 122565, at *6 (N.D. Cal. 2009) (same); *Richardson v. TVIA, Inc.*, 2007 U.S. Dist. LEXIS

5    28406, at *12-15 (N.D. Cal. 2007) (Whyte, J.) (same).[3]

6         Second, even under Defendants' flawed approach to calculating PGGM's damages by

7    importing pre-Class Period purchases of HP stock that are not at issue in this case, Defendants'

8    expert admits that PGGM has suffered damages under certain merits-based loss causation scenarios

9    that have yet to be tested in discovery.  Lehn Rpt. ¶21; Coffman Rbtl. ¶39; *In re Magma Design*

10   *Automation, Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 62641, at *3-6 (N.D. Cal. 2007) (Breyer, J.)

11   ("Defendants' argument may ultimately carry the day, knock out part of the lawsuit, and reveal that

12   the lead plaintiff is ineligible for relief.  But the proper vehicle for presenting this argument is on a

13   motion for partial summary judgment.  It is not a reason for denying class certification.").  Further,

14   Defendants' expert concedes that, on November 20, 2012—the Class Period-ending corrective

15   disclosure date—PGGM held 15,478 shares that it purchased on October 9, 2012 (*i.e.*, during the

16   Class Period at artificially inflated prices), thereby establishing damages.  Lehn Dep. at 126:21-

17   129:22; Coffman Rbtl. ¶¶8, 37.  As Judge Ellison explained in *BP I*, nothing further is required:

18   "[t]he Supreme Court has indicated that a securities fraud plaintiff has experienced injury if he, at

19   the time of any alleged corrective disclosure, held shares which he purchased during the Class

20   Period at allegedly inflated prices."  *In re BP p.l.c. Sec. Litig.*, 2013 U.S. Dist. LEXIS 173303, at

21

22   [2]    Defendants' own citation, *Frank v. Dana Corp.*, 237 F.R.D. 171, 172-73 (N.D. Ohio 2006)
      (Opp. at ii n.2, 7 n.8), explains that "though [lead plaintiff] may have been a net seller, it should

23   have no trouble proving damages…."  Defendants' other authorities all involve net gainers.  Opp. at
      ii, 7.  For instance, "*In re McKesson HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 996-97 (N.D. Cal.

24   1999)—dealt with a net seller that achieved a net gain, and, as such, is not relevant here."  *In re*
      *MGM Mirage Sec. Litig.*, 2010 U.S. Dist. LEXIS 120061, at *11-12 (D. Nev. 2010).  *See also*

25   *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 600 (N.D. Ill. 2009) (appointing "in-
      and-out trader" who suffered LIFO losses but rejecting proposed class representative who did not

26   "actually suffer[] a loss during the class period under LIFO analysis").

27   [3]    Mr. Coffman did not concede that PGGM realized a "net economic benefit" (Opp. at 7) but,
      rather, testified that "there was economic harm suffered as a result of those class period purchases."

28   Coffman Dep. at 134:19-21.  And, he made clear that "how and when and whether [an analysis of
      economic benefit is] relevant to damages calculation is a separate question."  *Id.* at 131:12-18.

Lead Plaintiff's Reply in Further Support of Its          2          Master File No. 3:12-cv-05980-CRB
Motion for Class Certification

*46 (S.D. Tex. 2013) ("The Court finds that [lead plaintiffs] meet this standard for injury during the Class Period and thus qualify as typical representatives for the Class regardless of the timing of their purchases.").

Although Defendants argue that PGGM is "conflict[ed]" because it allegedly may seek to "maximize" the August 2012 partial corrective disclosure (Opp. at 8),[4] "[c]ourts have [] repeatedly recognized that putative intra-class conflicts relating to the times at which particular class members purchased their securities, and which could potentially motivate different class members to argue that the securities were relatively more or less inflated at different time periods, relate to damages and do not warrant denial of class certification." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 254-55 (N.D. Cal. 2013) (Alsup, J.).[5] Indeed, the Ninth Circuit's seminal opinion in *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975) rejected identical arguments, reasoning that such a "conflict, if any, is peripheral, and substantially outweighed by the class members'…overriding common interest in establishing the existence and materiality of misrepresentations."

Defendants also incorrectly contend that: (1) "in-[and]-out" should traders be excluded from the Class definition; and (2) the Class Period should be shortened because Plaintiff will be unable to prove *scienter* for the May 23, 2012 omission. Opp. at vi, 24-25. The former argument has been soundly rejected, including by Defendants' own authorities. *See, e.g.*, Opp. at ii, 7, 9; *Tellabs*, 256 F.R.D. at 596-97 ("it is [] conceivable that the alleged series of misstatements caused a decline in stock prices that harmed 'in-and-out' traders as well as other investors"); *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985) (argument that in-and-out traders should be excluded has "been

---

[4]    Defendants inexplicably cite cases where courts found no conflicts at all. Opp. at 8; *Perlmutter v. Intuitive Surgical, Inc.,* 2011 U.S. Dist. LEXIS 16813, at *42 (N.D. Cal. 2011) (plaintiff "has no conflicts with the other class members"); *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) ("there are no conflicts between class members sufficient to defeat certification").

[5]    *See also In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 578 (N.D. Cal. 2009) (Illston, J.) ("[A]ccording to defendants' reasoning, a lead plaintiff's interests will not be aligned with those of the putative class unless all class members bought and sold stock at exactly the same time."); *In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 528-30 (N.D. Cal. 2009) (same); *In re CornerStone Propane Ptnrs., L.P. Sec. Litig.*, 2006 U.S. Dist. LEXIS 25819, at *20-24 (N.D. Cal. 2006) (Patel, J.) ("To accept these intra-class conflicts arguments at face value would prohibit the use of the class action mechanism in the vast majority of securities fraud actions.").

considered and rejected by a number of courts").[6]  Rather, as this Court explained, "[t]o the extent that any difference exists among shareholders in terms of…the damages they suffered…such issues may be addressed during subsequent phases of the trial." *Magma*, 2007 U.S. Dist. LEXIS 62641, at *7.  Similarly, Defendants' attempt to shorten the Class Period is baseless.  "Distilled to its essence, Defendant's argument is simply that some aspect of Plaintiffs' claims are going to fail," but "[i]t is axiomatic [] that arguments evaluating the weight of evidence or the merits of a case are improper at the class certification stage." *Id.* at *3-6;  *see Tellabs,* 256 F.R.D. at 595-96 (refusing to shorten class period because "this issue goes to the merits and does not directly impact the propriety of class certification").  In any event, evidence to date suggests Defendants were aware of the very practices raised by Whistleblower No. 4 long before he came forward in May 2012.  *See* LP Br. at 3-8.

Simply put, the Court "need not wade into these muddy waters" because individual damage "calculation[s] depend[] upon variables that are not and cannot be fixed without substantive merits determinations." *BP I*, 2013 U.S. Dist. LEXIS 173303, at *38-47 (rejecting atypicality argument that plaintiffs were "net sellers" who "profited from the alleged fraud").[7]  "Here, plaintiff's claims arose from the same set of events and course of conduct that gave rise to the claims of other class members, thus satisfying the typicality requirement of Rule 23." *In re Providian Fin. Corp. Sec. Litig.*, 2004 U.S. Dist. LEXIS 31107, at *16 (N.D. Cal. 2004) (Breyer, J.).

**B.     Defendants Fail to Prove Any Actual Conflict of Interest**

Defendants' contention that PGGM and KTMC are "inadequate" because of a "possible"

---

[6]      *See also UTStarcom*, 2010 U.S. Dist. LEXIS 48122, at *38 (refusing to "modify the class definition to exclude all class members who purchased and then sold stock in between any two of the approximately 20 alleged partial disclosures"); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009) (same).

[7]      Defendants cite no authority for the proposition that their liability should be reduced by PGGM's sales of Autonomy shares (an entirely different security not at issue here) in October 2011—over seven months prior to the Class Period.  Opp. at ii, 9.  Indeed, even netting gains in the *same* security is inappropriate at this stage.  *Centaur Classic Convertible Arbitrage Fund Ltd. v. Countrywide Fin. Corp.*, 793 F. Supp. 2d 1138, 1143-44 (C.D. Cal. 2011) ("[T]he netting of each Plaintiff's gains and losses is a detailed inquiry which the Court is unable to undertake at this stage of the litigation.").  Moreover, Defendants' flawed pre-Class Period offsetting theory ignores that HP shares may also have been purchased at inflated prices prior to the Class Period.  *See* Coffman Rbtl. ¶¶8, 41-43; *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1315-17 (11th Cir. 2011) (acknowledging that inflation can pre-date first actionable misstatement).

conflict of interest and a "specter" of concern arising from KTMC's provision of legal services to PGGM in foreign litigation is plainly insufficient to defeat adequacy under Rule 23(a).  Opp. at 10-11.  Indeed, "[t]he mere potential for a conflict of interest is not sufficient to defeat class certification; the conflict must be actual, not hypothetical."  *In re Static Random Access Memory Antitrust Litig.*, 264 F.R.D. 603, 609 (N.D. Cal. 2009) (citing *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) ("this circuit does not favor denial of class certification on the basis of speculative conflicts")); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 665 (C.D. Cal. 2014) ("in this case, the specter of a conflict of interest is too speculative to warrant denying Plaintiffs' class certification motion"); *In re Corinthian Colleges S'holder Derivative Litig.*, 2012 U.S. Dist. LEXIS 188623, at *46-49 (C.D. Cal. 2012) (rejecting argument that "counsel might be less willing to settle [one action] in order to [] leverage in the other action," calling it a "theoretical conflict of interest"); *O'Shea v. Epson Am., Inc.*, 2011 U.S. Dist. LEXIS 105504, at *14-16 (C.D. Cal. 2011) ("[B]ecause [defendant] presents no evidence showing that [plaintiff's] prior association with [class counsel] has manifested in an actual conflict, denial of class certification on this basis is inappropriate."); *In re Oracle Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 35723, at *6 (N.D. Cal. 2005) ("Defendants have not demonstrated that an actual conflict has ripened out of the mere theoretical conflict presented by [counsel's representation in both actions].").[8]  Thus, Defendants' speculative musings fail to satisfy their burden of proving an actual conflict.  *See Gutierrez v. Kovacevich "5" Farms*, 2004 U.S. Dist. LEXIS 29476, at *24-25 (E.D. Cal. 2004) (The Ninth Circuit "place[s] upon defendant the burden of proving a conflict of interest" at class certification.).

In any event, far from being a "unique arrangement," PGGM's participation in non-U.S. actions is the direct result of the Supreme Court's 2010 decision in *Morrison*, which compelled many large institutional investors to group together to protect their interests through foreign litigation.  *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010).  For example, in the *Fortis* litigation, PGGM is only one of 140 other large institutional investors in "Stichting Investor Claims

---

[8]    *See also Huberman v. Tag-It Pac., Inc.*, 314 Fed. Appx. 59, 62 (9th Cir. 2009) ("The district court concluded that [plaintiff] was atypical on the basis of unsupported speculation…[which] was contrary to the permissive standards of the typicality requirement and lacked a reasonable basis."); *Soc. Servs. Union, Local 535 v. Cnty. of Santa Clara*, 609 F.2d 944, 948 (9th Cir. 1979) (same).

Against Fortis," an "open" foundation organized pursuant to the Dutch Civil Code.  Hendriks Decl. ¶8.[9]  KTMC, in conjunction with a group of other law firms, provides legal services and guidance based on its experience in U.S. securities litigation to the foundation's Dutch counsel and acts as "the liaison between [PGGM and]…the Dutch firm[]."  Hendriks Dep. at 90:19-21; Hendriks Decl. ¶7.  The foundation's funding and fee arrangements with various foreign and U.S. counsel are substantively similar to those in U.S. securities litigation and allow these institutional investors, who otherwise would have no recourse, to pursue their foreign claims post-*Morrison*.[10]  Hendriks Decl. ¶7.  Defendants' argument, if taken to its logical conclusion, would automatically disqualify as class representatives many of the largest and most well-suited institutional investors in the world, including CalSTRS and CalPERS, simply because they acted as responsible fiduciaries by pursuing claims in foreign courts following *Morrison*.  *Providian*, 2004 U.S. Dist. LEXIS 31107, at *12-13 ("The PSLRA was designed to increase the likelihood that institutional investors will serve as lead plaintiffs.").[11]

Defendants' assertion that PGGM's "willingness" to lead this litigation is somehow "cast[] [in] doubt" is belied by the record thus far.  Opp. at 11.  Since being appointed as Lead Plaintiff, PGGM has vigorously defended the Class's interests, including expending significant time and resources responding to Defendants' broad discovery requests and ably testifying at deposition about its Rule 23 qualifications.[12]  Hendriks Decl. ¶4.  For two years, PGGM has been "informed

---

[9]     As Chief Investment Officer Magazine reported, the *Fortis* litigation "marks a major step in pursuing international securities claims in the wake of last year's US Supreme Court decision in [*Morrison*]."  *See* Ex. 7.

[10]    Indeed, there is no support for Defendants' suggestion that the fee arrangements are improper or that PGGM is a "co-investor" with KTMC.  *See* Opp. at 10-11.  For instance, the Netherlands' prohibition on contingency fees extends only to members of the Dutch bar, and special purpose foundations such as the foundation are regularly set up to fund litigation on a contingent basis.  *See* Journal of Law, Economics & Policy, 8 J.L. Econ. & Pol'y 549, 573-77 ("Contingency fees are not allowed in the Netherlands for members of the Dutch bar. Virtually anyone else, however, could enter into an unregulated contingency fee agreement with a potential claimant.").

[11]    Defendants' out-of-circuit authorities, by contrast, involve actual evidence of questionable relationships between class counsel and plaintiffs that the PSLRA sought to eliminate by encouraging institutional investors (like PGGM) to step into the fray.  Opp. at ii-iii, 10-11.

[12]    Contrary to Defendants' suggestion (Opp. at iii), PGGM is well versed in HP's fraud.  *See* Hendriks Dep. at 140:2-15 (Whitman "offered one explanation of the disappointing results but she omitted to offer the other solution and that was the accounting fraud" and instead "presented the

about every step [KTMC is] taking in [the] litigation," and has "review[ed] all [of] the documents [filed]."  *See* Hendriks Dep. at 148:15-149:7.  PGGM conducted an extensive search in response to Defendants' broad document requests, ultimately producing over 22,000 pages of documents, and its representatives have traveled to the U.S. on multiple occasions.  Hendriks Decl. ¶4.  Finally, PGGM has declared under oath that it will continue to tirelessly protect the Class's interests and that any involvement in foreign litigation has no bearing whatsoever on its role or decisions in this action.  *Id.* ¶¶6, 9-10; *In re Facebook, Inc., IPO Sec. and Derivative Litig.*, 288 F.R.D. 26, 39-41 (S.D.N.Y. 2012) ("[L]ead plaintiff's declared intent to vigorously prosecute an action is sufficient to dispense with 'baseless conjecture' about conflicts based on business relationships.").  Accordingly, Defendants' adequacy arguments fail.  *See White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1105 (C.D. Cal. 2011) ("Other than this speculative fear of conflict, [the opposing parties] present no evidence whatsoever indicating a lack of vigor….").[13]

## C.    Common Questions of Law and Fact Predominate Under Rule 23(b)(3)

"Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance."  *Erica P. John Fund, Inc. v. Halliburton Co.* 131 S. Ct. 2179, 2184 (2011) ("*Halliburton I*").  Here, Defendants cannot dispute that common questions predominate for ***all*** five liability elements, including the critical "element of reliance."  *Id*.  They also concede that Plaintiff has proven the predicates for the fraud-on-the market presumption.  Thus, as even Justices Thomas and Scalia acknowledged in the concurring opinion in *Halliburton II*, post-

---

scaling problems, which is not by definition what happened."); *id.* at 221:6-24 (same); *id.* at 141:8-142:3 (describing motion to dismiss order); *id.* at 143:20-145:12 (same).

[13]    PGGM's hope to improve HP's corporate governance *in addition* to maximizing the Class's monetary recovery does not render it inadequate.  Opp. at 9-10.  The "problem with [Defendants' argument] is that Congress seems to have rejected it when it enacted the lead plaintiff provisions of the PSLRA because…Congress anticipated and intended that [large institutional] investors would serve as lead plaintiffs" and large institutions are "highly unlikely to divest all of [their] holdings" in a corporate defendant.  *In re Cendant Corp. Litig.*, 264 F.3d 201, 219, 243-44, 246-47 (3d Cir. 2001) (finding no evidence that plaintiff "gave up anything of value to the class members to induce [defendant] to agree to the corporate governance changes").  PGGM has testified that there "is no tradeoff between the financial aspects of the case and governance."  Hendriks Dep. at 126:12-20, 129:22-130:14.  Defendants' authorities are inapplicable. Opp. at 9-10.  *In re Party City Sec. Litig.*, 189 F.R.D. 91 (D.N.J. 1999), predates *Cendant*.  In *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1193 (11th Cir. 2003), half of the class was "content" to let the misconduct continue.

*Comcast*, "*[securities] plaintiffs who invoke the presumption of reliance (by proving its predicates) are deemed to have met the predominance requirement of Rule 23(b)(3).*" *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. 2398, 2423 (2014).

In an attempt to circumvent this unavoidable result, Defendants raise various loss causation arguments regarding "disaggregation" and re-cast them as damages challenges under the guise of *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013), claiming that such questions will somehow "overwhelm" common issues.   But, loss causation challenges are expressly foreclosed by *Halliburton I*, 131 S. Ct. at 2184.   Furthermore, even if Defendants' loss causation attacks can be viewed as damages arguments, they fail in their own right—as the Ninth Circuit recently reiterated, "[s]o long as the plaintiffs were harmed by the same conduct, disparities in how or by how much they were harmed [do] not defeat class certification." *Jimenez v. Allstate Ins. Co*., 765 F.3d 1161, 1167-68 (9th Cir. 2014).   Finally, as detailed herein, Plaintiff's proposed damages methodology is both measurable on a classwide basis and entirely consistent with its theory of liability under *Comcast*.   Indeed, the same formulaic methodology has been uniformly endorsed in numerous post-*Comcast* securities class certification decisions.  *See* chart, *supra* at v.

### 1.      Securities Fraud Cases Are Subject to a Well-Settled Damages Methodology

Defendants devote the majority of their Opposition to arguing that *Comcast* dictates denial of class certification here.   Opp. at iii-iv, 11-24.   Importantly, however, *Comcast* was an antitrust case involving a class of over "2 million current and former Comcast subscribers" spanning 649 distinct franchise areas in 16 counties.  *Comcast*, 133 S. Ct. at 1434-35; Ex. 9 at 9:17-10:4.   There, plaintiffs alleged that over the course of 10 years, Comcast engaged in misconduct that resulted in four disparate types of injury—or "antitrust impact"—to those 649 franchise areas.  *Comcast*, 133 S. Ct. at 1435.   Of the four theories of liability, the district court accepted only one as capable of class-wide resolution and, accordingly, limited the plaintiffs' case to that single type of harm.  *Id.* at 1434-35.   Plaintiffs' damages methodology, however, "assumed the validity of all four theories of liability initially advanced" and "calculated damages resulting from the alleged anticompetitive conduct as a whole" rather than "attribut[ing] damages to any one particular theory of anticompetitive impact."  *Id*. at 1434.   As the majority explained, the methodology "might have

produced commonality of damages, if all four of those alleged distortions remained in the case." *Id*. Because, however, the 649 different areas were each damaged in differing combinations and degrees by the four types of impact[14] (unlike HP investors who were all harmed in precisely the same way—inflation in HP's stock price), a method that applied the full impact of the four types of harm across the board "identifie[d] damages that are not the result of the wrong." *Id*.[15] Given that the "permutations involving four theories of liability and 2 million subscribers located in 16 counties are nearly endless," the Court held that calculating damages for each class member would "require labyrinthine *individual* calculations." *Id*. at 1431-35.

These unique facts rendered *Comcast* the exception to the general rule that individualized damage questions do not predominate. Indeed, during oral argument, counsel for Comcast freely admitted that it was "not arguing—that the mere fact that there may be individual damages questions precludes class certification." *See* Ex. 9 at 10:24-11:19. To the contrary, it was only in the "certain cases in which—you know, the theory of injury and [] the proof that would be needed to make it out is so *sui* [*generis*] and individualized" that those issues predominate. *Id*. By contrast, it explained, in a case where only one "but-for" price is at issue (such as this action and most §10(b) actions) "and the question as to who bought what when is not really a question of adjudication, but of computation[,] [] those are the types of cases where the courts say that the individual damages questions really do not preclude [] certification." *Id*. at 13:5-11. Thus, Justices Ginsburg and Breyer aptly explained in their dissent that *Comcast* "**breaks no new ground** on the standard for certifying a class action" and "[i]n the mine run of cases, it remains the 'black letter rule' that a

---

[14]   Notably, the franchise areas were so numerous and the combination of impacts so varied that it was impossible even to craft subclasses. *See* Ex. 9 at 9:17-10:4 ("There are cases, indeed, in which—you know, the variances of the classes can be dealt with, with subclasses. No one on the plaintiffs' side has actually asserted here that the record would allow this."); *id*. at 56:11-57:8.

[15]   As Justice Scalia explained, "[f]or all we know, cable subscribers in Gloucester County may have been overcharged because of petitioners' alleged elimination of satellite competition (a theory of liability that is not capable of classwide proof); while subscribers in Camden County may have paid elevated prices because of petitioners' increased bargaining power vis-a-vis content providers (another theory that is not capable of classwide proof); while yet other subscribers in Montgomery County may have paid rates produced by the combined effects of multiple forms of alleged antitrust harm; and so on." *Id.* at 1434-35.

1  class may obtain certification under Rule 23(b)(3) when liability questions common to the class

2  predominate over damages questions unique to class members." *Comcast*, 133 S. Ct. at 1436-37.

3  It was the unique risk of countless individualized mini-trials that informed the Supreme

4  Court's reasoning in *Comcast*, and drove the D.C. Circuit's holding in *In re Rail Freight Fuel*

5  *Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013), another inapposite antitrust case

6  cited by Defendants.[16]   Here, by contrast, there is simply no suggestion that Plaintiff's expert's

7  proposed damages methodology could fail in a way that would fracture the Class into plaintiff-by-

8  plaintiff mini-trials.  Unlike *Comcast*, where defendants' misconduct caused four discrete types of

9  impact, each of which harmed the 649 franchise areas in differing combinations and degrees, here,

10  Defendants' fraud injured ***all*** class members in precisely the same manner—by inflating HP's stock

11  price.  Moreover, there are not 649 types of HP investors in this case; nor are there four "theories of

12  liability;" rather, there is a single theory of liability (misstatements/omissions regarding Autonomy)

13  that caused one uniform injury (inflation) to one variable (HP's stock price).  *See McIntire v. China*

14  *MediaExpress Holdings, Inc*., 2014 U.S. Dist. LEXIS 113446, at *41-44 (S.D.N.Y. 2014)

15  ("Plaintiffs' theory of liability is that [defendant's] misrepresentations caused losses of the same

16  kind: the artificial inflation of [the company's] share price.").  As Judge Easterbrook explained in

17  *Schleicher v. Wendt*, 618 F.3d 679, 682 (7th Cir. 2010):

18  When someone makes a false (or true) statement that adds to the supply of available
     information, that news passes to each investor through the price of the stock.  And
19   since all stock trades at the same price at any one time, every investor effectively
     possesses the same supply of information.  The price both transmits the information
20   and causes the loss.

21  Accordingly, because all investors in securities fraud cases are damaged in the same manner,

22  damages in these actions are subject to a well-settled "out-of-pocket" methodology.  *Affiliated Ute*

23  *Citizens v. U.S.*, 406 U.S. 128, 155 (1972) (adopting the out-of-pocket measure of damages).  *See*

24  *also Randall v. Loftsgaarden*, 478 U.S. 647, 661-62 (1986) ("[O]rdinarily, the correct measure of

---

[16]  In *Rail Freight*, it was undisputed that plaintiff's expert's proposed methodology resulted in
damages for plaintiffs who were bound by rates agreed to *before* the alleged conspiracy *happened*.
Thus, these plaintiffs could not have been harmed by the misconduct itself.  *See In re Elec. Books*
*Antitrust Litig.*, 2014 U.S. Dist. LEXIS 42537, at *66 (S.D.N.Y. 2014) ("The plaintiff's expert in
*Rail Freight* conceded that the model yielded false positives.  There is no such concession here.").

Lead Plaintiff's Reply in Further Support of Its          10          Master File No. 3:12-cv-05980-CRB
Motion for Class Certification

damages…in § 10(b) cases" is the "'out-of-pocket' measure of damages."); *Blackie*, 524 F.2d at 908-11 ("[O]ut of pocket loss is the ordinary standard in a 10b-5 suit."). The out-of-pocket method "allows a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud as measured by the correction in the market price following curative disclosure, *i.e.*, the difference between what the plaintiff paid for the security and what the plaintiff would have paid but for the fraud." *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 716-21 (S.D. Tex. 2006).

Thus, under the out-of-pocket method proposed by Plaintiff's expert here, there is simply no way damages could or would be made on an individualized basis, since classwide damages are determined by the *same* inflation in the stock price arising from the same misstatements/omissions. Regardless of whether that inflation is ultimately determined through a *loss causation* analysis to be 100%, 50% or 10% of the injury-causing stock declines, it still results from the *same* misconduct and applies in the *same* amount for all Class members. *See* Coffman Rbtl. ¶23 ("[R]egardless of how the finder of fact ultimately weighs the evidence and determines the appropriate percentage…, that percentage can be mechanically incorporated easily into the standard damages model already identified[.]").[17] Defendants' expert likewise testified that if, after a loss causation disaggregation analysis, only 50% of the abnormal residual return (rather than 100%) was attributable to the fraud, it would be a "rather simple exercise" to alter the mechanical damages calculation. Lehn Dep. at 157:21-158:25 ("[Y]ou cut Column B in half and you cut Column C in half."); *id*. at 163:4-15 ("Q…[A]ssuming your disaggregation loss causation analysis determined that the abnormal dollar change was 50 percent lower on each of the corrective disclosure dates, you could do the same math and apply it the same way, and you would just reduce Column B by 50 percent, Column C by 50 percent, Column D by 50 percent in the same way, and just do the straight math, right? A. Right, the math is the math, that's correct."); Coffman Rbtl. ¶¶20, 24-25, 31. Thus, whether the inflation

---

[17] *See also id*. ¶26 ("I have constructed [a spreadsheet] which allows one to mechanically input any finding regarding…the proportion of the price movement that is due to confounding information…and thereby formulaically adjust the damages calculation[.]"); *id*. ¶36 ("[T]he model I am proposing…for calculating damages is flexible enough to incorporate any factual finding and would be applied on a class-wide basis[.]").

is 100% or even 0% in the final analysis of loss causation, the Class rises or falls *together* in a common manner.  Coffman Rbtl. ¶¶ 20, 23-27, 30-31, 36.  For this reason, the Ninth Circuit has explained that when a securities fraud plaintiff proves liability, "the amount of price inflation during the period can be charted and the process of computing individual damages will be virtually a *mechanical task*."  *Blackie*, 524 F.2d at 905, 908-11.[18]  *See also Wendt*, 618 F.3d at 681 ("There will be some person-specific issues, such as when [] a given investor purchased or sold…. A computer can sort them out using a database of time and quantity information.").

Likewise, here, damages will be calculated utilizing the same formulaic out-of-pocket method that will be "virtually a mechanical task."  *Blackie*, 524 F.2d at 905; Coffman Rpt. ¶73; Coffman Rbtl. ¶¶4-5, 9, 19-20.  This is why courts have consistently rejected *Comcast* challenges in securities fraud actions over arguments nearly identical to those made by Defendants here.  *See* chart at v (collecting cases).  In fact, nearly two years after *Comcast* was decided, Defendants are unable to point to a *single* securities fraud opinion where a class invoking the out-of-pocket method was not certified as a result of Justice Scalia's majority opinion.  Indeed, the lone securities case cited by Defendants (*BP*) actually supports class certification.  Contrary to their suggestion that "the court in the *BP* securities case [] den[ied] certification twice despite Coffman's efforts" (Opp. at v), the court actually *certified* a class of BP investors who advanced the same out-of-pocket damages methodology, based on the same underlying event study analysis, using the same expert (Chad Coffman) as Plaintiff here.  *In re BP p.l.c. Sec. Litig.*, 2014 U.S. Dist. LEXIS 69900, at *90-92 (S.D. Tex. 2014) ("*BP II*").  In fact, while Defendants argue at-length that Plaintiff's out-of-pocket approach is not consistent with its theory of liability, *BP* held precisely the opposite, explaining that "the 'out-of-pocket' measure of damages employed in most securities fraud cases is *particularly consonant* with the 'fraud-on-the-market' theory" advanced here.  *Id.* at *88 n.14.

Judge Ellison's partial decision in *BP II* not to certify an entirely *separate* sub-class (the "pre-explosion subclass") that utilized a novel theory of damages—the aspect of *BP II* on which Defendants rely—is inapplicable here.  Most fundamentally, for the pre-explosion subclass,

---

[18]    Defendants' derisive characterization of *Blackie* as authority from a "bygone era" is a little curious—the Ninth Circuit recently cited it favorably in *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514-15 (9th Cir. 2013).

plaintiffs "***expressly eschew[ed]***" the out-of-pocket method and the "but for" damages approach utilized in this case.  *Id.* at *82-85 ("Plaintiffs disagree that the proper measure of pre-explosion purchasers' damages is the difference between the actual price paid for the stock and a hypothetical, ex ante 'but for' price....").  Rather, plaintiffs made a unique and untested argument that they should recover "consequential damages," rather than the traditional compensatory damages (*i.e.*, out-of-pocket measure).  *Id.*  During oral argument, Judge Ellison acknowledged the novelty of the theory and explained that this was a "key distinction" and "different from what I've dealt with in other securities fraud cases."  Ex. 10 at 41:20-25, 104:9-14; *id.* at 101:5-9 ("I'm more used to seeing the '***but for*** ' *analysis*…I think that's our issue.").[19]  Importantly, however, for the *BP* class that utilized the well-settled out-of-pocket approach, which measured inflation by "backcasting" the price drops on corrective disclosure dates (the same method proffered here), the court emphatically endorsed that methodology, citing decades of securities fraud jurisprudence:

> Typical Section 10(b) damages are governed by the 'out-of-pocket' rule….  And multiple cases indicate that these 'out of pocket' damages can be measured by reference to the decline in the stock price on the day of disclosure.  Thus, case law reflects a long-standing and widespread practice of measuring the stock price impact of a given misstatement by implication from the stock price decline caused by the misstatement's disclosure.

*BP II,* 2014 U.S. Dist. LEXIS 69900, at *76-78 (citing *Blackie*, 524 F.2d at 909 n.25).[20]  Here, the Class is not seeking consequential damages, but rather the out-of-pocket "but for" measure that the *BP* court found "particularly consonant" with the theory of liability advanced here.

---

[19]    In particular, unlike the out-of-pocket method, the *BP* court found this "articulation of consequential damages [] antithetical to the 'fraud-on-the-market' theory which enables the classwide resolution of their claims because it 'presumes that, in an impersonal well-developed market for securities, investors rely upon the integrity of the market price.'"  *BP II*, 2014 U.S. Dist. LEXIS 69900, at *88.  But if "investors are not relying upon the integrity of the market price—if they are, as Plaintiffs suggest, determining their own risk thresholds specific to the company at issue—then Plaintiffs' proposed measurement of damages cannot be deployed without an individualized inquiry into each investor's subjective motivations."  *Id.*

[20]    *Compare* Coffman Dep. at 64:11-16 (testifying that the corrective disclosures would be the starting point for his analysis because "the most objective and reliable way to test for the value or the price impact an omission had is to go and look at the price change that occurred when that omission was corrected…when the relevant truth that was alleged to have been concealed at that point is actually disclosed").

At any rate, *BP II* was decided prior to *Halliburton II*, which made clear that in securities class actions, a plaintiff's successful invocation of the *Basic* presumption of reliance satisfies Rule 23(b)'s predominance requirement. 134 S. Ct. at 2412 ("In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3).... *Basic* [] establishes that a plaintiff satisfies that burden by proving the prerequisites for invoking the [fraud-on-the-market] presumption...."). Justice Thomas's concurring opinion (which Justice Scalia, who penned *Comcast*, joined) likewise explained that, "*Basic* [] exempts Rule 10b-5 plaintiffs from Rule 23's proof requirement. ***Plaintiffs who invoke the presumption of reliance are deemed to have shown predominance as a matter of law***...." *Id.* at 2423-24. Here, Defendants do not dispute that Plaintiff has proven the prerequisites for invoking the *Basic* presumption.

Likewise, because securities cases are subject to the decades-old "out-of-pocket" approach to damages, so long as the fraud-on-the-market presumption is proven and reliance predominates, courts have almost uniformly found *Comcast* inapposite. For instance, in *In re Groupon, Inc. Sec. Litig.*, 2014 U.S. Dist. LEXIS 137382 (N.D. Ill. 2014), the court explained that "[i]n a securities fraud class action, the fraud-on-the-market doctrine makes it rather easy for a lead plaintiff to establish that common questions predominate over individual ones. Evidence from a plaintiff's expert verifying that the company's stock's price changed rapidly...in response to new information will suffice to certify the class...." *Id.* at *7-9. As a result, the court found that *Comcast* "is inapposite in a securities fraud class action such as this." *Id. See also In re Heckmann Corp. Sec. Litig.*, 2013 U.S. Dist. LEXIS 79345, at *43 (D. Del. 2013) ("[P]laintiff correctly points out that while *Comcast* addresses class action certification, it was not in regard to a securities fraud litigation, which have generally been certified for class status.").

These opinions also comport with long-standing Ninth Circuit precedent holding that in §10(b) cases, common questions of liability predominate over individualized questions of damages. As the court explained in *Blackie*, in §10(b) actions, individualized damages questions are "peripheral, and substantially outweighed by the class members' common interests." 524 F.2d at 909-10. Thus, contrary to Defendants' arguments, in this Circuit the *sine qua non* in securities fraud cases is *liability*, not damages. *Compare* Opp. at iv. *with Blackie*, 524 F.2d at 908-11

(holding, in a 10b-5 case, that "[i]t will be in the interest of each class member to maximize the inflation from those causes at every point in the class period…***to demonstrate the sine qua non—liability***…."). *See also* Fed. R. Civ. P. 23 Advisory Committee's Notes ("[A] fraud perpetrated on numerous persons [through] similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need…for separate determination of the damages suffered by the individual within the class."). Here, Defendants have conceded the *sine qua non* of Rule 23 by conceding that *all five* liability elements predominate. In these types of cases, *Comcast* is "simply inapplicable." *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014).

Indeed, since *BP II* was decided, the Fifth Circuit, relying on the Ninth Circuit's controlling decision in *Leyva*, 716 F.3d at 513, held that where, as here, liability issues overwhelmingly predominate, plaintiffs need not even provide a damages formula at class certification. Specifically, the Fifth Circuit rejected the argument that class certification is inappropriate "in any case where the class members' damages are not susceptible to a formula for classwide measurement" as a "***misreading of Comcast***...which has already been rejected by three other circuits." *Deepwater Horizon*, 739 F.3d at 815. Rather, the Fifth Circuit explained, "nothing in *Comcast* mandates a formula for classwide measurement of damages in all cases. Even after *Comcast*, therefore, this holding has no impact on cases such as the present one, in which predominance was based not on common issues of damages but on the numerous common issues of *liability*." *Id*.[21] *See also Diamond Foods*, 295 F.R.D. at 251-52 ("This order need not decide whether, as defendant claims, *Comcast* requires that class certification be denied absent affirmative evidence that 'damages are susceptible of measurement across the entire class.' Indeed, in a recent decision affirming class certification in a [§10(b)] securities fraud action [], the Supreme Court emphasized that Rule 23(b)(3) 'does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof. What the rule does require is that common questions predominate over any questions affecting only individual class members.'") (quoting *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013)). Here, because Plaintiff has

---

[21]    The Ninth Circuit recently held that *Deepwater Horizon* is "compelling" and "consistent with our circuit precedent in *Leyva*." *Allstate*, 765 F.3d at 1168-69.

1    established (and Defendants concede) that common issues predominate for every element of

2    liability, even if Defendants could demonstrate individualized damage questions (they cannot), this

3    case is patently appropriate for class treatment.

4          **2.     Plaintiff's Comprehensive Damages Methodology Satisfies *Comcast***

5          In any event, Plaintiff has set forth a damages methodology and "approach" that will

6    calculate damages on a classwide basis consistent with *Comcast*.  Specifically, Plaintiff's expert,

7    Mr. Coffman, has already performed a comprehensive event study for HP's common stock during

8    the Class Period to determine statistically significant, company-specific abnormal dollar changes

9    after excluding market and industry factors.  Coffman Rpt. ¶¶ 46-61, 73-74; Coffman Rbtl. ¶¶10,

10   13, 18-19.   This type of event study is the crux of commonly accepted damages analyses in

11   securities fraud actions.  *See id.* at ¶¶10, 19; *In re Imperial Credit Indus, Inc. Sec. Litig.*, 252 F.

12   Supp. 2d 1005, 1014-15 (C.D. Cal. 2003), *aff'd sub nom*, *Mortensen v. Snavely*, 145 Fed. Appx. 218

13   (9th Cir. 2005) (noting the "importance and centrality of the event study methodology in

14   determining damages in securities cases"); *In re Apollo Grp. Inc. Sec. Litig.*, 509 F. Supp. 2d 837,

15   844 (D. Ariz. 2007) ("The tool most often used by experts to isolate the economic losses caused by

16   the alleged fraud is the 'event study.'").  *In re Novatel Wireless Sec. Litig.*, 2013 U.S. Dist. LEXIS

17   154599, at *35 (S.D. Cal. 2013) ("To determine the 'true value' [of a stock absent an alleged fraud

18   for the out-of-pocket methodology], plaintiffs in a securities fraud case [] employ the use of event

19   studies."); Brief of Law Professors as *Amici Curiae* in Support of Petitioners, 2014 U.S. S. Ct.

20   Briefs LEXIS 28, at **52-53 (U.S. 2014) ("[T]he reliability of event studies is supported by their

21   adoption by courts in determining damages….    [M]any courts have found event studies

22   indispensable for this purpose.").[22]  In fact, event studies are "so accepted…that courts now reject

23   expert damage estimates which do not use event study methodology to evaluate the impact on the

24   market of a company's disclosures."  *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 253-54

25

26   [22]     Defendants' expert likewise testified that event studies are "used very frequently to estimate
     loss causation and damages in securities cases."  Lehn Dep. at 21:3-11.  *See also In re Countrywide*
27   *Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 614 (C.D. Cal. 2009); *Miller v. Thane Int'l, Inc.*, 2005 WL
     5957833, at *2 (C.D. Cal. 2005); *FindWhat*, 658 F.3d at 1312-13 (same); *U.S. v. Schiff*, 602 F.3d
28   152, 173 n.29 (3d Cir. 2010) (Event studies are the technique "most often used by experts to isolate
     the economic losses caused by the alleged fraud[.]").

(D.N.J. 2000).[23]  Just last year, the Supreme Court endorsed the use of event studies in securities

cases.  *See Halliburton II*, 134 S. Ct. at 2415.

Here, Defendants fail to mount a *single* challenge to Mr. Coffman's event study despite

grilling him at length regarding his variable inputs, rolling regression method, and peer index

composition, among other parts of his model.  *See, e.g.*, Coffman Dep. at 64:18- 81:21.  Far from

being "conclusory" or "devoid of analysis" (Opp. at iii), Mr. Coffman's event study, *inter alia*:

- ran a regression to evaluate the relationship between HP's stock's daily returns controlling for a broad market index and a peer index made up of "Competitors" identified in HP's 2011 10-K (Coffman Rpt. ¶49);
- constructed the peer index by "including the named HP peers that were publicly traded on major U.S. exchanges during the Class Period," "[w]ithin each segment [] equally-weight[ing] the named peers," and "weight[ing] each segment based upon its contribution to HP's [2011] Earnings from Operations"  (*id.*  ¶49 n.45);
- for each trading day, constructed a regression model using data from the prior 120 trading days to "allow[] for the relationship between HP's Common Stock and the market factors as well as the firm-specific volatility to update over time…" (*id.*  ¶50);
- ensured "a positive correlation between HP's Common Stock and the control variables," by plotting "the estimated coefficients [] for each day [of] the Class Period" (*id.*  ¶51);
- measured the Standard Deviation of the Errors (degree of imprecision in the model's predictions), and thus determined whether each day of the Class Period had an abnormal return large enough to reject random movement as an explanation (*id.*  ¶52);
- calculated a t-statistic for each day to measure the number of standard deviations between the actual observation and the prediction, thus determining with over 95% confidence whether new information released by HP caused stock price movement (*id.*  ¶¶53-56).

These efforts allowed Mr. Coffman to "determine what the abnormal returns are on any given day

during the class period."  Coffman Dep. at 157:5-6.  Indeed, Defendants' own expert implicitly

conceded the statistical integrity of the event study by using the *same* abnormal returns generated

by Mr. Coffman's event study to purportedly calculate PGGM's damages during the Class Period.

Because of the "importance and centrality of the event study methodology in determining

damages in securities cases" (*Imperial Credit*, 252 F. Supp. 2d at 1014-15), courts have consistently

found that market efficiency event studies, like that performed by Mr. Coffman here, are sufficient

to satisfy a plaintiff's burden under *Comcast.*  For example, in *Diamond Foods*, as here, plaintiff's

---

[23]     *See also In re Northern Telecom LTD. Sec. Litig.*, 116 F. Supp. 2d 446, 460 (S.D.N.Y. 2000) (expert's testimony was "fatally deficient in that he did not perform an event study…"); *In re Oracle Sec. Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) ("Use of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to Oracle which defendant allegedly have distorted.").

1  expert performed an event study for purposes of establishing market efficiency and reliance and

2  stated that "[d]amages will be calculated using an event study analysis similar to the event study

3  analysis regarding market efficiency." 295 F.R.D. at 251-52.  On that basis, the plaintiff argued

4  that "the event study already provided [for purposes of market efficiency] demonstrates that

5  damages are calculable on a classwide basis using this standard methodology." *Id.* at 251.  Judge

6  Alsup agreed, reasoning that "[t]he event study method is an accepted method for the evaluation of

7  materiality damages to a class of stockholders in a defendant corporation" noting "numerous

8  decisions wherein an event study was used to identify the economic loss caused by alleged fraud in

9  securities class actions." *Id*.  The court also relied on the Ninth Circuit's instruction that, in §10(b)

10 cases, "[t]he amount of damages is invariably an individual question and does not defeat class

11 action treatment" and "should the class prevail the amount of price inflation during the period can

12 be charted and the process of computing individual damages will be virtually a mechanical task."

13 *Id*. at 252 (quoting *Blackie*, 524 F.2d at 905).  As a result, it concluded that, "plaintiff has

14 sufficiently shown that damages are capable of measurement on a classwide basis such that

15 individual damage calculations do not threaten to overwhelm questions common to the class." *Id.*

16      Defendants erroneously assert that *Diamond Foods* is distinguishable because, there, the

17 defendant did not identify "any specific complications that would make [such a] calculation

18 [utilizing an event study] impossible or ill-advised[.]"  Opp. at 16, n.19.  In fact, the *Diamond*

19 *Foods* defendants argued that "this case presents myriad damages issues that vary across the class,"

20 utilizing arguments that are virtually identical to those Defendants make here:

| Defendants' Arguments in *Diamond Foods* | Defendants' Arguments Here |
|---|---|
| Plaintiff's expert's "conclusory statement" that "damages will be calculated using an event study analysis similar to the event study analysis presented in my first report on market efficiency" was "a far cry from the evidentiary showing that Comcast requires." Ex. 11 at 3. | PGGM's expert, Chad Coffman, asserts that "damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole"— namely, a statistical regression model known as an 'event study.' But his assertion is purely conclusory" and insufficient under *Comcast*. Opp. at iii. |
| Plaintiff's expert's event study is "not sufficient to show damages because it does not determine what portion, if any, of the movement is attributable to any 'fraud' as opposed to other company-specific factors." Ex. 11 at 3. | Coffman's event study is insufficient because it "did not control for HP-specific news unrelated to the alleged fraud." Opp. at 20. |
| "To show damages, plaintiff must establish how much the Company's stock price was inflated during each day of the lengthy class period as a result of the alleged fraud, an effort that plaintiff has specifically disclaimed making any effort to do." Ex. 11 at 3. | Coffman "candidly acknowledged that he did not have this [] essential ingredient of a damages analysis: 'I have not been asked to, and I have not engaged in any analysis on' 'what method [I] would use to determine what the inflation was for each day of the class period.'" Opp. at iv. |

| Plaintiff's expert failed to tie his analysis to the Court's Order on motion to dismiss or the allegations in the complaint. Ex. 11 at 3 & n.3. | Because he "has ignored the Court's [Order on motion dismiss], Coffman has implicitly conceded that he cannot opine that his proposed methodology is consistent with the claims that remain in this case." Opp. at 13. |
|---|---|
| There were "serious questions as to whether any disclosures prior to [the class period-ending disclosure] 'revealed' the alleged fraud, particularly since plaintiff sold all of its Diamond shares [earlier in the class period]." Ex. 11 at 3; Ex. 12 at 12-13, 15, 21-23. | "The statements that HP made on August 22, 2012 are not corrective under this standard, because HP did not then disclose that it suspected fraud at Autonomy (or that Autonomy executives had committed fraud)," and "with only one corrective disclosure, PGGM cannot possibly show a loss." Opp. at 8-9. |
| Plaintiff "eschews any analysis of damages at this stage. Its expert offers no examination of, or opinion on, the issue of damages…. The Supreme Court has admonished that this sort of 'trust me' approach to damages is not sufficient for Rule 23(b)(3) purposes." Ex. 12 at 20-21. | "Coffman and PGGM have made no effort to define the damages methodology they will employ" "[b]ut PGGM's and Coffman's 'burden [under *Comcast*] is not met by asking the Court simply to trust them.'" Opp. at iv-vi. |

In other words, it was not that the *Diamond Foods* defendants made no attempt to identify "specific complications" with the calculation of damages classwide.  Opp. at 16, n.19.  Rather, Judge Alsup considered and rejected them, because they did not render the approach "impossible or ill-advised."

Similarly, in *IBEW Local 98 Pension Fund v. Best Buy Co.*, 2014 U.S. Dist. LEXIS 108409, at *20-24 (D. Minn. 2014), as here, "Plaintiffs' expert [] performed an event study using methodology for the quantification of damages to show that damages are capable of calculation on a class-wide basis." *Id.* at *22.  Using the same expert that Defendants retained in this action (Dr. Kenneth Lehn), defendants made the same *Comcast*-based arguments that the event study was insufficient, because it did "not *isolate* the damages caused by the [defendants' false] statements." *Id.* at *21.[24]  The court rejected the defendants' arguments, explaining that "[w]hile there will likely be issues regarding the timing of a particular investor's purchase in relation to the fraudulent statements, these issues will not predominate over the common ones."  *Id.* at *23.    Indeed, "[w]hether Plaintiffs will ultimately prevail in proving damages is not an issue presently before the Court." *Id.* at *24.  Thus, the court concluded, based on their expert's market efficiency event study, "[p]laintiffs have sufficiently demonstrated that damages are capable of measurement on a class-wide basis such that individual issues of damages calculations will not overwhelm the

---

[24]    Likewise, the defendants in *Best Buy* made similar arguments to those raised here, including: (1) "a plaintiff in a securities case has an affirmative duty to proffer a damages model that tracks his liability theory, and cannot simply say he will conduct an 'event study' (Ex. 13 at 14); and (2) plaintiff's model fails to disaggregate and "makes no effort to isolate the impact on the share price (and the resultant alleged damages) flowing from the…actionable statements in this case" (*Id.* at 18-19).

1    predominate questions common to the class." *Id.* at \*24.   *See also Wallace v. Intralinks*, 302

2    F.R.D. 310, 318 (S.D.N.Y. 2014) ("Plaintiff's proposed determination of damages by event study

3    appears to be a workable methodology of determining damages on a class-wide basis that conforms

4    to its theory of liability, thus meeting the requirements of *Comcast*[.]").[25]

5            The remainder of Defendants' purported damages "questions" all boil down to the assertion

6    that Mr. Coffman fails to "disaggregate" and *prove* that losses stem from the fraud rather than other

7    "confounding" information.  Opp. at iv-vi, 16-24; Coffman Rbtl. ¶¶4-7, 21-31.  The courts in both

8    *Diamond Foods* and *Best Buy* rejected precisely the same argument, and for good reason:  it is a

9    premature challenge to **loss causation** that is foreclosed by *Halliburton I*.[26]  There, the Supreme

10   Court held that the Fifth Circuit erred by requiring plaintiff to prove, at the class certification stage,

11   that "the decline in [the company's] stock was because of the correction to a prior misleading

12   statement and that the subsequent loss could not otherwise be explained by some additional factors

13   revealed then to the market.  ***This is the loss causation requirement as we have described it***." 131

14   S. Ct. at 2185.  *See also Amgen*, 133 S. Ct. at 1200 ("[L]oss causation and...the misleading nature of

15   the defendant's alleged statements or omissions are common questions that need not be adjudicated

16   before a class is certified.").  Indeed, Defendants' own expert has repeatedly admitted that these

17   sorts of "disaggregation" analyses are all about *loss causation*.  *See, e.g.*, Lehn Dep. at 67:1-69:14

18   (If "there is no reliable method" to disaggregate, "one is left with the conclusion that there is no

19   reliable basis to conclude *loss causation*."); *id.* at 76:9-22 (If there was "confounding information

20   released," "then one would have to reliably control for that other bad news before one can conclude

21   that there was *loss causation*."); Ex. 15 at ¶121 ("In order to establish *loss causation*…the effects

22   on [the company's] stock price of the negative confounding information would have to be

23   ─────────────────────

24   [25]     Dr. Lehn admitted in his *Best Buy* report that "[e]vent study analysis is a method commonly
     used in financial economics to estimate the relation between releases of new information and
25   changes in a company's security prices" and "I often have used event study analysis to inform my
     opinions regarding the impact of information releases on stock prices." Ex. 14 at A-1, ¶2.

26   [26]     Likewise, in *BP II*, defendants argued that plaintiffs failed to "disaggregat[e] inflation by
     type of misrepresentation corrected or risk materialized." 2014 U.S. Dist. LEXIS 69900, at \*93-95.
27   Judge Ellison rejected defendants' argument and certified the out-of-pocket damage class,
     reasoning that Defendants' disaggregation argument "concern[s] loss causation" and is, thus,
28   "premature" as "[l]oss causation need not be proved at the class certification stage." *Id.*  at \*65-71,
     93-95 ("Plaintiffs—correctly—reframe this argument as an argument regarding loss causation.").

1    disentangled from the corresponding effects of the alleged corrective disclosures."); Ex. 16 at

2    106:23-107:14 ("[L]ooking at *loss causation* from an economics perspective, it would be necessary

3    to disentangle the contribution of the confounding information on [the company's] stock price from

4    the contribution of the alleged corrective disclosure on its stock price.").[27]

5         Even a cursory review of Defendants' arguments betrays their attempt to disguise merits-

6    based loss causation attacks as damages issues under *Comcast*.  For instance, citing the Ninth

7    Circuit's *loss causation* pleading jurisprudence in *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th

8    Cir. 2014) and *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010), Defendants

9    repeatedly suggest that Plaintiff has not adequately alleged loss causation for the August 22, 2012

10   stock drop, and, thus, "only the November 2012 corrective disclosure remains in the case."  Opp. at

11   8-9, 25.[28]  This is patently untrue.  This Court's Order on Defendants' motions to dismiss never

12   analyzed loss causation, let alone dismissed any corrective disclosure allegations.   In fact,

13   Defendants failed to challenge any aspect of loss causation at the pleading stage.   Thus, all of

14   Plaintiff's loss causation allegations, including the August 22 partial disclosure, indisputably

15   "remain in the case."   Defendants' attempt to introduce this issue for the first time at class

16   certification "flies in the face of Supreme Court precedent."  *Dodona I, LLC v. Goldman, Sachs &*

17   *Co.*, 296 F.R.D. 261, 270-71 (S.D.N.Y. 2014) (citing *Halliburton I*, 131 S. Ct. at 2183).  At best,

18

19
_____

20   [27]     Defendants' questioning of Mr. Coffman at his deposition also evidences their premature
     attack on loss causation.  *See* Coffman Dep. at 115:15-23 ("Q…the question there, which might
21   arise in this case, would be how much of the statistically significant abnormal return [on November
     20, 2012] was caused by the revelation of disclosure or the corrected disclosure that day that's
22   alleged versus other confounding information.  You understand that; right? A. I understand that
     could be an issue in this case in loss causation analysis."); *id.* at 116:20-25 ("for a loss
23   causation...type analysis.  You might need to disaggregate, yes.").
     [28]     Defendants' loss causation argument that Mr. Coffman failed to rule out that other news
24   caused the November 20, 2012 decline (Opp. at 21) is not only premature, but it cannot be squared
     with his testimony.  *See* Coffman Dep. at 148:8-152:19 (explaining why he was "extremely
25   confident that the impact would not have been zero of that new information").  In fact, analyst
     reports "specifically mention the write-down as a 'surprise' which clearly contributed to the stock
26   price decline on November 20, 2012." Coffman Rpt. ¶61; *see also* Coffman Rbtl. ¶16 (citing
     *Marketwatch* article stating that "***H-P shares fell 12% after news that the [C]ompany is writing***
27   ***down nearly $9 billion in impairment charges associated with its $10.3 billion acquisition of***
     ***Autonomy***.").  PGGM also testified that HP's "massive write-down of goodwill" on November 20,
28   2012 was "a real shock to the investor community."  Hendriks Dep. at 85:21-23.

1    "[w]hether plaintiff will ultimately prevail in demonstrating a significant market impact that was in

2    fact caused by the alleged fraudulent misrepresentations *is a matter for proof at trial, or summary*

3    *judgment*." *Diamond Foods*, 295 F.R.D. at 254.[29]  *See also In re St. Jude Med. Inc. Sec. Litig.*,

4    2014 U.S. Dist. LEXIS 169354, at *14-25 (D. Minn. 2014) (rejecting defendants' *Comcast*

5    argument that "Plaintiffs' damages theory is not adequately tied to their liability theory" because

6    plaintiff's expert "made no effort to disaggregate the effects of each of Plaintiffs' theories of

7    liability, let alone each individual alleged misrepresentation," reasoning that, "regardless, the jury

8    will be able to calculate damages on a class-wide basis").[30]

9        Defendants' suggestion that there is a "disconnect" between the corrective disclosures and

10   their omissions because they were not privy to the same information in May 2012 that they had by

11   November 2012 is likewise unavailing.  Opp. at v-vi, 17-20.  As an initial matter, Plaintiff's "theory

12   of liability" is that, by May 23, 2012, Defendants were aware, or were reckless in not knowing, of

13   the very issues announced on November 20, 2012, including the same improper accounting

14   practices and Autonomy's inflated valuation and goodwill.  *See* LP Br. at 3-8; Coffman Rbtl. ¶¶32-

15   36.  Defendants' expert, on the other hand, did no "independent empirical analysis of what

16   defendants knew at the time of" the alleged omissions and testified that Plaintiff's actual allegations

17   regarding Defendants' knowledge at that time "didn't inform [his] analysis."  Lehn Dep. at 176:24-

18   192:8.  In any event, the *BP* court rejected the identical argument, holding that it was a premature

19

20

21   [29]    *See also LDK Solar*, 255 F.R.D. at 532 ("Defendants [] have presented no clear explanation
22   as to why plaintiff would be unable to establish class-wide losses arising from the [two corrective]
     disclosures.  Defendants' argument []…that the stock's fall could have actually resulted from *other*
23   negative and confounding factors; or that plaintiff's expert fails adequately to tie the stock drop to
     the two reports—will be relevant to the merits of plaintiff's case, but defendants fail to explain how
24   they are relevant to the present motion, *i.e.*, to commonality and predominance."); *Magma*, 2007
     U.S. Dist. LEXIS 62641, at *8 ("To the extent that the claims set forth in the complaint are without
25   merit, or that even meritorious claims give rise to no damages for certain shareholders, the Court
26   expects such issues to be litigated in due course during these proceedings, and will respond
     appropriately to the merits of those issues when they are squarely presented.").
27   [30]    Even on the merits, Defendants cannot dispute loss causation for the August 2012 partial
     disclosure.  According to HP's own Demand Review Committee, "within hours after the [August
28   2012] earnings call, numerous analysts interpreted HP's statement as *warning that an impairment
     charge for Autonomy's goodwill was likely* to follow in Q4 2012."  *See* Dkt. No. 235-5 at 46.

1   loss causation inquiry.[31]   Defendants' expert agreed, consistently testifying that this argument

2   concerns whether Plaintiff can "*establish loss causation*."  Lehn Dep. at 77:10-78:3, 80:9-17.

3         At bottom, each of Defendants' challenges to Mr. Coffman's damages methodology suffers

4   from the same fundamental problem that ultimately dooms their opposition—they simply cannot

5   explain how the arguments raised, even if credited, could splinter the class in any way, let alone to

6   such an extent that individual damages issues could possibly "predominate" and "overwhelm" the

7   core common issues.  Rather, as detailed herein, each of Defendants' arguments relates to the actual

8   *calculation* of damages and the precise amount of post-disaggregation inflation in HP's stock

9   price—questions that uniformly impact all investors in the same formulaic manner.   As Judge

10  Easterbrook explained in *Wendt*, 618 F.3d at 687:

11        After a class has been certified, and other elements of the claim have been
      established, the court will need to pin down when the stock's price was affected by
12        any fraud. That decision, like the other issues, can be made on a class-wide basis,
      because it affects investors in common. It gets the cart before the horse to insist that
13        it be made before any class can be certified. If the data are so ambiguous that the
      decision can't be made at all, then the class loses outright (plaintiffs bear the burden
14        of persuasion, after all), but to repeat a point already made: The chance, even the
      certainty, that a class will lose on the merits does not prevent its certification.
15

16  In sum, "[t]his is not a case in which the asserted problem—*i.e.*, that the plaintiff class cannot prove

17  [damages]—exhibits some fatal dissimilarity among class members that would make use of the

18  class action device inefficient or unfair.  Instead, what [defendants] allege[] is a fatal similarity—

19  [an alleged] failure of proof as to an element of the plaintiffs' cause of action.  Such a contention is

20  properly addressed at trial or in a ruling [at] summary judgment…."  *Amgen*, 133 S. Ct. at 1197.

21        Finally, realizing that their *Comcast*-based arguments have been rejected by nearly every

22

23

24  ───────────────

25  [31]      *See BP II*, 2014 U.S. Dist. LEXIS 69900, at *93-95 ("Defendants criticize the decision to
    carry back the full measure of the stock price decline in the months after the explosion to the first
    alleged spill severity misstatement because there is no evidence that Defendants had the same
26  information [at the beginning of the Class Period] that the market acquired by [the final corrective
    disclosure]."  But this argument "concern[s] loss causation, in that [Defendants] challenge the 'fit'
27  between an alleged corrective event and an alleged fraudulent statement" and "failure to prove loss
    causation is not…an impediment to class certification.").  *See also St. Jude*, 2014 U.S. Dist. LEXIS
28  169354, at *19-20 (rejecting argument that expert's "backcasting methodology does not comport
    with Plaintiff's theory of liability because it does not account for purported increasing levels of
    risk" over the class period).

1   Court to address the issue in a §10(b) securities case, Defendants seek refuge in this Court's opinion

2   in *Jones v. ConAgra Foods, Inc*., 2014 U.S. Dist. LEXIS 81292 (N.D. Cal 2014), one of the many

3   food-labeling cases that have been rejected for classwide treatment.  Opp. at iv-v, 14 & n.16, 22.

4   Those unique cases, however, are significantly different from securities fraud actions, and *ConAgra*

5   is distinguishable on many levels.  First, the *ConAgra* plaintiffs' damages model was "highly

6   problematic" because it "requires purchase price information in order to allocate any award" and "it

7   is highly unlikely that consumers will be able to provide such information."  *ConAgra*, 2014 U.S.

8   Dist. LEXIS 81292, at *84; *see also id*. at *81 ("Plaintiffs point to no accurate way to determine

9   what class members actually paid.").  Here, by contrast, "the stock price at any given time, and the

10  price at which any particular class members bought or sold, is an objective fact which should be

11  readily discernible." *LDK Solar*, 255 F.R.D. at 529-30.

12          Second, this Court also deemed the *ConAgra* damages model flawed because it did not

13  sufficiently identify a peer index of "comparator" products to inform its regression analysis.  In fact,

14  plaintiffs' expert "admitted in his deposition that he *does not know whether such a comparator*

15  *product exists*."  *ConAgra*, 2014 U.S. Dist. LEXIS 81292, at *75-84 (plaintiff's expert "has not

16  determined, or shown how he would determine, which competing and complementary products he

17  would use").  Conversely, here, as explained *supra*, Mr. Coffman has already performed a robust,

18  multi-layered regression utilizing both an industry index and a carefully constructed peer index of

19  "comparable" stocks to calculate the residual, abnormal returns of HP's stock.  Notably, despite

20  questioning Mr. Coffman at length on these topics at his deposition, neither Defendants nor their

21  expert challenge Mr. Coffman's event study, regression analysis, comparative peer group, or the

22  statistical results of the event study itself.  Thus, the issues in *ConAgra* are simply not present here.

23          Third, in *ConAgra*, this Court found the proposed class of purchasers so "unwieldy" that it

24  could not even be ***ascertained***, let alone establish the requisite manageability, superiority and

25  cohesiveness requirements under Rule 23.  *Id*. at *39, 88-89 ("Plaintiffs have not established how

26  they will accurately identify all class members *ever*.").  Indeed, for one product, "there were

27  literally dozens of varieties with different can sizes, ingredients, and labeling over time and some []

28

1    cans included the challenged language, while others included no such language at all." *Id.* at *35-

2    38, 64-71.  None of those issues are present here.

3        Finally, the *ConAgra* plaintiffs failed to satisfy Rule 23(b)(3)'s predominance requirement

4    for the core **liability** elements of: (i) materiality, (ii) loss causation, and (iii) reliance.  *Id.* at *56-71.

5    Here, by contrast, Plaintiff is not required to establish loss causation or materiality at class

6    certification (*Amgen*, 133 S. Ct. at 1196-97, 1200) and Defendants have conceded that common

7    questions of law and fact predominate as to all five liability elements.  Thus, what Defendants are

8    left with is an argument that individual damages questions, standing alone, will somehow

9    "overwhelm" the Class's "overriding common interest in establishing the existence and materiality

10   of misrepresentations," among other common liability elements.[32]  *Blackie*, 524 F.2d at 909.  But in

11   this Circuit, "[t]he potential existence of individualized damage assessments...does not detract from

12   the action's suitability for class certification."  *Leyva*, 716 F.3d at 513-14 ("The district court

13   applied the wrong legal standard by concluding that individual questions predominate over common

14   questions. The only individualized factor that the district court identified was the amount of

15   [damages].") (citing *Blackie*, 524 F.2d at 905; *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d

16   1087, 1089 (9th Cir. 2010)).  *Comcast* does not alter these bedrock Rule 23 principles.

17   **II.    CONCLUSION**

18       "As in almost all lawsuits by shareholders of public companies, the investors in this case

19   easily satisfy the requirements of Rule 23."  *Magma*, 2007 U.S. Dist. LEXIS 62641, at *2.  For the

20   reasons set forth herein, Lead Plaintiff respectfully requests that the Court grant its Motion.

21   DATED: January 26, 2015                    Respectfully submitted,

22                                              KESSLER TOPAZ
                                                 MELTZER & CHECK, LLP
23

24                                             */s/ Eli R. Greenstein*
                                               ELI R. GREENSTEIN
25

---

26   [32]    Even if the Court were to find that individual damages issues predominate and threaten to
     overwhelm the litigation—a result that finds no legitimate support in the record—the class of HP
27   investors should still be certified on liability while deferring certification of damages until the
     parties' experts' loss causation analysis and reports are complete.  *See Allstate*, 765 F.3d at 1167-69
28   ("[N]o matter how individualized the issue of damages may be, determination of damages may be
     reserved for individual treatment with the question of liability tried as a class action.").

STACEY M. KAPLAN
PAUL A. BREUCOP
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone:  (415) 400-3000
Facsimile:  (415) 400-3001
egreenstein@ktmc.com
skaplan@ktmc.com
pbreucop@ktmc.com

-and-

KESSLER TOPAZ MELTZER
   & CHECK, LLP
DAVID KESSLER
DARREN J. CHECK
ANDREW L. ZIVITZ
GREGORY M. CASTALDO
JOSHUA A. MATERESE
280 King of Prussia Road
Radnor, PA  19087
Telephone:  (610) 667-7706
Facsimile:  (610) 667-7056
dkessler@ktmc.com
dcheck@ktmc.com
azivitz@ktmc.com
gcastaldo@ktmc.com
jmaterese@ktmc.com

*Counsel for Lead Plaintiff PGGM Vermogensbeheer
B.V. and Lead Counsel for the Proposed Class*