KESSLER TOPAZ MELTZER
  & CHECK, LLP
ELI R. GREENSTEIN (Bar No. 217945)
STACEY M. KAPLAN (Bar No. 241989)
PAUL A. BREUCOP (Bar No. 278807)
RUPA NATH COOK (Bar No. 296130)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone:  (415) 400-3000
Facsimile:   (415) 400-3001
egreenstein@ktmc.com
skaplan@ktmc.com
pbreucop@ktmc.com
rcook@ktmc.com

-and-

DAVID KESSLER (*pro hac vice*)
DARREN J. CHECK (*pro hac vice*)
ANDREW L. ZIVITZ (*pro hac vice*)
280 King of Prussia Road
Radnor, PA  19087
Telephone:  (610) 667-7706
Facsimile:   (610) 667-7056
dkessler@ktmc.com
dcheck@ktmc.com
azivitz@ktmc.com

*Counsel for Lead Plaintiff PGGM Vermogensbeheer B.V.*
*and Lead Counsel for the Proposed Settlement Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE HP SECURITIES LITIGATION,<br><br>This Document Relates To: All Actions | MASTER FILE No. 3:12-CV-05980-CRB<br><br>**CLASS ACTION**<br><br>**NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        November 13, 2015<br>Time:        10:00 a.m.<br>Judge:       Hon. Charles R. Breyer<br>Courtroom:  6, 17th Floor |

## NOTICE OF MOTION AND MOTION

**TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

PLEASE TAKE NOTICE that on November 13, 2015, at 10:00 a.m. in Courtroom 6 on the 17th Floor of the United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Ave., San Francisco, California, 94102, before the Honorable Charles R. Breyer, United States Senior District Judge, Court-appointed Lead Counsel Kessler Topaz Meltzer & Check, LLP ("Kessler Topaz") will and hereby does move for an Order pursuant to Rule 23 of the Federal Rules of Civil Procedure awarding: (i) attorneys' fees to Lead Counsel in the amount of 11% of the Settlement Amount,[1] net of Court-approved Litigation Expenses, plus interest; and (ii) reimbursement of $1,023,971.29 in Litigation Expenses incurred by Lead Counsel in prosecuting and resolving the above-captioned action, plus interest, which amount also includes a reimbursement request in the amount of $162,900 for PGGM Vermogensbeheer B.V. ("PGGM" or "Lead Plaintiff") for its costs and expenses reasonably incurred in connection with its representation of the Settlement Class.

This motion is based upon: (i) this Notice of Motion and Motion, and the Memorandum of Points and Authorities set forth below; (ii) the accompanying Declaration of Eli R. Greenstein in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation, and Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Greenstein Declaration" or "Greenstein Decl."), and the exhibits thereto; (iii) the Affidavit of Jose C. Fraga on behalf of Court-appointed Claims Administrator, Garden City Group, LLC, attached as Exhibit A to the Greenstein Declaration, and the exhibits thereto; (iv) the Declaration of Marcel Jeucken submitted on behalf of PGGM, attached as Exhibit B to the Greenstein Declaration (the "Jeucken Declaration" or "Jeucken Decl."), and the exhibits thereto; (v) the Declaration of David Kessler on behalf of Kessler Topaz, attached as Exhibit C to the Greenstein Declaration ("Kessler Declaration" or "Kessler Decl."), and the exhibits thereto; (vi) the Stipulation; (vii) the pleadings

---

[1]     All capitalized terms that are not defined herein are defined in the Stipulation of Settlement and Release dated as of June 8, 2015 (the "Stipulation").  ECF No. 258.

and records on file in this Action; and (ix) other such matters and argument as the Court may consider at the hearing of this motion.[2]

---

[2]    This motion is currently unopposed.  The deadline for filing any objections to Lead Counsel's request for attorneys' fees and reimbursement of Litigation Expenses is October 14, 2015.  Lead Counsel will address any objections that may be filed, and also submit a proposed fee order, in their reply submission to be filed with the Court on or before November 3, 2015.  Lead Plaintiff is also submitting its separate Notice of Motion and Motion for Final Approval of Class Action Settlement and Plan of Allocation, and Memorandum of Points and Authorities in Support Thereof (the "Settlement Motion") concurrently herewith.

## <u>TABLE OF CONTENTS</u>

STATEMENT OF ISSUES TO BE DECIDED ................................................................. viii

SUMMARY OF ARGUMENT.................................................................................... viii

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 1

   I.      PRELIMINARY STATEMENT ......................................................... 1

   II.     ARGUMENT ................................................................................ 3

        A.     The Appropriate Method for Awarding Attorneys' Fees in Common Fund Cases Is a Reasonable Percentage of the Fund Recovered.............................. 3

        B.     The Requested Fee Percentage Is Reasonable Under the Percentage Method, the Lodestar Method, and the *Vizcaino* Factors ............................................. 4

              1.     The Results Achieved .......................................................... 4

              2.     The Risks of Litigation ....................................................... 5

              3.     The Skill Required and the Quality of Representation...................... 6

              4.     The Contingent Nature of the Fee and the Financial Burden Carried by Lead Counsel ................................................................. 8

              5.     Awards in Similar Cases Support the Request Here ......................... 9

              6.     Lead Counsel's Lodestar Supports the Requested Percentage Fee Award ............................................................................. 10

   III.    LEAD COUNSEL IS ENTITLED TO REIMBURSEMENT FOR ITS REASONABLE LITIGATION EXPENSES ........................................... 12

   IV.    CONCLUSION .......................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

<u>C</u>ASES

*Bellinghausen v. Tractor Supply Co.*,
306 F.R.D. 245 (N.D. Cal. 2015) ......................................................................x

*Buccellato v. AT&T Operations, Inc.*,
2011 U.S. Dist. LEXIS 85699 (N.D. Cal. 2011) ..........................................x, 11

*Glass v. UBS Fin. Servs., Inc.*,
331 Fed. App'x 452 (9th Cir. 2009) ................................................................3, 4

*Hubbard v. BankAtlantic Bancorp, Inc.*,
688 F.3d 713 (11th Cir. 2012) ...........................................................................9

*In re Activision Sec. Litig.*,
723 F. Supp. 1373 (N.D. Cal. 1989) ...............................................................4, 9

*In re Am. Apparel S'holder Litig.*,
2014 U.S. Dist. LEXIS 184548 (C.D. Cal. 2014) ..............................................3

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
2013 U.S. Dist. LEXIS 131288 (S.D.N.Y. 2013) .............................................. xi

*In re Apple Iphone/Ipod Warranty Litig.*,
40 F. Supp. 3d 1176, 1181 (N.D. Cal. 2014) .....................................................4

*In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA)
Litig.*,
No. 1:09-md-02058-PKC (S.D.N.Y.) ...................................................................7

*In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA)
Litig.*,
No. 1:12-cv-06879, slip op. (S.D.N.Y. Apr. 8, 2013) .............................. xi, 14

*In re Bank of Am. Corp. Sec. Litig.*,
281 F.R.D. 134 (S.D.N.Y. 2012)........................................................................6

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
No. 0:07-cv-61542 (S.D. Fla.)............................................................................7

*In re Brocade Sec. Litig.*,
No. 3:05-cv-02042-CRB, slip op. (N.D. Cal. Jan. 26, 2009) .................10, 11

*In re Dole Food Co., Inc. Stockholder Litig.*,
No. 8703-VCL (Del. Ch.).....................................................................................7

*In re Ecotality, Inc. Sec. Litig.*,
2015 U.S. Dist. LEXIS 114804 (N.D. Cal. 2015) .................................3, 10

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   2008 U.S. Dist. LEXIS 85445 (S.D. Tex. 2008) ................................................. xi, 14

*In re Gilat Satellite Networks, Ltd.*,
   2007 U.S. Dist. LEXIS 68964 (E.D.N.Y. 2007) ...........................................................14

*In re Lehman Bros. Sec. and ERISA Litig.*,
   No. 09-md-02017-LAK (S.D.N.Y.) .............................................................................7

*In re Longtop Fin. Tech. Ltd. Sec. Litig.*,
   No. 1:11-cv-03658 (S.D.N.Y.) .................................................................................7

*In re Magma Design Automation, Inc. Sec. Litig.*,
   No. 3:05-cv-02394-CRB, slip op. (N.D. Cal. Mar. 27, 2009) ...............................10, 13

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   2009 U.S. Dist. LEXIS 120953 (S.D.N.Y. 2009) ......................................... xi, 14

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) .................................................................................9, 13

*In re Nuvelo, Inc. Sec. Litig.*,
   2011 U.S. Dist. LEXIS 72260 (N.D. Cal. 2011) ............................................. passim

*In re OmniVision Techs., Inc. Sec. Litig.*,
   2015 U.S. Dist. LEXIS 73300 (N.D. Cal. 2015) ......................................x, 9, 10

*In re OmniVision Techs. Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2007)........................................................ passim

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) .................................................................................9

*In re Petroleum Prods. Antitrust Litig.*,
   109 F.3d 602 (9th Cir. 1997) .................................................................................10

*In re Pfizer Inc. Sec. Litig.*,
   2014 U.S. Dist. LEXIS 92951 (S.D.N.Y. 2014) .......................................................9

*In re Portal Software, Inc. Sec. Litig.*,
   2007 U.S. Dist. LEXIS 88886 (N.D. Cal. 2007) ......................................................5

*In re Providian Fin. Corp. Sec. Litig.*,
   No. 3:01-cv-03952-CRB, slip op. (N.D. Cal. Sep. 24, 2004)................................13

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
   2008 U.S. Dist. LEXIS 124269 (D.N.J. 2008) .......................................... xi, 14

*In re S. Peru Copper Corp. S'holder Derivative Litig., Consol.*,
   No. 961-CS (Del. Ch.) .............................................................................................7

*In re Satyam Comput. Servs. Ltd. Sec. Litig.*,
   No. 1:09-md-02027-BSJ, slip op. (S.D.N.Y. Sept. 13, 2011) ............................ xi, 14

*In re Shoretel Inc. Sec. Litig.,*
  No. 3:08-cv-00271-CRB, slip op. (N.D. Cal. Oct. 18, 2010) ..................................10

*In re Transpacific Passenger Air Transp. Antitrust Litig.,*
  2015 U.S. Dist. LEXIS 67904 (N.D. Cal. 2015) .........................................10

*In re Tyco Int'l, Ltd. Sec. Litig.,*
  No. 1:02-md-1335-PB (D.N.H.) ....................................................................6

*In re Veritas Software Corp. Sec. Litig.,*
  2005 U.S. Dist. LEXIS 30880 (N.D. Cal. 2005) .........................................11

*In re Wachovia Preferred Sec. and Bond/Notes Litig.,*
  No. 1:09-cv-06351 (RJS) (S.D.N.Y.) ...........................................................7

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,*
  19 F.3d 1291 (9th Cir. 1994) ....................................................... viii, ix, 4, 5, 8

*Knight v. Red Door Salons, Inc.,*
  2009 U.S. Dist. LEXIS 11149 (N.D. Cal. 2009) .........................................13

*Ramirez v. Ghilotti Bros., Inc.,*
  2014 U.S. Dist. LEXIS 56038 (N.D. Cal. 2014) ......................................3, 10

*Shapiro v. JPMorgan Chase & Co.,*
  2014 U.S. Dist. LEXIS 37872 (S.D.N.Y. 2014) ...........................................9

*Van Vranken v. Atl. Richfield Co.,*
  901 F. Supp. 294 (N.D. Cal. 1995) ..........................................................x, 11

*Vincent v. Reser,*
  2013 U.S. Dist. LEXIS 22341 (N.D. Cal. 2013) ............................... viii, x, xi, 4, 12

*Vizcaino v. Microsoft Corp.,*
  290 F.3d 1043 (9th Cir. 2002) ......................................................... viii, 4, 10

## STATUTES

15 U.S.C. §77z-1(a)(6) .....................................................................................3

15 U.S.C. §78u-4 ............................................................................... xi, 3, 13, 15

## RULES

Fed. R. Civ. P. 23 ................................................................................................ i

Fed. R. Civ. P. 30(b)(6) .................................................................................12

1

## OTHER AUTHORITIES

2   Laarni T. Bulan et al., *Securities Class Action Settlements: 2014 Review and
      Analysis* (Cornerstone Research 2015)..................................................................5

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT OF ISSUES TO BE DECIDED

1.     Whether the requested attorneys' fees in the amount of 11% of the Settlement Amount net of Court-awarded Litigation Expenses, plus interest thereon, are fair and reasonable.

2.     Whether the requested reimbursement of Litigation Expenses, plus interest thereon, is fair and reasonable.

## SUMMARY OF ARGUMENT

After litigating this Action for nearly three years, Lead Counsel has achieved a highly respectable recovery of $100,000,000 in cash for the Settlement Class.  Lead Counsel now seeks attorneys' fees in the amount of 11% of the Settlement Amount, net of Court-approved Litigation Expenses.  This request is both fair and reasonable and satisfies all of the Ninth Circuit's criteria for assessing a proposed fee award.  *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) ("*WPPSS*").

To determine the reasonableness of a fee application, courts typically consider the following factors, among others: (1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs' counsel; and (5) awards made in similar cases.  *Vincent v. Reser*, 2013 U.S. Dist. LEXIS 22341, at *13 (N.D. Cal. 2013) (Breyer, J.) (citing *Vizcaino*, 290 F.3d at 1047).  Each of these factors supports the instant request.

*First*, the results achieved in this case merit particular consideration in determining an appropriate fee award.  *See In re OmniVision Techs. Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2007) ("*OmniVision I*").  Here, the Settlement represents a recovery of over 26% of the likely recoverable damages, thereby vastly exceeding typical recoveries in other securities class actions across the nation, and ranks among the top 15 securities fraud settlements in this District's history.  The Court acknowledged the positive result at the July 17, 2015 preliminary approval hearing, characterizing the Settlement as "extremely good" (ECF No. 264 at 2:22-3:4) based on the

preliminary record.  As set forth herein, the final approval record confirms the quality of the result achieved here.

*Second*, the risk of continued litigation is another key factor in determining an appropriate fee award.  *See, e.g.*, *OmniVision I,* 559 F. Supp. 2d at 1047; *WPPSS*, 19 F.3d at 1299-301.  As detailed in the accompanying Settlement Motion and the Greenstein Declaration, had the Action continued, substantial risks regarding liability and damages still remained.  For instance, the Settling Defendants repeatedly argued that multiple audit firms and financial consultants reviewed the same Autonomy financials prior to and during the Class Period but failed to discover any accounting improprieties.  The Settling Defendants also asserted that independent investigations led by HP's "Demand Review Committee," outside law firms, and forensic investigators found that HP and Whitman had engaged in no wrongdoing.  It is also worth noting that the Court sustained claims against only two of the original eight Defendants as to three statements, thereby compounding the risks of this case.

*Third*, Lead Counsel's skill and experience in securities litigation also support the requested fee award, as Lead Counsel is one of the nation's preeminent law firms in securities class action litigation and has successfully litigated numerous class actions on behalf of some of the largest institutional investors in the world.  *See infra* §II.B.3; *In re Nuvelo, Inc. Sec. Litig.*, 2011 U.S. Dist. LEXIS 72260, at *9 (N.D. Cal. 2011) (Breyer, J.).  The fact that Lead Counsel achieved this substantial recovery in spite of vigorous representation by formidable defense counsel further highlights the quality of Lead Counsel's work.

*Fourth*, the contingent nature of the litigation amply supports the fee request.  In this respect, Courts typically reward attorneys for taking on the serious risk of non-payment by permitting a fee award that reflects a premium over their normal hourly rates for prevailing in contingency cases.  *See WPPSS*, 19 F.3d 1291.  Here, Lead Counsel carried the entire financial burden of prosecuting this Action in the face of a legitimate risk that Lead Counsel and the Settlement Class would receive nothing.  "This substantial outlay . . . supports an award of

substantial fees." *In re OmniVision Techs., Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 73300, at *6 (N.D. Cal. 2015) ("*OmniVision II*").

*Fifth*, fee awards in similar cases further underscore the reasonableness of the requested fee. Given that the "Ninth Circuit's 'benchmark' for attorneys' fees in common fund class actions is 25% of the common fund[,]" Lead Counsel's 11% request is eminently reasonable. *See Nuvelo*, 2011 U.S. Dist. LEXIS 72260, at *5.

Although "use of the percentage method . . . appears to be dominant" in the Ninth Circuit (*see OmniVision I*, 559 F. Supp. 2d at 1046), some courts also perform a less rigorous "cross-check" of counsel's lodestar to confirm the reasonableness of the requested fees. *See Vincent*, 2013 U.S. Dist. LEXIS 22341, at *14.  Here, if fees and Litigation Expenses were granted in full, Lead Counsel's fee request would result in a multiplier of less than 1.15 on its lodestar of $9,475,154.50. Considering that courts in this jurisdiction have awarded multipliers over four, the lodestar cross-check also weighs heavily in favor of approving the fee request.  *See Buccellato v. AT&T Operations, Inc.*, 2011 U.S. Dist. LEXIS 85699, at *3-4 (N.D. Cal. 2011) (awarding multiplier of 4.3); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 298 (N.D. Cal. 1995) ("Multipliers in the 3-4 range are common in lodestar awards for lengthy and complex class action litigation.").[3]

Lead Counsel also seeks reimbursement of $1,023,971.29, plus interest, in out-of-pocket expenses incurred over the nearly three years it took to prosecute and settle this Action, including costs associated with, *inter alia,* court filings and admissions, service of process, experts and consultants, mediation, online legal and factual research, travel, copying, web hosting for document review, and messenger, courier and overnight mail.  Attorneys who create a common fund for the benefit of a class are entitled to be reimbursed for their out-of-pocket expenses incurred in creating the fund so long as the submitted expenses are reasonable, necessary, and directly related to the

---

[3]     "The absence of objections or disapproval by class members . . . provides further support for the finding that [a]. . . [requested] fee . . . is reasonable." *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 261 (N.D. Cal. 2015).  Lead Counsel is pleased to report that, after disseminating copies of the Notice to over 680,679 potential Settlement Class Members and nominees, it has received no objections to its fee request to date.  Because the time period to object has not yet concluded, however, Lead Counsel will assist the Court in evaluating this factor in its reply papers.

prosecution of the action.  *See OmniVision I*, 559 F. Supp. 2d at 1048.  The present expense request should be granted, as the expenses were reasonable and necessary for litigating the Action.  *See Vincent,* 2013 U.S. Dist. LEXIS 22341, at *15 (granting reimbursement of costs and expenses for "three experts and the mediator, photocopying and mailing expenses, travel expenses, and other reasonable litigation related expenses").

Included in the expense reimbursement request is $162,900 for the costs and expenses incurred by Lead Plaintiff in representing the Settlement Class in this Action.  15 U.S.C. §78u-4(a)(4).  But for this litigation, the PGGM employees who collectively dedicated 1,210 hours to this case would have devoted this time to other work for PGGM's benefit.  The PSLRA precisely envisioned this type of reimbursement "to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place."  *See In re Am. Int'l Grp., Inc. Sec. Litig.,* 2013 U.S. Dist. LEXIS 131288, at *23-24 (S.D.N.Y. 2013).  In this respect, PGGM has actively and effectively fulfilled its obligations as a representative of the Settlement Class by, *inter alia*, reviewing and approving key filings, complying with enormous discovery obligations, preparing for and testifying at deposition, and participating in protracted settlement negotiations.  *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 U.S. Dist. LEXIS 120953, at *62 (S.D.N.Y. 2009) ("These are precisely the types of activities that support awarding reimbursement of expenses to class representatives.").[4]

---

[4]  *See, e.g.*, *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 2008 U.S. Dist. LEXIS 85445, at *49-50 (S.D. Tex. 2008) (awarding $600,000 to UC Regents); *In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, No. 1:12-cv-06879, slip op., ¶8 (S.D.N.Y. Apr. 8, 2013) (awarding, among others, PGGM $259,610 for its costs and expenses in representing the class) (Ex. 1 hereto); *In re Satyam Comput. Servs. Ltd. Sec. Litig.*, No. 1:09-md-02027-BSJ, slip op. at 3-4 (S.D.N.Y. Sept. 13, 2011) (awarding $195,111 to class representatives) (Ex. 2 hereto); *In re Royal Dutch/Shell Transp. Sec. Litig.*, 2008 U.S. Dist. LEXIS 124269, at *29 (D.N.J. 2008) (awarding $150,000 to class representatives).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Lead Counsel, with the express approval of Lead Plaintiff PGGM, respectfully submits this Memorandum of Points and Authorities in support of its motion for an award of attorneys' fees and reimbursement of Litigation Expenses.   Specifically, Lead Counsel requests: (i) an award of attorneys' fees in the amount of 11% of the Settlement Amount (after reduction of Court-approved Litigation Expenses), plus interest; and (ii) reimbursement of Litigation Expenses in the amount of $1,023,971.29 that Lead Counsel reasonably and necessarily incurred in prosecuting and resolving the Action, inclusive of Lead Plaintiff's PSLRA reimbursement request for $162,900 in costs and expenses incurred in representing the Settlement Class, plus interest on all Litigation Expenses. Considering Lead Counsel's and Lead Plaintiff's efforts in obtaining an outstanding result for the Settlement Class despite the significant risks discussed herein, the requested award of attorneys' fees and reimbursement of Litigation Expenses are reasonable and appropriate and should be granted in their entirety.

## I.      PRELIMINARY STATEMENT

Through their efforts and perseverance, Lead Counsel and Lead Plaintiff have obtained $100 million in cash for the benefit of the Settlement Class.   This significant recovery represents approximately 26.5% of the Settlement Class's likely recoverable damages, as estimated by Lead Plaintiff's damages expert—an outstanding recovery by any measure, particularly in light of the continuing litigation risks that were present when the Settlement was reached.  *See* Greenstein Decl., ¶77.   It is also one of the top 15 securities class action settlements in the history of this District.  *See id.* ¶7.   This result would not have been possible without the skill, tenacity and advocacy of Lead Counsel, who devoted nearly three years to investigating, vigorously prosecuting, and ultimately settling this Action on a wholly contingent basis.   In doing so, Lead Counsel, among other things: (i) thoroughly reviewed and analyzed thousands of pages of publicly available information regarding HP and Autonomy including Securities and Exchange Commission ("SEC") filings, financial statements, press releases, conference call transcripts, analysts' reports, and media coverage; (ii) interviewed, through its investigators and/or its agents, former HP and Autonomy

employees and other witnesses; (iii) drafted and filed a comprehensive complaint for violations of the federal securities laws; (iv) extensively researched the applicable law for claims in this Action and the potential defenses thereto, including English law; (v) opposed eight motions to dismiss; (vi) consulted with, and obtained reports or analyses from, multiple experts regarding, *inter alia*, revenue recognition, market efficiency, loss causation, and damages; (vii) researched and filed extensive class certification briefing, as well as expert market efficiency and damages analyses in connection therewith; (viii) responded to substantial written discovery propounded by the Settling Defendants, deposed the Settling Defendants' damages expert, and defended the depositions of Lead Plaintiff and its expert on market efficiency; (ix) conducted an extensive document review in response to the Settling Defendants' document requests, resulting in Lead Plaintiff's production of thousands of pages of documents; (x) conducted substantial discovery, including issuing numerous party and non-party discovery requests, meeting and conferring with the Settling Defendants and the subpoenaed non-parties, and reviewing and analyzing over 80,000 pages of documents produced by the Settling Defendants and various non-party witnesses; and (xi) researched, prepared and briefed four joint discovery motions that were to be filed with the Court. *See generally id.* ¶¶5, 21-66.

This recovery is even more remarkable considering the substantial risks faced in proving multiple elements of Lead Plaintiff's claims—including scienter, falsity, loss causation, and damages—and given that only two defendants and three actionable statements and/or omissions remained in the case following the Court's decision on Defendants' eight separate motions to dismiss. *See id.* ¶¶78-87.  In light of these risks, Lead Counsel believes that the Settlement is a testament to counsel's hard work and the quality of its legal representation.  Given the recovery obtained, the amount and complexity of the work involved in litigating the Action for nearly three years, the skill and expertise required to prosecute and resolve the claims asserted, and the substantial risks that Lead Counsel undertook in this Action, Lead Counsel's 11% fee request— which falls well below half of the Ninth Circuit's benchmark of 25%—is fair and reasonable.  Lead Counsel's lodestar also fully supports this conclusion, as the net fee, if granted, would represent a

modest multiplier of less than 1.15 on Lead Counsel's lodestar of approximately $9.48 million.  *Id.* ¶107.   Additionally, Lead Counsel's request for reimbursement of Litigation Expenses in the amount of $1,023,971.29 is fair and reasonable and, therefore, warrants approval by the Court.  *Id.* ¶¶123-31.   Lead Counsel also respectfully submits that PGGM's request for reimbursement of its costs and expenses in representing the Settlement Class in this Action warrants the Court's approval given PGGM's extensive involvement in and contributions to the Action.  *Id.* ¶¶132-34.[1]

## II.   ARGUMENT

### A.   The Appropriate Method for Awarding Attorneys' Fees in Common Fund Cases Is a Reasonable Percentage of the Fund Recovered

"[A] litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Ramirez v. Ghilotti Bros., Inc.*, 2014 U.S. Dist. LEXIS 56038, at *5-6 (N.D. Cal. 2014) (Breyer, J.) (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).  In the Ninth Circuit, "use of the percentage method in common fund cases appears to be [the] dominant" method for determining attorneys' fees.  *See OmniVision I*, 559 F. Supp. 2d at 1046.[2]

"[U]sing the percentage method is proper in a securities fraud case."  *In re Am. Apparel S'holder Litig.*, 2014 U.S. Dist. LEXIS 184548, at *66 (C.D. Cal. 2014).  "The PSLRA states that '[t]otal attorneys' fees and expenses awarded by the court to counsel for plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.'" *See id.* (citing 15 U.S.C. §78u-4(a)(6); 15 U.S.C. §77z-1(a)(6)).  "By using this language, 'Congress plainly contemplated that percentage-of-recovery would be the primary measure of attorneys' fees awards in [] securities class actions.'"  *Id.*

---

[1]     For a detailed description of this Action's procedural history, Lead Counsel respectfully refers the Court to the accompanying Settlement Motion and the Greenstein Declaration, which is incorporated herein by reference.

[2]     *See, e.g.*, *Glass v. UBS Fin. Servs., Inc.*, 331 Fed. App'x 452, 456-57 (9th Cir. 2009) (overruling objection to use of percentage-of-recovery approach); *In re Ecotality, Inc. Sec. Litig.*, 2015 U.S. Dist. LEXIS 114804, at *11 (N.D. Cal. 2015) ("The percentage of the fund is the typical method of calculating class fund fees.").

The percentage-of-recovery method also decreases the burden imposed on courts by eliminating a detailed and time-consuming lodestar analysis. *See In re Apple iPhone/iPod Warranty Litig.*, 40 F. Supp. 3d 1176, 1181 (N.D. Cal. 2014); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1378-79 (N.D. Cal. 1989). Although not required, rather than engaging in a full-blown lodestar analysis, courts employing the percentage method sometimes use a less rigorous lodestar "cross-check" on the reasonableness of the requested fee. *See, e.g.*, *Vizcaino*, 290 F.3d at 1047 (affirming use of percentage method and application of lodestar method as a cross-check); *Vincent*, 2013 U.S. Dist. LEXIS 22341, at *14 (using percentage method with lodestar cross-check); *Nuvelo*, 2011 U.S. Dist. LEXIS 72260, at *10 (same). Regardless of which method is utilized, the fees awarded must be fair and reasonable under the circumstances of a particular case. *See WPPSS*, 19 F.3d at 1295.

### B.   The Requested Fee Percentage Is Reasonable Under the Percentage Method, the Lodestar Method, and the *Vizcaino* Factors

Courts consider the following five factors, among others, to determine whether a fee is fair and reasonable: (1) the results achieved; (2) the risk of litigation; (3) the skill required and the quality of the work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs' counsel; and (5) awards made in similar cases. *Vincent*, 2013 U.S. Dist. LEXIS 22341, at *12-16 (citing *Vizcaino*, 290 F.3d at 1047-50). An analysis of the foregoing *Vizcaino* factors, as well as an analysis under the percentage-of-recovery and lodestar methods, demonstrate that the present fee and expense request is reasonable and appropriate and should be approved by the Court.

#### 1.   The Results Achieved

The Ninth Circuit recognizes that the result achieved is one of the most important factors in determining an appropriate fee award. *See OmniVision I*, 559 F. Supp. 2d at 1046; *UBS*, 331 Fed. App'x at 456-57. Here, through its extensive efforts, Lead Counsel recovered $100 million for the Settlement Class, which will not revert back to the Settling Defendants regardless of the number of valid Claims submitted. *See generally* Greenstein Decl., ¶¶5, 21-75 (detailing counsel's efforts). As mentioned above, not only is this recovery one of the top 15 securities litigation settlements in this District's history, but at over 26% of the Settlement Class's likely recoverable damages, it also

far exceeds the typical recovery in securities class actions.  *Id.* ¶7 & n.3.[3]  Additionally, despite more than three years of investigation, the SEC has yet to file a complaint against any of the Defendants for the violations alleged in the Action—making this recovery the *only* financial recovery for HP's investors arising from the Autonomy acquisition.  *See* Greenstein Decl., ¶¶8, 77.  The recovery also provides an immediate benefit for the Settlement Class, as opposed to the uncertainty and delays that would necessarily accompany continued litigation.  Consequently, this factor weighs heavily in favor of approving the fee request.

### 2.     The Risks of Litigation

Where, as here, counsel prosecutes a case on a contingent basis, the risk of litigation is also a key factor in determining an appropriate fee award.  *See, e.g.*, *OmniVision I,* 559 F. Supp. 2d at 1047; *WPPSS*, 19 F.3d at 1299-301.  While courts have historically recognized that securities class actions are complex and carry significant risks, post-PSLRA rulings make it abundantly clear that the risk of no recovery has increased significantly since the PSLRA's enactment.  *See, e.g.*, *In re Portal Software, Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 88886, at *8 (N.D. Cal. 2007) (noting "significant risks" that the PSLRA poses "to plaintiffs' ability to survive . . . summary judgment and prevail[] at trial").  If this Action had proceeded to trial, numerous material uncertainties existed concerning liability and damages, in addition to the risk that, even if Lead Counsel succeeded in proving liability and damages at trial, years of appeals could have delayed any recovery.[4]  In fact, the Settling Defendants repeatedly argued that independent investigations led by outside law firms and forensic investigators found that they had engaged in no wrongdoing and pointed to the fact that HP is actively pursuing claims against Autonomy in the U.K. court system.

---

[3]     Had Lead Counsel only obtained the median securities class action settlement as a percentage of estimated damages, a figure which never rose above 3.1% from 2005 to 2014, the Court would be evaluating an approximate $12 million recovery in light of the likely recoverable damages in this case.  *See* Laarni T. Bulan et al., *Securities Class Action Settlements: 2014 Review and Analysis* (Cornerstone Research 2015), at 8-9.

[4]     Lead Counsel respectfully refers the Court to the extensive discussion of the risks of litigation in Section IV.B of the Greenstein Declaration and Sections III.B.2-4 of the Settlement Motion.

---

Greenstein Decl., ¶81.[5]  Without giving credence to any of these arguments, the risk still exists that a jury might find them appealing or persuasive if the case went to trial and such evidence was found to be admissible.

As noted above, the extensive litigation risks will not be repeated here.  However, it is beyond question that the risks in this case vastly exceeded the typical securities class action, as the case was limited to three potentially actionable statements and, of the eight original Defendants, only two remained when the Settlement was reached.  In addition, while Lead Counsel believes it would have prevailed on its class certification motion, the Court had not rendered its decision when the Settlement was reached.  Thus, an additional risk was that the Court might further narrow the proposed class or deny certification entirely, thereby further diminishing the chance of a large recovery.  *See* Greenstein Decl., ¶11.  Furthermore, Defendants fought Lead Counsel at every turn in discovery.  *See id.* ¶¶51-54.  Whether or not Defendants would ultimately succeed in resisting such discovery, it was obvious to all involved that this Action would have continued for a significant period of time had the parties not reached Settlement when they did, with the assistance of the Hon. Layn R. Phillips (Ret.) at the final mediation.

### 3.    The Skill Required and the Quality of Representation

Lead Counsel's skill and experience in securities litigation also supports the requested fee award.  *Nuvelo,* 2011 U.S. Dist. LEXIS 72260, at *9.  "The 'prosecution and management of a complex national class action requires unique legal skills and abilities.'  This is particularly true in securities cases because the [PSLRA] makes it much more difficult for securities plaintiffs to get past a motion to dismiss."  *OmniVision I*, 559 F. Supp. 2d at 1047.  "Kessler Topaz . . . [is] highly experienced in prosecuting securities class actions" and has successfully litigated numerous class actions on behalf of some of the largest institutional investors in the world.  *In re Bank of Am. Corp. Sec. Litig.*, 281 F.R.D. 134, 149-50 (S.D.N.Y. 2012).[6]  In this instance, the tenacity of Lead Counsel

---

[5]    As noted above, the SEC has not brought any enforcement action against HP or its officers, despite three years of investigations.  Greenstein Decl., ¶81.

[6]    *See, e.g., In re Tyco Int'l, Ltd. Sec. Litig.*, No. 1:02-md-1335-PB (D.N.H.) (recovering a total of $3.2 billion from Tyco International, Ltd. and its auditor on behalf of a group of

clearly led to a better result for the Settlement Class, as the Settling Defendants were well aware of Lead Counsel's demonstrated ability to counter Defendants' positions and arguments, both in Court (Greenstein Decl., ¶¶28-33, 55-61 (motions to dismiss and class certification briefing and hearings)) and in numerous meet and confer sessions necessitated by discovery disputes. *Id.* ¶¶51-54.

The quality of opposing counsel is also important in evaluating the quality of the services rendered.  In this Action, highly experienced and skilled defense firms represented the Settling Defendants, including Wachtell, Lipton, Rosen & Katz and Cooley LLP.  Greenstein Decl., ¶113. These firms spared no effort or expense in defending their clients against Lead Plaintiff's claims, and they vigorously defended their clients at every turn.  *Id.*  Notwithstanding this formidable opposition, Lead Counsel overcame a round of eight motions to dismiss, developed Lead Plaintiff's claims in discovery in the face of constant opposition, and persuaded the Settling Defendants to agree to a favorable financial recovery for the Settlement Class after multiple sessions of mediation seemed to be making little to no progress.  *Id.*  The Settling Defendants surely recognized Lead Counsel's financial ability and willingness to take the case even deeper and to trial, if necessary.[7] Given the complex issues presented in this Action, coupled with Defendants' vigorous defense, Lead Counsel believes this high level of skill and perseverance is what led to the sizeable recovery presented to the Court in this Settlement.

---

institutional investors); *In re Bank of Am. Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, No. 1:09-md-02058-PKC (S.D.N.Y.) (representing two large foreign pension funds and others, and recovering $2.425 billion for investors); *In re Wachovia Preferred Sec. and Bond/Notes Litig.*, No. 1:09-cv-06351 (RJS) (S.D.N.Y.) (representing Southeastern Pennsylvania Transportation Authority—the nation's sixth largest transportation system—and obtaining a total recovery of $627 million for investors); and *In re Lehman Bros. Sec. and ERISA Litig.*, No. 09-md-02017-LAK (S.D.N.Y.) (representing Alameda County Employees' Retirement Association, and obtaining a combined recovery of over $615 million for investors); *see also* the firm resume of Kessler Topaz attached as Exhibit C to the Kessler Declaration.

[7]      *See, e.g.*, *In re Longtop Fin. Tech. Ltd. Sec. Litig.*, No. 1:11-cv-03658 (S.D.N.Y.) (securing jury verdict in plaintiff's favor); *In re S. Peru Copper Corp. S'holder Derivative Litig., Consol.*, No. 961-CS (Del. Ch.) (securing largest damage award in Delaware Chancery Court history in a shareholder derivative action in a bench trial resulting in a verdict exceeding $2 billion inclusive of interest); *In re Dole Food Co., Inc. Stockholder Litig.*, No. 8703-VCL (Del. Ch.) (securing largest post-trial class verdict in the merger context totaling $148 million for Dole stockholders); and *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 0:07-cv-61542 (S.D. Fla.) (securing initial verdict in Plaintiffs' favor at trial after three years of litigation).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4. The Contingent Nature of the Fee and the Financial Burden Carried by Lead Counsel

It is an established practice in the private legal market to reward attorneys for taking on the serious risk of non-payment by permitting a fee award that reflects a premium over their normal hourly rates for prevailing in contingency cases.  *See Nuvelo*, 2011 U.S. Dist. LEXIS 72260, at *8 (citing *WPPSS*, 19 F.3d at 1299).  "This practice encourages the legal profession to assume such a risk and promotes competent representation for plaintiffs who could not otherwise hire an attorney." *Id.* at *9.  Here, at the outset of the Action, PGGM and Lead Counsel entered into a retention agreement that required Lead Counsel to advance all expenses for the litigation and apply for a contingent fee based upon a sliding scale arrangement.  Greenstein Decl., ¶102.  Unlike defense counsel—who typically receives payment on a timely basis whether they win or lose—Lead Counsel sustained the entire risk that it would have to fund the expenses of this Action and that, unless Lead Counsel succeeded, it would not be entitled to any compensation whatsoever.

Thus, Lead Counsel has received no compensation during this nearly three-year litigation, despite investing over 17,723.70 hours for a total lodestar of $9,475,154.50, and expending over $860,000 to pay for expenses incurred in prosecuting and resolving this case.  *See id.* ¶¶107, 109, 116, 125-29; Kessler Decl., Exs. 1 and 2.  Moreover, Lead Counsel has continued to perform legal work on behalf of the Settlement Class since the Settlement was reached and will continue to spend additional resources assisting Settlement Class Members with their Claim Forms and related inquiries and working with the Claims Administrator to ensure that the claims process progresses smoothly.  *See, e.g.*, Greenstein Decl., ¶¶88-100.

Additionally, Lead Counsel has borne the entire risk of prosecuting this Action, including adequately pleading liability, surviving eight motions to dismiss, briefing class certification and multiple discovery motions, and conducting substantial, costly discovery.  From the outset, Lead Counsel knew it was embarking on complex, expensive and lengthy litigation that would require investing hundreds of thousands of dollars and thousands of hours of attorney time, with no guarantee of receiving compensation.  *Id.* ¶118.  Lead Counsel further understood that the Defendants would (and, in fact, did) retain large, highly experienced defense firms to mount a

strong defense.  *Id.* ¶¶113, 118.  In assuming this risk, Lead Counsel was obligated to ensure that sufficient financial and professional resources were dedicated to prosecuting this Action.  *Id.* ¶116.

"[T]he risk of non-payment in complex cases, such as this one, is very real."  *Shapiro v. JPMorgan Chase & Co.*, 2014 U.S. Dist. LEXIS 37872, at *75-76 (S.D.N.Y. 2014).  Commencing a class action does not guarantee success.  Securities cases are not always settled, and plaintiffs' lawyers are not always successful, especially in the post-PSLRA era of securities litigation.  In numerous hard-fought lawsuits, plaintiffs' attorneys have received no fee—despite *years* of excellent, professional work—due to the discovery of facts unknown when the case started, changes in the law while the case is pending, or a decision of a judge, jury, or court of appeals after a full trial.  *See, e.g.*, *In re Pfizer Inc. Sec. Litig.*, 2014 U.S. Dist. LEXIS 92951 (S.D.N.Y. 2014) (dismissing ten year old litigation on a *Daubert* ruling just before trial, after plaintiffs' class prevailed on summary judgment); *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012) (overturning jury verdict in favor of plaintiffs' class).  Thus, a very real risk existed that Lead Counsel would invest substantial resources yet receive nothing at the conclusion of the matter.  "This substantial outlay, when there [was] a risk that none of it [would] be recovered, further supports an award of substantial fees."  *OmniVision II,* 2015 U.S. Dist. LEXIS 73300, at *6.

### 5.    Awards in Similar Cases Support the Request Here

"The Ninth Circuit's 'benchmark' for attorneys' fees in common fund class actions is 25% of the common fund."  *Nuvelo,* 2011 U.S. Dist. LEXIS 72260, at *5; *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015).  As this Court noted, some cases suggest "the Ninth Circuit's benchmark 'is at approximately 30% of the fund.'"  *Nuvelo*, 2011 U.S. Dist. LEXIS 72260, at *7 (noting *Activision*, 723 F. Supp. at 1378, "contains an exhaustive list of cases" supporting a 30% benchmark).

Here, pursuant to its arrangement with PGGM, Lead Counsel seeks attorneys' fees in the amount of 11% of the Settlement Fund, net of expenses, which is less than half of the Ninth Circuit's benchmark.  Ample precedent in this Circuit and in this Court supports granting fees to plaintiff's counsel well in excess of the requested 11% fee.  *See, e.g.*, *In re Mego Fin. Corp. Sec.*

1   *Litig.*, 213 F.3d 454, 460 (9th Cir. 2000) (affirming award of one-third of the total recovery); *In re*

2   *Transpacific Passenger Air Transp. Antitrust Litig.*, 2015 U.S. Dist. LEXIS 67904, at *18 (N.D.

3   Cal. 2015) (Breyer, J.) (awarding roughly 30% of net settlement fund).[8]  Accordingly, the requested

4   fee is exceedingly reasonable.  *See OmniVision II*, 2015 U.S. Dist. LEXIS 73300, at *6-7 (finding

5   requested fee of 22% reasonable, as it was "less than fees that have been awarded in similar

6   complex class actions").

7               **6.     Lead Counsel's Lodestar Supports the Requested Percentage Fee Award**

8           Although not required, cross-checking the requested fee with Lead Counsel's lodestar also

9   shows that the requested fee is reasonable.  *See Vizcaino*, 290 F.3d at 1048-50; *In re Petroleum*

10  *Prods. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997).  "The lodestar crosscheck calculation

11  need entail neither mathematical precision nor bean counting . . . . [Courts] may rely on summaries

12  submitted by the attorneys and need not review actual billing records."  *Ecotality*, 2015 U.S. Dist.

13  LEXIS 114804, at *12.

14          As detailed herein and in the accompanying Greenstein Declaration, the work Lead Counsel

15  performed in this matter wholly supports the Court's approval of Lead Counsel's request for a fee

16  award of $10,887,363.16, *i.e.*, 11%, net of Litigation Expenses.  *See* Greenstein Decl., ¶¶5, 21-75.

17  Through September 17, 2015, Lead Counsel devoted over 17,723.70 hours to this Action,

18  amounting to a lodestar of $9,475,154.50.  *Id.* ¶¶107, 109, 116, 125-29; *see also* Kessler Decl., Ex.

19  1.[9]  Thus, Lead Counsel's fee request results in a multiplier of 1.15 to Lead Counsel's total lodestar.

20  Greenstein Decl., ¶107.  This modest multiplier falls on the lower end of multipliers typically

21  awarded in complex securities cases in this jurisdiction.  *See, e.g.*, *Vizcaino*, 290 F.3d at 1051 n.6

22  (awarding 3.65 multiplier which the court found to be "within the range of multipliers applied in

23  ────────────────

24  [8]      *See also Ramirez*, 2014 U.S. Dist. LEXIS 56038, at *6 (awarding 30% of net settlement
    fund); *In re Shoretel Inc. Sec. Litig.*, No. 3:08-cv-00271-CRB, slip op., ¶17 (N.D. Cal. Oct. 18,
    2010) (Breyer, J.) (awarding 26% fee) (Ex. 3 hereto); *In re Magma Design Automation, Inc. Sec.*

25  *Litig.*, No. 3:05-cv-02394-CRB, slip op. at 8 (N.D. Cal. Mar. 27, 2009) (Breyer, J.) (awarding 20%
    fee) (Ex. 4 hereto); *In re Brocade Sec. Litig.*, No. 3:05-cv-02042-CRB, slip op. at 2 (N.D. Cal. Jan.

26  26, 2009) (Breyer, J.) (Ex. 5 hereto) (awarding 25% fee).

27  [9]      The Kessler Declaration also sets forth the hourly billing rate information that Lead Counsel
    used to calculate its lodestar.  *See* Kessler Decl., Ex. 1.

28

common fund cases"); *Brocade*, slip op. at 2 (awarding 25% fee representing a multiplier of 3.5) (Ex. 5 hereto).[10]

   As detailed in the Greenstein Declaration, Lead Counsel undertook extensive efforts to litigate this Action to a successful result for the Settlement Class.  Over the course of nearly three years, Lead Counsel, *inter alia*: (i) conducted a thorough investigation of Lead Plaintiff's claims, including the review of voluminous publicly available information regarding HP and Autonomy and interviews (through its investigators and/or its agents) with former HP and Autonomy employees and other important witnesses; (ii) used the information gleaned from its extensive investigation, as well as additional research, to fine-tune Lead Plaintiff's claims and craft a detailed complaint for violations of the federal securities laws; (iii) synthesized an omnibus opposition in response to arguments raised by Defendants in eight separate motions to dismiss; (iv) consulted with multiple experts regarding issues such as revenue recognition, market efficiency, loss causation, and damages; (v) researched and filed extensive class certification briefing, as well as expert market efficiency and damages analyses in connection therewith; and (vi) engaged in protracted settlement efforts, including two in-person, formal mediation sessions and the submission of detailed mediation statements.  *See* Greenstein Decl., ¶¶5, 21-25.

   Additionally, Lead Counsel ultimately engaged in a vigorously contested discovery process with the Settling Defendants, which was ongoing when the Settlement was reached.  *See supra* §III.B.3.  As a result, Lead Counsel met and conferred extensively with the Settling Defendants and third parties, in an effort to resolve discovery-related disputes without the Court's intervention.  *Id.* ¶¶41-42, 51.  Lead Counsel, however, also prepared several discovery motions for key disputes that the parties had been unable to resolve.  *Id.* ¶¶52-54.  Moreover, Lead Counsel assisted Lead Plaintiff in complying with substantial discovery obligations, including responding to written discovery, conferring with defense counsel regarding the scope of the Settling Defendants'

---

[10]   *See also, e.g.*, *In re Veritas Software Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 30880, at *42 (N.D. Cal. 2005) (awarding multiplier of 4.0); *Buccellato*, 2011 U.S. Dist. LEXIS 85699, at *3-4 (awarding multiplier of 4.3); *Van Vranken*, 901 F. Supp. at 298 ("Multipliers in the 3-4 range are common in lodestar awards for lengthy and complex class action litigation.").

1
2
3
4
5

document requests, conducting electronic searches, analyzing the over 690,000 pages of documents gathered by Lead Plaintiff in response thereto, preparing Lead Plaintiff for its Rule 30(b)(6) deposition, and defending Lead Plaintiff at its deposition.  *See* Greenstein Decl., ¶¶43-46.  Thus, Lead Counsel submits that its request of 11% of the Settlement Fund, net of Court-awarded Litigation Expenses, is fair and reasonable under the lodestar cross-check.

6
7

### III.   LEAD COUNSEL IS ENTITLED TO REIMBURSEMENT FOR ITS REASONABLE LITIGATION EXPENSES

8
9
10
11
12
13
14
15

Lead Counsel also requests reimbursement of Litigation Expenses in the amount of $1,023,971.29, incurred in prosecuting and resolving the Action on behalf of the Settlement Class, plus interest on such amount at the same rate as earned by the Settlement Fund.  Greenstein Decl., ¶¶123-34.  Attorneys who create a common fund for the benefit of a class are entitled to be reimbursed for their out-of-pocket expenses incurred in creating the fund so long as the submitted expenses are reasonable, necessary and directly related to the prosecution of the action.  *See OmniVision I*, 559 F. Supp. 2d at 1048 ("Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters.").

16
17
18
19
20
21
22

From the outset of the case, Lead Counsel was aware that it might not recover any of its expenses or, at the very least, would not recover anything until the Action was successfully resolved.  Greenstein Decl., ¶¶114-24.  Lead Counsel also understood that, even if the case was ultimately successful, reimbursement for expenses would not compensate it for the lost use of the funds advanced to prosecute the Action.  *Id*.  Thus, Lead Counsel was motivated to, and did, take significant steps to minimize expenses wherever practicable without jeopardizing the vigorous and efficient prosecution of the Action.  *Id*.

23
24
25
26
27

The types of expenses for which Lead Counsel seeks reimbursement are necessarily incurred in litigation and routinely charged to clients billed by the hour.  *See id*. ¶¶125-29.  These include expenses associated with, among others things, court filings, service of process, experts and consultants, mediation, online legal and factual research, travel, copying, web hosting for document review, and messenger, courier and overnight mail.  *Compare id. with Vincent*, 2013 U.S. Dist.

28

LEXIS 22341, at *15 (granting reimbursement of costs and expenses for "three experts and the mediator, photocopying and mailing expenses, travel expenses, and other reasonable litigation related expenses"); *Knight v. Red Door Salons, Inc.*, 2009 U.S. Dist. LEXIS 11149, at *20 (N.D. Cal. 2009) (granting reimbursement because "[a]ttorneys routinely bill clients for all of these expenses"). Lead Counsel bills these expense items separately, and such charges are not duplicated in its billing rates. Kessler Decl., ¶7.

A large portion of these expenses was used to pay: (i) experts and consultants (*i.e.*, $519,733.30, almost 60% of the total amount of expenses); (ii) data hosting and processing for reviewing, storing, and producing document discovery (*i.e.*, $117,902.82, approximately 13% of the total amount of expenses); (iii) legal and factual research tied to Lead Plaintiff's investigation and analysis of the Settlement Class's claims (*i.e.*, $64,296.98, approximately 7% of the total amount of expenses); and (iv) the mediation process (*i.e.*, $60,820.84, approximately 7% of the total amount of expenses). Kessler Decl., ¶8 and Ex. 2. These expenses were critical to Lead Counsel's success in achieving the Settlement. Greenstein Decl., ¶¶125-29.

As part of Lead Counsel's request for reimbursement of Litigation Expenses, PGGM also seeks reimbursement in the amount of $162,900 for the costs (*i.e.*, lost wages) it incurred in representing the Settlement Class in this Action. The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be granted to "any representative party serving on behalf of a class." 15 U.S.C. §78u-4(a)(4); *see also Mego*, 213 F.3d at 463 (affirming reimbursement award to class representative in securities class action). This Court has previously granted such reimbursements in securities cases. *See, e.g.*, *Magma Design*, slip op. at 1, 6 (Ex. 4 hereto); *In re Providian Fin. Corp. Sec. Litig.*, No. 3:01-cv-03952-CRB, slip op. at 3 (N.D. Cal. Sep. 24, 2004) (Breyer, J.) (Ex. 6 hereto).

As detailed in the Jeucken Declaration submitted herewith, PGGM has actively and effectively fulfilled its obligations as a representative of the Settlement Class, complying with all of the many demands placed upon it, and providing valuable assistance to Lead Counsel. In addition to negotiating a retention agreement at the outset of this Action that provides for attorneys' fees at a

percentage substantially below the Ninth Circuit benchmark of 25%, PGGM and its personnel, *inter alia*: (i) regularly communicated with Lead Counsel in writing and telephonically; (ii) attended this Court's hearing regarding lead plaintiff motions; (iii) reviewed and approved strategic decisions; (iv) reviewed, analyzed, and commented on court filings; (v) compiled and reviewed documents in response to discovery requests; (vi) searched for and gathered over 690,000 pages of documents and ultimately produced over 22,000 pages of documents; (vii) prepared for and testified in a full-day deposition in New York City; (viii) prepared for and attended multiple mediation sessions in New York City; and (ix) remained extensively involved in the negotiations of the final settlement amount.  *See* Jeucken Decl., ¶¶4-10, 17-18.  "These are precisely the types of activities that support awarding reimbursement of expenses to class representatives."  *Marsh*, 2009 U.S. Dist. LEXIS 120953, at *62 (awarding $144,657 to the New Jersey Attorney General's Office and $70,000 to certain Ohio pension funds).   Indeed, based on similar efforts, PGGM previously received a reimbursement of $259,610 for its costs and expenses in representing the class in *Bank of America*, slip op., ¶8 (Ex. 1 hereto).  Courts across the country have awarded similar reimbursements.[11]

PGGM's personnel devoted 1,210 hours to this Action in performing these tasks.  Jeucken Decl., ¶17.[12]  PGGM paid these employees for the time they spent working on this Action—time which they otherwise would have spent on work for PGGM's benefit.  *Id.* ¶11.  Thus, when PGGM paid these wages to its employees (*i.e.*, $162,900), it incurred a loss directly relating to the representation of the Settlement Class.  *Id.*; *see In re Gilat Satellite Networks, Ltd.*, 2007 U.S. Dist. LEXIS 68964, at *62 (E.D.N.Y. 2007) (granting plaintiff reimbursement where "the tasks undertaken by employees of Lead Plaintiffs reduced the amount of time those employees would

---

[11]      *See, e.g.*, *Enron*, 2008 U.S. Dist. LEXIS 85445, at *49-50 (awarding $600,000 to UC Regents); *Satyam*, slip op. at 3-4 (Ex. 2 hereto) (awarding $195,111 to class representatives); *Royal Dutch/Shell*, 2008 U.S. Dist. LEXIS 124269, at *29 (awarding $150,000 to class representatives).

[12]      PGGM calculated the hourly rates for these individuals by dividing their annual salary by the number of hours they typically work in a year and then applied each individual's hourly rate to the hours they provided in service of the Settlement Class. Jeucken Decl., ¶11.  The total was then converted from Euros to U.S. Dollars based upon the closing price of the exchange rate on September 24, 2015.  *Id.*

have spent on other work and [the] tasks and rates appear reasonable to the furtherance of the litigation").

Although Lead Plaintiff will share in the Net Settlement Fund in the same proportion as all of the Settlement Class Members, it should recover its reasonable expenses incurred as a result of activities undertaken on behalf, and directly related to its representation, of the Settlement Class. 15 U.S.C. §78u-4(a)(4) ("Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses."). Thus, PGGM's reimbursement request is reasonable and fully justified under the PSLRA based on its involvement in the Action.

## IV.    CONCLUSION

For the reasons set forth herein, Lead Counsel respectfully requests that the Court award: (i) attorneys' fees of 11% of the Settlement Fund, net of Litigation Expenses; and (ii) reimbursement of $1,023,971.29 in Litigation Expenses incurred by Lead Counsel, including $162,900 in costs and expenses incurred by Lead Plaintiff in connection with its representation of the Settlement Class.

DATED: September 29, 2015                Respectfully submitted,

                                         KESSLER TOPAZ
                                           MELTZER & CHECK, LLP

                                         /s/ Eli R. Greenstein
                                         ELI R. GREENSTEIN
                                         STACEY M. KAPLAN
                                         PAUL A. BREUCOP
                                         RUPA NATH COOK
                                         One Sansome Street, Suite 1850
                                         San Francisco, CA 94104
                                         Telephone:  (415) 400-3000
                                         Facsimile:   (415) 400-3001
                                         egreenstein@ktmc.com
                                         skaplan@ktmc.com
                                         pbreucop@ktmc.com
                                         rcook@ktmc.com
                                         -and-

                                         DAVID KESSLER
                                         DARREN J. CHECK
                                         ANDREW L. ZIVITZ
                                         280 King of Prussia Road
                                         Radnor, PA  19087

Telephone:  (610) 667-7706
Facsimile:   (610) 667-7056
dkessler@ktmc.com
dcheck@ktmc.com
azivitz@ktmc.com

*Counsel for Lead Plaintiff*
*PGGM Vermogensbeheer B.V*
*and Lead Counsel for the*
*Proposed Settlement Class*